UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 22-CR-60078-6

UNITED STATES OF AMERICA,

vs.

WILBER VIGIL-BENITEZ,

Defendant.

Miami, Florida

January 23, 2025

9:17 a.m. - 5:15 p.m.

Volume 3

Pages 1 to 157

---

JURY TRIAL
BEFORE THE HONORABLE RODOLFO A. RUIZ, II
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

BRIAN DOBBINS
ELENA SMUKLER
ASSISTANT UNITED STATES ATTORNEYS
UNITED STATES ATTORNEY'S OFFICE
99 NE 4th Street
Miami, Florida 33132

FOR THE DEFENDANT:

JOSEPH S. ROSENBAUM
KIMBERLY ACEVEDO
ROSENBAUM & ACEVEDO, LLP
100 S.E. 2nd Street
Suite 3400
Miami, Florida 33131

STENOGRAPHICALLY REPORTED BY:

ILONA LUPOWITZ, RMR, CRR
Official Court Reporter to:
The Honorable Rodolfo A. Ruiz, II
United States District Court
Southern District of Florida
400 North Miami Avenue
Room 11-2
Miami, Florida 33128
(305) 523-5737

I N D E X

| WITNESS | Page |
|---|---|
| Wilmar Viera-Gonzalez | |
| DIRECT EXAMINATION BY MR. DOBBINS: | 7 |
| CROSS-EXAMINATION BY MR. ROSENBAUM: | 60 |
| REDIRECT EXAMINATION BY MR. DOBBINS: | 72 |
| Detective Andrew Gianino | |
| DIRECT EXAMINATION BY MR. DOBBINS: | 85 |

GOVERNMENT'S EXHIBITS

| Exhibit | Received |
|---|---|
| 84 | 24 |
| 78 | 49 |
| 31-A and 31-B | 105 |
| 32 | 116 |
| 33 | 118 |
| 41-A | 122 |
| 73 | 127 |

DEFENDANT'S EXHIBITS
(No exhibits marked.)

(Call to the Order of the Court.)

THE COURT: Good morning, everyone. Please be seated. All right. We are here for case number 22-60078, in the matter of the United States of America versus Wilber Vigil-Benitez.

Let's go ahead and get appearances, please, on behalf of the government.

MR. DOBBINS: Good morning, Your Honor. Brian Dobbins, Elena Smukler, on behalf of the United States. Also present at counsel table is Special Agent Nathan Ferguson of the Federal Bureau of Investigation.

THE COURT: Good morning.

And on behalf of Mr. Vigil-Benitez.

MR. ROSENBAUM: Good morning, Your Honor. Joe Rosenbaum, with Kimberly Acevedo, on behalf of Wilber Vigil-Benitez, and Mr. Vigil-Benitez is present before the Court.

THE COURT: Very good. Good morning to you-all.

And as we've done every day at trial, Mr. Vigil-Benitez, I know you're using the services of the Spanish interpreter. If at any point the equipment is not working, or you can't follow or hear what is going on in court, will you please let me know?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Very good. Thank you. You can all be seated.

So we're moving on with our trial. We currently have in the witness stand Mr. Gonzalez, who has already been seated. And I wanted to go ahead and get him set up so we didn't have any logistical issues. The last juror just arrived. That's why we're starting a little bit after time. We had one of our jurors was running behind due to traffic, but all the jurors are now present and accounted for.

Before I bring them in, any housekeeping concerns or any issues, starting with the government?

MR. DOBBINS: Nothing from the government, Your Honor.

THE COURT: All right.

How about from the defense, Mr. Rosenbaum, any issues?

MR. ROSENBAUM: No, Your Honor.

THE COURT: All right. So you may recall our discussion yesterday. I would begin by once again giving the limiting instruction with a qualification, and then we'll turn it over to our witness. Okay?

So with that, let's round them up, please. Thank you, guys.

THE COURT SECURITY OFFICER: All rise for the jury.

(Jury enters at 9:19 a.m.)

THE COURT: Please be seated, everyone.

Ladies and gentlemen of the jury, good morning. Good to see you-all.

THE JURORS: Good morning.

THE COURT: I would say that, you know, given the weather today, this is probably a very nice warm and cozy place to be for the remainder of the day. I appreciate everyone getting in here as close to 9:00 as possible because the traffic was a little difficult, given the weather.

So you may recall before we broke yesterday that the government is continuing to put on their witnesses. We already have taken the steps to set up the next witness, who is on the stand, and we're going to swear that witness in, in just a moment, beginning with the direct examination of that witness.

Now, does everybody have their notepads? Yes? Okay, very good.

As we did yesterday, the plan is to begin with this witness. We'll take a mid-morning break, and then we'll go into kind of that 12:30-ish lunch hour. And then we'll take a break and come back after lunch, give you guys a chance to stretch out and grab something to eat.

One brief word, you may recall I gave this instruction yesterday, the limiting instruction. I want to give it again before the next witness's testimony, reminding you-all that you're going to hear evidence about the defendant's association, participation, and membership in MS-13. And you're also going to hear evidence about criminal activities, including violent acts allegedly committed by MS-13.

I want to remind all of you that this evidence may be

similar to the crime with which the defendant is currently charged, and it is relevant in that the government is required to prove that the defendant was an associate or a member of a racketeering enterprise.

Therefore, the evidence may be considered by you for the limited purpose of assisting you in determining whether MS-13 is a racketeering enterprise and the defendant was an associate or member of MS-13.

But it is important, as I stated yesterday, that you must not consider any of this evidence, coming into this next witness, to decide whether the defendant participated in a murder charged in the indictment. It's very important you keep those two things separate, the association part and the direct evidence part of the crimes charged in the indictment.

To the extent I confused anybody yesterday, some of the testimony you heard from Mr. Tirado did directly involve the defendant. Okay? So I want everyone to understand that Mr. Vigil-Benitez was raised and discussed in that testimony.

Testimony from a witness that directly implicates or goes to the charged crimes of the defendant absolutely can be considered and weighed as evidence if the government has proven and established it beyond a reasonable doubt. It's when we're talking about other incidents, things that are MS-13 associated, but maybe not directly connected to the defendant, that you must parse out in your mind because they are important

to ensure that association element that the government must prove, but they may not be used to show the direct evidence of the charged crime.

Do you all understand that difference?

All right. I appreciate that. Sometimes it can be a little confusing, but some witnesses, some of their testimony is for one, some for the other, some testimony covers both issues. I just want to make sure we understand.

Government okay with that?

MR. DOBBINS: Yes, Your Honor.

THE COURT: Very good. And I appreciate the clarification.

So with that, I'm going to turn it back to Mr. Dobbins. Before we start, sir, we're going to have you rise and be sworn in, please.

(Government witness, Wilmar Viera-Gonzalez, duly sworn.)

THE COURT: All right. Please make yourself comfortable. Speak directly into the microphone, if you could. You might have to lean in a little bit.

With that, Mr. Dobbins, I'll turn it over to you.

MR. DOBBINS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. DOBBINS:

Q. Sir, can you please state your name and spell your last

name for the record?
A. Wilmar Viera-Gonzalez. Viera, V-I-E-R-A. Gonzalez, G-O-N-Z-A-L-E-Z.
Q. Can you tell the members of the jury how old you are, sir?
A. I'm 31.
Q. And where were you born?
A. El Salvador.
Q. When did you come to the United States?
A. 2005.
Q. How old were you when you came to the United States?
A. 12.
Q. Who did you come with when you came to the United States?
A. My cousin.
Q. And were any of your family already here in the United States when you made the trip?
A. Yes.
Q. Who?
A. My mom, my father, and my grandma.
Q. Why did you leave El Salvador to come to the United States?
A. I was being threatened by gang members in El Salvador.
Q. What gang was that?
A. MS-13.
Q. So how did you get to the United States? Did you fly? Did you take a boat? Did you travel over land?
A. Across the border.

Q. Did you have permission or status to come into the United States?
A. No, I did not.
Q. Okay. What happened when you came into the United States?
A. I came, and I was just trying to study and, you know, just get education, be with my father, my mom.
Q. Let me just stop you there. What I actually was meaning was, when you crossed the border, whereabouts, in Texas or somewhere else?
A. Texas, San Antonio.
Q. Were you encountered by Immigration at that time?
A. Yes, I was.
Q. Okay. And what happened with your status at that point? Were you permitted to stay in the United States?
A. Yeah. I was released to my grandmother, and to follow up with the courts, with ICE.
Q. And did you have some sort of status throughout the course while you were growing up?
A. Yes.
Q. What was that?
A. DACA.
Q. Is that the deferred action for a child alien, something like that?
A. Childhood arrivals.
Q. Childhood arrivals. Sorry.

So once you arrived and you were in San Antonio, where did you go next?
A. I went to live with my grandma in Sterling, Virginia.
Q. And did you stay living with your grandmother, or did you move in with your mom and dad at some point?
A. At some point, I went and moved with my mom.
Q. Okay. And where did your mom live?
A. She was living in Sterling, as well, at that time.
Q. How far have you gone in school, sir?
A. Tenth grade.
Q. What happened in tenth grade?
A. I dropped out.
Q. Why is that?
A. I had a girl at the time that was pregnant with my daughter and took the decision to drop out of school so that I could work and provide for her.
Q. Had you attained your GED?
A. Yes, I did.
Q. When did you attain your GED?
A. 2014.
Q. After you dropped out, did you do any work?
A. Yes. I was working different jobsites.
Q. What kind of work?
A. I was a ticket and receiving clerk at a warehouse in Winchester, Virginia. Also, I was a store manager at Advance

Auto Parts.
Q. Okay. Did your family have any experiences with MS-13, other than you being threatened while you were living in El Salvador?
A. Yes, my uncle.
Q. What happened to your uncle?
A. He was being extorted by members.
Q. Where was your uncle living when he was being extorted by MS-13 members?
A. He was in San Miguel, El Salvador.
Q. San Miguel, El Salvador?
A. Yes.
Q. What kind of business was he running that he was getting extorted?
A. Taxi. He was a taxi driver.
Q. And what happened to your uncle?
A. He got killed.
Q. And why is that; do you know?
A. He refused to continue paying the extortion.
Q. Now, despite all that, those prior experiences, did you eventually start hanging out with people from MS-13?
A. Yes.
Q. And did you become -- well, let me ask you this: How did you start hanging out with people from MS-13?
A. I had a female friend who had a -- we had a friend in

common, and I learned later that he was a member of MS-13.
Q. What was that person's name?
A. Andy. I knew him by Yulo at the time.
Q. Did you -- did he later acquire another MS-13 name?
A. Yes.
Q. What was that name?
A. Fearless.
Q. So Andy, Fearless, did he try to recruit you into MS-13?
A. Yes.
Q. And where did you meet him at, what part of Virginia?
A. Winchester.
Q. And what kind of things would you do with Fearless, Andy?
A. We would go out to clubs. We would get into fights in clubs, hang out. At the time, that was mainly the -- the main things we would do, are just hang out at the club. But most of the time, if we was at the club, we would pick fights.
Q. Fights with who?
A. Whoever we thought would be a rival to MS-13.
Q. All right. Do you remember what clique Andy was in?
A. Yes.
Q. What clique was that?
A. The GLCS, Guanacos Lil Cycos.
Q. Is that GLCS, I'm sorry?
A. Yes.
Q. It may just be the way you're pronouncing it.

A. Yes.
Q. And Guanacos Lil Cycos Salvatrucha?
A. Yes.
Q. Now, did you ultimately end up joining GLCS?
A. No, I did not.
Q. Okay. Did you join another clique within MS-13?
A. Yes, I did.
Q. What clique was that?
A. Virginia Locos Salvatrucha, VLS.
Q. How did you become involved with VLS?
A. Andy, or Yulo, had a friend at the time that was from VLS who was named Caballo and he introduced him to us and I started ham go out with him more.
Q. So I just want to make sure I heard you correctly. So you said the friend's name was Caballo?
A. Yes.
Q. I apologize if I'm mispronouncing it. Okay.
Were Caballo and Andy friends, though?
A. Yes.
Q. So why did you go with VLS instead of Andy and GLCS?
A. Caballo was providing me more info as to the gang. He was more serious to try to get me to go with his clique at the time because Andy was traveling more to a different state, which is Maryland, so he wasn't around too much.
Q. So what kind of knowledge was Caballo giving you about the

gang?
A. Well, he started with letting me know about the rules of the clique and MS-13. He would teach me things, how to -- how -- be a member of MS-13.
Q. Can you give the members of the jury some examples of some of the rules of what would be required to become a member of MS-13?
A. You've got to fight any rival to MS-13, regardless of who they are, kill. You've got to make sure that you respect one another and you give the respect that everybody deserves within the gang.
Q. Okay. I want to break that down a little bit. You said you have to fight any rivals of MS-13, and you said kill, but you didn't follow up with anything.
Who do you have to kill?
A. Chavalas.
Q. And what are chavalas?
A. Those are -- that's a term MS-13 uses for rivals, mainly used for 18th Street.
Q. That's the 18th Street Gang?
A. Yes.
Q. You also said that you have to -- I believe it was -- another rule was to respect the gang or respect homeboys?
A. That's correct.
Q. What does that mean?

A. You've got to show -- you've got to show respect. You've got to -- treat one another with respect. You've got to just treat them as a brother.
Q. All right. Is respect very important within MS-13?
A. Yes, it is.
Q. Then I thought there was a third rule that she said also about listening to other homeboys or following what they say or something to that effect?
A. You've got to follow the rules is the main thing. You've got to follow what the gang ask you to do.
Q. Are there consequences if you don't follow the rules?
A. Yes.
Q. What are the consequences?
A. It depends on the severity or the level of the infraction that you commit, such as beatings. And other instances, if you go beyond what they -- disrespect the main rule, you could get killed as well.
Q. I'm sorry. You said -- disrespect whom, you can get killed?
A. Just homeboys, the gangs, the gang rules.
Q. All right. We'll get into that a little bit more in a minute.
Did you start off at any specific rank with Caballo? Did he assign you some sort of rank?
A. Yes.

Q. What was your rank?
A. Paro.
Q. What is a paro?
A. Paro means someone who does favors for the gang, anything they ask, you've got to do.
Q. Okay. Are you considered a member of MS-13 when you're a paro?
A. Nah, not at the time.
Q. And what would -- what was your next rank?
A. I was observacion.
Q. Did you have to do anything to move from paro to observacion?
A. I did not. There's a rule that has to be followed to be one.
Q. So what were those rules?
A. So in order to move from one level to another, you are required to kill someone, a rival, a chavala.
Q. So normally you said to move from one level to another, you'd have to kill a rival or a chavala?
A. Yes.
Q. Okay. Why did you not have to do that to move to observacion?
A. Caballo explained to me that I was a good member and that I had earned his trust in order for me to become a homeboy.
Q. So did you even move to observacion or did you move

directly to homeboy?
A. No, I was observacion for quite a few months -- it don't recall the exact number. And then I moved to chequeo.
Q. And normally, did you have to -- would you have had to done the same thing for paro that you had to do for observacion, would you have to kill a rival?
A. Yes.
Q. Did you have to do that in your case?
A. I did not.
Q. And why not again?
A. Because for the same reason, that Caballo told me I was trusted. He trusted me.
Q. And then from chequeo to homeboy, how long did that take for you to move up and get jumped-in?
A. Probably a few months.
Q. Okay. Did you have to kill a rival to get jumped-in as a homeboy?
A. I did not.
Q. And why not?
A. Same reason, Caballo trusted me well, and at the time there was not as many members in the clique. So he was more rushed to get more numbers into the clique, so he rushed me to become a homeboy.
Q. So he's trying to build the numbers of BLS?
A. Yes.

Q. All right. When, approximately, or how old were you when you became a homeboy in VLS?
A. Oh, I was approximately 20.
Q. Were you still working at this time?
A. Yes.
Q. Did you have kids?
A. Yes.
Q. Where were you living at this time, when you became a homeboy in VLS? Were you still in Winchester or somewhere else?
A. Winchester.
Q. And where, just roughly, where in Virginia is Winchester?
A. It's, like, west of Virginia, closer to West Virginia.
Q. So like northern, northwestern Virginia?
A. Yes.
Q. Did you stay as a homeboy, or did you move up in the ranks at VLS?
A. I moved up.
Q. What did you move up to?
A. I became a first -- the palabrero of VLS.
Q. Is that the same thing as the First Word?
A. Yes.
Q. Is that the equivalent of what would be a shot-caller?
A. Yes.
Q. At some point did you also move up within the ranks to

become a leader of some other part of MS-13?
A. Yeah, I did.
Q. What was that?
A. I was a leader for the East Coast program.
Q. And what was the East Coast program?
A. The East Coast program, it's a program that has -- has many cliques within -- within the program, multiple cliques of MS.
Q. Now, while you were a palabrero of VLS, did you do something that got you locked up?
A. Yes.
Q. What did you do?
A. I killed a chavala.
Q. Did you do it by yourself or with others?
A. With others.
Q. Can you tell the members of the jury how you killed that chavala?
A. So we -- we drove -- we picked this guy up. We had somebody that was an associate from VLS reach out to him through social medias, get him ready to pick him up in a designated spot.
We drove him with the intentions that we were gonna -- we lied to him and told him we were going to a party, got him in the car, and drove to West Virginia, Harpers Ferry to be exact.
Q. Let me slow you down. I just want to break it down, if that's all right.

You said something about an associate, VLS associate found him on social media, the victim?
A. Yes.
Q. And what did the VLS associate tell you guys, or what did you guys do once you found this person on social media?
A. He related to us that he was -- about an 18th Street member, chavala, and he was posting things on social media, Facebook, that relates to their gang.
Q. Okay. Did you -- so you said something about trying to take this -- the victim to a party or telling him you were going to take him to a party?
A. Yeah. So once this guy started to communicate, he became friends with him, they became a little bit close. So that was the whole intention of him trying to be friends with him.
Q. So let me stop you there. So you had the VLS associate pretend to befriend the rival, the chavala, so that you could have him meet up with you guys and then you could do something to him.
A. Yes.
Q. All right. And so what happened? How did you get -- how did you get the victim to come meet all of you?
A. So we arrived in the car while the guy that was in charge of becoming his friend, telling him he was going to a party, and that's how he got into the car that we were driving at the time.

Q. So the victim thinks you guys were taking him to a party somewhere. And where did you end up taking him?
A. Harpers Ferry, West Virginia.
Q. And what happened when you got to Harpers Ferry?
A. We killed him.
Q. What kind of area was it that you took him?
A. It was like a wooded area, isolated.
Q. While you were driving the victim, were you still doing anything to find out if the victim was a chavala?
A. Yeah. So I personally started questioning him about his whereabouts and specifically if he was a gang member of any gang. And he told me he was 18th Street member.
Q. Were you giving him any alcohol at the time?
A. We was drinking. Yes, we was drinking. We was giving him beers.
Q. And what happened when you got to the wooded area?
A. We started beating him. I ordered the other guys to start beating him. Eventually, they started stabbing him.
Q. So just so we're clear, you said you ordered the others that were with you to start beating him.
A. Yes.
Q. And then they started stabbing him?
A. Yes.
Q. And did they kill him?
A. Yeah, they did.

Q. And what did you and the others do with the victim's body?
A. So they pick him up. One grabbed one leg, the other one grab one leg each in each hand, and they put his body in the ditch.
Q. Did they do anything with his clothes?
A. We burned his clothes and anything we could think of that would be his belongings.
Q. What did you do with the clothes you guys had been wearing that night?
A. We went back and we burned our clothes, as well.
Q. All right. Were you also charged with doing something else in association with VLS?
A. Yes.
Q. What was that?
A. So I had to make sure that everything was running smooth in the clique. I had to make sure that the guys that were coming up, newcomers, were able to follow the rules, and after that we would start out by doing extortions.
Q. So what would you do when you're doing an extortion?
A. We call it renta, which is like a rent. We will have somebody pay specifically those that would, like, sell drugs in our -- what we call territory. So we'll ask a person to pay -- in order for them to be -- be able to sell any type of drugs or whatever it is that they're dealing.
Q. Okay. So you would extort drug dealers to allow them to

sell drugs in your territory.
A. Yes.
Q. And you called that rent?
A. Yes.
Q. Now, were you charged specifically, though, with extorting this specific individual?
A. Yes.
Q. What did you do to that individual to try and get him to pay rent?
A. So one day we pick him up. We knew about him. We pick him up in a car, drove him to an isolated area in Leesburg, Virginia. I put a gun to his head.
Q. I'm sorry?
A. I put a gun to his head. I'm sorry.
Q. You said you picked him up and drove him to an isolated area in Leesburg, Virginia?
A. Yes.
Q. Is that near Winchester?
A. It's roughly 30 minutes away from Winchester.
Q. Okay. And when you put the gun to his head, did you demand any money?
A. Yeah. I told him that if he wanted to continue selling drugs in there, that he would have to pay up. Otherwise, he would be killed.
Q. Did you threaten anybody else besides him?

A. Yes. His family.
Q. Did he end up paying up some money?
A. Yes, he was paying some money.
Q. And you were ultimately arrested and charged with extortion and also that murder of the person you took to Harpers Ferry, West Virginia?
A. Yes.
Q. Did you plead guilty in that case?
A. I did.
Q. Did you agree to cooperate with the government to assist and potentially testify later on?
A. Yes.
MR. DOBBINS: Your Honor, without objection, the government would move into evidence Government's Exhibit 84.
THE COURT: All right. Is that correct, Mr. Rosenbaum, no objection?
MR. ROSENBAUM: Yes, Your Honor.
THE COURT: All right. We'll admit 84 at this time.
(Government Exhibit 84 was received in evidence.)
BY MR. DOBBINS:
Q. All right. Mr. Viera-Gonzalez, if you look at your screen there, I'm going to put up a document. Okay?
A. All right.
Q. I'll zoom out. But if you have any trouble seeing anything and need me to zoom in, just let me know. Okay?

A. Okay.
Q. All right. So I'm showing you the first page of Government's Exhibit 84. It's a 16-page document. I'm going to show you the next-to-last page. I'm going to show you the last page.
Do you recognize this document?
A. Yes.
Q. What is this document?
A. That's the plea agreement that I signed with the attorney's office.
Q. And you were prosecuted in the Eastern District of Virginia; is that correct?
A. Correct.
Q. Now, what is your understanding of -- well, let me ask you this: Within this plea agreement, is there terms of what we would call a cooperation agreement?
A. Yes.
Q. All right. And what is your understanding of the cooperation agreement? What do you have to do to try and -- well, let me ask you this: Why did you sign a cooperation agreement? What are you hoping to receive?
A. I'm hoping to receive a reduced sentence.
Q. And you've already been sentenced in this case?
A. Yes.
Q. And what sentence did you receive?

A. A life sentence.
Q. Was that a mandatory sentence?
A. Mandatory, without the possibility of parole.
Q. And on the extortion, what was your sentence; do you recall?
A. I believe it was five years.
Q. Was that the maximum for that count, as well?
A. Yes.
Q. Now, what is your understanding of what you have to do to try to earn a potential sentence reduction?
A. So I understand that I have to provide all my information that relates to the criminal activities that I was doing myself and all those that I knew, cooperate, tell the truth every time, I would -- any information that I would have, that I would provide, would have to be truthful.
Q. Okay. And you would have to testify anytime you were requested to by the government?
A. That's correct.
Q. So if you look at the third page here, it tells us what your -- it says that the maximum penalties here -- it says that the maximum penalty for Count 1 was a maximum term of five years' imprisonment.
That was the extortion, right? The conspiracy to commit extortion, right?
A. Yes.

Q. And that's what you received on that count?
A. Yes.
Q. And the maximum penalties for Count 7 is a mandatory term of life in prison.
A. Correct.
Q. And that's what you received on that.
A. Yes.
Q. All right. Just general background here.
Paragraph No. 6, it says you also waived your right to appeal; is that correct?
A. Correct.
Q. So that means that you can't appeal your current sentence, correct?
A. Yeah, I cannot appeal my conviction.
Q. And you did that knowingly and voluntarily, right?
A. Yes.
Q. There's paragraphs about restitution.
Now, in paragraph 10, it states that the U.S. Attorney's Office in the Eastern District of Virginia will not prosecute you for the conduct that you pled guilty to other than what you've already been charged with, right?
A. Yes.
Q. Okay. And it also says that they can -- they may prosecute you for any other crime of violence or conspiracy to commit a crime of violence, right?

A. Yes.
Q. And they agreed to dismiss some other counts, I believe, which were substantive extortion?
A. Yes.
Q. And then we go to paragraph 12, which is your cooperation agreement, right?
A. Correct.
Q. I think that's what you talked about earlier, that you have to cooperate fully and truthfully with the U.S.?
A. Yes.
Q. Let's go through it here. I just like to highlight things.
A. Okay.
Q. I'll highlight this paragraph.
It gives you some conditions here, right?
A. Yes.
Q. All right. So A says what?
A. It says: The defendant agrees to testify truthfully and completely at any grand jury trials or other proceedings.
Q. Okay. What's the second one, B here? I can highlight it and you can read it.
A. The defendant agrees to be reasonably available for debriefing and pretrial conferences as the United States may require.
Q. What's the next one?
A. The defendant agrees to provide all documents, records,

writings, or materials of any kind in the defendant's possession or under the defendant's care, custody, or control relating directly or indirectly to all areas of inquiry and investigation.
Q. All right. Let's go to E.
A. The defendant agrees that the statement of facts is limited to information to support the plea. The defendant will provide more detailed facts relating to this case during ensuing debriefings.
Q. All right. Now let's go to F. This is an important one, right?
A. Yes.
Q. What does that one say?
A. The defendant is hereby on notice that the defendant may not violate any federal, state, or local criminal law while cooperating with the government, and that the government will, in its discretion, consider any such violation in evaluating whether to file a motion for a downward departure or reduction of sentence.
Q. Okay. Now the downward departure, reduction of sentence is what you're hoping eventually to receive, correct?
A. Correct.
Q. And then G.
A. Nothing in this agreement places any obligation on the government to seek the defendant's cooperation or assistance.

Q. What does that mean to you?
A. It means that they're not obligated to give me any reduction for my current sentence.
Q. Now, paragraph 13 is important, as well, right?
A. Yes.
Q. And 14.
A. Prosecution in other jurisdictions?
Q. Yeah. You don't have to read it. We'll just talk about it.
A. All right.
Q. So paragraph 14 states that if you had provided information about other crimes in other jurisdictions, they would not notify those other jurisdictions, correct?
A. Correct.
Q. And also -- however -- this one's important here.
So if another jurisdiction, though, did find out about something you had said during a debrief, or statement to the police, that they could charge you with, they could still try to charge you, right?
A. That's right.
Q. And because when you were -- if you debriefed on crimes of violence, you weren't covered or protected by anything, right?
A. Correct.
Q. And what it says here is that the Eastern District of Virginia would try to ask that jurisdiction not to prosecute

you based on your statements alone, right?
A. Right.
Q. Then there's this last sentence here.
It says there that you and the Eastern District of Virginia, though, both understand that they have no control of what a different jurisdiction wants to do in your case.
A. Correct.
Q. That hasn't been an issue so far for you, right?
A. No.
Q. All right. If we go to paragraph 15, what is the -- what does this say?
Just read those first two sentences, please.
A. The plea agreement is not conditioned upon charges being brought against any other individual. This plea agreement is not conditioned upon any outcome in any pending investigation.
Q. Go ahead and put this here.
Go ahead and read the next sentence, please.
A. This plea agreement is not conditioned upon any result in any future prosecution which may occur because of the defendant's cooperation.
Q. Go ahead and read the next sentence.
A. This plea agreement is not conditioned upon any result in any future grand jury presentation or trial involving charges resulting from this investigation.
Q. So what do those sentences mean to you?

A. It means, to me, that regardless of the outcome of any information or any trial I provide anything, it does not influence anything related to me as far as, like, the -- it would not affect whether I get any reduction.
Q. Okay. So the outcome of any legal proceeding that you testify at or provide information for doesn't impact whether EDVA, Eastern District of Virginia, excuse me, will consider giving you a sentence reduction -- making a motion for a sentence reduction.
A. That's correct.
Q. All right. And then that last sentence tells you what EDVA is going to consider, right?
A. Yes.
Q. Go ahead and read that, please.
A. This plea agreement is conditioned upon the defendant providing a full, complete, and truthful cooperation.
Q. And who makes that determination whether to file a motion for a sentence reduction in your case?
A. The EDVA, Virginia.
Q. That would be the U.S. Attorney's Office there?
A. Yes.
Q. Can you force them to make -- to file such a motion?
A. No, I cannot.
Q. So it's up to them whether they give you one or not?
A. Correct.

Q. And then, if they filed it, who makes the decision as to whether or not you receive the sentence reduction?
A. The judge.
Q. And can you force the U.S. Attorney's Office in the Eastern District of Virginia to ask for a certain amount off?
A. No, I cannot.
Q. Can you force the judge to give you a certain amount off?
A. Absolutely not.
Q. Does the judge have to follow the recommendation of the U.S. Attorney's Office in the Eastern District of Virginia?
A. No, he does not.
Q. Does the judge have to follow the recommendation of your defense attorney?
A. No.
Q. So ultimately, if you receive a sentence reduction, who makes that determination?
A. The judge.
Q. Just real quick, paragraph 19. You said that you had DACA status, or DACA. I may mispronounce that.
Do you still have that status?
A. I don't.
Q. So what can happen to you because you've been convicted of a violent crime?
A. I will get deported to my country.
Q. And what does paragraph 19 say about your immigration

status?

A. It says: The defendant recognizes that pleading guilty may have consequences with respect to defendant's immigration status if defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including an offense to which the defendant is pleading guilty. Indeed, because the defendant is pleading guilty to kidnapping resulting in death, removal is presumptively mandatory. Because removal and other immigration consequences are the subjects of a separate proceeding, the defendant understands that no one, including the defendant's attorney or the district court, can predict to a certainty the effect of the defendant's conviction on defendant's immigration status. Defendant nevertheless affirms that defendant wants to plead guilty regardless of any immigration consequences that defendant's plea may entail, even if the consequence is the defendant's automatic removal from the United States.

Q. All right. And, in fact, paragraph 20 says that you give consent for removal from the United States if you're ever released?

A. Yes.

Q. And you waived certain rights to removal and agree not to appeal them, right?

A. Correct.

Q. Paragraph 24 says you'll even agree to assist the

Department of Homeland Security in the execution of your removal, right?
A. Correct.
Q. It talks -- paragraph 26 talks about what happens if you breach the plea agreement, right?
A. Yes.
Q. What would happen then? What would happen to any potential substantial assistance or consideration for anything you've done in cooperation?
A. Can you repeat that question, please?
Q. If you breach the plea agreement, what would happen to any potential substantial assistance or cooperation and consideration that you've earned so far?
A. It'll get voided.
Q. Voided?
A. Yes.
Q. Now, I'd like to note on the plea agreement, the case number starts with the number 16.
Were you charged in 2016?
A. Yes.
Q. And as a result of your cooperation agreement, did you ultimately testify in another trial against some of the people that you participated in that murder with?
A. Yes.
Q. As a result of your cooperation, are you currently in any

kind of protected status while incarcerated?
A. Yes, I am.
Q. That would be the Witness Security Program?
A. That's correct.
Q. Okay. Now, you were talking about how you moved up the ranks and became eventually the First Word, or palabrero, of VLS.
What was it that you did as the First Word of VLS?
A. To ensure everything was running smooth within the clique. Mostly follow the rules from all members. Make sure that we create power in our territory and that we obey many rules, which is the MS-13 rules.
Q. All right. So let's talk a little bit about this: MS-13, as a whole, are there certain rules that all MS-13 must follow?
A. Yes.
Q. What are those rules?
A. You've got to -- the main rule -- as a general rule that MS-13 follows: Respect to homeboys. General rules, I can't think of them right now, just involving any kind of activity that would engage a stronghold in the territories.
Q. I'm sorry. You said engaged in criminal activity that would happen, your power over territory?
A. Yes.
Q. How is it that a clique gains or starts a territory?
A. You start looking at all the -- whatever places that you

live in. You start looking for those individuals that might be involved with MS-13, whether they're homeboys or not or just paros or observaciones, chequeos, starting to recruit more members to become more members.
Q. So what's the main goal of a clique or of MS-13 in general?
A. The main goals is just to be the number one gang.
Q. All right. And how do you become the number one gang?
A. By killing any rivals that are opposed to their territory, to their will.
Q. And what about trying to grow the gang? Is that important to gaining power?
A. Right. So it would lead to -- in order to be the number one, you've got to increase numbers because it's said that you can't fight a battle without enough soldiers.
Q. You can't fight a battle without enough soldiers?
A. Yes.
Q. All right. What do -- what does MS-13 do to try to -- well, let me ask you this: Does MS-13, do the cliques have meetings?
A. They do.
Q. Okay. And did VLS have meetings?
A. We did.
Q. All right. And were members and associates of VLS required to pay dues?
A. They do.

Q. Okay. And does -- does MS-13 do other things to try and make money?
A. Yeah. So they will provide cliques with drugs, guns, in order to create or provide more money, more income.
Q. Okay. And you talked about charging rent to people.
Is that another way that MS-13 tries to make money?
A. Yes, any means necessary.
Q. And again, you say you're charging rent. It's not like you're landlords.
You're trying to extort people, right?
A. No. It's go around and find out those who are within the territory of MS-13 and try to obtain their money.
Q. Okay. By doing what? Do they just give it to you?
A. No. We got -- we gotta let them know that -- we gotta impose our will through violence, let them know that MS-13 does not play. That includes beating, threaten their families, themselves.
Q. All right. So beatings, threatening their families and themselves.
Do you also sometimes try to abduct people?
A. Yes.
Q. Okay. Why do you do that?
A. So that they can know that we're not playing, so that they know it's serious, and that they mean what they're saying.
Q. What happens to the dues money within a clique or the money

that is made through the extortion or drug selling? What happens to that money?
A. It goes to -- it's called, like, a pot. So that becomes a -- it's like a bank to each clique, and they start grabbing all the money in order for them to start buying more guns so they can have more weapons, they can have more drugs to sell in order to keep improving their gain or their income.
Q. Okay. So it's to keep growing the enterprise and keep furthering the illegal gains of the enterprise?
A. Correct.
Q. Are there other rules that are specific to each clique?
A. Yes. Different cliques got different rules that they abide.
Q. Okay. And I think -- before we get to the different rules of the clique, you were talking about how generally to move up from ranks from paro to observacion to chequeo to homeboy, you usually have to kill a chavala, right?
A. Correct.
Q. All right. But there are times that either a First Word or somebody else can make an exception to let that person advance like you did?
A. It shouldn't. It shouldn't have to be like that. It should have to be followed through.
Q. Right. Even though you didn't have to, you think it should be followed through?

A. Yes.
Q. Okay. Who does the palabrero report to? Do they have to report to anybody else, or are they just all in charge of the clique?
A. They have to report to ranfleros in El Salvador. Those are the leaders.
Q. Okay. And what does that mean, the ranflero? Who are they?
A. Ranflero is the one who runs -- whether it's the ranflero for the clique, which is like the main leader in charge for the whole clique, or the ranfleros are in charge for the gang, in general.
Q. Okay. Does the clique have to send money sometimes back to the ranfleros in El Salvador?
A. Yes, they do.
Q. Okay. For what purpose?
A. For the same purpose, to gain and increase their income so that they can be well-armed, especially as the main purpose, so that they can have weapons to combat any rivals.
Q. And you mentioned something earlier about that sometimes MS-13 will provide, I believe you said drugs to either the clique or the program.
Does MS-13 sometimes coordinate either bulk transactions or shipments of drugs?
A. They do. So they try -- if a clique is in need of any

drugs, the MS-13 or the leaders that are in El Salvador will coordinate --

(Court reporter clarification.)

THE WITNESS: If the clique is in need of drugs, then MS-13 will try to provide or coordinate a means to how to get drugs to them so that they can increase in power, money.

BY MR. DOBBINS:

Q. Okay. And what kind of drugs are we talking about? What kind of drugs does MS-13 sell?

A. So mainly marijuana and cocaine.

Q. All right. Does MS-13 or did your clique have any rules about the use of drugs?

A. Yes, they do.

Q. What was that rule?

A. You can't consume specific drugs such as -- at anytime they're not supposed to be consuming any drugs.

Q. Okay. What about marijuana? Is marijuana allowed?

A. On specific days.

Q. Okay. Was that your clique or just overall?

A. Overall. It's MS-13 in general.

Q. All right. Do certain cliques follow the rules more closely than others?

A. They do.

Q. Did VLS follow pretty strict?

A. We tried.

Q. Okay. All right. Let's talk about the East Coast program. What was that called when you were the head of the East Coast program?
A. What was I called?
Q. Yeah. Did you have a title as head of the East Coast program?
A. Yeah, I was the palabrero.
Q. Okay. So you're palabrero for VLS and also the palabrero for the East Coast program?
A. Yes.
Q. Okay. How many cliques -- when you were the palabrero of the program, how many cliques were under your control?
A. I don't know the exact number, but at least 32.
Q. Okay. And how far in territory did the East Coast program cover? How far north did it go?
A. I will say to multiple states. So some of the states that I can think would be Virginia, Maryland, D.C., New York, North Carolina, Ohio. Those are on the top of my mind right now.
Q. Okay. Did they cover anything in Boston, in Massachusetts?
A. Yes.
Q. Okay. So even further north than New York, then, right?
A. Yes.
Q. All right. And you said as far west as Ohio, you can think of?
A. Yes.

Q. And down to North Carolina?
A. Correct.
Q. And all of the D.C. area?
A. Yes.
Q. Including Virginia and Maryland?
A. Yes.
Q. What is the purpose of the East Coast program?
A. The purpose was to maintain better control of all the cliques so that everybody will follow the same rules and to be stronghold or more united as a whole.
Q. And did the cliques that were members of the East Coast program have to pay dues to the program?
A. Every clique that's in the program would have to, yes.
Q. And how often would they have to pay dues?
A. Monthly.
Q. Would the East Coast program have meetings?
A. Yes, we would.
Q. How often?
A. We try to do it at least once a month.
Q. And who attends those meetings?
A. The leaders of every clique or the ones in charge.
Q. Okay. What does the East Coast program do with the dues that they collect from the cliques?
A. It's being distributed to members in El Salvador so that they can have their management do what it's being utilized for.

Q. Okay. And within the East Coast program, are there different leaders in El Salvador than the leaders, ranflero for each clique, or are sometimes they the same members?
A. Sometimes there's different leaders, but mostly they will be within the same cliques that are involved with the program.
Q. Okay. Now, do sometimes some of the cliques drop out of the program briefly, or sometimes they come in and leave? What happens there?
A. It could happen. They can drop out, or they could -- or new cliques would join in.
Q. What would be a reason that a clique might drop out?
A. They don't have the sufficient numbers to be involved with the activities that they're holding, or maybe they committed some type of violations of any rules, so they would have to be kicked out of the program.
Q. Okay. I wanted to talk about, within the clique, are their punishments that are given for, like you said, for violations or infractions?
A. There are.
Q. And what are those called?
A. Cortes.
Q. Okay.
A. They consist of a beating. It depends on the amount of the infraction you commit. It's how they -- it reflects of how much time you get beat by. Normally, it would be 30 seconds.

Q. Okay. And you said there are even more serious penalties, though, for certain violations.
A. Yes.
Q. And what would the most serious penalty be?
A. Cooperate with law enforcement. That's the main one.
Q. Okay. What would happen if you cooperate with law enforcement?
A. You will -- they will give you a green light. A luz verde means that they get to kill you.
Q. Okay. Green light is luz verde, you said?
A. Yes.
Q. Who issues the green light?
A. The leader in charge.
Q. Would that be the palabrero?
A. Yes.
Q. What happens if a homeboy has another problem with a homeboy in the clique?
A. Depending on the severity of or what is the problem, it would have to be handled within the clique before it can reach to the program. But normally, it's a beating. But if there's something, then they will have to make a decision how -- the severity of the rules that were broken.
Q. Who decides what happens if there's a dispute like that?
A. The palabrero.
Q. Does ranflero also get involved in that decision-making?

A. Every year, whether here in United States or El Salvador, would have to get involved, would have to approve the -- whatever the -- it would have to come to agreement as to what is to follow, what is next.
Q. Now, when you're in the program, when a clique is in the program, is there sometimes when cliques are -- the whole clique is disciplined by the program?
A. Yes.
Q. Okay. What would be an example of why that would happen?
A. Not following the rules that the program has imposed. Being disrespectful to another homeboy within -- that's included in the program. Could be just not following through with everything that's being demanded.
Q. Okay. What were some of the -- so what happens to the whole clique? What's the punishment that will happen?
A. So everybody will get beat. The ranfleros would impose a punishment for every member that's in the clique.
Q. And who would administer the beating?
A. It would have to be the ranfleros in El Salvador, and they will have to come to whoever is in charge here in the United States.
Q. Who's the first person that gets beaten in the clique if the whole clique's getting punished?
A. The leader of each clique.
Q. Does the East Coast program, when you were in charge --

Well, let me ask you this: When approximately were you in charge of the East Coast program?
A. Approximately, late 2015, beginning of '16.
Q. Okay. And how did you come to be a leader or the first -- the palabrero of the East Coast program? What happened to make you the leader?
A. The previous one that was in charge got arrested and convicted in Boston, Massachusetts, and so we needed to put somebody else in charge. And every clique that was in the program had a meeting. Everybody was on the phone. And we all vote as to who should be the next one to step in and fill in the blank.
Q. All right. So you got elected?
A. I did.
Q. That's a lot of responsibility, right?
A. Yes.
Q. Okay. When you were in charged of the East Coast program, if a clique was low in numbers and low in numbers of homeboys, would you do anything to assist them?
A. Yeah, we would try to provide them with more assistance, more homeboys to their region, send more homeboys to their region so that they can provide more help as to whatever it is that they needed help with. We would also try to school, what we call giving it escuela, to school newcomers to try and help them build their numbers.

Q. So you sound like recruiters, almost?
A. Yes.
Q. What if a clique was low on homeboys and needed help with some chavalas that were coming into their territory?
A. The program would provide the homeboys necessary in order for that to be carried out.
Q. So the program would provide additional homeboys to help out?
A. Yes.
Q. To fight back against the chavalas that were in the territory?
A. Correct.
Q. Okay. Did there come a time when you've met with myself and Special Agent Nathan Ferguson of the FBI?
A. Yeah.
Q. All right. And at that time, did Special Agent Ferguson show you some series of photographs?
A. He did.
Q. To see if you could recognize anybody?
A. Yes.
(Discussion was held off the record.)
MR. DOBBINS: Your Honor, I think without objection, the government moves 78, Government's Exhibit 78 into evidence.
THE COURT: No objection, Mr. Rosenbaum?
MR. ROSENBAUM: No objection.

THE COURT: All right. That will be admitted at this time.

(Government Exhibit 78 was received in evidence.)

BY MR. DOBBINS:

Q. Mr. Viera-Gonzalez, I'm showing you Government's Exhibit 78, a series of six photographs. One, two, three, four, five, six.

Going back to number 4, did you recognize that individual?

A. Yes.

Q. Are these your initials here?

A. That is my initials, yes.

Q. And what did you write underneath number 4?

A. Yulo/Fearless.

Q. All right. And who is this that we're looking at in this picture?

A. Andy.

Q. Okay. That's the one you knew as Andy but also --

A. Yulo and Fearless.

Q. And what clique, again, was he in?

A. Guanacas Lil Cycos, GLCS.

Q. Where was GLCS located, or what was their territory in relation to VLS?

A. At the time, they were in Virginia, New York, specifically Virginia, Manassas.

Q. Okay. What would happen if two cliques within a program

had a conflict about territory they were trying to take or expand?
A. We would go back to records. So there's actually records when a clique was founded, where it was founded, and we would look at the records to find out who was there first, who was the one -- who was the clique that was there first.
Q. So you keep some sort of documents or historical documents to figure out who was where first?
A. Yes.
Q. All right. Have you heard -- let me ask you this: Was GLCS within the East Coast program? Had they joined the East Coast program?
A. Yes.
Q. Were they always in the East Coast program?
A. As far as I know, yes.
Q. Okay. Have you heard -- what were some other types of cliques that were in the East Coast program? Can you give us some names of cliques?
A. As you know, VLS, Santa Marias, Little Gangsters, Cycos, Treces, Pelones, Demonios, Delicias. Those are some of the names that I can remember right now.
Q. You said Delicias?
A. Yes.
Q. Where was the Delicias clique based out of?
A. I didn't know that they were in Virginia at the time, but

mainly in El Salvador.
Q. Okay. Now -- one moment. As leader of the East Coast program, did you help to try to obtain bulk quantities of drugs for the different cliques to try to sell?
A. Yeah, I would try to obtain bulk of drugs so that they can be distributed among all the cliques in the program.
Q. All right. Now, were there, like, series of rules that the East Coast program had on top of what the cliques have and MS-13 has in general?
A. Yes, there is.
Q. All right. How did you learn those rules since you were the palabrero?
A. So I would obtain the rules from ranfleros in El Salvador. They would send them to me through WhatsApp messaging, and that's how I'll get to -- would get the record and try and learn them.
Q. Okay. Did you also have to report back updates to the ranflero for the East Coast programs?
A. Yes.
Q. All right. I wanted to talk to you -- so the murder that you were -- that you ordered those other people to do, were those people all homeboys, or were they lower in rank?
A. They were lower in rank. The purpose -- the purpose for that was so that they can increase their rank.
Q. Okay. So they were trying to move up in rank?

A. Yes.
Q. Okay. And when you were driving that person out to Harpers Ferry, I think you said you were asking questions.
Do you recall that's something, when you're doing that?
A. Yeah, I recall asking him specifically if he was a gang member of any gang, and the guy answered, yes, that he was 18th Street.
Q. Why are you doing that? You already suspected him of being 18th Street?
A. We need confirmation from him that, in fact, he was a chavala.
Q. All right. I wanted to talk just a little bit about the rules.
So the main rule -- one of the main rules that you always have to follow in MS-13 is fight and kill chavalas?
A. Main one.
Q. And you have to do that to move up in rank to eventually become a homeboy, right?
A. Correct.
Q. What happens after you become a homeboy? Do you get to just kick your heels up and let everybody else do it?
A. You got to continue with the activity of -- keep up with the activity of building status with the gang.
Q. And why is that?
A. To obtain more respect from other homeboys.

Q. Respect is a big deal within MS-13?
A. It is.
Q. And if you don't participate in attacking or trying to kill a chavala, even if you're a homeboy, what can happen to you?
A. You can get killed.
Q. At the very least, you would lose respect?
A. Yes. But breaking that rule means -- consequences is, you get killed.
Q. Okay. And everybody knows that in MS-13?
A. Correct.
Q. Now, the murder you committed with those other people, one of those people that were with you was Caballo, right?
A. Yes.
Q. And he's the one that brought you into MS-13 -- to VLS?
A. Yes.
Q. And he was obviously a homeboy.
A. Correct.
Q. And in that murder, did he actually stab or beat the victim in your case?
A. He did not.
Q. All right. Why was he allowed to do that?
A. Because he was -- already had the respect. And according to homeboys in El Salvador, he had already done it before. So he was just a lookout. So he was just a lookout at the time, make sure nobody come in where we were at the time.

Q. Was he the driver of the vehicle?
A. He was.
Q. And he acted as a lookout when you got to Harpers Ferry?
A. Yes.
Q. So he still helped.
A. Yes.
Q. I wanted to talk about tattoos.
What kind of -- do you have to have permission to get any MS-related tattoos on your body?
A. You do.
Q. Okay. Who gives that permission?
A. Ranfleros.
Q. And what are the types of tattoos that you're allowed to get?
A. MS-13. Eventually your clique's initials.
Q. Okay. Is there any rule on the position of MS and the number 13?
A. I can't recall, but I -- I can't recall right now.
Q. Okay. Are you allowed to get your clique's initials before you get the MS letters on there?
A. You are not allowed.
Q. And why not?
A. MS comes before anything and everything.
Q. More important than the clique?
A. Yes.

Q. Did you receive any MS-13 tattoos?
A. I did not.
Q. Why not?
A. I didn't want to attract any attraction from law enforcement.
Q. What was your -- did you have a nickname? Or I believe it's called a taca?
A. I did.
Q. Did you have more than one?
A. I did.
Q. What were those nicknames?
A. Started off with Nitido. Then once I became a homeboy, they switched mine to Little Humilde. And once I became the leader of the East Coast program, I was told by the ranfleros to change it to a different one, which it was Demonio.
Q. Okay. What does the first one mean? Did you say natindo (phonetic)?
A. Nitido.
Q. Nitido?
A. It's kind of, like, fresh, like, nice.
Q. Okay. And what was the second one?
A. Little Humilde.
Q. What does that mean?
A. Humble.
Q. And what does Demonio mean?

A. Demonio means demon.
Q. Have you have seen -- or when you were leader of VLS or leader of the East Coast program, had you seen where other members of cliques -- members from different cliques might get together to work together to do -- to attack a chavala?
A. Yes.
Q. All right. Or to do any other kind of illegal crime?
A. Yes.
Q. But if you had a problem or an issue with a homeboy from another clique, would you be allowed to punish that homeboy?
A. I could. It depends if there's just not enough numbers to provide or to carry out that punishment. But it would have to be settled among cliques before it happens.
Q. Okay. So before you could act, you would have to do what?
A. You would have to obtain permission and -- from that clique and the ranfleros in El Salvador.
Q. And they would decide what the punishment should be?
A. Correct.
Q. And what would happen if you punished a homeboy from another clique without doing that, following that procedure?
A. Everybody involved or whoever carried out that punishment would have to get punished as well.
Q. So if you punished a homeboy from another clique without getting permission from the ranflero and going through that procedure, then you and the whole clique would be punished in

return?
A. Yes.
Q. And what would that punishment entail?
A. Most likely a beating.
Q. What if -- would it be the equivalent of what you had done to that homeboy without permission?
A. No. So normally it would be 30 seconds, but because of the severity of whatever it was, then the number increases. It could become more seconds. It could become minutes.
Q. Okay.
MR. DOBBINS: One moment.
THE COURT: Sure.
(Discussion was held off the record.)
BY MR. DOBBINS:
Q. Okay. We were talking about respect within the clique and with also -- between the cliques and with other members of MS-13, right?
A. Yes.
Q. Was GLCS respected within MS-13?
A. They were.
Q. Okay. And when you say "respect," along with that respect, does that mean that they are also to be feared?
A. Correct.
Q. Okay. Was VLS your clique? Were they well-respected within MS-13?

A. They were.
Q. Okay. We were talking about gaining respect.
Do -- even after you become a homeboy, do people gain more respect by the number of chavalas they may have attacked or killed?
A. Yeah, they do.
Q. Do sometimes members of MS-13, the more people they have attacked or killed, do they do something with tattoos on their body to signify that?
A. They start on -- they get more permission as to where they can place their tattoos -- to obtain the permission so that they can show off more of their tattoos.
Q. Okay. So when you say "they get more permission," where generally does someone get the MS tattoos that you know of?
A. That I know of, most commonly it's in your throat, your forehead, your chest, your stomach. Those are the main ones that I seen.
Q. All right. And again, who has to give you permission to get these tattoos?
A. Ranfleros.
Q. That's for all MS-13?
A. Yes.
Q. And is there any rules on where you can get them if they're in, like, say someplace that's more visible or higher up like on your face or your head? Is that different than if you get

it on your chest?
A. It is.
Q. What does that signify?
A. It signifies that you have earned a big status within the gang to gain that permission to show off your tattoos.
Q. So somebody like Fearless --
MR. DOBBINS: If I could just have the ELMO, please.
BY MR. DOBBINS:
Q. Government's 78. By having those tattoos on his forehead, what do you know just seeing that, without even having knowing him, just being a member of MS-13?
A. That means that he was well-respected in MS-13. He has a big status, probably.
Q. And you can get -- you can improve your status by killing more chavalas, correct?
A. Correct.
MR. DOBBINS: I have no further questions, Your Honor.
I pass the witness.
THE COURT: Thank you.
Mr. Rosenbaum, cross-examination.
MR. ROSENBAUM: I need a quick break, Your Honor.
THE COURT: Sure.
Ladies and gentlemen, let's take a ten-minute break. We'll take it a little earlier, before the cross.
Go ahead and leave your notepads in your chairs. Use

the restroom. We'll bring you back in in just a moment.

Thank you.

THE COURT SECURITY OFFICER: All rise for the jury.

(Jury exits at 10:40 a.m.)

THE COURT: All right. We'll go ahead and take a restroom break, as well, for everybody. Thank you.

(Court recessed at 10:41 a.m.)

(Back on the record at 11:13 a.m.)

THE COURT: Please be seated, everyone. Thank you for your patience.

Let's go ahead and check in on our jurors. They should be ready to go.

(Jury enters at 11:14 a.m.)

THE COURT: All right. Please be seated, everyone. We're going to turn it over now to defense counsel for cross-examination.

Mr. Rosenbaum, the floor is yours.

MR. ROSENBAUM: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ROSENBAUM:

Q. Okay. On your direct testimony, what you were talking to the prosecutor about, you said that when -- in order for you to become a homeboy, you didn't have to kill anybody; is that right?

A. Yes.

Q. In fact, you talked about the various steps that you started with MS-13, observacion, paro, all the way up to homeboy.

Normally, you said, you have to kill somebody to increase up the ladder, right?

A. Yes.

Q. You said you didn't have to do any killings to increase from when you started all the way up to homeboy, right?

A. Yes.

Q. Okay. So even though it's one of the rules, there's exception to the rules, correct?

A. I was one exception.

Q. Excuse me?

A. I was one of the exceptions.

Q. Okay. And there's other exceptions, too, right?

A. I never encountered one.

Q. Say what?

A. I have never encountered one.

Q. But there's other cliques and they do -- other cliques run differently than maybe the VLS clique, right?

A. Yes.

Q. Okay. Now, eventually you said you became head of the East Coast program, right?

A. Yes.

Q. After you were the First Word, or the leader of the VLS

clique, you then became the head of the entire East Coast, from Boston down to North Carolina, right?
A. Yes.
Q. West to Ohio, correct?
A. Correct.
Q. And in order to become, what's it called, the palabrero?
A. Yes.
Q. In order to do that, you didn't have to kill anybody either, did you?
A. Correct.
Q. Now, as the palabro [sic], you're the shot-caller for the East Coast program, right?
A. Yes.
Q. Okay. Now, in that position, you are authorized to green-light killings, aren't you?
A. Yes.
Q. How many killings did you green-light when you were head of the East Coast program?
A. None.
Q. None?
A. None.
Q. So in the six to nine months that you were head of the East Coast program, there were no killings in any of the cliques in that program?
A. No.

Q. When did you become the head of the East Coast program?
A. Late 2015.
Q. When you say "late," what are you talking about, September, October, November?
A. Probably November.
Q. Now, in your clique, VLS, you said you would extort money from people, pay rent, correct?
A. Yes.
Q. One of the counts you pled to in the Eastern District of Virginia involved an extortion and a kidnapping, right?
A. Correct.
Q. And that's where you threatened someone to pay the rent, right?
A. Yes.
Q. And you put a gun to his head and took him for a little ride, right?
A. Yes.
Q. Okay. That's not the person that was killed. That's someone else?
A. Someone else.
Q. Okay. And that's not the only extortion you've been involved in, correct?
A. That was the only one.
Q. That was the only one?
A. Yes.

Q. So all the time you were in MS-13, that was the only extortion you were involved in?
A. Yes.
Q. And after you became the head of the East Coast program, you weren't involved in any extortions, either?
A. Correct.
Q. Were you involved in green-lighting any extortions?
A. No.
Q. You never gave orders to extort anybody?
A. No.
Q. You never threatened anybody other's family -- any other families?
A. No.
Q. The only time you did it was the case that you pled guilty to in the Eastern District of Virginia?
A. That's correct.
Q. So the one time you were involved in a killing and one time you were involved in an extortion, you got caught?
A. I did.
Q. Now, you said you were involved in raising money for the cliques and for the people back in El Salvador, right?
A. Yes.
Q. All right. And you said you did that through guns and drugs, right?
A. Through -- through the rent that we was obtaining from the

guy that we extorted.
Q. I'm sorry?
A. Through the rent that we were getting from the guy that we extorted.
Q. Okay. From the people that your gang was extorting, right?
A. Yes.
Q. Okay. But you weren't involved in any of the extortions, right, except for the one?
A. Correct.
Q. Okay. Now you said the clique would sell guns in order to raise money, didn't you?
A. I did not.
Q. Didn't you say you raised money to buy guns?
A. That was the purpose of raising the money.
Q. Okay. And who would you buy the guns for?
A. I never bought any.
Q. Okay. Who was buying the guns?
A. Some of the ranfleros in El Salvador.
Q. Nobody here in the U.S.?
A. No.
Q. Okay. None of the money that was raised ever went to purchase any weapons?
A. No.
Q. Now, you did say you raised money by selling drugs, pot, marijuana, and cocaine, correct?

A. Correct.
Q. Okay. You needed money to buy those drugs to resell it, correct?
A. Yes.
Q. Okay. And who was your supplier of drugs?
A. We didn't have one. It was actually obtained through another homeboy.
Q. So you would get them from someone else from MS-13?
A. Yes.
Q. Always the same homeboy?
A. It was one time.
Q. One time. That's the only time you bought drugs, one time?
A. Yes.
Q. Now, when you became the First Word of the VLS clique and eventually the head of the East Coast program, you kept a notebook, right?
A. I did.
Q. And in that notebook, you listed all the cliques in the East Coast program, right?
A. Majority.
Q. Excuse me?
A. Majority.
Q. Majority?
A. Yes.
Q. Some were not included?

A. Correct.
Q. Okay. You'll agree with me that Delicias is not listed in your notebook at all, correct?
A. I don't recall. I have to see the documents.
Q. You'd have to see the documents?
A. Yes.
Q. If I were to show you the notebook and you were to go through it, would it refresh your memory?
A. Probably. It's been awhile.
MR. ROSENBAUM: May I be able to do that, Your Honor?
THE COURT: You may.
THE WITNESS: I'm on the page of the cliques.
BY MR. ROSENBAUM:
Q. Okay. Do you see Delicias listed there at all? Did it refresh your memory whether or not it's listed in your notebook?
A. Yeah, it refreshed my memories.
Q. Okay. Is Delicias in your notebook?
A. It is not.
Q. Not?
A. No.
Q. Okay. And that's your handwriting, right?
A. It is.
Q. Okay. Can you pass it back, please?
Now, you were talking about discipline before, if there

were violations of the rules. As head of the VLS or head of -- and eventually head of the East Coast group, did you ever authorize any beatings?
A. Within the clique, not the program.
Q. Okay. Did you ever authorize any beatings within the clique?
A. I did.
Q. Okay. So some of your members were beaten because of your giving that authorization?
A. Yes.
Q. Did you participate in the beatings?
A. I did not.
Q. Did you witness them?
A. I did.
Q. Let's talk about the tattoos.
Isn't it a fact that once someone reaches the rank of homeboy, you're allowed to get tattoos?
A. If the clique allows you to.
Q. You need permission even if you're a homeboy, at that level, to get permission?
A. Yes.
Q. Okay. And you get permission from your clique?
A. Correct.
Q. Okay. So you'd have to get permission from the First Word of your clique, right?

A. Yes, both here and El Salvador.
Q. And tattoos are not required?
A. They're not.
Q. And you decided not to get any tattoos?
A. Yes.
Q. And that's so you could float under the radar of law enforcement?
A. Yes.
Q. You mentioned before that if there was a disagreement as to territory between cliques, you would resolve it by going to historical documents kept by MS-13, correct?
A. Yes.
Q. And those historical documents, did you keep them in your possession when you were head of the clique, when you were the First Word of the VLS?
A. I did not.
Q. Did you keep these documents or have access to them when you were head of the East Coast program?
A. I did not.
Q. So where are these historical documents that you would review to determine territorial rights of various cliques?
A. Ranfleros in El Salvador keep them. And if needed, then I would have to -- or whoever required would have to ask them, and they will keep those records.
Q. They kept those records.

A. Yes.
Q. And you would know who -- the person who has the records in El Salvador, right?
A. Yes.
Q. Okay. And you gave that to law enforcement, right?
A. I believe so.
Q. But you're not sure?
A. I'm not sure, 100 percent sure.
Q. Now, your clique raised money by selling drugs?
A. They did.
Q. Okay. And over what period of time did your clique sell drugs, how many years?
A. Not even a year.
Q. Not even a year.
A. Not even a year.
Q. And you're talking about cocaine and marijuana?
A. Yes.
Q. Okay. And you said, again, the drugs were supplied by a homeboy?
A. Yes.
Q. In your clique?
A. Other clique.
Q. Other cliques.
A. Yes.
Q. Okay. And what other clique -- what clique was he involved

in -- from?
A. He was from Centrales.
Q. Where are they located?
A. Ohio.
Q. Ohio. So you're buying drugs from a gang member in Ohio --
A. Yes.
Q. -- to supply your clique on the East Coast of the United States?
A. Yes.
Q. Okay. Do you know where he sourced it?
A. No, no idea.
Q. And that's the only place you ever bought drugs?
A. Yes.
Q. And how much drugs are we talking about?
A. Probably a pound or two of weed.
Q. And how about cocaine?
A. I never purchased cocaine.
Q. Okay. So your clique, the purpose was to raise money, right?
A. Yes.
Q. And raise money for your clique but also to send it to El Salvador, correct?
A. Correct.
Q. All right. So you didn't sell guns, so you didn't make any money from guns, right?

A. Yes.
Q. Drugs, very little, one delivery, couple of pounds of marijuana.
That's it, right?
A. That's it.
Q. That's it. And the rest of it must have come from, what, extorting people and forcing them to pay rent?
A. From the one specific individual.
Q. That's it?
A. Yes.
Q. So how long were you the First Word for VLS?
A. Probably around two years.
Q. Two years. So in all the two years, couple of pounds of marijuana, no guns and one extortion, and that's the source of the income for the VLS?
A. Yes.
MR. ROSENBAUM: I have no further questions, Your Honor.
THE COURT: Thank you.
Redirect?

REDIRECT EXAMINATION

BY MR. DOBBINS:
Q. All right. Just so we're clear, when we're talking about drugs that were bought and sold by VLS, was that just you or was that other people within VLS that would do that?

A. It was other people, was mostly lower-ranked guys in the clique.

Q. Okay. So when you were asked by Mr. Rosenbaum on cross about people, or VLS making money off of selling drugs, and you're saying it was just the one time that you went to Ohio to pick up the couple of pounds of weed, were there other occasions when VLS or VLS associates would sell drugs to make money for the clique?

A. That's -- we picked that up -- two pounds of weed and started selling that. That was it.

Q. Okay. Were there other ways that VLS members were able to pay dues?

A. No, that was -- that was the only way. Most people come from their own pocket at times.

Q. All right. And you actually worked -- you testified on direct that you worked some legitimate jobs, right?

A. Yes.

Q. Is that how you paid your dues?

A. Yes.

Q. All right. Similarly, you were asked on cross about the extortion that you pled guilty to.

Do you recall that line of questioning?

A. Yes.

Q. Okay. Were there other times that members or associates of VLS would try to extort either drug dealers or other people in

the territory to collect money?
A. No, I only recall this one time.
Q. One time you were involved with?
A. Yes.
Q. But that wasn't just one time that you extorted that person, right?
A. Right.
Q. You did that on multiple occasions?
A. Yes.
Q. And you collected rent from that person on multiple occasions?
A. Correct.
Q. And that rent, again, is not rent because you're their landlord, it's rent that you're threatening them if they don't pay, that you're going to hurt them or their family.
A. Correct.
Q. And that money went to you or that money went to the clique?
A. To the clique.
Q. You were asked on cross by Mr. Rosenbaum about green-lighting extortion.
Do you recall that line of questioning?
A. I recall.
Q. All right. Is that what a green light is? Is green light about extortion?

A. Not necessarily, no.
Q. All right. What does a green light refer to?
A. It's to killing somebody.
Q. And do you need a green light to kill a chavala?
A. Yes.
Q. Okay. Is that why you do your investigation and have them confirm they're a chavala before you kill them?
A. Yes.
Q. You were asked on cross about when you were the head of the East Coast program how many green lights did you approve.
Do you recall that line of questioning?
A. I recall.
Q. Okay. Are green lights also able to be authorized by an individual clique and the ranflero for that clique?
A. Yes.
Q. So would it necessarily be the palabrero of the East Coast program that would have to get to issue a green light?
A. Not necessarily.
Q. But you did say that when you were the palabrero of VLS, you did authorize beatings or punishments --
A. From my clique.
Q. -- in your clique?
A. In my clique.
Q. And you were asked if you participated in the beating, if you, I guess, helped beat that person.

Do you recall that line of questioning?
A. I recall that question.
Q. And the answer was no?
A. Yes.
Q. What generally does the First Word do during a -- I believe it's called a corta?
A. Corta, yes.
Q. What is the role of the First Word during a corta?
A. To verify and make sure it's being carried out the way the gang or the rules that's been established. So I'm just looking to make sure that it's being carried out the appropriate way.
Q. Okay. Does somebody have to keep the time for the beating?
A. Yes.
Q. Who keeps the time?
A. I could, but in that moment, somebody -- we have enough people to -- I didn't have to do it. I could, but I didn't have to do it at the time because we had enough homeboys to do it themselves.
Q. Right. And you said "had enough homeboys."
How many homeboys do you have to have to conduct a corta on somebody?
A. We had four.
Q. Is that the minimum required?
A. No -- oh, yes. I'm sorry.
Q. Okay. But in your case, you said you even had enough that

somebody else could keep the time?
A. Yes.
Q. And keeping the time, what does that mean? What are they counting to?
A. They're counting to whatever the time was established, so they're counting in seconds, or if it was more than a second, then they would have to keep track of the time, whether it's a watch or something like that.
Q. Okay. What number are they trying to go to?
A. 13 is the main one. We had some that were carried out by two minutes.
Q. Okay. So you enforced discipline in the clique?
A. Yes.
Q. And are these beatings with hands or with other things?
A. Could be other things.
Q. Like what?
A. Such as bats, baseball bats, and wood or sticks.
Q. Okay. You were asked on cross about even a homeboy needs to get permission to get tattoos?
A. Yes.
Q. All right. And you said that they had to get permission not only from the First Word of their clique in the U.S., but also from the ranflero in El Salvador?
A. Correct.
Q. And the ranflero are the ones that keep the records, the

historical records?
A. Yes.
Q. In El Salvador?
A. Yes.
Q. So if somebody has a dispute like you were talking about, do you have to message the ranflero down there to send the proof of the historical records to resolve the situation?
A. Right. I will have to call them or text them and ask them about if records are being kept for that specific location, and they would let me know who -- who would be the ones to obtain that -- who was there first.
Q. And you were asked about -- if you were involved in any other extortions when you were the head of ECP, of the East Coast program.
As the palabrero of the East Coast program, are you participating in extortions on behalf of the East Coast program?
A. I did not at the time.
Q. You were asked about that notebook. I believe you might even still have it up there. I'm not sure.
A. He took it back.
Q. Okay. Where were those notebooks seized from?
A. My house.
Q. Okay. And did you go over that with law enforcement in the debriefs and talk about those notebooks?

A. I did.
Q. Were those lists of cliques in the East Coast program, was that a complete list?
A. It was not.
Q. All right. And on direct, I believe you testified that sometimes cliques might stay in or might be out for a period of time, and then come back in the program, right?
A. They could do that.
Q. Okay. And what would be the reason for that? What would be some of the reasons?
A. Disobeying the rules, maybe kicked out by the program where all the cliques have admitted and they agree that they're not following the rules throughout, so they will be kicked out. They will have to earn their trust again in order to reenter the program.
Q. All right. Do sometimes cliques lose members also?
A. Yes. It means they're -- they don't have enough homeboys or soldiers to maintain that seat in the program.
Q. You said seat in the boardroom?
A. The program.
Q. Oh, the program. I'm sorry.
MR. DOBBINS: One moment, please.
THE COURT: Sure.
(Discussion was held off the record.)
BY MR. DOBBINS:

Q. You were asked on cross about that other cliques are run differently, perhaps, than VLS, your clique, right?
A. Yes.
Q. Do you recall that line of questioning?
But all cliques are still basically structured the same way, right?
A. Mostly.
Q. Okay. They still take orders from people down in El Salvador?
A. Yes.
Q. Those are the people that give them the rules?
A. Yes.
Q. And there's still general rules that every clique follows, right?
A. Yes.
Q. All right. Because if you're not -- if you're claiming to be MS-13 and you stop following the rules, what does that mean?
A. That means you're not MS-13.
Q. So what happens to somebody that's -- was MS-13 and stops following the rules?
A. They would have to be green-lighted.
Q. Which means what?
A. You get killed.
Q. And so what would happen to a clique that just decided, you know what, I don't like chavalas anymore -- I mean, I like

chavalas now. I like 18th Street. I don't want to kill them. I want to be their friend.

What would happen to that clique?

A. Everybody would get killed.

Q. You've talked a lot today about what your title meant in MS-13, including, saying here's what we will do, here's what things would happen.

Are you still in MS-13?

A. No.

Q. And as a result of you cooperating with law enforcement, have you violated a rule?

A. I did.

Q. And by testifying against your co-defendants, did you violate a rule?

A. I did.

Q. Pretty big rule, right?

A. Big one, one of the big ones, biggest ones in MS.

Q. One of the big three or four, right?

A. Yes.

Q. Right up there with respect MS above all?

A. The top.

Q. Right up there with kill chavalas on sight?

A. Top, yes, right next to each other.

Q. So what's happened to you? Have you received a green light?

A. I did.
Q. Does MS-13 consider you a part -- a member of the gang?
A. No.
Q. Do you consider yourself a member of MS-13 anymore?
A. Absolutely not.

MR. DOBBINS: No further questions, Your Honor. Thank you.

THE COURT: Thank you.

Do you guys want a minute so we can go ahead and clear?

We can excuse him.

All right. Ladies and gentlemen of the jury, we're just going to take a moment so we can set up with our next witness, okay. Just go ahead and leave your notepads on the chairs, and we'll bring you out in just a moment, please.

THE COURT SECURITY OFFICER: All rise for the jury.

(Jury exits at 11:42 a.m.)

THE COURT: All right. Everyone can please be seated. I just wanted to make sure we set that up.

Next witness, so I know -- we're going to go until about 12:30, so I just want to get a sense of who we've got on deck.

MR. DOBBINS: Yes, Your Honor, Detective Gianino will be introducing the defendant's post-Miranda statements at this time.

THE COURT: Right. Okay.

MR. DOBBINS: We have binders for the jury with redactions --

THE COURT: Okay.

MR. DOBBINS: -- that we agreed upon. We've also redacted the recording, as well.

THE COURT: Okay.

MR. DOBBINS: I anticipate this witness is going to take a bit.

THE COURT: Let's get as much of it as we can.

MR. DOBBINS: Oh, no, I understand, but also just to let the Court know, we do have Cruz-Ortiz available this afternoon, as well --

THE COURT: Okay.

MR. DOBBINS: -- if we get through him. So I don't think we'll have a shortage of witnesses.

THE COURT: Okay. Very good. Yeah, let's go ahead then and get ready. Just to be clear for the defense, you guys have seen the binders and the redactions? I just want to make sure it's streamlined and we don't have any objections with what's being shown to the witness.

MS. ACEVEDO: Your Honor, we haven't seen the binders, however, we do know what the redactions are based on.

THE COURT: That's what I wanted to make sure, maybe not the physical binder, but just to make sure you've seen the redactions and you're okay with it. Okay. Very good.

All right. Let's get -- you guys go ahead and finish setting up. We'll just get them to step off for one minute, and then we're going to bring them back in. So we can set up, if we need to bring stuff out, and have it ready for the jury.

We'll be right back.

(Court recessed at 11:44 a.m.)

(Back on the record at 11:55 a.m.)

THE COURT SECURITY OFFICER: All rise.

THE COURT: Please be seated, everyone. Let's go ahead and round up our jurors, please.

(Jury enters at 11:56 a.m.)

THE COURT: Please be seated, everyone.

All right. Turning back to the government, Mr. Dobbins, next witness.

MR. DOBBINS: Yes, Your Honor, the government would call to the stand, Detective Andrew Gianino for the Broward Sheriff's Office.

THE COURT: Detective, come on up.

We're going to swear you in, please.

THE COURTROOM DEPUTY: Please raise your right hand.

(Government witness, Detective Andrew Gianino, duly sworn.)

THE COURTROOM DEPUTY: Please be seated. Speak into the microphone. Say and spell your name for the record.

THE WITNESS: Andrew Gianino, G-i-a-n-i-n-o.

DIRECT EXAMINATION

BY MR. DOBBINS:

Q. Good afternoon, Detective.

A. Good afternoon.

Q. Can you please tell the member of the jury where you're currently employed?

A. Broward Sheriff's Office.

Q. What is your current rank?

A. Detective.

Q. And where are you currently assigned?

A. Cold case homicide.

Q. What are your duties and responsibilities with the Cold Case Homicide Unit?

A. Investigating cases which were unsolved dating back to the early '70s.

Q. How long have you been with the Broward Sheriff's Office?

A. By virtue of a merger between the City of Deerfield Beach and the Broward Sheriff's Office, I've been there 45 years.

Q. And when did you start in Deerfield Beach?

A. 1979.

Q. And did you attend a police academy?

A. I did. I graduated in August of 1980.

Q. And what were your duties initially when you started out at Deerfield Beach?

A. Road patrol, Deerfield Beach.

Q. Okay. At some point did you become a detective?
A. I did. Approximately five to six years later, I became a property detective.
Q. And how long did you serve in that capacity?
A. For approximately three years. It was a small city, so anything property related, burglary, larcenies, grand thefts, we would investigate.
Q. And after those three years were up, where did you go?
A. Same place. We just -- I'd been moved to crimes against persons, which would include robberies, sexual assault, kidnapping, homicides.
Q. And when did the merger occur with the Broward Sheriff's Office?
A. In January of 1990.
Q. Did there come a time when you were assigned to some sort of task force?
A. I've been assigned to several task force over the years. My first task force, with the Workers' Compensation Task Force that I created related to money laundering and counterterrorism.
Q. Okay. And when did you join the Homicide Cold Case Unit?
A. Approximately in 2020, I was transferred there.
Q. Okay. Was that an established unit, or was that something new?
A. It was something new. They'd had cold cases before, just

not at the present time. So when I entered it in 2020, I was the only detective assigned to it.

Q. So when you say "they'd had cold cases before," you mean that they had handled them in a different way than having a specific unit?

A. Correct.

Q. Okay. Can you tell the members of the jury what some of the training you received as a detective has been, and then also in the area of homicide investigation?

A. Sure. Criminal law, interviews, interrogation, surveillance techniques, terrorism, homicide, cold case, death investigations, a number of seminars involving cold cases and some of -- and homicide. I'm a member of the Florida Homicide Association. That's basically it.

Q. What does that mean, to be a member of the Florida homicide association?

A. Attending their seminars regularly and being a member, paid membership.

Q. Okay. So when you say you attend seminars, is there like training and new techniques that are discussed and reviewed?

A. That is correct, as well as case presentation. So other agencies would present their cases of unsolved cases, and then we would discuss possibilities and avenues in which they may not have pursued.

Q. How many cold case investigations have you touched over the

time in the Cold Case Homicide Unit?

A. Probably 15 to 20.

Q. Can you tell the members of the jury what some of the difficulties or obstacles you encounter when you're investigating a cold case homicide?

A. Cold cases have their own unique difficulties. The memory of witnesses fade over the years. Technology that was available or not available during the time of the homicide must have been captured at the time of the homicide. That would be GPS, geofencing, phone, toll records from the turnpike and toll roads, phone bills, social media accounts -- all those things would have had to be captured during the initial homicide if, in fact, they ever existed.

Q. Okay. Do you have problems with losing contact with witnesses as well?

A. Certainly. And also a number of witnesses pass away.

Q. You talked a little bit just now about doing geofencing and some other types of technology.

Can you explain what you mean by that? What does geofencing mean?

A. A geofence would be asking -- by court order, getting a court order, asking cell towers throughout a particular area what IP addresses, what phone pinged at a particular time. So it actually shows the movement of an IP, or cell phone, from venue to venue. And that's all captured by tower dumps.

Q. Okay. And why is that -- why is there any obstacle or difficulty in a cold case situation to try to obtain that information?
A. It's only captured for a short period of time. The data is very large. So the company is responsible for housing that data, only keep it for a minimal amount of time, weeks and months.
Q. You also talked about, like, phone records and other types of records.
Why is -- why is that an obstacle in a cold case homicide investigation?
A. It's the same theory. If it wasn't obtained at the time of the homicide and captured and preserved, by the time you work it as a cold case, those records are long gone.
Q. Now, when you're assigned a cold case homicide to investigate, do you always have suspects?
A. No.
Q. I'd like to direct your attention to the year 2020.
Were you working for the County Broward Sheriff's Office at that time?
A. I was.
Q. All right. And were you assigned to that Cold Case Homicide Unit?
A. I was.
Q. All right. Were you assigned two cases that eventually led

to your testimony here today?
A. I was.
Q. Can you tell the members of the jury what those cold cases were?
A. They were two cases. One was investigated by then Sergeant Brian Tutler, the Broward Sheriff's Office homicide division, was the death of Omar Gutierrez, a gang-related death, and the death of Chrislet Ondina investigated by Detective James Hayes of the Broward Sheriff's Office, both homicides occurring in 2015.
Q. All right. And when you received those cases, what did you do?
A. They were given to me actually by Sergeant Tutler who believed that the cases had some merit, that there was some sound evidence in those cases. And he felt putting forth an effort, they could be solved.
Q. And you said there was some sound evidence in those cases.
What was the sound evidence that you had in the Omar Gutierrez murder?
A. In the Gutierrez murder there was GPS captured of the suspect in the area at the time of the homicide.
Q. And what was that suspect's name?
A. That was Wilson Tirado-Silva.
Q. And what was the good evidence that Sergeant Tutler felt was in the Chrislet Ondina murder?

A. DNA, as well as GPS evidence.
Q. Of whom?
A. I'm sorry?
Q. Whose DNA and whose GPS evidence?
A. The GPS evidence came back to Wilson Tirado, and I believe the DNA evidence came back to him, as well. It was on an iced tea can at the crime scene.
Q. Now, obviously you still worked with Sergeant Tutler.
So did you converse with him about the steps he had taken in investigating the case before it became a cold case?
A. I did. He's currently a lieutenant.
Q. Okay. And what about Detective Hayes?
A. At the time I took the case from Detective Hayes in 2020, he was ill.
Q. Okay. Were you able to speak with him some about the investigative steps he had taken?
A. I did.
Q. Okay. Did there come a time in 2020 when the Broward Sheriff's Office specifically received a letter addressed to Detective Hayes?
A. Yes.
Q. Okay. And who was that letter from?
A. It was from Wilson Tirado-Silva.
Q. Okay. And just in sum and substance, did you review that letter?

A. I did.
Q. Okay. And in if sum and substance, what was basically the contents of that letter?
A. It was asking for Detective Hayes to reach out to Tirado, as he had some very important information that he wanted to share with him.
Q. Okay. And how did Wilson Tirado-Silva know Detective Hayes?
A. Detective Hayes had traveled to New York to interview Tirado, and that's how they met.
Q. Okay. Was that when Tirado-Silva was arrested on another case and to be extradited back to Florida from New York?
A. That is correct.
Q. All right. So once BSO received that letter, had you already been assigned those cases?
A. Two days prior.
Q. What a break.
So as a result of receiving that letter, what did you decide to do?
A. It was decided that Detective Hayes could not travel. And then I coordinated with the prison system to travel and interview Wilson Tirado in place of Detective Hayes.
Q. Okay. And did you talk to Detective Hayes about going to do the interview to try and get some background and also get some ideas?

A. I did. Detective Hayes had mentioned to me that he had spoken with or knew of an FBI agent, Special Agent Nathan Ferguson, that had significant information regarding gangs, and I did reach out to him regarding that letter and the subsequent interview.
Q. Okay. So directing your attention to on or about September 11th of 2020, did you go with Special Agent Ferguson to interview Tirado-Silva?
A. I did.
Q. Okay. And did he admit, at that time, to participating in the killings of both Omar Gutierrez and Chris -- sorry -- Chrislet Ondina?
A. He did.
Q. All right. Did he also tell you about any other violent crimes?
A. He did.
Q. Okay. What were those other violent crimes that he told you about?
A. He discussed with us the death of Joel Lara, who was just a missing person at the Broward Sheriff's Office. We had not found his body as of yet. And then a death that occurred in West Boca Raton.
Q. Okay. The part about Joel or Joel Lara, when you said BSO had not found his body yet, did BSO even know that he was dead?
A. No. We knew that he was missing because his family had

reported him such in -- I believe it was 2014. It could have been '15. But they had reported him as missing, but we had yet to find the body.

Q. Okay. And what about the murder in -- I believe you said it was West Boca Raton?

A. It was unincorporated. It was investigated by the Palm Beach Sheriff's Office.

Q. Okay. What information did he provide you about that murder?

Well, let me ask you this: Did he provide you, like, around when it occurred?

A. Yes.

Q. Okay. And based on that information, what did you endeavor to do at that point?

A. Well, we knew that the incident occurred around a particular boxing match, and it ended up being, I believe, on May the 3rd of 2015. And reached out to Palm Beach County, and I teamed up with Detective Robert Drake, who is now a retired cold case homicide detective with the Palm Beach Sheriff's Office.

Q. And did the Palm Beach County Sheriff's Office and Detective Drake confirm that there was a body that -- and a killing that had occurred that had fit sort of the description that Tirado-Silva had given you?

A. Yes, he did.

Q. What other steps did you take as far as confirming the information that Tirado-Silva gave you about the body of Joel Lara?

A. The FBI was able to obtain GPS coordinates on the movement of Wilson Tirado during that time frame of the murder. That, along with his testimony and his -- his voluntary assistance in traveling from a secured facility to the actual crime scene, was paramount in locating where the body was.

Q. Okay. Did you show him maps of where the body might be buried?

A. We did. Prior to removing him from prison, we brought Google Earth maps with us. We tried to get those maps consistent with the maps of 2015 so that he can illustrate and point and make marks as to where, to the best of his ability, he believed Joel was buried.

Q. Okay. You said you also pulled him from his facility to see if he could identify that spot?

A. That is correct.

Q. Were there other locations that you also took him to, to see if he could talk to you about those locations?

A. He did. He took us to the crime scene of Chrislet Ondina. He took us to the crime scene of Gutierrez. He showed us the trailer that he lived at. So there were various scenes that he had taken us to.

Q. All right. Was there a change in the area where -- was it

different from when Tirado-Silva said that they had killed Joel Lara and buried him compared to what that area looks like today?
A. Yes. So at the time it occurred it was a cow pasture, and today it's an apartment complex with a lake.
Q. But based on the GPS data and Tirado-Silva's information, was law enforcement able to find a spot to potentially dig to locate that body?
A. We did. We were able to narrow it down to about a 30-by-50-foot section next to the lake, under a sidewalk, where Tirado's GPS brought him last and to where Tirado had pointed it out himself.
Q. And so was that body ultimately recovered?
A. It was.
Q. All right. And was DNA taken to confirm the identity?
A. It was.
Q. And was it actually Joel Lara, as Tirado-Silva had said?
A. That is correct.
Q. Did Tirado-Silva indicate that he had done these acts by himself or that other people had been involved?
A. Other people had been involved.
Q. Okay. So what did Tirado-Silva -- well, did you ask Tirado-Silva to do anything else in addition to helping you find this body that you hadn't found and talking about the crime in West Boca?

Did you ask Tirado-Silva if he would do anything else to try to help gather evidence?
A. I did.
Q. Okay. And what happened?
A. We asked him to make -- if he would be willing to make controlled phone calls on behalf of the Broward Sheriff's Office and the FBI.
Q. Okay. And how was that accomplished? Because he's locked up.
A. We had him moved from his State facility to the Broward Sheriff's Office where we dedicated a pod just for him had around-the-clock security, and was able to work with him for four to five weeks making controlled phone calls.
Q. Okay. When you say "controlled phone calls," what does that mean?
A. Recorded call on a -- in this particular case, an FBI phone, recorded telephone call to a designated person in hopes to capture some relevant conversation.
Q. And were those calls also monitored by law enforcement to make sure that he was not doing anything untoward with those calls?
A. Absolutely.
Q. All right. Was he only provided the phone when it was time for law enforcement to watch him make these calls to potential other suspects?

A. That is correct.
Q. Okay. As a result of those calls, was Tirado-Silva able to get in touch with any other potential suspects in this case?
A. He was.
Q. All right. Who was he able to get in touch with?
A. He had extensive conversations with Mariachi, Miguel Cabrera, who was a participant in the Joel Lara homicide.
Q. All right. Anybody else?
A. He was able to get ahold of defendant Bigfoot, Melvin David Cruz-Ortiz, and have conversations with him.
Q. Okay. And do you recall what homicides they talked about?
A. They discussed the homicide of Chrislet Ondina and I believe the homicide of Gerson Portillo, this particular one.
Q. Okay. Gerson Vasquez-Portillo being the victim in the West Boca case?
A. That is correct.
Q. Okay. And anybody else besides Bigfoot, Melvin David Cruz-Ortiz, and Mariachi, Miguel Cabrera?
A. He also was able to contact Ardilla and have conversation with him regarding the homicides.
Q. Is that Kevin Gamez-Melendez?
A. That is correct.
Q. And based upon the investigation, what, if anything, did you do with the Palm Beach County file?
A. Well, Palm Beach County is not Broward's jurisdiction. The

lead on that would have been the FBI and the Palm Beach Sheriff's Office. So we were able to get all of their records, and we turned them over to the FBI.

Later on in the investigation, after Detective Drake retired, I was able to capture the evidence that they had -- they had in their possession and bring it to our evidence locker and our lab.

Q. Okay. So you took possession of the physical evidence in the Palm Beach County case?

A. That is correct, in August of 2024.

Q. And that was the -- again, the murder of Gerson Vasquez-Portillo?

A. Correct.

Q. All right. As a result of those phone calls that Tirado-Silva made, were you able to arrest Gamez-Melendez, Cruz-Ortiz, and Cabrera?

A. Correct.

Q. As far as the murder of Gerson Vasquez-Portillo, was that the extent of the participants, or did Tirado-Silva tell you there were others?

A. No, there were others.

Q. Okay. And based on that, have you endeavored to try to investigate those other individuals and potentially tried to interview them, if you could?

A. We have.

Q. Okay. What was the name of one of those individuals?
A. Involved in the Portillo homicide?
Q. Yes.
A. In addition to what I already named, there was Power. It would have been his street name.
Q. Okay. Anybody else?
A. Hugo would have been his -- his birth first name. His alias is Blue.
Q. Okay.
A. Discreto.
Q. Okay.
A. And Chango. And the defendant, Solitario.
Q. Okay. That's Wilber Vigil-Benitez?
A. That is correct.
Q. All right. Now, have you been able to interview Power -- or have you interviewed Power, Hugo, Chango, or Discreto over -- about these homicides?
A. Regarding these homicides?
Q. Yes.
A. No.
Q. Okay. Were you able to interview Wilber Vigil-Benitez, the defendant, about the homicide involving Gerson Vasquez-Portillo?
A. I have.
Q. Okay. On how many occasions?

A. Two.
Q. Before we get into that, I just wanted to focus on -- again, so you took possession of the evidence -- Broward Sheriff's Office took possession of the evidence in the Gerson Vasquez-Portillo case?
A. That's correct.
Q. Okay. So that's why when we look at the, for instance -- and you've seen the evidence, such as -- I'm not holding it up for you now, but you've seen in the past, right, the evidence such as the shirt and the pants and those items, right?
A. I have.
Q. Okay. And so that's why it would have, say, for instance, on there, in addition to Palm Beach County notations, it would potentially have Broward Sheriff's Office notations?
A. That is correct.
Q. And/or sealing tape.
A. Correct.
Q. All right. And in fact, did you ask one of your colleagues in the Broward Sheriff's Office to mount some of those items of clothing?
A. Crime Scene Detective Clint Williams.
Q. Did you do anything else with the evidence that was collected -- did you submit anything to the lab to try to further the investigation?
A. Crime Scene Detective Roberto Caceres processed some of the

items on our behalf in hopes of getting DNA.
Q. Okay. And when you arrested, for instance, Gamez Portillo -- I'm sorry, I apologize -- Gamez-Melendez and/or Cabrera and/or Cruz-Ortiz, did you take any -- did anybody in law enforcement take their DNA?
A. Yes.
Q. Okay. Is that for possible comparison?
A. That's correct.
Q. Okay. What about when you interviewed Wilber Vigil-Benitez?
A. Yes, we did.
Q. Okay. And did you submit that to your lab for possible comparisons?
A. I have.
Q. Okay. All right. So I'd like to direct your attention at this time to January 18th of 2023.
Did you -- at that point, were you still working with the Broward Sheriff's Office?
A. I was.
Q. All right. And on that day, did you attempt to interview Wilber Vigil-Benitez about the murder of Gerson Vasquez-Portillo?
A. Yes.
Q. Who else was with you?
A. Special Agent Nate Ferguson and CBP Agent Juan Miranda.

Q. Okay. Why was CBP Agent Juan Miranda with you?
A. He was on a task force that works with the FBI, and he acted as our translator.
Q. Okay. Do you not speak any Spanish?
A. Not a word.
Q. What about Special Agent Ferguson?
A. He speaks some.
Q. Okay. And then going to -- when you went for that interview, did you provide Wilber Vigil-Benitez with what are commonly referred to as his Miranda rights?
A. They were offered and read to him, yes.
Q. Okay. And were they read to him in Spanish by Border Agent Miranda?
A. They were.
Q. Okay. And did he sign those, the waiver and agree to answer questions?
A. He did.
Q. Okay. Was that interview memorialized in any way?
A. It was recorded.
Q. Okay. Only audio?
A. Correct.
Q. Okay. Directing your attention now, at this time, to June 28th of 2023, did you, again, attempt to interview Wilber Vigil-Benitez about the murder of Gerson Vasquez-Portillo and other things?

A. I did. This time with Special Agent Nate Ferguson and CBP Officer David Hernandez, acting as the translator.
Q. And again, did you read him what are commonly referred to as his Miranda rights?
A. His rights were offered -- read to him, and he acknowledged and signed them.
Q. Were they read to him in Spanish?
A. They were.
Q. And did he agree to waive those rights and answer questions?
A. He did.
Q. All right. And was that interview also memorialized in any way?
A. It was also recorded.
Q. Okay. Now, we've had some transcripts created of those two interviews.
Have you listened to the recordings and reviewed those transcripts?
A. I have.
MR. DOBBINS: Your Honor, I would move -- without objection, the government would move into evidence Government's Exhibits 31-A and 31-B. 31-A being the recording from January 18, 2023, and 31-B being the transcript and translation of that recording.
THE COURT: No objection, Mr. Rosenbaum?

MR. ROSENBAUM: No, Your Honor.

THE COURT: All right. Those will be admitted at this time.

(Government Exhibits 31-A and 31-B were received in evidence.)

MR. DOBBINS: Your Honor, we do have transcript binders for the jury, if you'd like me to pass them out at this time.

THE COURT: You may pass them out at this time, Mr. Dobbins. Thank you.

Ladies and gentlemen, the purpose of having those binders is so you can follow along with transcripts of the audio. There may be moments where the audio is not as clear, so you're free to follow along with that. Okay?

MR. DOBBINS: Judge, I notice it's 12:25.

Do you want me to start playing?

THE COURT: Let's go ahead and take it because it's a natural break. So what we'll do, ladies and gentlemen of the jury, I don't want to start and then bleed into our lunch break for you-all.

So here's what we're going to go ahead and do. Let's go ahead and leave the binders in the chairs with your notes. Okay? We'll leave everything as it is. We're going to pick up with playing the recording, following it along, and listening to the remaining testimony of the witness when we get back from lunch.

As we did yesterday, if I could have everybody back in the jury room at 1:45, so about an hour and 15 from now. Okay? And I will get you guys some coffee in there before I bring you out.

But if you could please just go ahead and remember the rules here while we take our lunch break. Do not discuss the case with each other. Do not discuss the case with anyone else, be it family, friends, co-workers. No independent research regarding any people, places, or things or subject matter regarding the case.

No social media posting regarding your involvement as jurors or any material about the case. When you go to lunch, if the lawyers are out there and they avoid you, take no offense from that.

Let's have you guys exit. Go out this way, and everybody just report back to the room at 1:45. Enjoy your lunch break. We'll see you then.

THE COURT SECURITY OFFICER: All rise for the jury.

(Jury exits at 12:27 p.m.)

THE COURT: All right. Everyone please be seated. Before I let you guys go, any other issues, housekeeping? I think we can break until lunch.

Just remember I have a sentencing at 1:30. It should be relatively brief. But just so we can clear some space at counsel tables for my sentencing.

Anything else on the government's end?

MR. DOBBINS: No, Your Honor.

MR. ROSENBAUM: How many defendants?

THE COURT: A single defendant. So you can move it to the side. We got plenty of room, a single defendant case.

All right. We're in recess. See you guys at about 1:45 or so.

THE COURT SECURITY OFFICER: All rise.

(Court recessed at 12:29 p.m.)

(Back on the record at 2:25 p.m.)

THE COURT: We're back on the record in Case No. 22-60078, the matter of United States versus Vigil-Benitez. First and foremost, my understanding is we needed to make a change in the binders, but we've been able to swap out a page that wasn't redacted; is that right, everybody?

MR. DOBBINS: Yes, Your Honor. There was one page that we missed where it said, When I was arrested. It was just on page 23 of Government's 31-A. Defense caught it. We were able to print out extra copies with redactions and swap out, with the assistance of your courtroom deputy, the pages.

THE COURT: And they hadn't even gotten into it anyway, so --

MR. DOBBINS: We hadn't started playing anything.

THE COURT: We hadn't played anything, so we caught it before it was an issue. So glad to hear that.

The one thing I need to address, Juror No. 9, Ms. Fragoso, she wanted to meet with us real quick. I think she's a little under the weather.

Perhaps, you may recall, she's the one at the end of yesterday, rushed back in to use the restroom, I think, again. So if you guys would indulge me a moment, I just want to make sure she's okay.

Can we go get Juror No. 9, please? Thank you.

(Juror enters at 2:26 p.m.)

THE COURT: Hi, ma'am. Please just go ahead and if you could just grab a quick seat here. I don't want you to keep standing. Please everyone be seated. So, Juror No. 9, my courtroom deputy informed me you wanted a brief moment. You're not feeling so great; is that right?

THE JUROR: No, no. On Tuesday, I -- I woke up, and I was feeling so much anxiety.

THE COURT: Okay.

THE JUROR: And so I came in, and I thought, okay, well, just see how today goes, you know, like, just try my best. And it was not great. It was, like, extreme bouts of fatigue, and that happens sometimes when I have my anxiety attacks. And I haven't had them in a long time. So I thought, like, they should -- it should be fine. And this is just bringing them back up again. And it's been really hard.

THE COURT: I want to first thank you so far because I

know it's been difficult. And I think, certainly, yesterday was a tough day. We looked at a lot of evidence. Some of it was difficult, I know, to take a look at.

My hope is today is less so, given that this afternoon we're really going to be just working here with the current witness and going through some transcripts. Certainly I don't want to cause a panic attack.

I don't want the level of anxiety to get to the point where you can't listen to what's happening. Are you able to, at least, to stick it out with us this afternoon and then we can maybe evaluate how you're doing at the end of the day?

THE JUROR: Sure, yeah.

THE COURT: Okay.

THE JUROR: I mean, I think I can do this afternoon. It's -- you know, when they, like, come, they just come.

THE COURT: Sure.

THE JUROR: So that's hard to evaluate. Last -- last afternoon, yesterday afternoon, I -- I don't know if you recall, I excused myself.

THE COURT: I did. That's why I wanted to bring you in. I figured that maybe you weren't feeling well and we gave you a break.

THE JUROR: So I just don't want to be disruptive because I can't predict them.

THE COURT: Of course. Well, I'll say this, if at any

point this afternoon, and my hope is that the pace and what we're covering will not be unduly stressful, but I want you to know that at any point, like you did yesterday, if you feel something physically and you need that break, just raise your hand. Okay? I have no problem. I'll find the time to accommodate you so that we can give everybody some air and let you take a little break. Okay?

I don't want to overwhelm you. So just have no shame at all. You're not interrupting anything. Just raise your hand, and I'll know what it's about, and I'll call for a break. Okay?

THE JUROR: Okay.

THE COURT: Thank you so much. We'll bring you in in just a moment.

THE JUROR: Thank you.

THE COURT: Thank you so much.

(Juror exits at 2:29 p.m.)

THE COURT: All right. Look, I think at this point she's doing her level best to stick with us. If I observe or anybody observes her having a legitimate panic attack or something of that nature, we'll deal with it.

But I think right now, she's doing her best and we moved at a heavy pace yesterday. I'll keep an eye on her. I think we're fine. We can always address it later. But for now, I don't see any reason why she can't stick with us. So

unless anybody has some difference of opinion, I think we can proceed. All right?

MR. DOBBINS: No, Your Honor.

THE COURT: Okay. All right.

MR. DOBBINS: Judge, before we bring out the jury, though, did you want to -- since we have -- some of the pages are heavily redacted, not a lot, but there are some. Did you want to just maybe instruct them that, like --

THE COURT: Disregard it. Yeah, I might just let them know so they're not wondering what's on there. You know, as I've explained in the beginning, I can tell them, you know, many evidentiary rules may limit certain things of admissibility. It is nothing you need to be concerned about regarding any redactions. You should just follow along with whatever text is available. Something to that effect.

Does that work?

MR. DOBBINS: That's -- I think that's fine.

THE COURT: Just so they're not being inquisitive about what's redacted. I'll do that. Yes.

MR. ROSENBAUM: The only thing is, after these have been played, I think the -- after these have been played, there's a lot of stuff about other crimes, gangs, and stuff like that, we need that instruction again.

THE COURT: Yeah, I'll read it, again, for sure after we go through it. Thank you. All right. I think we have a

good game plan. I'll give them that brief instruction, and I'll throw it back to you, Mr. Dobbins, when I'm done. Okay? All right. Let's round them all up, please. Thank you.

THE COURT SECURITY OFFICER: Remain standing for the jury, please.

(Jury enters at 2:32 p.m.)

THE COURT: All right. Welcome back, everybody. Please be seated. Hope everyone had a good lunch break. So we're going to pick up where we left off. We were just about to get into some of the transcripts and calls.

One thing I do want to mention, you guys all have binders in front of you with the transcripts so you can follow along. You will notice that there's certain segments of the transcript that are blacked out; there's redactions throughout it.

As you may recall, when we first started, there are a number of evidentiary rulings that have to be made before trials, and sometimes certain evidence is limited in nature. You shouldn't be worried about any of the redactions. Okay?

That's to follow all the Rules of Evidence and only be guided by what we're allowing you to follow along with. Okay? So I don't want anyone to worry about why those are there. They're not of any relevance to you.

Everyone understand? All right. Very good. So with that, Mr. Dobbins, I'll turn it back to you.

MR. DOBBINS: Thank you, Your Honor.

BY MR. DOBBINS:

Q. Good afternoon again, Detective Gianino.

A. Thank you, Mr. Dobbins.

Q. So when we left off, we were about to start playing the recording of the first interview that you did with the defendant on January 18th of 2023.

And do you have a copy of Government's Exhibit 31-B up there with you?

A. I do.

Q. All right. So what we're going to do now is we're going to start by playing it, and I'm going to stop at certain points to ask you questions and talk about things that you're talking about on the recording.

MR. DOBBINS: So if we may all turn to 31-B, it should be tabbed in your jury binder. The first tab is the things we went over with the witness yesterday from his phone, the rules, and the translations are there. And then 31-B is the start of this recording.

I'll turn up the volume.

BY MR. DOBBINS:

Q. All right. So we're going to get started on page 1, Detective Gianino.

(Audio was published.)

(Audio was paused.)

BY MR. DOBBINS:

Q. Okay. So then because it's redacted, we're gonna go into some dead air there.

So on the transcripts, we have your identifiers and then the initials for the speakers there. Do you see that?

A. I do.

Q. All right. And just again, what was Agent Juan Miranda there for?

A. To read Miranda and to act as the interpreter.

Q. Okay. I'm going to go ahead and advance it to 2 minutes and 11 seconds, skip the dead air, as much of it as possible.

(Audio was published.)

(Audio was paused.)

BY MR. DOBBINS:

Q. All right. Excuse me. So now we're going to move on to page 3, which is going to start at 3 minutes and 12 seconds.

And just looking ahead there on page 3, what is it that's about to happen?

A. It's the reading of the Miranda rights.

Q. All right. I'll go ahead and play that.

(Audio was published.)

(Audio was paused.)

BY MR. DOBBINS:

Q. Okay. So stopping it there, was there a written form that was presented to the defendant when you were interviewing him

for the advising of his rights?

A. There was.

Q. Okay. And was the rights form, after it was read to him, are there certain spots where he had to sign or write his name?

A. Yes.

Q. All right. And do you know if that rights form was in English or in Spanish?

A. It was in English.

Q. All right. And did he sign that form and agree to waive it?

A. He did.

Q. All right. Let's move on.

(Audio was published.)

(Audio was paused.)

MR. DOBBINS: I'm not sure why it's skipping.

(Audio was published.)

(Audio was paused.)

BY MR. DOBBINS:

Q. Okay. So just to go back a little bit -- I apologize for swinging back. But when the rights were read to the defendant, that was Customs and Border Patrol Agent Miranda reading them to the defendant in Spanish, correct?

A. That's correct.

MR. DOBBINS: All right. And, Your Honor, I think without objection the government would move at this time

Government's Exhibit 32 into evidence.

MR. ROSENBAUM: That's correct.

THE COURT: All right. That'll be admitted at this time.

(Government Exhibit 32 was received in evidence.)

MR. DOBBINS: And if I just may switch it over briefly to the ELMO just to show -- publish for the jury?

BY MR. DOBBINS:

Q. Okay. So showing you Government's Exhibit 32. Is this the form that was taken?

A. It is.

Q. Okay. And was it in English or in Spanish?

A. It's in English, dated 1/18 of '23 at 8:15 a.m., and it bears my signature on the bottom left.

Q. All right. As a witness, does it also bear the defendant's signature, what he wrote for a signature?

A. That is correct.

MR. DOBBINS: Thank you. If we may switch back to the . . .

BY MR. DOBBINS:

Q. All right. So I'm going to move a little bit ahead to page 12. We're going to start with where it says "inaudible" at 16 minutes and 59 seconds, about four lines down or five lines down. I'm going to start it a little bit before because for some reason it's a little bit of a delay before it starts

playing.

(Audio was published.)

(Audio was paused.)

BY MR. DOBBINS:

Q. All right. I'm going to pause it there.

Let's now move ahead to page 23. We'll start it at the 34-minute mark. So it should be starting with the Spanish translation where it says: Which cliques did you know, below the redacted section.

(Audio was published.)

(Audio was paused.)

MR. DOBBINS: Let's take it back a little bit.

(Audio was published.)

(Audio was paused.)

BY MR. DOBBINS:

Q. And then move ahead to page 33, about two-thirds of the way down, where Special Agent Ferguson starts with: Who is the First Word for Delicias?

(Audio was published.)

(Audio was paused.)

BY MR. DOBBINS:

Q. All right. We're going to pause it there. Let's move to page 42, about halfway down.

(Audio was published.)

(Audio was paused.)

BY MR. DOBBINS:
Q. All right. We're going to pause it there.
Let's flip ahead to page 46, top of the page. Starting at page 1:03:46, so it should come out to 1:04.
(Audio was published.)
(Audio was paused.)
BY MR. DOBBINS:
Q. Let me pause it there. Now if we could flip to page 52. Okay. I'm going to pause it there.
Okay. At that point, what is happening? What are these photos that are being shown to the defendant?
A. Special Agent Ferguson is displaying six photographs, commonly referred to as a six-pack, and he's flipping through the photographs and identifying different subjects that he may know.
Q. Okay. And did he identify somebody at that time?
A. As the recording indicates, he identified Fearless.
MR. DOBBINS: Your Honor, without objection, the government would introduce Government's Exhibit 33.
THE COURT: Any objection?
MR. ROSENBAUM: No objection.
THE COURT: All right. We'll admit 33 at this time.
(Government Exhibit 33 was received in evidence.)
MR. DOBBINS: All right. If I could show you Government's Exhibit 33, if we could have that for the ELMO,

please. Let me zoom out.

BY MR. DOBBINS:

Q. Okay. So it's a six-pack, this is what you're talking about, six -- series of six photographs?

A. Correct.

Q. One, two, three, four -- sorry, we've got six and five mixed up, but there's five and six. Going back to four, who is the person that the defendant wrote a name there for?

A. He wrote the name Fearless, and that would be Andy Tovar.

MR. DOBBINS: Okay. All right. If we may go back to the laptop at the lectern, please.

BY MR. DOBBINS:

Q. Now, before we start playing some more, at this point, Special Agent Ferguson is doing most of the questioning here; is that correct?

A. He is.

Q. All right. And at this point, the defendant doesn't know the subject matter for which you have come to interview him about, right?

A. That is correct.

Q. All right. And why, based on your training and experience, would you start out with just general questions, background of the gang, that kind of thing, before getting into some of the events that you wanted to actually talk to him about?

(Court reporter clarification.)

THE WITNESS: Special Agent Ferguson was establishing a rapport with Virgil [sic], going over the history, not only of the gang but his own history, family ties, children ages, just establishing a rapport with Virgil prior to getting into the subject matter.

BY MR. DOBBINS:

Q. Okay. And right now, also, just general background about the gang?

A. Correct, the different levels of the gang and how one advances from one level to the next.

Q. And, yeah, I think you said Virgil, but did you mean Vigil-Benitez?

A. I did, I'm sorry.

Q. That's all right. Had the defendant indicated to you at that point and Special Agent Ferguson and Agent Miranda that he had sort of left MS-13 at this point?

A. At this point, that's correct.

Q. Okay. I'm going to go ahead and hit play. Let's pick up where we left off.

(Audio was published.)

(Audio was paused.)

BY MR. DOBBINS:

Q. I just wanted to pause it there.

In that response, the defendant was actually responding and speaking in English to you at that point. Did he do that

periodically throughout the interview?
A. He did.
Q. All right. Did he appear to understand some English and answer even before sometimes Agent Miranda could get in there with the Spanish translation?
A. I believe so.
MR. DOBBINS: I'll play.
(Audio was published.)
(Audio was paused.)
BY MR. DOBBINS:
Q. Let's pause it there. Let's now flip to page 58.
(Audio was published.)
(Audio was paused.)
BY MR. DOBBINS:
Q. Okay. We'll stop it right there. All right. Let's move ahead to page 65, please.
(Audio was published.)
(Audio was paused.)
BY MR. DOBBINS:
Q. Okay. So at this point, Detective Gianino, it seems like we're starting to focus on our attention to the events that may have happened -- or the events that happened around May 2nd and 3rd of 2015. Would that be correct?
A. We're working that way, correct.
Q. Okay. And at this point, based on the transcript and the

recording, Special Agent Ferguson has shown another picture to the defendant; is that right?
A. That is correct.
Q. All right.
MR. DOBBINS: Your Honor, without objection, the government would move Government's Exhibit 41-A into evidence.
MR. ROSENBAUM: No objection.
THE COURT: That will be admitted at this time.
(Government Exhibit 41-A was received in evidence.)
MR. DOBBINS: If we may have the ELMO, please? Let me zoom out.
BY MR. DOBBINS:
Q. All right. Is this the picture that was shown to the defendant?
A. It was.
Q. All right. And who did he recognize in this photo?
A. The subject in the middle with the white shirt, wearing the baseball cap.
Q. And who did he say that was?
A. Himself.
Q. Okay. I believe he was just asked if he recognized the other two on either side of him there, right, and he said he wasn't sure.
A. That's correct.
Q. If you go back to the --

MR. DOBBINS: Although, Judge, we've been going for a while. I don't know if you wanted to --

THE COURT: Let's go another five minutes, and then we'll take a break.

MR. DOBBINS: All right.

BY MR. DOBBINS:

Q. Let's go ahead and hit play.

(Audio was published.)

(Audio was paused.)

BY MR. DOBBINS:

Q. I'll pause it there. So of course, in reading the translation there, he starts out by saying he hasn't been to Florida, right?

A. Correct.

Q. And then, when you confront him and say we know you've been in Florida, he said, Well, maybe, but that doesn't mean I did bad things.

A. That's correct.

Q. And then later he says, Well, maybe I was in a tourist city in Florida.

A. Correct.

Q. And then, after that, now he's saying, Well, maybe I was in Florida, but I just don't remember the date.

A. Correct.

Q. And based on your training and experience, this is kind of

common as you're trying to interview somebody to see if they'll admit to any wrongdoing?

A. It is. He's basically minimizing at this point.

Q. And what does that mean, to minimize?

A. Give you as little as he possibly can to get off the topic.

MR. DOBBINS: Judge, I think we've gone past 4:00 o'clock. I don't know if you wanted to take that break now.

THE COURT: Ladies and gentlemen of the jury, let's go ahead and take a 15-minute break. You can go ahead and leave the binders in your chairs and your notebooks. Go ahead and use the restroom. When we come back, we'll finish up for today with the last bit of testimony.

You are excused.

THE COURT SECURITY OFFICER: All rise for the jury.

(Jury exits at 4:05 p.m.)

THE COURT: Please be seated, everyone. We can go ahead and take a 15-minute break, as well.

(Court recessed at 4:06 p.m.)

(Back on the record at 4:20 p.m.)

THE COURT: Let's go ahead and round them up, please. Thank you.

(Jury enters at 4:21 p.m.)

THE COURT: Please be seated everyone, as you're settling in.

All right. We're going to pick up where we left off.

Mr. Dobbins, I turn it back to you.

MR. DOBBINS: Thank you, Your Honor.

BY MR. DOBBINS:

Q. So now we're going to move forward to page 75 of the transcript, please.

Are you ready, Detective Gianino?

A. I am, sir.

Q. All right. Let's start with what the defendant is saying to you there on the first line there, page 75.

(Audio was published.)

(Audio was paused.)

BY MR. DOBBINS:

Q. Let's stop it there. Let's move ahead to page 76, the bottom third.

(Audio was published.)

(Audio was paused.)

BY MR. DOBBINS:

Q. We'll stop it there.

And why are you telling the defendant that there, Detective Gianino?

A. I wanted to make clear to the defendant that there is no promises made to him in exchange for his testimony.

Q. Okay. I'm going to move ahead now to page 79, a third of the way down.

(Audio was published.)
(Audio was paused.)
BY MR. DOBBINS:
Q. I just want to pause it there.
So now we've gone from I haven't been to Florida, to maybe I was in a tourist city, to maybe I was hanging out with those guys, but I was smoking a lot of marijuana?
A. That's the transition so far.
Q. All right. Hit play.
(Audio was published.)
(Audio was paused.)
BY MR. DOBBINS:
Q. Okay. Let's stop it there. Let's now move to page 83, about two-thirds of the way down. Just let it play for a little bit.
(Audio was published.)
(Audio was paused.)
BY MR. DOBBINS:
Q. I'll pause it there.
You were asking about tattoos on his chest there, right?
A. Yes, sir.
Q. And did he indicate to you that he had tattoos on his chest?
A. He did.
Q. Did he show them to you at this time?

A. He did.
Q. Okay. And what did you observe?
A. Two large letters, MS.
Q. And you also asked him about a scar.
A. Correct, it was visible.
Q. Why did you ask him about a scar?
A. It was visible on his right pectoral muscle.
Q. All right. But later you said, I know you have a scar there?
A. Correct.
Q. Why did you say that?
A. Because I knew, when he lifted his shirt, that I would find it there.
Q. And was that based on interviews you had done with other suspects and/or Wilber Tirado-Silva?
A. That is correct.

MR. DOBBINS: Your Honor, without objection the government would move into evidence Government's Exhibit 73-A and 73-B.

THE COURT: No objection?

MR. ROSENBAUM: No objection.

THE COURT: Thank you, Mr. Rosenbaum. 73 is moved in.

(Government Exhibits 73 were received in evidence.)

BY MR. DOBBINS:
Q. All right. And before I show you this, so he's basically

saying there now, If somebody told you that I got this, they should have told you how I got it. It's because I was smoking a lot of marijuana, and I wasn't keeping up in the game.

A. That's correct.

Q. All right.

MR. DOBBINS: Let me have the ELMO, please.

All right. Let me zoom out.

BY MR. DOBBINS:

Q. Showing you Government's Exhibit 73-A.

Is this a fair and accurate depiction of what the defendant looked like at around the time you interviewed him there?

A. It is.

Q. All right. Showing you Government's Exhibit 73-B.

Is this a fair and accurate depiction of the chest area that the defendant showed you guys on January 18th of 2023?

A. It is.

Q. All right. And you were talking about the tattoos that you saw. Can you just show us where those are and describe them again, please, for the record?

A. Sure. It's above his breast, and it has the M on the right and S on the left. And below the M, on the pectoral muscle, horizontally, is a scar.

Q. Okay. And you can touch the screen if you want and you can circle it.

A. Oh, I didn't know that.

Q. Yeah. There you go.
That's the scar you're showing there?
A. It is.
Q. All right.
MR. DOBBINS: If we may clear that, and then we'll go back to the lectern. Thank you.
BY MR. DOBBINS:
Q. All right. So I'm just going to go ahead and hit play. I think we left off there around at the bottom of 84, where Special Agent Ferguson is talking.
(Audio was published.)
(Audio was paused.)
BY MR. DOBBINS:
Q. All right. I'm going to pause it there.
So we've gone from never been in Florida, to maybe I was in a tourist city, to maybe I was hanging out with these guys smoking lots of marijuana; I don't know what happened. But that doesn't mean I did a bad thing. Now I got this cut on my chest, and now he's talking about a victim.
A. He is.
Q. And you guys even talked about who this victim is at this point?
A. Not at this point. He had noted in his statement that it was someone that the group had known.
Q. I'll just hit play.

(Audio was published.)

(Audio was paused.)

BY MR. DOBBINS:

Q. Just so we can get to where we were at there.

So it went to he was in the car, he didn't know what was happening, he saw people hitting the victim. And then he was handed a knife. But he said he didn't want to do anything, so he got stabbed and thought he also got shot.

A. That was his testimony.

(Audio was published.)

(Audio was paused.)

BY MR. DOBBINS:

Q. Let's pause it there.

Okay. Let's skip ahead to page 97.

(Audio was published.)

(Audio was paused.)

BY MR. DOBBINS:

Q. Let's just pause it here again.

MR. DOBBINS: If I may have the ELMO again, please.

BY MR. DOBBINS:

Q. I'm referring to Government's Exhibit 41-A. That's just the picture you were showing him.

Now again, he's identified himself as the one with the white shirt in the middle?

A. That is correct.

Q. All right. And he's saying that he may have lived with the guy I believe on the right side; is that what he said?
A. With the black shirt.
Q. Yeah. But he doesn't remember their names, right?
A. Correct.
Q. We'll be taking it over to page 100.
(Audio was published.)
(Audio was paused.)
MR. DOBBINS: I'm going to pause it there.
Judge, I noticed we've hit 5:00 o'clock, so I don't know if you wanted to stop there.
THE COURT: Is this an okay moment to break?
MR. DOBBINS: Sure.
THE COURT: Okay. All right. Let's go ahead and call it then for today.
So ladies and gentlemen of the jury, we're going to go ahead and break and be done for the day. It's just after 5:00 o'clock. What we're gonna go ahead and do to make it easy is just go ahead and leave the binders in your chairs so we don't have to lug them back and forth. We can pick up where we left off tomorrow. Go ahead and take the notepads, however, and put them in the jury room. So just leave your binders on your chairs. It'll be the same way tomorrow. When you come in it'll be waiting for you. You can take the notepads back.
We'll start again tomorrow at 9:00. All right? Same

plan. We'll have a break and lunch right around the same time.

Just a couple of quick reminders before I let you go. We've heard quite a bit of evidence. I want to keep reminding you-all not to discuss this case with one another, with family or friends. People might ask how things are going when you get home. You can only discuss scheduling, nothing more. And, of course, with each other there should be no conversations when we're going on breaks about what you've seen and what you've heard. Please continue not to do any independent research regarding people, places or things, not to go on any sort of social media to discuss the case or make any posts about the case.

And, of course, when you come in tomorrow if you're running a little late -- a couple of have done this already and I really appreciate it so we'll know you're on your way -- just give us a call. We can't start until everybody's here and the lawyers will avoid you, as they must. So take no offense from that when you come in and out tomorrow morning.

All right, folks. With that, we're going to go ahead and let you guys go. Have a great evening. We'll see you back in the jury room tomorrow at 9:00 a.m.

THE COURT SECURITY OFFICER: All rise for the jury.

(Jury exits at 5:05 p.m.)

THE COURT: All right. Please be seated, everyone. Before we break, just a little bit of housekeeping.

So we'll continue with Detective Gianino tomorrow morning and pick up where we left off, just over page 100 or so. Just to get a sense of timing, I know that we had -- I think we said we had at least one of the two remaining co-defendants on standby, I think? Who do we have again?

MR. DOBBINS: Melvin David Cruz-Ortiz. And I spoke to the marshals. He'll be here tomorrow.

THE COURT: Okay. Very good. So we can have them on once we get to -- just so I can get a sense of timing and when we would get to Cruz-Ortiz. How much longer do you think you have with this witness?

MR. DOBBINS: Judge, I'm going to try to -- we have been having some problems with the laptop. This isn't -- on my laptop, it works differently, but I obviously didn't want to use my laptop.

THE COURT: Right.

MR. DOBBINS: So I'm gonna try to make some clips instead to speed some things along.

THE COURT: That would be great. That would be great if we can. I mean, I think we're in the core of the testimony here, but I'm not sure how much more we have left. So maybe if you can do some snips or figure out how to get some clips, that would be useful.

MR. DOBBINS: I can say the second statement is, it was three hours, but it's not as long for us -- for our purposes

because there's a lot of time where they're talking about other things, and I've already redacted all that stuff.

THE COURT: Okay.

MR. DOBBINS: The second statement won't be quite as long as either.

THE COURT: Very good.

MR. DOBBINS: We'll try to expedite it. I don't want to lose anybody either to sleep or . . .

THE COURT: Yeah, I know. I think they're doing a good job and they're alert, but after a certain point, I think they begin to glaze over a little bit on it. All right. So that works for me.

Hopefully we can get through the remainder of this testimony and the transcripts and we can get to our other witnesses in the afternoon. I think, you know, I, again, I don't think we're gonna get done with much more than this witness, the detective, and Cruz-Ortiz tomorrow is probably best case.

So we'll go ahead and go for that. Just so I can -- looking a little farther ahead, we'll evaluate tomorrow, do you have a sense -- I know who we have remaining. I know we have our expert on the DNA and some other issues.

Just looking ahead so I can kind of look at next week, do we have any expectation now where we think the government can target for finishing? I mean, I cannot imagine at the pace

we're keeping, we're going to need the remainder of next week, but I kind of want to get a sense after we get through this and Ortiz, how many we have left.

MR. DOBBINS: I think we're actually on track --

THE COURT: Okay.

MR. DOBBINS: -- for where I was hoping we would be at this point --

THE COURT: Okay.

MR. DOBBINS: -- and assuming we can get this down, I think we can be probably be finished with our case-in-chief by Tuesday.

THE COURT: That's what I was thinking, early to midweek. That makes sense. Okay. So that works and we'll, hopefully, keep that target. I just kind of wanted to look ahead, more so for juror expectations and all of that.

Okay. So very good. So we know where we're at. We'll pick up where we left off tomorrow with our detective and the transcript. And anything we can summarize or clip, that would be great.

Anything else on behalf of the government before we conclude?

MR. DOBBINS: Nothing from the government, Your Honor. Thank you.

THE COURT: Very good. Anything else from the defense team?

MS. ACEVEDO: Your Honor, so tomorrow at 2:00 o'clock, it's the orientation.

THE COURT: Oh, that's the orientation, right.

Look, I definitely don't -- how long do you expect that to be?

MS. ACEVEDO: An hour and a half.

THE COURT: Hour and a half. Okay. I don't know where we're going to be in this testimony, and I hate to press on without you. But if we're still going through this tomorrow in the afternoon, I mean, is this something that you're asking me to break for an hour and a half and lose that time tomorrow?

I mean, respectfully, I don't want to do it if I can avoid it. The only thing I would say is if there's anything I can do to assist you in rescheduling or getting another opportunity to do this sooner, I don't know. I would have to check with the chair of our CJA committee and see what I can do.

MS. ACEVEDO: I have already warned them that this trial was pushed back, and it just messed with the scheduling of everything. But at the -- I believe -- I hope that we would be done with Detective Gianino, perhaps done with cross and redirect prior to 2:00 o'clock.

THE COURT: That's my hope. I mean, I --

MR. DOBBINS: I would expect that.

THE COURT: Yeah, that's my hope. And look, I can tell

you tomorrow, the only thing I have on my calendar again -- I have two sentencings at the break, but I actually -- I may be able to have a colleague cover them so that I can push on.

I was looking into that because of your conflict. I was hoping to try to have it -- I don't want to say that you would have to do it over lunch, but go a little later. I don't know that yet.

But I can tell you I have -- I think it was one at 1:30 and one at 2:00. So what I was thinking of trying to do was maybe go a little closer like 12:45, something like that, then I could go a little longer. But I don't know that I could give a whole hour and a half. I mean, you're thinking 2:00 to 3:30?

MS. ACEVEDO: 2:00 to 3:30. The other thing that I was thinking, depending on how the day tracks, is if we get through with this current witness and perhaps finish Cruz-Ortiz, then if the Court would be inclined --

THE COURT: Oh, there just is no universe we're going to be done that fast. I mean, that would be great, but I just -- I can't -- I mean, I've looked at these transcripts. There's not a universe where I could be done with both of those witnesses by 2:00.

I absolutely would let these jurors go early if we're ahead of schedule. I don't think it's possible. I think best case we can finish this witness. And then if you guys tell me you can get Cruz-Ortiz done if we go from 3:30 to 5:00, great.

But I also don't know that that's realistic either. We may just have to evaluate where we end up time-wise with this witness.

MR. DOBBINS: The problem with Cruz-Ortiz, though, is he's the one that needs an interpreter. So that's going to -- that's going to --

THE COURT: Add delays.

MR. DOBBINS: -- add some time to his testimony.

I will endeavor to make these clips so that we can hit the highlights. I think we've kind of gotten the -- we've gotten to a point where I think we've gotten the general story out, so I think I can start moving faster. I was just having some trouble trying to fast-forward to --

THE COURT: Yeah, it jumped back.

MR. DOBBINS: Yeah, and it would, like, pause and delay. So I will endeavor to make some clips to do my best to speed things up a bit. There are some additional exhibits that they're going to talk about that are going to have to come in. But other than that, you know, I will do my best to do that so that we can try to compress the testimony a little bit.

THE COURT: I mean, I think at this point, it's a little premature for us to make a definitive judgment call until we see where we're at around the lunch hour.

So let's just see how far we can get and then that will give me -- that will leave me a little more informed to see

what I can do if there's a break that I can take.

I just wouldn't want to lose too much time with a witness that, unfortunately, because we are going to need to take a little more delay in translating, I don't know that we'll be able to finish him if we lose out on all of that time.

I think at this point, Ms. Acevedo, I mean, I'll just do the best I can. I just don't know, really, how quickly we can finish with this witness. So I can let you know tomorrow. I'd like to try to take a break if it organically works out close to when you're in your training. Okay?

MS. ACEVEDO: We'll play it by ear. Thank you, Your Honor.

THE COURT: Yes, I'll do my best.

(Discussion was held off the record.)

THE COURT: Okay. Let's see what we can do tomorrow. And if there's anything, Ms. Acevedo, you find out in the morning about CJA and what the timing is for that type of thing and if there's anything that can be done, just let me know in the morning. Okay.

MS. ACEVEDO: Will do. Thank you.

THE COURT: All right. Thank you, guys. All right. We're in recess. See everybody tomorrow at 9:00 a.m.

(Court recessed at 5:15 p.m.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: January 23, 2025

/s/Ilona Lupowitz

ILONA LUPOWITZ, RMR, CRR
Official Court Reporter
United States District Court
Southern District of Florida
400 North Miami Avenue
Room 11-2
Miami, Florida 33128
(305) 523-5737

## '

**'15** [1] - 94:2
**'16** [1] - 47:3
**'23** [1] - 116:13
**'70s** [1] - 85:15

## /

**/s/Ilona** [1] - 140:8

## 1

**1** [3] - 1:8, 26:21, 113:22
**1/18** [1] - 116:13
**10** [1] - 27:18
**100** [4] - 1:18, 70:8, 131:6, 133:2
**105** [1] - 2:14
**10:40** [1] - 60:4
**10:41** [1] - 60:7
**11** [1] - 114:11
**11-2** [2] - 1:24, 140:11
**116** [1] - 2:15
**118** [1] - 2:15
**11:13** [1] - 60:8
**11:14** [1] - 60:13
**11:42** [1] - 82:16
**11:44** [1] - 84:6
**11:55** [1] - 84:7
**11:56** [1] - 84:11
**11th** [1] - 93:7
**12** [4] - 8:11, 28:5, 114:16, 116:22
**122** [1] - 2:16
**127** [1] - 2:16
**12:25** [1] - 105:14
**12:27** [1] - 106:19
**12:29** [1] - 107:9
**12:30** [1] - 82:20
**12:30-ish** [1] - 5:15
**12:45** [1] - 137:10
**13** [3] - 30:4, 54:17, 77:10
**14** [2] - 30:6, 30:11
**15** [3] - 31:10, 88:2, 106:2
**15-minute** [2] - 124:10, 124:18
**16** [2] - 35:18, 116:23
**16-page** [1] - 25:3
**18** [1] - 104:23
**18th** [10] - 14:19, 14:20, 20:6, 21:12, 52:6, 52:9, 81:1, 102:16, 113:7, 128:15
**19** [2] - 33:18, 33:25
**1979** [1] - 85:20
**1980** [1] - 85:22
**1990** [1] - 86:14
**1:03:46** [1] - 118:4
**1:04** [1] - 118:4
**1:30** [2] - 106:23, 137:8
**1:45** [3] - 106:2, 106:16, 107:7

## 2

**2** [1] - 114:10
**20** [3] - 18:3, 34:18, 88:2
**2005** [1] - 8:9
**2014** [2] - 10:20, 94:1
**2015** [6] - 47:3, 63:2, 90:10, 94:17, 95:13, 121:23
**2016** [1] - 35:19
**2020** [6] - 86:22, 87:1, 89:18, 91:13, 91:18, 93:7
**2023** [5] - 102:16, 103:23, 104:23, 113:7, 128:15
**2024** [1] - 99:10
**2025** [2] - 1:5, 140:8
**22-60078** [2] - 3:3, 107:12
**22-CR-60078-6** [1] - 1:2
**23** [4] - 1:5, 107:18, 117:6, 140:8
**24** [2] - 2:13, 34:25
**26** [1] - 35:4
**28th** [1] - 103:23
**2:00** [6] - 136:1, 136:22, 137:9, 137:12, 137:13, 137:21
**2:25** [1] - 107:10
**2:26** [1] - 108:9
**2:29** [1] - 110:17
**2:32** [1] - 112:6
**2nd** [2] - 1:18, 121:22

## 3

**3** [4] - 1:7, 114:16, 114:17
**30** [3] - 23:19, 44:25, 57:7
**30-by-50-foot** [1] - 96:10
**305** [2] - 1:25, 140:12
**31** [1] - 8:5
**31-A** [5] - 2:14, 104:22, 105:4, 107:18
**31-B** [7] - 2:14, 104:22, 104:23, 105:4, 113:8, 113:15, 113:18
**32** [5] - 2:15, 42:13, 116:1, 116:5, 116:9
**33** [6] - 2:15, 117:16, 118:19, 118:22, 118:23, 118:25
**33128** [2] - 1:24, 140:11
**33131** [1] - 1:19
**33132** [1] - 1:15
**34-minute** [1] - 117:7
**3400** [1] - 1:18
**3:30** [3] - 137:12, 137:13, 137:25
**3rd** [2] - 94:17, 121:23

## 4

**4** [2] - 49:8, 49:12
**400** [2] - 1:23, 140:10
**41-A** [4] - 2:16, 122:6, 122:9, 130:21
**42** [1] - 117:23
**45** [1] - 85:18
**46** [1] - 118:3
**49** [1] - 2:14
**4:00** [1] - 124:7
**4:05** [1] - 124:16
**4:06** [1] - 124:19
**4:20** [1] - 124:20
**4:21** [1] - 124:23
**4th** [1] - 1:15

## 5

**52** [1] - 118:8
**523-5737** [2] - 1:25, 140:12
**58** [1] - 121:11
**59** [1] - 116:23
**5:00** [3] - 131:10, 131:18, 137:25
**5:05** [1] - 132:23
**5:15** [2] - 1:6, 139:23

## 6

**6** [1] - 27:9
**60** [1] - 2:6
**65** [1] - 121:16

## 7

**7** [2] - 2:5, 27:3
**72** [1] - 2:6
**73** [3] - 2:16, 127:22, 127:23
**73-A** [2] - 127:18, 128:9
**73-B** [2] - 127:19, 128:13
**75** [2] - 125:5, 125:10
**76** [1] - 125:14
**78** [6] - 2:14, 48:23, 49:3, 49:6, 59:9
**79** [1] - 125:24

## 8

**83** [1] - 126:13
**84** [6] - 2:13, 24:14, 24:18, 24:19, 25:3, 129:9
**85** [1] - 2:8
**8:15** [1] - 116:13

## 9

**9** [3] - 108:1, 108:8, 108:12
**97** [1] - 130:14
**99** [1] - 1:15
**9:00** [4] - 5:4, 131:25, 132:21, 139:22
**9:17** [1] - 1:6
**9:19** [1] - 4:21

## A

**a.m** [13] - 1:6, 4:21, 60:4, 60:7, 60:8, 60:13, 82:16, 84:6, 84:7, 84:11, 116:13, 132:21, 139:22
**abduct** [1] - 38:20
**abide** [1] - 39:13
**ability** [1] - 95:14
**able** [24] - 22:17, 22:23, 67:10, 73:11, 75:13, 91:15, 95:4, 96:7, 96:9, 97:12, 98:2, 98:5, 98:9, 98:19, 99:2, 99:5, 99:15, 100:15, 100:21, 107:14, 107:18, 109:9, 137:3, 139:5
**above-entitled** [1] - 140:5
**absolutely** [5] - 6:20, 33:8, 82:5, 97:22, 137:22
**academy** [1] - 85:21
**access** [1] - 69:17
**accommodate** [1] - 110:6
**accomplished** [1] - 97:8
**according** [1] - 53:22
**accounted** [1] - 4:7
**accounts** [1] - 88:11
**accurate** [3] - 128:10, 128:14, 140:4
**ACEVEDO** [9] - 1:17, 1:17, 83:21, 136:1, 136:6, 136:18, 137:13, 139:11, 139:20
**Acevedo** [3] - 3:14, 139:6, 139:16
**acknowledged** [1] - 104:5
**acquire** [1] - 12:4
**act** [2] - 56:14, 114:9
**acted** [2] - 54:3, 103:3
**acting** [1] - 104:2
**action** [1] - 9:22
**activities** [3] - 5:23, 26:12, 44:13
**activity** [4] - 36:19, 36:21, 52:22, 52:23
**acts** [2] - 5:24, 96:19
**actual** [1] - 95:7
**add** [2] - 138:7, 138:8
**addition** [3] - 96:23, 100:4, 101:13
**additional** [2] - 48:7, 138:17
**address** [2] - 108:1, 110:24
**addressed** [1] - 91:19
**addresses** [1] - 88:23
**administer** [1] - 46:18

**admissibility** [1] - 111:13
**admit** [4] - 24:18, 93:10, 118:22, 124:2
**admitted** [5] - 49:1, 79:12, 105:2, 116:3, 122:8
**advance** [2] - 39:20, 114:10
**Advance** [1] - 10:25
**advances** [1] - 120:10
**advising** [1] - 115:1
**affect** [1] - 32:4
**affirms** [1] - 34:14
**afternoon** [12] - 83:12, 85:3, 85:4, 109:4, 109:10, 109:14, 109:18, 110:1, 113:3, 134:15, 136:10
**agencies** [1] - 87:22
**Agent** [22] - 3:9, 48:14, 48:16, 93:2, 93:7, 102:25, 103:1, 103:6, 103:12, 104:1, 114:7, 115:21, 117:17, 118:12, 119:14, 120:1, 120:15, 121:4, 122:1, 129:10
**agent** [1] - 93:2
**ages** [1] - 120:3
**agree** [8] - 24:10, 34:22, 34:25, 67:2, 79:12, 103:15, 104:9, 115:9
**agreed** [2] - 28:2, 83:4
**agreement** [17] - 25:9, 25:15, 25:16, 25:19, 25:21, 28:6, 29:24, 31:13, 31:14, 31:18, 31:22, 32:15, 35:5, 35:11, 35:17, 35:21, 46:3
**agrees** [4] - 28:17, 28:21, 28:25, 29:6
**ahead** [49] - 3:5, 4:3, 31:16, 31:17, 31:21, 32:14, 59:25, 60:5, 60:11, 82:9, 82:13, 83:16, 84:1, 84:9, 105:16, 105:20, 105:21, 106:5, 108:10, 114:10, 114:17, 114:20, 116:21, 117:6, 117:16, 118:3, 120:18, 121:16, 123:7, 124:10, 124:11, 124:18, 124:21, 125:14, 125:24, 129:8, 130:14, 131:14, 131:17, 131:18, 131:19, 131:21, 132:19, 134:19, 134:20, 134:23, 135:15, 137:23
**ahold** [1] - 98:9
**air** [3] - 110:6, 114:3, 114:11
**alcohol** [1] - 21:13
**alert** [1] - 134:10
**alias** [1] - 100:8
**alien** [1] - 9:22
**allegedly** [1] - 5:24
**allow** [1] - 22:25
**allowed** [7] - 41:17, 53:21, 54:13, 54:19, 54:21, 56:10, 68:17
**allowing** [1] - 112:21
**allows** [1] - 68:18
**almost** [1] - 48:1
**alone** [1] - 31:1
**AMERICA** [1] - 1:4
**America** [1] - 3:4
**amount** [4] - 33:5, 33:7, 44:23, 89:6
**Andrew** [4] - 2:7, 84:16, 84:21, 84:25
**Andy** [11] - 12:3, 12:8, 12:12, 12:19, 13:11, 13:18, 13:20, 13:23, 49:16, 49:17, 119:9
**answer** [4] - 76:3, 103:16, 104:9, 121:4
**answered** [1] - 52:6
**anticipate** [1] - 83:7
**Antonio** [2] - 9:10, 10:1
**anxiety** [3] - 108:16, 108:21, 109:8
**anytime** [2] - 26:16, 41:15
**anyway** [1] - 107:21
**apartment** [1] - 96:5
**apologize** [3] - 13:17, 102:3, 115:19
**appeal** [4] - 27:10, 27:12, 27:14, 34:23
**appear** [1] - 121:3
**APPEARANCES** [1] - 1:11
**appearances** [1] - 3:5
**appreciate** [4] - 5:3, 7:5, 7:11, 132:15
**appropriate** [1] - 76:11
**approve** [2] - 46:2, 75:10
**Ardilla** [1] - 98:19
**area** [12] - 21:6, 21:7, 21:16, 23:11, 23:16, 43:3, 87:9, 88:22, 90:21, 95:25, 96:2, 128:14
**areas** [1] - 29:3
**armed** [1] - 40:18
**around-the-clock** [1] - 97:12
**arrest** [1] - 99:15
**arrested** [5] - 24:4, 47:7, 92:11, 102:2, 107:17
**arrivals** [2] - 9:24, 9:25
**arrived** [3] - 4:4, 10:1, 20:22
**assault** [1] - 86:10
**assign** [1] - 15:24
**assigned** [8] - 85:10, 86:15, 86:17, 87:2, 89:15, 89:22, 89:25, 92:15
**assist** [4] - 24:10, 34:25, 47:19, 136:14
**assistance** [6] - 29:25, 35:8, 35:12, 47:20, 95:6, 107:20
**ASSISTANT** [1] - 1:14
**assisting** [1] - 6:6
**associate** [7] - 6:3, 6:8, 19:18, 20:1, 20:4, 20:15
**associated** [1] - 6:24
**associates** [3] - 37:23, 73:7, 73:24
**Association** [1] - 87:14
**association** [5] - 5:22, 6:13, 7:1, 22:12, 87:16
**assuming** [1] - 135:9
**attack** [3] - 56:5, 109:7, 110:20
**attacked** [2] - 58:4, 58:8
**attacking** [1] - 53:3
**attacks** [1] - 108:22
**attain** [1] - 10:19
**attained** [1] - 10:17
**attempt** [2] - 102:20, 103:23
**attend** [2] - 85:21, 87:19
**attending** [1] - 87:17
**attends** [1] - 43:20
**attention** [5] - 89:18, 93:6, 102:15, 103:22, 121:21
**attorney** [2] - 33:13, 34:12
**attorney's** [1] - 25:9
**Attorney's** [4] - 27:18, 32:20, 33:4, 33:10
**ATTORNEY'S** [1] - 1:14
**ATTORNEYS** [1] - 1:14
**attract** [1] - 55:4
**attraction** [1] - 55:4
**Audio** [52] - 113:24, 113:25, 114:12, 114:13, 114:21, 114:22, 115:13, 115:14, 115:16, 115:17, 117:2, 117:3, 117:10, 117:11, 117:13, 117:14, 117:19, 117:20, 117:24, 117:25, 118:5, 118:6, 120:20, 120:21, 121:8, 121:9, 121:12, 121:13, 121:17, 121:18, 123:8, 123:9, 125:11, 125:12, 125:16, 125:17, 126:1, 126:2, 126:10, 126:11, 126:16, 126:17, 129:11, 129:12, 130:1, 130:2, 130:10, 130:11, 130:15, 130:16, 131:7, 131:8
**audio** [3] - 103:20, 105:12
**August** [2] - 85:22, 99:10
**authorization** [1] - 68:9
**authorize** [3] - 68:3, 68:5, 75:20
**authorized** [2] - 62:14, 75:13
**Auto** [1] - 11:1
**automatic** [1] - 34:17
**available** [5] - 28:21, 83:11, 88:8, 111:15
**Avenue** [2] - 1:23, 140:10
**avenues** [1] - 87:23
**avoid** [3] - 106:13, 132:17, 136:13
**awhile** [1] - 67:9

## B

**background** [4] - 27:8, 92:24, 119:22, 120:7
**bad** [2] - 123:17, 129:18
**bank** [1] - 39:4
**baseball** [2] - 77:17, 122:18
**based** [11] - 31:1, 50:24, 83:22, 94:13, 96:6, 98:23, 99:22, 119:21, 121:25, 123:25, 127:14
**bats** [2] - 77:17
**battle** [2] - 37:14, 37:15
**Beach** [13] - 85:17, 85:19, 85:24, 85:25, 94:7, 94:17, 94:19, 94:21, 98:24, 98:25, 99:1, 99:9, 101:13
**bear** [1] - 116:15
**bears** [1] - 116:14
**beat** [4] - 44:25, 46:16, 53:18, 75:25
**beaten** [2] - 46:22, 68:8
**beating** [10] - 21:17, 21:18, 21:20, 38:16, 44:23, 45:20, 46:18, 57:4, 75:24, 76:12
**beatings** [7] - 15:15, 38:18, 68:3, 68:5, 68:11, 75:20, 77:14
**became** [14] - 18:2, 18:8, 18:20, 20:12, 20:13, 36:6, 55:12, 55:13, 61:22, 62:1, 64:4, 66:14, 86:2, 91:10
**become** [17] - 11:23, 13:10, 14:6, 16:24, 17:22, 19:1, 37:4, 37:7, 52:18, 52:20, 57:9, 58:3, 60:23, 62:6, 63:1, 86:1
**becomes** [1] - 39:3
**becoming** [1] - 20:23
**beers** [1] - 21:15
**BEFORE** [1] - 1:10
**befriend** [1] - 20:16
**begin** [3] - 4:15, 5:13, 134:11
**beginning** [3] - 5:10, 47:3, 111:11
**behalf** [8] - 3:5, 3:8, 3:12, 3:14, 78:16, 97:6, 102:1, 135:20
**behind** [1] - 4:6

**belongings** [1] - 22:7
**below** [2] - 117:8, 128:21
**Benitez** [14] - 3:4, 3:12, 3:15, 3:19, 6:18, 100:13, 100:21, 102:10, 102:21, 103:9, 103:24, 107:12, 120:12
**BENITEZ** [1] - 1:7
**best** [10] - 95:14, 108:20, 110:19, 110:22, 134:18, 137:23, 138:16, 138:19, 139:7, 139:13
**better** [1] - 43:8
**between** [3] - 57:16, 69:10, 85:17
**beyond** [2] - 6:22, 15:16
**big** [7] - 53:1, 59:4, 59:13, 81:16, 81:17, 81:18
**Bigfoot** [2] - 98:9, 98:17
**biggest** [1] - 81:17
**bills** [1] - 88:11
**binder** [2] - 83:24, 113:16
**binders** [11] - 83:1, 83:18, 83:21, 105:6, 105:11, 105:21, 107:14, 112:12, 124:11, 131:19, 131:22
**birth** [1] - 100:7
**bit** [21] - 4:5, 7:20, 14:12, 15:21, 20:13, 36:13, 52:12, 83:8, 88:17, 115:19, 116:21, 116:24, 116:25, 117:12, 124:13, 126:15, 132:3, 132:25, 134:11, 138:17, 138:20
**black** [1] - 131:3
**blacked** [1] - 112:14
**blank** [1] - 47:12
**bleed** [1] - 105:18
**BLS** [1] - 17:24
**Blue** [1] - 100:8
**boardroom** [1] - 79:19
**boat** [1] - 8:24
**Boca** [4] - 93:22, 94:5, 96:25, 98:15
**body** [14] - 22:1, 22:3, 54:9, 58:9, 93:21, 93:24, 94:3, 94:22, 95:2, 95:8, 95:9, 96:8, 96:13, 96:24
**Border** [2] - 103:12, 115:21
**border** [2] - 8:25, 9:8
**born** [1] - 8:6
**Boston** [3] - 42:19, 47:8, 62:2
**bottom** [3] - 116:14, 125:15, 129:9
**bought** [4] - 65:16, 66:12, 71:12, 72:24
**bouts** [1] - 108:20
**boxing** [1] - 94:16
**breach** [2] - 35:5, 35:11
**break** [30] - 5:14, 5:16, 14:12, 19:24, 59:21, 59:23, 60:6, 92:17, 105:17, 105:18, 106:6, 106:17, 106:22, 109:22, 110:4, 110:7, 110:10, 112:8, 123:4, 124:7, 124:10, 124:18, 131:12, 131:17, 132:1, 132:25, 136:11, 137:2, 139:1, 139:9
**breaking** [1] - 53:7
**breaks** [1] - 132:8
**breast** [1] - 128:20
**Brian** [2] - 3:7, 90:6
**BRIAN** [1] - 1:13
**brief** [4] - 5:18, 106:24, 108:13, 112:1
**briefly** [2] - 44:7, 116:6
**bring** [10] - 4:8, 60:1, 82:14, 84:3, 84:4, 99:6, 106:3, 109:20, 110:13, 111:5
**bringing** [1] - 108:24
**broad** [1] - 34:5
**broke** [1] - 5:6
**broken** [1] - 45:22
**brother** [1] - 15:3
**brought** [4] - 31:14, 53:14, 95:11, 96:11
**Broward** [16] - 84:16, 85:7, 85:16, 85:18, 86:12, 89:19, 90:6, 90:9, 91:18, 93:20, 97:6, 97:10, 101:3, 101:14, 101:19, 102:18
**Broward's** [1] - 98:25
**BSO** [3] - 92:14, 93:23, 93:24
**build** [2] - 17:24, 47:25
**building** [1] - 52:23
**bulk** [3] - 40:23, 51:3, 51:5
**Bureau** [1] - 3:10
**burglary** [1] - 86:6
**buried** [3] - 95:10, 95:15, 96:2
**burned** [2] - 22:6, 22:10
**business** [1] - 11:13
**buy** [3] - 65:13, 65:15, 66:2
**buying** [3] - 39:5, 65:17, 71:5
**BY** [53] - 1:20, 2:5, 2:6, 2:6, 2:8, 7:24, 24:20, 41:7, 49:4, 57:14, 59:8, 60:20, 67:13, 72:22, 79:25, 85:2, 113:2, 113:21, 114:1, 114:14, 114:23, 115:18, 116:8, 116:20, 117:4, 117:15, 117:21, 118:1, 118:7, 119:2, 119:12, 120:6, 120:22, 121:10, 121:14, 121:19, 122:12, 123:6, 123:10, 125:4, 125:13, 125:18, 126:3, 126:12, 126:18, 127:24, 128:8, 129:7, 129:13, 130:3, 130:12, 130:17, 130:20

## C

**Caballo** [10] - 13:12, 13:15, 13:18, 13:21, 13:25, 15:23, 16:23, 17:11, 17:20, 53:12
**Cabrera** [4] - 98:7, 98:18, 99:16, 102:4
**Caceres** [1] - 101:25
**calendar** [1] - 137:1
**caller** [2] - 18:23, 62:11
**cannot** [4] - 27:14, 32:23, 33:6, 134:25
**cap** [1] - 122:18
**capacity** [1] - 86:4
**capture** [2] - 97:18, 99:5
**captured** [6] - 88:9, 88:12, 88:25, 89:4, 89:13, 90:20
**car** [5] - 19:23, 20:22, 20:24, 23:11, 130:5
**care** [1] - 29:2
**Carolina** [3] - 42:18, 43:1, 62:2
**carried** [5] - 48:6, 56:21, 76:9, 76:11, 77:10
**carry** [1] - 56:12
**CASE** [1] - 1:2
**case** [41] - 3:3, 17:8, 24:8, 25:23, 29:8, 31:6, 32:18, 35:17, 53:19, 64:14, 76:25, 85:11, 87:11, 87:21, 87:25, 88:5, 89:2, 89:10, 89:14, 89:15, 91:10, 91:13, 92:12, 94:19, 97:16, 98:3, 98:15, 99:9, 101:5, 106:7, 106:10, 106:12, 107:5, 132:4, 132:11, 132:12, 134:18, 135:10, 137:24
**Case** [5] - 85:13, 86:21, 88:1, 89:22, 107:11
**case-in-chief** [1] - 135:10
**cases** [15] - 85:14, 86:25, 87:3, 87:12, 87:22, 88:6, 89:25, 90:3, 90:5, 90:11, 90:14, 90:15, 90:17, 92:15
**caught** [3] - 64:18, 107:18, 107:24
**CBP** [3] - 102:25, 103:1, 104:1
**cell** [2] - 88:22, 88:24
**Centrales** [1] - 71:2
**certain** [12] - 33:5, 33:7, 34:22, 36:14, 41:21, 45:2, 111:12, 112:13, 112:18, 113:12, 115:4, 134:10
**certainly** [3] - 88:16, 109:1, 109:6
**certainty** [1] - 34:12
**certify** [1] - 140:3
**chair** [1] - 136:16
**chairs** [6] - 59:25, 82:14, 105:21, 124:11, 131:19, 131:23
**chance** [1] - 5:16
**change** [3] - 55:15, 95:25, 107:14
**Chango** [2] - 100:12, 100:16
**charge** [13] - 20:22, 30:18, 30:19, 40:3, 40:10, 40:11, 43:21, 45:13, 46:20, 46:25, 47:2, 47:7, 47:9
**charged** [11] - 6:2, 6:12, 6:14, 6:20, 7:3, 22:11, 23:5, 24:4, 27:21, 35:19, 47:17
**charges** [2] - 31:13, 31:23
**charging** [2] - 38:5, 38:8
**chavala** [13] - 16:17, 16:19, 19:12, 19:16, 20:7, 20:16, 21:9, 39:17, 52:11, 53:4, 56:5, 75:4, 75:7
**chavalas** [10] - 14:16, 14:17, 48:4, 48:10, 52:15, 58:4, 59:15, 80:25, 81:1, 81:22
**check** [2] - 60:11, 136:16
**chequeo** [3] - 17:3, 17:13, 39:16
**chequeos** [1] - 37:3
**chest** [6] - 58:16, 59:1, 126:20, 126:23, 128:14, 129:19
**chief** [1] - 135:10
**child** [1] - 9:22
**childhood** [2] - 9:24, 9:25
**children** [1] - 120:3
**Chris** [1] - 93:11
**Chrislet** [5] - 90:8, 90:25, 93:12, 95:21, 98:12
**circle** [1] - 128:24
**citizen** [1] - 34:4
**City** [1] - 85:17
**city** [4] - 86:5, 123:19, 126:6, 129:16
**CJA** [2] - 136:16, 139:17
**claiming** [1] - 80:16
**clarification** [3] - 7:12, 41:3, 119:25
**clear** [8] - 21:19, 72:23, 82:9, 83:17, 105:12, 106:24, 125:22, 129:5
**clerk** [1] - 10:24
**Clint** [1] - 101:21
**clip** [1] - 135:18
**clips** [4] - 133:17, 133:22, 138:9, 138:16
**clique** [88] - 12:19, 12:21,

13:6, 13:8, 13:22, 14:3, 17:21, 17:22, 22:16, 36:9, 36:24, 37:5, 38:25, 39:4, 39:11, 39:15, 40:4, 40:10, 40:11, 40:13, 40:22, 40:25, 41:4, 41:11, 41:19, 43:13, 43:21, 44:3, 44:11, 44:16, 45:17, 45:19, 46:5, 46:7, 46:15, 46:17, 46:22, 46:24, 47:9, 47:18, 48:3, 49:19, 50:4, 50:6, 50:24, 54:24, 56:10, 56:15, 56:20, 56:23, 56:25, 57:15, 57:24, 61:20, 62:1, 63:6, 65:10, 66:14, 68:4, 68:6, 68:18, 68:22, 68:25, 69:14, 70:9, 70:11, 70:21, 70:22, 70:25, 71:7, 71:18, 71:21, 73:2, 73:8, 74:18, 74:19, 75:14, 75:21, 75:22, 75:23, 77:12, 77:22, 80:2, 80:13, 80:24, 81:3
**clique's** [3] - 46:23, 54:15, 54:19
**cliques** [41] - 19:7, 37:18, 38:3, 39:12, 41:21, 42:11, 42:12, 43:9, 43:11, 43:23, 44:5, 44:6, 44:10, 46:6, 49:25, 50:17, 50:18, 51:4, 51:6, 51:8, 56:4, 56:13, 57:16, 61:19, 62:23, 64:21, 66:18, 67:12, 69:10, 69:21, 70:23, 79:2, 79:6, 79:12, 79:16, 80:1, 80:5, 117:8
**clock** [1] - 97:12
**close** [3] - 5:4, 20:13, 139:10
**closely** [1] - 41:22
**closer** [2] - 18:13, 137:10
**clothes** [4] - 22:5, 22:6, 22:8, 22:10
**clothing** [1] - 101:20
**club** [2] - 12:15, 12:16
**clubs** [2] - 12:13, 12:14
**co** [3] - 81:13, 106:8, 133:5
**co-defendants** [2] - 81:13, 133:5
**co-workers** [1] - 106:8
**Coast** [44] - 19:4, 19:5, 19:6, 42:1, 42:3, 42:5, 42:9, 42:14, 43:7, 43:11, 43:16, 43:22, 44:1, 46:25, 47:2, 47:5, 47:17, 50:11, 50:12, 50:14, 50:17, 51:2, 51:8, 51:18, 55:14, 56:3, 61:23, 62:1, 62:12, 62:18, 62:23, 63:1, 64:4, 66:15, 66:19, 68:2, 69:18, 71:7, 75:10, 75:16, 78:14, 78:15, 78:16, 79:2
**cocaine** [5] - 41:10, 65:25, 70:16, 71:16, 71:17
**coffee** [1] - 106:3
**cold** [15] - 85:11, 86:25, 87:3, 87:11, 87:12, 87:25, 88:5, 88:6, 89:2, 89:10, 89:14, 89:15, 90:3, 91:10, 94:19
**Cold** [4] - 85:12, 86:21, 88:1, 89:22
**colleague** [1] - 137:3
**colleagues** [1] - 101:18
**collect** [2] - 43:23, 74:1
**collected** [2] - 74:10, 101:23
**combat** [1] - 40:19
**comfortable** [1] - 7:19
**coming** [3] - 6:10, 22:16, 48:4
**commit** [4] - 15:15, 26:23, 27:24, 44:24
**committed** [3] - 5:24, 44:13, 53:11
**committee** [1] - 136:16
**common** [2] - 12:1, 124:1
**commonly** [4] - 58:15, 103:10, 104:3, 118:13
**communicate** [1] - 20:12
**company** [1] - 89:5
**compared** [1] - 96:2
**comparison** [1] - 102:7
**comparisons** [1] - 102:13
**Compensation** [1] - 86:18
**complete** [2] - 32:16, 79:3
**completely** [1] - 28:18
**complex** [1] - 96:5
**compress** [1] - 138:20
**concerned** [1] - 111:13
**concerns** [1] - 4:8
**conclude** [1] - 135:21
**conditioned** [5] - 31:13, 31:15, 31:18, 31:22, 32:15
**conditions** [1] - 28:14
**conduct** [2] - 27:20, 76:20
**conferences** [1] - 28:22
**confirm** [3] - 75:7, 94:22, 96:15
**confirmation** [1] - 52:10
**confirming** [1] - 95:1
**conflict** [2] - 50:1, 137:4
**confront** [1] - 123:15
**confused** [1] - 6:15
**confusing** [1] - 7:6
**connected** [1] - 6:24
**consent** [1] - 34:19
**consequence** [1] - 34:16
**consequences** [6] - 15:11, 15:13, 34:3, 34:10, 34:15, 53:7
**consider** [6] - 6:10, 29:17, 32:7, 32:12, 82:2, 82:4
**consideration** [2] - 35:8, 35:13
**considered** [3] - 6:5, 6:21, 16:6
**consist** [1] - 44:23
**consistent** [1] - 95:13
**conspiracy** [2] - 26:23, 27:24
**consume** [1] - 41:15
**consuming** [1] - 41:16
**contact** [2] - 88:14, 98:19
**contents** [1] - 92:3
**continue** [5] - 11:19, 23:22, 52:22, 132:9, 133:1
**continuing** [1] - 5:7
**control** [4] - 29:2, 31:5, 42:12, 43:8
**controlled** [3] - 97:6, 97:13, 97:14
**conversation** [2] - 97:18, 98:19
**conversations** [3] - 98:6, 98:10, 132:7
**converse** [1] - 91:9
**convicted** [2] - 33:22, 47:8
**conviction** [2] - 27:14, 34:13
**cooperate** [5] - 24:10, 26:13, 28:9, 45:5, 45:6
**cooperating** [2] - 29:16, 81:10
**cooperation** [11] - 25:16, 25:19, 25:20, 28:5, 29:25, 31:20, 32:16, 35:9, 35:12, 35:21, 35:25
**coordinate** [3] - 40:23, 41:2, 41:5
**coordinated** [1] - 92:21
**coordinates** [1] - 95:4
**copies** [1] - 107:19
**copy** [1] - 113:8
**core** [1] - 133:20
**Correct** [1] - 71:23
**correct** [93] - 14:24, 24:15, 25:12, 25:13, 26:18, 27:5, 27:10, 27:11, 27:13, 28:7, 29:21, 29:22, 30:13, 30:14, 30:23, 31:7, 32:10, 32:25, 34:24, 35:3, 36:4, 39:10, 39:18, 43:2, 48:12, 52:19, 53:10, 53:17, 56:18, 57:23, 59:15, 59:16, 61:11, 62:4, 62:5, 62:10, 63:7, 63:11, 63:22, 64:6, 64:16, 65:9, 65:25, 66:1, 66:3, 67:1, 67:3, 68:23, 69:11, 71:22, 74:12, 74:16, 77:24, 87:6, 87:21, 92:13, 95:18, 96:18, 98:1, 98:16, 98:22, 99:10, 99:13, 99:17, 100:14, 101:6, 101:15, 101:17, 102:8, 103:21, 115:22, 115:23, 116:2, 116:17, 119:5, 119:15, 119:20, 120:9, 120:17, 121:23, 121:24, 122:3, 122:24, 123:14, 123:18, 123:21, 123:24, 127:5, 127:10, 127:16, 128:4, 130:25, 131:5
**correctly** [1] - 13:14
**corta** [4] - 76:6, 76:7, 76:8, 76:20
**Cortes** [1] - 44:21
**counsel** [3] - 3:9, 60:15, 106:25
**count** [2] - 26:7, 27:1
**Count** [2] - 26:21, 27:3
**counterterrorism** [1] - 86:20
**counting** [3] - 77:4, 77:5, 77:6
**country** [1] - 33:24
**counts** [2] - 28:2, 63:9
**County** [7] - 89:19, 94:17, 94:21, 98:24, 98:25, 99:9, 101:13
**couple** [5] - 72:2, 72:13, 73:6, 132:2, 132:14
**course** [5] - 9:17, 109:25, 123:11, 132:7, 132:13
**Court** [14] - 1:21, 1:22, 3:1, 3:16, 60:7, 83:11, 84:6, 107:9, 119:25, 124:19, 137:16, 139:23, 140:9, 140:9
**COURT** [104] - 1:1, 3:2, 3:11, 3:17, 3:24, 4:11, 4:14, 4:20, 4:22, 5:1, 7:11, 7:18, 24:15, 24:18, 48:24, 49:1, 57:12, 59:19, 59:22, 60:3, 60:5, 60:9, 60:14, 67:11, 72:19, 79:23, 82:8, 82:15, 82:17, 82:25, 83:3, 83:6, 83:9, 83:13, 83:16, 83:23, 84:8, 84:9, 84:12, 84:18, 104:25, 105:2, 105:8, 105:16, 106:18, 106:20, 107:4, 107:8, 107:11, 107:21, 107:24, 108:10, 108:17, 108:25, 109:13, 109:16, 109:20, 109:25, 110:13, 110:16, 110:18, 111:4, 111:9, 111:18, 111:24, 112:4, 112:7, 116:3, 118:20, 118:22, 122:8, 123:3, 124:9, 124:15, 124:17, 124:21, 124:24, 127:20, 127:22, 131:12, 131:14, 132:22, 132:24, 133:8, 133:16, 133:19,

134:3, 134:6, 134:9, 135:5, 135:8, 135:12, 135:24, 136:3, 136:7, 136:23, 136:25, 137:17, 138:7, 138:14, 138:21, 139:13, 139:15, 139:21
**court** [5] - 3:21, 34:12, 41:3, 88:21, 88:22
**COURTROOM** [2] - 84:20, 84:23
**courtroom** [2] - 107:20, 108:13
**courts** [1] - 9:16
**cousin** [1] - 8:13
**cover** [3] - 42:15, 42:19, 137:3
**covered** [1] - 30:22
**covering** [1] - 110:2
**covers** [1] - 7:7
**cow** [1] - 96:4
**cozy** [1] - 5:2
**create** [2] - 36:11, 38:4
**created** [2] - 86:19, 104:15
**crime** [12] - 6:1, 7:3, 27:24, 27:25, 33:23, 56:7, 91:7, 95:7, 95:21, 95:22, 96:25, 101:25
**Crime** [1] - 101:21
**crimes** [9] - 6:14, 6:20, 30:12, 30:21, 34:5, 86:9, 93:15, 93:17, 111:22
**criminal** [5] - 5:23, 26:12, 29:15, 36:21, 87:10
**CROSS** [2] - 2:6, 60:19
**cross** [10] - 59:20, 59:24, 60:16, 73:3, 73:20, 74:20, 75:9, 77:18, 80:1, 136:21
**CROSS-EXAMINATION** [2] - 2:6, 60:19
**cross-examination** [2] - 59:20, 60:16
**crossed** [1] - 9:8
**CRR** [2] - 1:21, 140:8
**Cruz** [11] - 83:11, 98:10, 98:18, 99:16, 102:4, 133:6, 133:10, 134:17, 137:15, 137:25, 138:4
**Cruz-Ortiz** [11] - 83:11, 98:10, 98:18, 99:16, 102:4, 133:6, 133:10, 134:17, 137:15, 137:25, 138:4
**current** [5] - 27:12, 30:3, 85:8, 109:5, 137:15
**custody** [1] - 29:2
**Customs** [1] - 115:21
**cut** [1] - 129:18
**Cycos** [4] - 12:22, 13:2, 49:20, 50:19

## D

**D.C** [2] - 42:17, 43:3
**DACA** [3] - 9:21, 33:18, 33:19
**dad** [1] - 10:5
**data** [3] - 89:4, 89:6, 96:6
**DATE** [1] - 140:8
**date** [1] - 123:23
**dated** [1] - 116:13
**dating** [1] - 85:14
**daughter** [1] - 10:14
**David** [4] - 98:9, 98:17, 104:2, 133:6
**days** [2] - 41:18, 92:16
**dead** [3] - 93:24, 114:3, 114:11
**deal** [2] - 53:1, 110:21
**dealers** [2] - 22:25, 73:25
**dealing** [1] - 22:24
**death** [7] - 34:8, 87:11, 90:7, 90:8, 93:19, 93:21
**debrief** [1] - 30:17
**debriefed** [1] - 30:21
**debriefing** [1] - 28:22
**debriefings** [1] - 29:9
**debriefs** [1] - 78:25
**decide** [3] - 6:11, 56:17, 92:19
**decided** [3] - 69:4, 80:24, 92:20
**decides** [1] - 45:23
**decision** [4] - 10:15, 33:1, 45:21, 45:25
**decision-making** [1] - 45:25
**deck** [1] - 82:21
**dedicated** [1] - 97:11
**Deerfield** [4] - 85:17, 85:19, 85:24, 85:25
**defendant** [43] - 6:1, 6:3, 6:7, 6:11, 6:17, 6:20, 6:24, 28:17, 28:21, 28:25, 29:6, 29:7, 29:14, 32:15, 34:2, 34:4, 34:6, 34:7, 34:11, 34:14, 98:9, 100:12, 100:22, 107:4, 107:5, 113:7, 114:25, 115:20, 115:22, 118:11, 119:8, 119:17, 120:14, 120:24, 122:2, 122:14, 125:9, 125:20, 125:22, 128:10, 128:15
**Defendant** [1] - 1:8
**DEFENDANT** [2] - 1:16, 3:23
**DEFENDANTS** [1] - 2:18
**defendant's** [13] - 5:21, 29:1, 29:2, 29:25, 31:20, 34:3, 34:11, 34:13, 34:16, 34:17, 82:23, 116:15
**defendants** [3] - 81:13, 107:3, 133:5
**defense** [6] - 4:12, 33:13, 60:15, 83:17, 107:18, 135:24
**deferred** [1] - 9:22
**definitely** [1] - 136:4
**definitive** [1] - 138:22
**delay** [3] - 116:25, 138:16, 139:4
**delays** [1] - 138:7
**Delicias** [7] - 50:20, 50:22, 50:24, 67:2, 67:14, 67:18, 117:18
**delivery** [1] - 72:2
**demand** [1] - 23:20
**demanded** [1] - 46:13
**demon** [1] - 56:1
**Demonio** [3] - 55:15, 55:25, 56:1
**Demonios** [1] - 50:20
**Department** [1] - 35:1
**departure** [2] - 29:18, 29:20
**depiction** [2] - 128:10, 128:14
**deported** [1] - 33:24
**DEPUTY** [2] - 84:20, 84:23
**deputy** [2] - 107:20, 108:13
**describe** [1] - 128:18
**description** [1] - 94:23
**deserves** [1] - 14:10
**designated** [2] - 19:20, 97:17
**despite** [1] - 11:20
**detailed** [1] - 29:8
**detective** [9] - 84:18, 85:9, 86:1, 86:3, 87:2, 87:8, 94:19, 134:17, 135:17
**Detective** [28] - 2:7, 82:22, 84:16, 84:21, 85:3, 90:8, 91:12, 91:13, 91:20, 92:4, 92:7, 92:9, 92:20, 92:22, 92:23, 93:1, 94:18, 94:22, 99:4, 101:21, 101:25, 113:3, 113:23, 121:20, 125:7, 125:20, 133:1, 136:21
**determination** [2] - 32:17, 33:16
**determine** [1] - 69:21
**determining** [1] - 6:6
**difference** [2] - 7:4, 111:1
**different** [16] - 10:22, 13:23, 31:6, 39:12, 39:14, 44:2, 44:4, 51:4, 55:15, 56:4, 58:25, 87:4, 96:1, 118:14, 120:9
**differently** [3] - 61:20, 80:2, 133:14
**difficult** [3] - 5:5, 109:1, 109:3
**difficulties** [2] - 88:4, 88:6
**difficulty** [1] - 89:2
**dig** [1] - 96:7
**DIRECT** [4] - 2:5, 2:8, 7:23, 85:1
**direct** [8] - 5:10, 6:13, 7:2, 60:21, 73:16, 79:5, 89:18, 102:15
**directing** [2] - 93:6, 103:22
**directly** [6] - 6:16, 6:19, 6:24, 7:19, 17:1, 29:3
**disagreement** [1] - 69:9
**discipline** [2] - 67:25, 77:12
**disciplined** [1] - 46:7
**discretion** [1] - 29:17
**Discreto** [2] - 100:10, 100:16
**discuss** [6] - 87:23, 106:6, 106:7, 132:4, 132:6, 132:11
**discussed** [4] - 6:18, 87:20, 93:19, 98:12
**discussion** [1] - 4:15
**Discussion** [4] - 48:21, 57:13, 79:24, 139:14
**dismiss** [1] - 28:2
**disobeying** [1] - 79:11
**displaying** [1] - 118:12
**dispute** [2] - 45:23, 78:5
**disregard** [1] - 111:9
**disrespect** [2] - 15:16, 15:18
**disrespectful** [1] - 46:11
**disruptive** [1] - 109:23
**distributed** [2] - 43:24, 51:6
**District** [13] - 1:22, 1:23, 25:11, 27:19, 30:24, 31:4, 32:7, 33:5, 33:10, 63:9, 64:15, 140:9, 140:10
**DISTRICT** [3] - 1:1, 1:1, 1:10
**district** [1] - 34:12
**ditch** [1] - 22:4
**division** [1] - 90:6
**DIVISION** [1] - 1:2
**DNA** [7] - 91:1, 91:4, 91:6, 96:15, 102:1, 102:5, 134:22
**DOBBINS** [114] - 1:13, 2:5, 2:6, 2:8, 3:7, 4:10, 7:10, 7:22, 7:24, 24:13, 24:20, 41:7, 48:22, 49:4, 57:11, 57:14, 59:7, 59:8, 59:17, 72:22, 79:22, 79:25, 82:6, 82:22, 83:1, 83:4, 83:7, 83:10, 83:14, 84:15, 85:2, 104:20, 105:6, 105:14, 107:2, 107:16, 107:23, 111:3, 111:5, 111:17, 113:1, 113:2, 113:15, 113:21, 114:1, 114:14, 114:23, 115:15, 115:18, 115:24, 116:6, 116:8, 116:18,

116:20, 117:4, 117:12, 117:15, 117:21, 118:1, 118:7, 118:18, 118:24, 119:2, 119:10, 119:12, 120:6, 120:22, 121:7, 121:10, 121:14, 121:19, 122:5, 122:10, 122:12, 123:1, 123:5, 123:6, 123:10, 124:6, 125:3, 125:4, 125:13, 125:18, 126:3, 126:12, 126:18, 127:17, 127:24, 128:6, 128:8, 129:5, 129:7, 129:13, 130:3, 130:12, 130:17, 130:19, 130:20, 131:9, 131:13, 133:6, 133:12, 133:17, 133:24, 134:4, 134:7, 135:4, 135:6, 135:9, 135:22, 136:24, 138:4, 138:8, 138:15
**Dobbins** [9] - 3:7, 7:13, 7:21, 84:14, 105:9, 112:2, 112:25, 113:4, 125:2
**document** [4] - 24:22, 25:3, 25:6, 25:8
**documents** [9] - 28:25, 50:7, 67:4, 67:5, 69:11, 69:13, 69:17, 69:20
**done** [17] - 3:18, 17:4, 35:9, 53:23, 57:5, 96:19, 112:2, 127:14, 131:17, 132:14, 134:16, 136:21, 137:18, 137:20, 137:25, 139:18
**doubt** [1] - 6:22
**down** [15] - 14:12, 19:24, 43:1, 62:2, 78:6, 80:8, 96:9, 116:23, 116:24, 117:17, 117:23, 125:25, 126:14, 135:9
**downward** [2] - 29:18, 29:20
**Drake** [3] - 94:18, 94:22, 99:4
**drinking** [2] - 21:14
**driver** [2] - 11:15, 54:1
**driving** [3] - 20:24, 21:8, 52:2
**drop** [4] - 10:15, 44:6, 44:9, 44:11
**dropped** [2] - 10:12, 10:21
**drove** [5] - 19:17, 19:21, 19:23, 23:11, 23:15
**drug** [3] - 22:25, 39:1, 73:25
**drugs** [33] - 22:21, 22:24, 23:1, 23:23, 38:3, 39:6, 40:21, 40:24, 41:1, 41:4, 41:6, 41:8, 41:9, 41:12, 41:15, 41:16, 51:3, 51:5, 64:24, 65:24, 66:2, 66:5, 66:12, 70:9, 70:12, 70:18, 71:5, 71:12, 71:14, 72:2, 72:24, 73:4, 73:7
**due** [1] - 4:6
**dues** [7] - 37:24, 38:25, 43:12, 43:14, 43:22, 73:12, 73:18
**duly** [2] - 7:16, 84:21
**dumps** [1] - 88:25
**during** [7] - 29:8, 30:17, 76:5, 76:8, 88:8, 88:12, 95:5
**duties** [2] - 85:12, 85:23

**E**

**ear** [1] - 139:11
**early** [3] - 85:15, 135:12, 137:22
**earn** [2] - 26:10, 79:14
**earned** [3] - 16:24, 35:13, 59:4
**Earth** [1] - 95:12
**East** [44] - 19:4, 19:5, 19:6, 42:1, 42:2, 42:5, 42:9, 42:14, 43:7, 43:11, 43:16, 43:22, 44:1, 46:25, 47:2, 47:5, 47:17, 50:11, 50:14, 50:17, 51:2, 51:8, 51:18, 55:14, 56:3, 61:22, 62:1, 62:12, 62:18, 62:22, 63:1, 64:4, 66:15, 66:19, 68:2, 69:18, 71:7, 75:10, 75:16, 78:13, 78:15, 78:16, 79:2
**Eastern** [9] - 25:11, 27:19, 30:24, 31:4, 32:7, 33:4, 33:10, 63:9, 64:15
**easy** [1] - 131:18
**eat** [1] - 5:17
**ECP** [1] - 78:13
**education** [1] - 9:6
**EDVA** [3] - 32:7, 32:11, 32:19
**effect** [3] - 15:8, 34:13, 111:15
**effort** [1] - 90:16
**either** [10] - 39:19, 40:21, 40:23, 62:9, 64:5, 73:25, 122:22, 134:5, 134:8, 138:1
**El** [26] - 8:7, 8:19, 8:20, 11:3, 11:10, 11:11, 40:5, 40:14, 41:1, 43:24, 44:2, 46:1, 46:19, 51:1, 51:13, 53:23, 56:16, 64:21, 65:18, 69:1, 69:22, 70:3, 71:21, 77:23, 78:3, 80:8
**elected** [1] - 47:13
**element** [1] - 7:1
**Elena** [1] - 3:8
**ELENA** [1] - 1:13
**ELMO** [6] - 59:7, 116:7, 118:25, 122:10, 128:6, 130:19
**employed** [1] - 85:6
**encounter** [1] - 88:4
**encountered** [3] - 9:11, 61:16, 61:18
**end** [7] - 13:4, 21:2, 24:2, 107:1, 108:4, 109:11, 138:2
**endeavor** [3] - 94:13, 138:9, 138:16
**endeavored** [1] - 99:22
**ended** [1] - 94:16
**enforced** [1] - 77:12
**enforcement** [11] - 45:5, 45:7, 55:5, 69:7, 70:5, 78:24, 81:10, 96:7, 97:19, 97:24, 102:5
**engage** [1] - 36:20
**engaged** [1] - 36:21
**English** [6] - 115:7, 115:8, 116:12, 116:13, 120:25, 121:3
**enjoy** [1] - 106:16
**ensuing** [1] - 29:8
**ensure** [2] - 7:1, 36:9
**entail** [2] - 34:16, 57:3
**entered** [1] - 87:1
**enterprise** [4] - 6:4, 6:7, 39:8, 39:9
**enters** [6] - 4:21, 60:13, 84:11, 108:9, 112:6, 124:23
**entire** [1] - 62:1
**entitled** [1] - 140:5
**equipment** [1] - 3:20
**equivalent** [2] - 18:23, 57:5
**escuela** [1] - 47:24
**especially** [1] - 40:18
**established** [4] - 6:22, 76:10, 77:5, 86:23
**establishing** [2] - 120:1, 120:4
**evaluate** [4] - 109:11, 109:17, 134:20, 138:2
**evaluating** [1] - 29:17
**evening** [1] - 132:20
**events** [3] - 119:24, 121:21, 121:22
**eventually** [10] - 11:21, 21:18, 29:21, 36:6, 52:17, 54:15, 61:22, 66:15, 68:2, 89:25
**evidence** [41] - 5:21, 5:23, 5:25, 6:5, 6:10, 6:14, 6:21, 7:2, 24:14, 24:19, 48:23, 49:3, 90:15, 90:17, 90:18, 90:24, 91:1, 91:4, 91:5, 91:6, 97:2, 99:5, 99:6, 99:8, 101:3, 101:4, 101:8, 101:9, 101:22, 104:21, 105:5, 109:2, 112:18, 116:1, 116:5, 118:23, 122:6, 122:9, 127:18, 127:23, 132:3
**Evidence** [1] - 112:20
**evidentiary** [2] - 111:12, 112:17
**exact** [3] - 17:3, 19:23, 42:13
**EXAMINATION** [8] - 2:5, 2:6, 2:6, 2:8, 7:23, 60:19, 72:21, 85:1
**examination** [3] - 5:10, 59:20, 60:16
**example** [1] - 46:9
**examples** [1] - 14:5
**except** [1] - 65:8
**exception** [3] - 39:20, 61:11, 61:12
**exceptions** [2] - 61:14, 61:15
**exchange** [1] - 125:23
**excuse** [4] - 32:7, 61:13, 66:21, 82:10
**Excuse** [1] - 114:15
**excused** [2] - 109:19, 124:14
**execution** [1] - 35:1
**Exhibit** [20] - 2:12, 24:14, 24:19, 25:3, 48:23, 49:3, 49:6, 113:8, 116:1, 116:5, 116:9, 118:19, 118:23, 118:25, 122:6, 122:9, 127:18, 128:9, 128:13, 130:21
**Exhibits** [3] - 104:22, 105:4, 127:23
**EXHIBITS** [2] - 2:10, 2:18
**exhibits** [2] - 2:19, 138:17
**existed** [1] - 88:13
**exit** [1] - 106:15
**exits** [6] - 60:4, 82:16, 106:19, 110:17, 124:16, 132:23
**expand** [1] - 50:2
**expect** [2] - 136:4, 136:24
**expectation** [1] - 134:24
**expectations** [1] - 135:15
**expedite** [1] - 134:7
**experience** [2] - 119:21, 123:25
**experiences** [2] - 11:2, 11:20
**expert** [1] - 134:22
**explain** [1] - 88:19
**explained** [2] - 16:23, 111:11
**extensive** [1] - 98:6
**extent** [2] - 6:15, 99:19
**extort** [5] - 22:25, 38:10, 63:6, 64:9, 73:25
**extorted** [6] - 11:7, 11:8, 11:14, 65:1, 65:4, 74:5

**extorting** [3] - 23:5, 65:5, 72:7
**extortion** [16] - 11:19, 22:19, 24:4, 26:4, 26:23, 26:24, 28:3, 39:1, 63:10, 63:21, 64:2, 64:18, 72:14, 73:21, 74:21, 74:25
**extortions** [6] - 22:18, 64:5, 64:7, 65:7, 78:13, 78:16
**extra** [1] - 107:19
**extradited** [1] - 92:12
**extreme** [1] - 108:20
**eye** [1] - 110:23

## F

**face** [1] - 58:25
**Facebook** [1] - 20:8
**facility** [3] - 95:7, 95:16, 97:10
**fact** [6] - 34:18, 52:10, 61:1, 68:16, 88:13, 101:18
**facts** [2] - 29:6, 29:8
**fade** [1] - 88:7
**fair** [2] - 128:10, 128:14
**families** [3] - 38:16, 38:18, 64:12
**family** [9] - 8:14, 11:2, 24:1, 64:11, 74:15, 93:25, 106:8, 120:3, 132:4
**far** [13] - 10:9, 31:8, 32:3, 35:13, 42:14, 42:15, 42:23, 50:15, 95:1, 99:18, 108:25, 126:8, 138:24
**fast** [2] - 137:18, 138:13
**fast-forward** [1] - 138:13
**faster** [1] - 138:12
**father** [2] - 8:18, 9:6
**fatigue** [1] - 108:21
**favors** [1] - 16:4
**FBI** [8] - 48:14, 93:2, 95:4, 97:7, 97:16, 99:1, 99:3, 103:2
**feared** [1] - 57:22
**fearless** [1] - 12:7
**Fearless** [6] - 12:8, 12:12, 49:18, 59:6, 118:17, 119:9
**federal** [2] - 29:15, 34:5
**Federal** [1] - 3:9
**felt** [2] - 90:15, 90:24
**female** [1] - 11:25
**Ferguson** [15] - 3:9, 48:14, 48:16, 93:3, 93:7, 102:25, 103:6, 104:1, 117:17, 118:12, 119:14, 120:1, 120:15, 122:1, 129:10
**Ferry** [6] - 19:23, 21:3, 21:4, 24:5, 52:3, 54:3
**few** [2] - 17:2, 17:15
**fight** [6] - 14:8, 14:13, 37:14, 37:15, 48:10, 52:15
**fights** [3] - 12:13, 12:16, 12:17
**figure** [2] - 50:8, 133:22
**figured** [1] - 109:21
**file** [4] - 29:18, 32:17, 32:22, 98:24
**filed** [1] - 33:1
**fill** [1] - 47:11
**fine** [3] - 108:23, 110:24, 111:17
**finish** [6] - 84:1, 124:12, 137:15, 137:24, 139:5, 139:8
**finished** [1] - 135:10
**finishing** [1] - 134:25
**first** [18] - 18:20, 25:2, 31:12, 46:22, 47:5, 50:5, 50:6, 50:8, 55:16, 78:11, 86:18, 100:7, 107:13, 108:25, 112:16, 113:6, 113:16, 125:10
**First** [13] - 18:21, 36:6, 36:8, 39:19, 61:25, 66:14, 68:24, 69:15, 72:11, 76:5, 76:8, 77:22, 117:18
**fit** [1] - 94:23
**five** [9] - 26:6, 26:21, 49:7, 86:2, 97:13, 116:23, 119:6, 119:7, 123:3
**flip** [3] - 118:3, 118:8, 121:11
**flipping** [1] - 118:13
**float** [1] - 69:6
**floor** [1] - 60:17
**FLORIDA** [1] - 1:1
**Florida** [16] - 1:4, 1:15, 1:19, 1:23, 1:24, 87:13, 87:15, 92:12, 123:13, 123:16, 123:20, 123:23, 126:5, 129:15, 140:10, 140:11
**fly** [1] - 8:23
**focus** [2] - 101:2, 121:21
**folks** [1] - 132:19
**follow** [22] - 3:21, 9:15, 14:14, 15:9, 15:10, 15:11, 22:17, 33:9, 33:12, 36:10, 36:14, 41:21, 41:24, 43:9, 46:4, 52:15, 105:11, 105:13, 111:14, 112:12, 112:20, 112:21
**followed** [3] - 16:13, 39:23, 39:25
**following** [8] - 15:7, 46:10, 46:12, 56:20, 79:13, 80:17, 80:20, 105:23
**follows** [2] - 36:18, 80:13
**FOR** [2] - 1:13, 1:16
**force** [7] - 32:22, 33:4, 33:7, 86:16, 86:17, 86:18, 103:2
**Force** [1] - 86:18
**forcing** [1] - 72:7
**foregoing** [1] - 140:3
**forehead** [2] - 58:16, 59:9
**foremost** [1] - 107:13
**form** [5] - 114:24, 115:3, 115:6, 115:9, 116:10
**FORT** [1] - 1:2
**forth** [2] - 90:15, 131:20
**forward** [2] - 125:5, 138:13
**founded** [2] - 50:4
**four** [7] - 49:7, 76:22, 81:18, 97:13, 116:23, 119:6, 119:7
**Fragoso** [1] - 108:2
**frame** [1] - 95:5
**free** [1] - 105:13
**fresh** [1] - 55:20
**friend** [5] - 11:25, 13:11, 20:23, 81:2
**friend's** [1] - 13:15
**friends** [5] - 13:18, 20:13, 20:14, 106:8, 132:5
**front** [1] - 112:12
**full** [1] - 32:16
**fully** [1] - 28:9
**furthering** [1] - 39:9
**future** [2] - 31:19, 31:23

## G

**G-i-a-n-i-n-o** [1] - 84:25
**G-O-N-Z-A-L-E-Z** [1] - 8:3
**gain** [4] - 39:7, 40:17, 58:3, 59:5
**gaining** [2] - 37:11, 58:2
**gains** [2] - 36:24, 39:9
**game** [2] - 112:1, 128:3
**Gamez** [4] - 98:21, 99:15, 102:2, 102:3
**Gamez-Melendez** [3] - 98:21, 99:15, 102:3
**Gang** [1] - 14:20
**gang** [29] - 8:20, 8:21, 13:21, 14:1, 14:11, 14:23, 15:10, 15:20, 16:4, 20:8, 21:11, 21:12, 37:6, 37:7, 37:10, 40:11, 52:5, 52:6, 52:23, 59:5, 65:5, 71:5, 76:10, 82:2, 90:7, 119:23, 120:3, 120:8, 120:9
**gang-related** [1] - 90:7
**gangs** [3] - 15:20, 93:3, 111:22
**Gangsters** [1] - 50:19
**gather** [1] - 97:2
**GED** [2] - 10:17, 10:19
**general** [11] - 27:8, 36:17, 36:18, 37:5, 40:12, 41:20, 51:9, 80:13, 119:22, 120:7, 138:11
**generally** [3] - 39:15, 58:14, 76:5
**gentlemen** [7] - 4:23, 59:23, 82:11, 105:10, 105:17, 124:9, 131:16
**geofence** [1] - 88:21
**geofencing** [3] - 88:10, 88:17, 88:20
**Gerson** [8] - 98:13, 98:14, 99:11, 99:18, 100:22, 101:4, 102:21, 103:24
**Gianino** [12] - 2:7, 82:22, 84:16, 84:21, 84:25, 113:3, 113:23, 121:20, 125:7, 125:21, 133:1, 136:21
**girl** [1] - 10:14
**given** [6] - 5:1, 5:5, 44:17, 90:13, 94:24, 109:4
**glad** [1] - 107:25
**glaze** [1] - 134:11
**GLCS** [8] - 12:22, 12:23, 13:4, 13:20, 49:20, 49:21, 50:11, 57:19
**goal** [1] - 37:5
**goals** [1] - 37:6
**gonna** [5] - 19:21, 114:2, 131:18, 133:17, 134:16
**Gonzalez** [7] - 2:4, 4:2, 7:16, 8:2, 24:21, 49:5
**Google** [1] - 95:12
**gotta** [2] - 38:14
**GOVERNMENT** [1] - 1:13
**Government** [2] - 7:16, 84:21
**government** [32] - 3:6, 4:9, 4:10, 5:7, 6:2, 6:21, 7:1, 7:9, 24:10, 24:14, 24:19, 26:17, 29:16, 29:25, 48:23, 49:3, 84:13, 84:15, 104:21, 105:4, 115:25, 116:5, 118:19, 118:23, 122:6, 122:9, 127:18, 127:23, 134:24, 135:20, 135:22
**government's** [1] - 107:1
**Government's** [17] - 24:14, 25:3, 48:23, 49:5, 59:9, 104:21, 107:18, 113:8, 116:1, 116:9, 118:19, 118:25, 122:6, 127:18, 128:9, 128:13, 130:21
**GOVERNMENT'S** [1] - 2:10
**GPS** [8] - 88:10, 90:20, 91:1, 91:4, 91:5, 95:4, 96:6, 96:11
**grab** [3] - 5:17, 22:3, 108:11
**grabbed** [1] - 22:2
**grabbing** [1] - 39:4
**grade** [2] - 10:10, 10:11
**graduated** [1] - 85:22

**grand** [3] - 28:18, 31:23, 86:6
**grandma** [2] - 8:18, 10:3
**grandmother** [2] - 9:15, 10:4
**great** [8] - 108:14, 108:20, 132:20, 133:19, 135:19, 137:18, 137:25
**green** [16] - 45:8, 45:10, 45:12, 62:15, 62:17, 64:7, 74:21, 74:24, 75:2, 75:4, 75:10, 75:13, 75:17, 80:21, 81:24
**green-light** [2] - 62:15, 62:17
**green-lighted** [1] - 80:21
**green-lighting** [2] - 64:7, 74:21
**group** [2] - 68:2, 129:24
**grow** [1] - 37:10
**growing** [2] - 9:18, 39:8
**Guanacas** [1] - 49:20
**Guanacos** [2] - 12:22, 13:2
**guess** [1] - 75:25
**guided** [1] - 112:21
**guilty** [8] - 24:8, 27:20, 34:2, 34:7, 34:8, 34:15, 64:14, 73:21
**gun** [4] - 23:12, 23:14, 23:20, 63:15
**guns** [10] - 38:3, 39:5, 64:23, 65:10, 65:13, 65:15, 65:17, 71:24, 71:25, 72:14
**Gutierrez** [5] - 90:7, 90:19, 90:20, 93:11, 95:22
**guy** [7] - 19:17, 20:12, 20:22, 52:6, 65:1, 65:3, 131:2
**guys** [26] - 4:19, 5:16, 20:4, 20:5, 20:17, 21:1, 21:17, 22:8, 22:16, 73:1, 82:9, 83:17, 84:1, 106:3, 106:15, 106:21, 107:6, 108:6, 112:11, 126:7, 128:15, 129:16, 129:21, 132:20, 137:24, 139:21

**H**

**half** [4] - 136:6, 136:7, 136:11, 137:12
**halfway** [1] - 117:23
**ham** [1] - 13:13
**hand** [4] - 22:3, 84:20, 110:5, 110:10
**handed** [1] - 130:7
**handled** [2] - 45:19, 87:4
**hands** [1] - 77:14
**handwriting** [1] - 67:22
**hang** [2] - 12:14, 12:15
**hanging** [4] - 11:21, 11:24, 126:6, 129:16
**hard** [2] - 108:24, 109:17
**Harpers** [6] - 19:23, 21:3, 21:4, 24:5, 52:2, 54:3
**hate** [1] - 136:8
**Hayes** [11] - 90:8, 91:12, 91:13, 91:20, 92:4, 92:8, 92:9, 92:20, 92:22, 92:23, 93:1
**head** [21] - 23:12, 23:14, 23:20, 42:2, 42:5, 58:25, 61:22, 62:1, 62:17, 62:22, 63:1, 63:15, 64:4, 66:15, 68:1, 68:2, 69:14, 69:18, 75:9, 78:13
**hear** [4] - 3:21, 5:21, 5:23, 107:25
**heard** [6] - 6:16, 13:14, 50:10, 50:16, 132:3, 132:9
**heavily** [1] - 111:7
**heavy** [1] - 110:23
**heels** [1] - 52:21
**held** [4] - 48:21, 57:13, 79:24, 139:14
**help** [7] - 47:22, 47:23, 47:24, 48:3, 48:7, 51:3, 97:2
**helped** [2] - 54:5, 75:25
**helping** [1] - 96:23
**hereby** [2] - 29:14, 140:3
**Hernandez** [1] - 104:2
**hi** [1] - 108:10
**higher** [1] - 58:24
**highlight** [3] - 28:11, 28:13, 28:19
**highlights** [1] - 138:10
**himself** [4] - 96:12, 96:20, 122:20, 130:23
**historical** [6] - 50:7, 69:11, 69:13, 69:20, 78:1, 78:7
**history** [2] - 120:2, 120:3
**hit** [7] - 120:18, 123:7, 126:9, 129:8, 129:25, 131:10, 138:9
**hitting** [1] - 130:6
**holding** [2] - 44:13, 101:8
**home** [1] - 132:6
**homeboy** [32] - 16:24, 17:1, 17:13, 17:17, 17:23, 18:2, 18:9, 18:16, 39:16, 45:16, 45:17, 46:11, 52:18, 52:20, 53:4, 53:16, 55:12, 56:9, 56:10, 56:19, 56:23, 57:6, 58:3, 60:23, 61:3, 61:8, 66:7, 66:10, 68:17, 68:19, 70:19, 77:18
**homeboys** [18] - 14:23, 15:7, 15:20, 36:18, 37:2, 47:18, 47:21, 48:3, 48:5, 48:7, 51:22, 52:25, 53:23, 76:17, 76:19, 76:20, 79:17
**Homeland** [1] - 35:1
**homicide** [20] - 85:11, 87:9, 87:11, 87:13, 87:15, 88:5, 88:8, 88:9, 88:12, 89:10, 89:13, 89:15, 90:6, 90:21, 94:19, 98:7, 98:12, 98:13, 100:2, 100:22
**Homicide** [5] - 85:13, 86:21, 87:13, 88:1, 89:23
**homicides** [6] - 86:11, 90:9, 98:11, 98:20, 100:17, 100:18
**Honor** [34] - 3:7, 3:13, 3:23, 4:10, 4:13, 7:10, 7:22, 24:13, 24:17, 48:22, 59:17, 59:21, 60:18, 67:10, 72:18, 82:6, 82:22, 83:21, 84:15, 104:20, 105:1, 105:6, 107:2, 107:16, 111:3, 113:1, 115:24, 118:18, 122:5, 125:3, 127:17, 135:22, 136:1, 139:12
**HONORABLE** [1] - 1:10
**Honorable** [1] - 1:22
**hope** [6] - 109:4, 110:1, 112:8, 136:20, 136:23, 136:25
**hopefully** [2] - 134:13, 135:14
**hopes** [2] - 97:17, 102:1
**hoping** [5] - 25:21, 25:22, 29:21, 135:6, 137:5
**horizontally** [1] - 128:22
**hour** [7] - 5:15, 106:2, 136:6, 136:7, 136:11, 137:12, 138:23
**hours** [1] - 133:25
**house** [1] - 78:23
**housekeeping** [3] - 4:8, 106:21, 132:25
**housing** [1] - 89:5
**Hugo** [2] - 100:7, 100:16
**Humble** [1] - 55:24
**Humilde** [2] - 55:13, 55:22
**hurt** [1] - 74:15

**I**

**ICE** [1] - 9:16
**iced** [1] - 91:6
**idea** [1] - 71:11
**ideas** [1] - 92:25
**identified** [2] - 118:17, 130:23
**identifiers** [1] - 114:4
**identify** [2] - 95:17, 118:16
**identifying** [1] - 118:14
**identity** [1] - 96:15
**II** [2] - 1:10, 1:22
**ill** [1] - 91:14
**illegal** [2] - 39:9, 56:7
**illustrate** [1] - 95:13
**ILONA** [2] - 1:21, 140:8
**imagine** [1] - 134:25
**Immigration** [1] - 9:11
**immigration** [5] - 33:25, 34:3, 34:9, 34:13, 34:15
**impact** [1] - 32:6
**implicates** [1] - 6:19
**important** [10] - 6:9, 6:12, 6:25, 15:4, 29:10, 30:4, 30:15, 37:10, 54:24, 92:5
**impose** [2] - 38:15, 46:16
**imposed** [1] - 46:10
**imprisonment** [1] - 26:22
**improve** [1] - 59:14
**improving** [1] - 39:7
**inaudible** [1] - 116:22
**incarcerated** [1] - 36:1
**incident** [1] - 94:15
**incidents** [1] - 6:23
**inclined** [1] - 137:16
**include** [1] - 86:10
**included** [2] - 46:12, 66:25
**includes** [1] - 38:16
**including** [5] - 5:24, 34:6, 34:11, 43:5, 81:6
**income** [4] - 38:4, 39:7, 40:17, 72:15
**increase** [6] - 37:13, 40:17, 41:6, 51:24, 61:4, 61:7
**increases** [1] - 57:8
**indeed** [1] - 34:7
**independent** [2] - 106:8, 132:9
**indicate** [2] - 96:19, 126:22
**indicated** [1] - 120:14
**indicates** [1] - 118:17
**indictment** [2] - 6:12, 6:14
**indirectly** [1] - 29:3
**individual** [6] - 23:6, 23:8, 31:14, 49:8, 72:8, 75:14
**individuals** [3] - 37:1, 99:23, 100:1
**indulge** [1] - 108:6
**influence** [1] - 32:3
**info** [1] - 13:21
**information** [13] - 26:11, 26:14, 29:7, 30:11, 32:2, 32:6, 89:3, 92:5, 93:3, 94:8, 94:13, 95:2, 96:6
**informed** [2] - 108:13, 138:25
**infraction** [2] - 15:14, 44:24
**infractions** [1] - 44:18
**initial** [1] - 88:12
**initials** [5] - 49:10, 49:11, 54:15, 54:19, 114:5
**inquiry** [1] - 29:3

**inquisitive** [1] - 111:18
**instance** [3] - 101:7, 101:12, 102:2
**instances** [1] - 15:15
**instead** [2] - 13:20, 133:18
**instruct** [1] - 111:8
**instruction** [5] - 4:16, 5:18, 5:19, 111:23, 112:1
**intention** [1] - 20:14
**intentions** [1] - 19:21
**interpreter** [3] - 3:20, 114:9, 138:5
**interrogation** [1] - 87:10
**interrupting** [1] - 110:9
**interview** [17] - 92:9, 92:22, 92:24, 93:5, 93:8, 99:24, 100:15, 100:21, 102:20, 103:9, 103:18, 103:23, 104:12, 113:6, 119:18, 121:1, 124:1
**interviewed** [3] - 100:16, 102:9, 128:11
**interviewing** [1] - 114:25
**interviews** [3] - 87:10, 104:16, 127:14
**introduce** [1] - 118:19
**introduced** [1] - 13:12
**introducing** [1] - 82:23
**investigate** [3] - 86:7, 89:16, 99:23
**investigated** [3] - 90:5, 90:8, 94:6
**investigating** [3] - 85:14, 88:5, 91:10
**investigation** [9] - 29:4, 31:15, 31:24, 75:6, 87:9, 89:11, 98:23, 99:4, 101:24
**Investigation** [1] - 3:10
**investigations** [2] - 87:12, 87:25
**investigative** [1] - 91:16
**involve** [1] - 6:16
**involved** [22] - 13:10, 37:2, 44:5, 44:12, 45:25, 46:2, 56:21, 63:10, 63:22, 64:2, 64:5, 64:7, 64:17, 64:18, 64:20, 65:7, 70:25, 74:3, 78:12, 96:20, 96:21, 100:2
**involvement** [1] - 106:11
**involving** [4] - 31:23, 36:19, 87:12, 100:22
**IP** [2] - 88:23, 88:24
**isolated** [3] - 21:7, 23:11, 23:15
**issue** [4] - 31:8, 56:9, 75:17, 107:25
**issues** [7] - 4:4, 4:9, 4:12, 7:8, 45:12, 106:21, 134:22
**it'll** [3] - 35:14, 131:23, 131:24
**items** [3] - 101:10, 101:19, 102:1

## J

**James** [1] - 90:8
**January** [7] - 1:5, 86:14, 102:16, 104:23, 113:7, 128:15, 140:8
**job** [1] - 134:10
**jobs** [1] - 73:16
**jobsites** [1] - 10:22
**Joe** [1] - 3:13
**Joel** [8] - 93:19, 93:23, 95:2, 95:15, 96:1, 96:17, 98:7
**join** [3] - 13:6, 44:10, 86:21
**joined** [1] - 50:11
**joining** [1] - 13:4
**JOSEPH** [1] - 1:16
**Juan** [3] - 102:25, 103:1, 114:7
**Judge** [2] - 123:1, 131:10
**judge** [9] - 33:3, 33:7, 33:9, 33:12, 33:17, 105:14, 111:5, 124:6, 133:12
**JUDGE** [1] - 1:10
**judgment** [1] - 138:22
**jumped** [3] - 17:14, 17:16, 138:14
**jumped-in** [2] - 17:14, 17:16
**June** [1] - 103:23
**jurisdiction** [4] - 30:16, 30:25, 31:6, 98:25
**jurisdictions** [3] - 30:7, 30:12, 30:13
**Juror** [5] - 108:1, 108:8, 108:9, 108:12, 110:17
**juror** [2] - 4:4, 135:15
**JUROR** [8] - 108:15, 108:18, 109:12, 109:14, 109:17, 109:23, 110:12, 110:15
**jurors** [6] - 4:6, 60:11, 84:10, 106:12, 137:22
**JURORS** [1] - 4:25
**JURY** [1] - 1:9
**jury** [30] - 4:20, 4:23, 8:4, 14:5, 19:15, 28:18, 31:23, 60:3, 82:11, 82:15, 83:1, 84:4, 85:5, 87:7, 88:3, 90:3, 105:7, 105:18, 106:2, 106:18, 111:5, 112:5, 113:16, 116:7, 124:9, 124:15, 131:16, 131:22, 132:21, 132:22
**Jury** [10] - 4:21, 60:4, 60:13, 82:16, 84:11, 106:19, 112:6, 124:16, 124:23, 132:23

## K

**keep** [19] - 6:12, 39:7, 39:8, 50:7, 52:22, 69:13, 69:17, 69:22, 69:24, 76:12, 77:1, 77:7, 77:25, 89:6, 108:11, 110:23, 132:3, 135:14
**keeping** [3] - 77:3, 128:3, 135:1
**keeps** [1] - 76:14
**kept** [4] - 66:15, 69:11, 69:25, 78:9
**Kevin** [1] - 98:21
**kick** [1] - 52:21
**kicked** [3] - 44:15, 79:11, 79:13
**kidnapping** [3] - 34:8, 63:10, 86:11
**kids** [1] - 18:6
**kill** [19] - 14:9, 14:13, 14:15, 16:17, 16:19, 17:6, 17:16, 21:24, 39:17, 45:9, 52:15, 53:3, 60:23, 61:4, 62:8, 75:4, 75:7, 81:1, 81:22
**killed** [15] - 11:17, 15:17, 15:19, 19:12, 19:15, 21:5, 23:24, 53:5, 53:8, 58:5, 58:8, 63:18, 80:23, 81:4, 96:1
**killing** [5] - 37:8, 59:14, 64:17, 75:3, 94:23
**killings** [5] - 61:7, 62:15, 62:17, 62:23, 93:11
**KIMBERLY** [1] - 1:17
**Kimberly** [1] - 3:14
**kind** [20] - 5:15, 10:23, 11:13, 12:12, 13:25, 21:6, 29:1, 36:1, 36:19, 41:8, 41:9, 54:8, 55:20, 56:7, 119:23, 123:25, 134:23, 135:2, 135:14, 138:10
**knife** [1] - 130:7
**knowing** [1] - 59:10
**knowingly** [1] - 27:15
**knowledge** [1] - 13:25
**known** [1] - 129:24
**knows** [1] - 53:9

## L

**lab** [3] - 99:7, 101:23, 102:12
**ladder** [1] - 61:5
**ladies** [7] - 4:23, 59:23, 82:11, 105:10, 105:17, 124:9, 131:16
**lake** [2] - 96:5, 96:10
**land** [1] - 8:24
**landlord** [1] - 74:14
**landlords** [1] - 38:9
**laptop** [4] - 119:11, 133:13, 133:14, 133:15
**Lara** [6] - 93:19, 93:23, 95:3, 96:2, 96:17, 98:7
**larcenies** [1] - 86:6
**large** [2] - 89:5, 127:3
**last** [10] - 4:4, 7:25, 25:4, 25:5, 31:3, 32:11, 96:11, 109:17, 124:13
**late** [4] - 47:3, 63:2, 63:3, 132:14
**LAUDERDALE** [1] - 1:2
**laundering** [1] - 86:19
**law** [14] - 29:15, 34:5, 45:5, 45:6, 55:4, 69:6, 70:5, 78:24, 81:10, 87:10, 96:7, 97:19, 97:24, 102:5
**lawyers** [2] - 106:13, 132:17
**lead** [2] - 37:12, 99:1
**leader** [12] - 19:1, 19:4, 40:10, 45:13, 46:24, 47:4, 47:6, 51:2, 55:14, 56:2, 56:3, 61:25
**leaders** [6] - 40:6, 41:1, 43:21, 44:2, 44:4
**lean** [1] - 7:20
**learn** [2] - 51:11, 51:16
**learned** [1] - 12:1
**least** [5] - 42:13, 43:19, 53:6, 109:10, 133:4
**leave** [10] - 8:19, 44:7, 59:25, 82:13, 105:21, 105:22, 124:10, 131:19, 131:22, 138:25
**lectern** [2] - 119:11, 129:6
**led** [1] - 89:25
**Leesburg** [2] - 23:11, 23:16
**left** [13] - 112:9, 113:5, 116:14, 120:16, 120:19, 125:1, 128:21, 129:9, 131:21, 133:2, 133:21, 135:3, 135:17
**leg** [2] - 22:2, 22:3
**legal** [1] - 32:5
**legitimate** [2] - 73:16, 110:20
**less** [1] - 109:4
**letter** [7] - 91:19, 91:22, 91:25, 92:3, 92:14, 92:18, 93:4
**letters** [2] - 54:20, 127:3
**letting** [1] - 14:2
**level** [7] - 15:14, 16:16, 16:18, 68:20, 109:8, 110:19, 120:10
**levels** [1] - 120:9
**lied** [1] - 19:22
**lieutenant** [1] - 91:11

**life** [2] - 26:1, 27:4
**lifted** [1] - 127:12
**light** [11] - 45:8, 45:10, 45:12, 62:15, 62:17, 74:24, 75:2, 75:4, 75:17, 81:25
**lighted** [1] - 80:21
**lighting** [2] - 64:7, 74:21
**lights** [2] - 75:10, 75:13
**likely** [1] - 57:4
**Lil** [3] - 12:22, 13:2, 49:20
**limit** [1] - 111:12
**limited** [3] - 6:6, 29:6, 112:18
**limiting** [2] - 4:16, 5:19
**line** [6] - 73:22, 74:22, 75:11, 76:1, 80:4, 125:10
**lines** [2] - 116:23, 116:24
**list** [1] - 79:3
**listed** [4] - 66:18, 67:2, 67:14, 67:15
**listen** [1] - 109:9
**listened** [1] - 104:17
**listening** [2] - 15:7, 105:23
**lists** [1] - 79:2
**live** [3] - 10:3, 10:7, 37:1
**lived** [2] - 95:23, 131:1
**living** [5] - 10:4, 10:8, 11:3, 11:8, 18:8
**LLP** [1] - 1:17
**local** [1] - 29:15
**locate** [1] - 96:8
**located** [2] - 49:21, 71:3
**locating** [1] - 95:8
**location** [1] - 78:9
**locations** [2] - 95:19, 95:20
**locked** [2] - 19:9, 97:8
**locker** [1] - 99:7
**Locos** [1] - 13:9
**logistical** [1] - 4:4
**look** [10] - 24:21, 26:19, 50:5, 101:7, 109:3, 110:18, 134:23, 135:14, 136:4, 136:25
**looked** [3] - 109:2, 128:11, 137:19
**looking** [8] - 36:25, 37:1, 49:14, 76:10, 114:17, 134:20, 134:23, 137:4
**lookout** [3] - 53:24, 54:3
**looks** [1] - 96:2
**lose** [6] - 53:6, 79:16, 134:8, 136:11, 139:2, 139:5
**losing** [1] - 88:14
**low** [3] - 47:18, 48:3
**lower** [3] - 51:22, 51:23, 73:1
**lower-ranked** [1] - 73:1
**lug** [1] - 131:20
**lunch** [12] - 5:15, 5:16, 105:18, 105:25, 106:6, 106:12, 106:17, 106:22, 112:8, 132:1, 137:6, 138:23
**LUPOWITZ** [2] - 1:21, 140:8
**Lupowitz** [1] - 140:8
**luz** [2] - 45:8, 45:10

## M

**ma'am** [1] - 108:10
**main** [14] - 12:14, 15:9, 15:16, 36:17, 37:5, 37:6, 40:10, 40:18, 45:5, 52:14, 52:16, 58:16, 77:10
**maintain** [2] - 43:8, 79:18
**majority** [3] - 66:20, 66:22, 66:23
**management** [1] - 43:25
**manager** [1] - 10:25
**Manassas** [1] - 49:24
**mandatory** [4] - 26:2, 26:3, 27:3, 34:9
**maps** [4] - 95:9, 95:12, 95:13
**Mariachi** [2] - 98:6, 98:18
**Marias** [1] - 50:19
**marijuana** [10] - 41:10, 41:17, 65:25, 70:16, 72:3, 72:14, 126:7, 128:3, 129:17
**mark** [1] - 117:7
**marked** [1] - 2:19
**marks** [1] - 95:14
**marshals** [1] - 133:7
**Maryland** [3] - 13:24, 42:17, 43:5
**Massachusetts** [2] - 42:19, 47:8
**match** [1] - 94:16
**material** [1] - 106:12
**materials** [1] - 29:1
**matter** [6] - 3:3, 106:10, 107:12, 119:18, 120:5, 140:5
**maximum** [5] - 26:7, 26:20, 26:21, 27:3
**mean** [32] - 14:25, 30:1, 31:25, 38:24, 40:7, 55:16, 55:23, 55:25, 57:22, 77:3, 80:17, 80:25, 87:3, 87:15, 88:19, 88:20, 97:15, 109:14, 120:11, 123:16, 124:4, 129:18, 133:20, 134:25, 136:10, 136:12, 136:23, 137:12, 137:18, 137:19, 138:21, 139:6
**meaning** [1] - 9:7
**means** [13] - 16:4, 27:12, 30:2, 32:1, 38:7, 41:5, 45:9, 53:7, 56:1, 59:12, 79:17, 80:18, 80:22
**meant** [1] - 81:5
**media** [6] - 20:2, 20:5, 20:7, 88:11, 106:11, 132:11
**medias** [1] - 19:19
**meet** [4] - 12:10, 20:17, 20:21, 108:2
**meeting** [1] - 47:10
**meetings** [4] - 37:19, 37:21, 43:16, 43:20
**Melendez** [3] - 98:21, 99:15, 102:3
**Melvin** [3] - 98:9, 98:17, 133:6
**member** [20] - 6:3, 6:8, 12:1, 14:4, 14:6, 16:6, 16:23, 20:7, 21:11, 21:12, 46:17, 52:6, 59:11, 71:5, 82:2, 82:4, 85:5, 87:13, 87:15, 87:17
**members** [25] - 8:4, 8:20, 11:7, 11:9, 14:5, 17:21, 19:15, 36:10, 37:4, 37:23, 43:11, 43:24, 44:3, 56:4, 57:16, 58:7, 68:8, 73:11, 73:24, 79:16, 87:7, 88:3, 90:3
**membership** [2] - 5:22, 87:18
**memorialized** [2] - 103:18, 104:12
**memories** [1] - 67:17
**memory** [3] - 67:8, 67:15, 88:6
**mention** [1] - 112:11
**mentioned** [3] - 40:20, 69:9, 93:1
**merger** [2] - 85:17, 86:12
**merit** [1] - 90:14
**message** [1] - 78:6
**messaging** [1] - 51:14
**messed** [1] - 136:19
**met** [2] - 48:13, 92:10
**Miami** [7] - 1:4, 1:15, 1:19, 1:23, 1:24, 140:10, 140:11
**microphone** [2] - 7:19, 84:24
**mid** [1] - 5:14
**mid-morning** [1] - 5:14
**middle** [2] - 122:17, 130:24
**midweek** [1] - 135:13
**might** [10] - 7:20, 37:1, 44:11, 56:4, 78:19, 79:6, 95:9, 111:9, 132:5
**Miguel** [4] - 11:10, 11:11, 98:6, 98:18
**mind** [2] - 6:25, 42:18
**mine** [1] - 55:13
**minimal** [1] - 89:6
**minimize** [1] - 124:4
**minimizing** [1] - 124:3
**minimum** [1] - 76:23
**minute** [4] - 15:22, 59:23, 82:9, 84:2
**minutes** [7] - 23:19, 57:9, 77:11, 114:10, 114:16, 116:23, 123:3
**Miranda** [12] - 82:23, 102:25, 103:1, 103:10, 103:13, 104:4, 114:7, 114:9, 114:19, 115:21, 120:15, 121:4
**mispronounce** [1] - 33:19
**mispronouncing** [1] - 13:17
**missed** [1] - 107:17
**missing** [3] - 93:20, 93:25, 94:2
**mixed** [1] - 119:7
**mom** [5] - 8:18, 9:6, 10:5, 10:6, 10:7
**moment** [12] - 5:10, 51:2, 57:11, 60:1, 76:15, 79:22, 82:12, 82:14, 108:6, 108:13, 110:14, 131:12
**moments** [1] - 105:12
**money** [31] - 23:21, 24:2, 24:3, 38:2, 38:4, 38:6, 38:12, 38:25, 39:2, 39:5, 40:13, 41:6, 63:6, 64:20, 65:11, 65:13, 65:14, 65:21, 65:24, 66:2, 70:9, 71:18, 71:21, 71:25, 73:4, 73:8, 74:1, 74:17, 86:19
**monitored** [1] - 97:19
**month** [1] - 43:19
**monthly** [1] - 43:15
**months** [4] - 17:2, 17:15, 62:22, 89:7
**morning** [12] - 3:2, 3:7, 3:11, 3:13, 3:17, 4:23, 4:25, 5:14, 132:18, 133:2, 139:17, 139:19
**most** [6] - 12:15, 45:4, 57:4, 58:15, 73:13, 119:14
**mostly** [4] - 36:10, 44:4, 73:1, 80:7
**motion** [4] - 29:18, 32:8, 32:17, 32:22
**mount** [1] - 101:19
**move** [32] - 10:5, 16:11, 16:16, 16:18, 16:21, 16:25, 17:14, 18:16, 18:19, 18:25, 24:14, 39:15, 51:25, 52:17, 104:20, 104:21, 107:4, 114:15, 115:12, 115:25, 116:21, 117:6, 117:16, 117:22, 121:15, 122:6, 125:5, 125:14, 125:24, 126:13, 127:18
**moved** [8] - 10:6, 17:3, 18:18, 36:5, 86:9, 97:10, 110:23, 127:22

**movement** [2] - 88:24, 95:4
**moves** [1] - 48:23
**moving** [2] - 4:1, 138:12
**MR** [131] - 2:5, 2:6, 2:6, 2:8, 3:7, 3:13, 4:10, 4:13, 7:10, 7:22, 7:24, 24:13, 24:17, 24:20, 41:7, 48:22, 48:25, 49:4, 57:11, 57:14, 59:7, 59:8, 59:17, 59:21, 60:18, 60:20, 67:10, 67:13, 72:17, 72:22, 79:22, 79:25, 82:6, 82:22, 83:1, 83:4, 83:7, 83:10, 83:14, 84:15, 85:2, 104:20, 105:1, 105:6, 105:14, 107:2, 107:3, 107:16, 107:23, 111:3, 111:5, 111:17, 111:20, 113:1, 113:2, 113:15, 113:21, 114:1, 114:14, 114:23, 115:15, 115:18, 115:24, 116:2, 116:6, 116:8, 116:18, 116:20, 117:4, 117:12, 117:15, 117:21, 118:1, 118:7, 118:18, 118:21, 118:24, 119:2, 119:10, 119:12, 120:6, 120:22, 121:7, 121:10, 121:14, 121:19, 122:5, 122:7, 122:10, 122:12, 123:1, 123:5, 123:6, 123:10, 124:6, 125:3, 125:4, 125:13, 125:18, 126:3, 126:12, 126:18, 127:17, 127:21, 127:24, 128:6, 128:8, 129:5, 129:7, 129:13, 130:3, 130:12, 130:17, 130:19, 130:20, 131:9, 131:13, 133:6, 133:12, 133:17, 133:24, 134:4, 134:7, 135:4, 135:6, 135:9, 135:22, 136:24, 138:4, 138:8, 138:15
**MS** [16] - 19:7, 54:9, 54:16, 54:20, 54:23, 58:14, 81:17, 81:20, 83:21, 127:3, 136:1, 136:6, 136:18, 137:13, 139:11, 139:20
**MS-13** [69] - 5:22, 5:24, 6:7, 6:8, 6:23, 8:22, 11:2, 11:9, 11:21, 11:24, 12:1, 12:4, 12:8, 12:18, 13:6, 14:3, 14:4, 14:7, 14:8, 14:13, 14:18, 15:4, 16:6, 19:1, 36:12, 36:13, 36:14, 36:18, 37:2, 37:5, 37:17, 37:18, 38:1, 38:6, 38:12, 38:15, 40:21, 40:23, 41:1, 41:5, 41:9, 41:11, 41:20, 51:9, 52:15, 53:1, 53:9, 53:14, 54:15, 55:1, 57:17, 57:19, 57:25, 58:7, 58:21, 59:11, 59:12, 61:2, 64:1, 66:8, 69:11, 80:17, 80:18, 80:19, 81:6, 81:8, 82:2, 82:4, 120:16
**MS-related** [1] - 54:9
**multiple** [4] - 19:7, 42:16, 74:8, 74:10
**murder** [16] - 6:12, 24:5, 35:23, 51:20, 53:11, 53:18, 90:19, 90:20, 90:25, 94:4, 94:9, 95:5, 99:11, 99:18, 102:21, 103:24
**muscle** [2] - 127:7, 128:21
**must** [7] - 6:10, 6:25, 7:1, 36:14, 72:6, 88:8, 132:17

## N

**nah** [1] - 16:8
**name** [14] - 7:25, 8:1, 12:2, 12:4, 12:6, 13:15, 84:24, 90:22, 100:1, 100:5, 100:7, 115:4, 119:8, 119:9
**named** [2] - 13:12, 100:4
**names** [3] - 50:18, 50:21, 131:4
**narrow** [1] - 96:9
**Nate** [2] - 102:25, 104:1
**Nathan** [3] - 3:9, 48:14, 93:2
**natindo** [1] - 55:16
**natural** [1] - 105:17
**nature** [2] - 110:21, 112:18
**NE** [1] - 1:15
**near** [1] - 23:18
**necessarily** [3] - 75:1, 75:16, 75:18
**necessary** [2] - 38:7, 48:5
**need** [14] - 24:25, 40:25, 41:4, 52:10, 59:21, 68:19, 75:4, 84:4, 108:1, 110:4, 111:13, 111:23, 135:1, 139:3
**needed** [6] - 47:8, 47:23, 48:3, 66:2, 69:22, 107:13
**needs** [2] - 77:18, 138:5
**never** [7] - 61:16, 61:18, 64:9, 64:11, 65:16, 71:17, 129:15
**nevertheless** [1] - 34:14
**New** [5] - 42:17, 42:21, 49:23, 92:9, 92:12
**new** [4] - 44:10, 86:24, 86:25, 87:20
**newcomers** [2] - 22:17, 47:24
**next** [19] - 5:8, 5:20, 6:10, 10:2, 16:9, 25:4, 28:24, 31:17, 31:21, 46:4, 47:11, 81:23, 82:12, 82:19, 84:14, 96:10, 120:10, 134:23, 135:1
**next-to-last** [1] - 25:4
**nice** [2] - 5:2, 55:20
**nickname** [1] - 55:6
**nicknames** [1] - 55:11
**night** [1] - 22:9
**nine** [1] - 62:22
**Nitido** [3] - 55:12, 55:18, 55:19
**NO** [1] - 1:2
**nobody** [2] - 53:25, 65:19
**none** [4] - 62:19, 62:20, 62:21, 65:21
**normally** [6] - 16:18, 17:4, 44:25, 45:20, 57:7, 61:4
**north** [2] - 42:15, 42:21
**North** [5] - 1:23, 42:17, 43:1, 62:2, 140:10
**northern** [1] - 18:14
**northwestern** [1] - 18:14
**notations** [2] - 101:13, 101:14
**note** [1] - 35:17
**notebook** [7] - 66:16, 66:18, 67:3, 67:7, 67:16, 67:18, 78:19
**notebooks** [3] - 78:22, 78:25, 124:11
**noted** [1] - 129:23
**notepads** [5] - 5:11, 59:25, 82:13, 131:21, 131:24
**notes** [1] - 105:21
**nothing** [5] - 4:10, 29:24, 111:13, 132:6, 135:22
**notice** [3] - 29:14, 105:14, 112:13
**noticed** [1] - 131:10
**notify** [1] - 30:13
**November** [2] - 63:4, 63:5
**number** [17] - 3:3, 17:3, 35:18, 37:6, 37:7, 37:12, 42:13, 49:8, 49:12, 54:17, 57:8, 58:4, 77:9, 87:12, 88:16, 112:17
**numbers** [8] - 17:22, 17:24, 37:13, 44:12, 47:18, 47:25, 56:11

## O

**o'clock** [5] - 124:7, 131:10, 131:18, 136:1, 136:22
**obey** [1] - 36:11
**objection** [16] - 24:13, 24:16, 48:22, 48:24, 48:25, 104:21, 104:25, 115:25, 118:18, 118:20, 118:21, 122:5, 122:7, 127:17, 127:20, 127:21
**objections** [1] - 83:19
**obligated** [1] - 30:2
**obligation** [1] - 29:24
**observacion** [8] - 16:10, 16:12, 16:22, 16:25, 17:2, 17:5, 39:16, 61:2
**observaciones** [1] - 37:3
**observe** [2] - 110:19, 127:2
**observes** [1] - 110:20
**obstacle** [2] - 89:1, 89:10
**obstacles** [1] - 88:4
**obtain** [10] - 38:12, 51:3, 51:5, 51:13, 52:25, 56:15, 58:11, 78:10, 89:2, 95:4
**obtained** [2] - 66:6, 89:12
**obtaining** [1] - 64:25
**obviously** [3] - 53:16, 91:8, 133:14
**occasions** [4] - 73:7, 74:8, 74:11, 100:25
**occur** [2] - 31:19, 86:12
**occurred** [5] - 93:21, 94:11, 94:15, 94:23, 96:4
**occurring** [1] - 90:9
**October** [1] - 63:4
**OF** [2] - 1:1, 1:4
**offense** [3] - 34:6, 106:14, 132:17
**offenses** [1] - 34:6
**offered** [2] - 103:11, 104:5
**office** [1] - 25:10
**Office** [24] - 27:19, 32:20, 33:4, 33:10, 84:17, 85:7, 85:16, 85:18, 86:13, 89:19, 90:6, 90:9, 91:19, 93:20, 94:7, 94:20, 94:21, 97:7, 97:11, 99:2, 101:4, 101:14, 101:19, 102:18
**OFFICE** [1] - 1:14
**Officer** [1] - 104:2
**OFFICER** [9] - 4:20, 60:3, 82:15, 84:8, 106:18, 107:8, 112:4, 124:15, 132:22
**Official** [2] - 1:21, 140:9
**often** [2] - 43:14, 43:18
**Ohio** [7] - 42:18, 42:23, 62:4, 71:4, 71:5, 73:5
**old** [3] - 8:4, 8:10, 18:1
**Omar** [3] - 90:7, 90:18, 93:11
**once** [10] - 4:15, 10:1, 20:5, 20:12, 43:19, 55:12, 55:13, 68:16, 92:14, 133:9
**Ondina** [5] - 90:8, 90:25, 93:12, 95:21, 98:12
**one** [84] - 4:5, 5:18, 7:7, 14:9, 15:2, 16:14, 16:16, 16:18, 22:2, 22:3, 23:10, 28:19, 28:24, 29:10, 29:13, 32:24, 34:11, 37:6, 37:7, 37:13, 40:9, 45:5, 47:7, 47:11, 49:6, 49:17, 50:6, 51:2, 52:14, 52:16, 53:11,

53:14, 55:9, 55:15, 55:16, 55:21, 57:11, 61:10, 61:12, 61:14, 61:16, 61:18, 63:9, 63:23, 63:24, 64:17, 65:8, 66:6, 66:11, 66:12, 72:2, 72:8, 72:14, 73:5, 74:2, 74:3, 74:5, 77:10, 79:22, 81:17, 81:18, 84:2, 90:5, 98:13, 100:1, 101:18, 107:16, 108:1, 108:4, 112:11, 119:6, 120:9, 120:10, 130:23, 132:4, 133:4, 137:8, 137:9, 138:5
**one's** [1] - 30:15
**ones** [6] - 43:21, 58:16, 77:25, 78:10, 81:17
**opinion** [1] - 111:1
**opportunity** [1] - 136:15
**opposed** [1] - 37:8
**Order** [1] - 3:1
**order** [15] - 16:16, 16:24, 22:23, 37:12, 38:4, 39:5, 39:7, 48:5, 60:22, 62:6, 62:8, 65:10, 79:14, 88:21, 88:22
**ordered** [3] - 21:17, 21:19, 51:21
**orders** [2] - 64:9, 80:8
**organically** [1] - 139:9
**orientation** [2] - 136:2, 136:3
**Ortiz** [12] - 83:11, 98:10, 98:18, 99:16, 102:4, 133:6, 133:10, 134:17, 135:3, 137:15, 137:25, 138:4
**otherwise** [1] - 23:23
**outcome** [3] - 31:15, 32:1, 32:5
**overall** [2] - 41:19, 41:20
**overwhelm** [1] - 110:8
**own** [3] - 73:14, 88:6, 120:3

**P**

**p.m** [13] - 1:6, 106:19, 107:9, 107:10, 108:9, 110:17, 112:6, 124:16, 124:19, 124:20, 124:23, 132:23, 139:23
**pace** [3] - 110:1, 110:23, 134:25
**pack** [2] - 118:13, 119:3
**Page** [1] - 2:2
**page** [29] - 25:2, 25:4, 25:5, 26:19, 67:12, 107:14, 107:16, 107:18, 113:22, 114:16, 114:17, 116:22, 117:6, 117:16, 117:23, 118:3, 118:4, 118:8, 121:11, 121:16, 125:5, 125:10, 125:14, 125:24, 126:13, 130:14, 131:6, 133:2
**Pages** [1] - 1:8
**pages** [2] - 107:20, 111:6
**paid** [2] - 73:18, 87:17
**palabrero** [16] - 18:20, 19:8, 36:6, 40:2, 42:7, 42:8, 42:11, 45:14, 45:24, 47:5, 51:12, 62:6, 75:16, 75:19, 78:15
**palabro** [1] - 62:11
**Palm** [9] - 94:6, 94:17, 94:19, 94:21, 98:24, 98:25, 99:1, 99:9, 101:13
**panic** [2] - 109:7, 110:20
**pants** [1] - 101:10
**Paragraph** [1] - 27:9
**paragraph** [11] - 27:18, 28:5, 28:13, 30:4, 30:11, 31:10, 33:18, 33:25, 34:18, 34:25, 35:4
**paragraphs** [1] - 27:17
**paramount** [1] - 95:8
**paro** [8] - 16:2, 16:3, 16:4, 16:7, 16:11, 17:5, 39:16, 61:2
**parole** [1] - 26:3
**paros** [1] - 37:3
**parse** [1] - 6:25
**part** [6] - 6:13, 6:14, 12:10, 19:1, 82:2, 93:23
**participant** [1] - 98:7
**participants** [1] - 99:19
**participate** [2] - 53:3, 68:11
**participated** [3] - 6:11, 35:23, 75:24
**participating** [2] - 78:16, 93:10
**participation** [1] - 5:22
**particular** [5] - 88:22, 88:23, 94:16, 97:16, 98:13
**Parts** [1] - 11:1
**party** [5] - 19:22, 20:10, 20:11, 20:23, 21:1
**pass** [5] - 59:18, 67:24, 88:16, 105:7, 105:8
**past** [2] - 101:9, 124:6
**pasture** [1] - 96:4
**patience** [1] - 60:10
**Patrol** [1] - 115:21
**patrol** [1] - 85:25
**pause** [15] - 117:5, 117:22, 118:2, 118:8, 118:9, 120:23, 121:11, 123:11, 126:4, 126:19, 129:14, 130:13, 130:18, 131:9, 138:15
**paused** [26] - 113:25, 114:13, 114:22, 115:14, 115:17, 117:3, 117:11, 117:14, 117:20, 117:25, 118:6, 120:21, 121:9, 121:13, 121:18, 123:9, 125:12, 125:17, 126:2, 126:11, 126:17, 129:12, 130:2, 130:11, 130:16, 131:8
**pay** [12] - 22:21, 22:23, 23:9, 23:23, 37:24, 43:12, 43:14, 63:7, 63:12, 72:7, 73:12, 74:15
**paying** [3] - 11:19, 24:2, 24:3
**pectoral** [2] - 127:7, 128:21
**Pelones** [1] - 50:20
**penalties** [3] - 26:20, 27:3, 45:1
**penalty** [2] - 26:21, 45:4
**pending** [1] - 31:15
**people** [30] - 11:21, 11:24, 35:22, 38:5, 38:10, 38:20, 51:21, 51:22, 53:11, 53:12, 58:3, 58:7, 63:7, 64:21, 65:5, 72:7, 72:25, 73:1, 73:4, 73:13, 73:25, 76:16, 80:8, 80:11, 96:20, 96:21, 106:9, 130:6, 132:5, 132:10
**percent** [1] - 70:8
**perhaps** [4] - 80:2, 108:4, 136:21, 137:15
**period** [3] - 70:11, 79:6, 89:4
**periodically** [1] - 121:1
**permission** [17] - 9:1, 54:8, 54:11, 56:15, 56:24, 57:6, 58:10, 58:11, 58:13, 58:18, 59:5, 68:19, 68:20, 68:22, 68:24, 77:19, 77:21
**permitted** [1] - 9:14
**person** [14] - 20:5, 22:22, 24:5, 39:20, 46:22, 52:2, 63:18, 70:2, 74:6, 74:10, 75:25, 93:20, 97:17, 119:8
**person's** [1] - 12:2
**personally** [1] - 21:10
**persons** [1] - 86:10
**phone** [13] - 47:10, 88:10, 88:11, 88:23, 88:24, 89:8, 97:6, 97:13, 97:14, 97:17, 97:23, 99:14, 113:17
**phonetic** [1] - 55:17
**photo** [1] - 122:16
**photographs** [5] - 48:17, 49:6, 118:12, 118:14, 119:4
**photos** [1] - 118:11
**physical** [2] - 83:24, 99:8
**physically** [1] - 110:4
**pick** [13] - 12:16, 19:19, 22:2, 23:10, 73:6, 105:22, 112:9, 120:18, 125:1, 131:20, 133:2, 135:17
**picked** [3] - 19:17, 23:15, 73:9
**picture** [4] - 49:15, 122:1, 122:13, 130:22
**pinged** [1] - 88:23
**place** [5] - 5:2, 58:11, 71:12, 86:9, 92:22
**places** [4] - 29:24, 36:25, 106:9, 132:10
**plan** [3] - 5:13, 112:1, 132:1
**play** [10] - 38:16, 114:20, 120:18, 121:7, 123:7, 126:9, 126:14, 129:8, 129:25, 139:11
**played** [3] - 107:24, 111:21
**playing** [8] - 38:23, 105:15, 105:23, 107:23, 113:5, 113:12, 117:1, 119:13
**plea** [12] - 25:9, 25:15, 29:7, 31:13, 31:14, 31:18, 31:22, 32:15, 34:16, 35:5, 35:11, 35:17
**plead** [2] - 24:8, 34:15
**pleading** [3] - 34:2, 34:7
**pled** [4] - 27:20, 63:9, 64:14, 73:21
**plenty** [1] - 107:5
**pocket** [1] - 73:14
**pod** [1] - 97:11
**point** [30] - 3:20, 9:13, 10:5, 10:6, 18:25, 86:1, 94:14, 95:14, 102:17, 109:8, 110:1, 110:3, 110:18, 118:10, 119:13, 119:17, 120:15, 120:16, 120:17, 120:25, 121:20, 121:25, 124:3, 129:22, 129:23, 134:10, 135:7, 138:11, 138:21, 139:6
**pointed** [1] - 96:11
**points** [1] - 113:12
**police** [2] - 30:18, 85:21
**Portillo** [10] - 98:13, 98:14, 99:12, 99:18, 100:2, 100:23, 101:5, 102:3, 102:22, 103:24
**position** [2] - 54:16, 62:14
**possession** [6] - 29:2, 69:14, 99:6, 99:8, 101:3, 101:4
**possibilities** [1] - 87:23
**possibility** [1] - 26:3
**possible** [5] - 5:4, 102:7, 102:12, 114:11, 137:23
**possibly** [1] - 124:5
**post** [1] - 82:23
**post-Miranda** [1] - 82:23
**posting** [2] - 20:7, 106:11
**posts** [1] - 132:11
**pot** [2] - 39:3, 65:24
**potential** [5] - 26:10, 35:7, 35:12, 97:24, 98:3
**potentially** [4] - 24:11, 96:7, 99:23, 101:14

**pound** [1] - 71:15
**pounds** [4] - 72:2, 72:13, 73:6, 73:9
**power** [4] - 36:11, 36:22, 37:11, 41:6
**Power** [3] - 100:4, 100:15, 100:16
**predict** [2] - 34:12, 109:24
**pregnant** [1] - 10:14
**premature** [1] - 138:22
**present** [5] - 3:8, 3:15, 4:7, 87:1, 87:22
**presentation** [2] - 31:23, 87:21
**presented** [1] - 114:25
**preserved** [1] - 89:13
**press** [1] - 136:8
**presumptively** [1] - 34:9
**pretend** [1] - 20:16
**pretrial** [1] - 28:22
**pretty** [2] - 41:24, 81:16
**previous** [1] - 47:7
**print** [1] - 107:19
**prison** [3] - 27:4, 92:21, 95:11
**problem** [5] - 45:16, 45:18, 56:9, 110:5, 138:4
**problems** [2] - 88:14, 133:13
**procedure** [2] - 56:20, 56:25
**proceed** [1] - 111:2
**proceeding** [2] - 32:5, 34:10
**proceedings** [2] - 28:18, 140:4
**processed** [1] - 101:25
**Program** [1] - 36:3
**program** [68] - 19:4, 19:5, 19:6, 19:7, 40:22, 42:1, 42:3, 42:6, 42:9, 42:12, 42:14, 43:7, 43:12, 43:13, 43:16, 43:22, 44:1, 44:5, 44:7, 44:15, 45:20, 46:5, 46:6, 46:7, 46:10, 46:12, 46:25, 47:2, 47:5, 47:10, 47:17, 48:5, 48:7, 49:25, 50:11, 50:12, 50:14, 50:17, 51:3, 51:6, 51:8, 55:14, 56:3, 61:23, 62:12, 62:18, 62:23, 62:24, 63:1, 64:4, 66:15, 66:19, 68:4, 69:18, 75:10, 75:17, 78:14, 78:15, 78:17, 79:2, 79:7, 79:11, 79:15, 79:18, 79:20, 79:21
**programs** [1] - 51:18
**promises** [1] - 125:23
**pronouncing** [1] - 12:25
**proof** [1] - 78:7
**property** [2] - 86:3, 86:6
**prosecute** [3] - 27:19, 27:23, 30:25
**prosecuted** [1] - 25:11
**prosecution** [2] - 30:7, 31:19
**prosecutor** [1] - 60:22
**protected** [2] - 30:22, 36:1
**prove** [2] - 6:3, 7:2
**proven** [1] - 6:21
**provide** [19] - 10:16, 26:11, 26:15, 28:25, 29:7, 32:2, 32:6, 38:3, 38:4, 40:21, 41:5, 47:20, 47:22, 48:5, 48:7, 56:12, 94:8, 94:10, 103:9
**provided** [2] - 30:11, 97:23
**providing** [2] - 13:21, 32:16
**publish** [1] - 116:7
**published** [26] - 113:24, 114:12, 114:21, 115:13, 115:16, 117:2, 117:10, 117:13, 117:19, 117:24, 118:5, 120:20, 121:8, 121:12, 121:17, 123:8, 125:11, 125:16, 126:1, 126:10, 126:16, 129:11, 130:1, 130:10, 130:15, 131:7
**pulled** [1] - 95:16
**punish** [1] - 56:10
**punished** [5] - 46:23, 56:19, 56:22, 56:23, 56:25
**punishment** [6] - 46:15, 46:17, 56:12, 56:17, 56:21, 57:3
**punishments** [2] - 44:17, 75:20
**purchase** [1] - 65:22
**purchased** [1] - 71:17
**purpose** [11] - 6:6, 40:16, 40:17, 40:18, 43:7, 43:8, 51:23, 65:14, 71:18, 105:10
**purposes** [1] - 133:25
**pursued** [1] - 87:24
**push** [1] - 137:3
**pushed** [1] - 136:19
**put** [10] - 5:7, 22:3, 23:12, 23:14, 23:20, 24:22, 31:16, 47:8, 63:15, 131:22
**putting** [1] - 90:15

## Q

**qualification** [1] - 4:16
**quantities** [1] - 51:3
**questioning** [7] - 21:10, 73:22, 74:22, 75:11, 76:1, 80:4, 119:14
**questions** [8] - 52:3, 59:17, 72:17, 82:6, 103:16, 104:10, 113:13, 119:22
**quick** [5] - 33:18, 59:21, 108:2, 108:11, 132:2
**quickly** [1] - 139:7
**quite** [3] - 17:2, 132:3, 134:4

## R

**racketeering** [2] - 6:4, 6:7
**radar** [1] - 69:6
**raise** [6] - 65:11, 71:18, 71:21, 84:20, 110:4, 110:9
**raised** [5] - 6:18, 65:13, 65:21, 65:24, 70:9
**raising** [2] - 64:20, 65:14
**ranflero** [11] - 40:7, 40:9, 44:2, 45:25, 51:18, 56:24, 75:14, 77:23, 77:25, 78:6
**ranfleros** [12] - 40:5, 40:11, 40:14, 46:16, 46:19, 51:13, 54:12, 55:14, 56:16, 58:20, 65:18, 69:22
**range** [1] - 34:5
**rank** [11] - 15:23, 15:24, 16:1, 16:9, 51:22, 51:23, 51:24, 51:25, 52:17, 68:16, 85:8
**ranked** [1] - 73:1
**ranks** [4] - 18:16, 18:25, 36:6, 39:16
**rapport** [2] - 120:2, 120:4
**Raton** [2] - 93:22, 94:5
**reach** [4] - 19:18, 45:19, 92:4, 93:4
**reached** [1] - 94:17
**reaches** [1] - 68:16
**read** [15] - 28:20, 30:8, 31:12, 31:17, 31:21, 32:14, 103:11, 103:12, 104:3, 104:5, 104:7, 111:24, 114:9, 115:3, 115:20
**reading** [3] - 114:19, 115:21, 123:11
**ready** [5] - 19:19, 60:12, 83:17, 84:4, 125:7
**real** [2] - 33:18, 108:2
**realistic** [1] - 138:1
**really** [4] - 108:24, 109:5, 132:15, 139:7
**reason** [6] - 17:11, 17:20, 44:11, 79:9, 110:25, 116:25
**reasonable** [1] - 6:22
**reasonably** [1] - 28:21
**reasons** [1] - 79:10
**receive** [7] - 25:21, 25:22, 25:25, 29:21, 33:2, 33:15, 55:1
**Received** [1] - 2:12
**received** [14] - 24:19, 27:1, 27:6, 49:3, 81:24, 87:8, 90:11, 91:19, 92:14, 105:4, 116:5, 118:23, 122:9, 127:23
**receiving** [2] - 10:24, 92:18
**recess** [2] - 107:6, 139:22
**recessed** [5] - 60:7, 84:6, 107:9, 124:19, 139:23
**recognize** [4] - 25:6, 48:19, 49:8, 122:16
**recognized** [1] - 122:21
**recognizes** [1] - 34:2
**recommendation** [2] - 33:9, 33:12
**record** [13] - 8:1, 48:21, 51:15, 57:13, 60:8, 79:24, 84:7, 84:24, 107:10, 107:11, 124:20, 128:19, 139:14
**recorded** [4] - 97:16, 97:17, 103:19, 104:14
**recording** [9] - 83:5, 104:22, 104:24, 105:23, 113:6, 113:14, 113:19, 118:17, 122:1
**recordings** [1] - 104:17
**records** [16] - 28:25, 50:3, 50:5, 69:24, 69:25, 70:2, 77:25, 78:1, 78:7, 78:9, 88:10, 89:8, 89:9, 89:14, 99:2
**recovered** [1] - 96:13
**recruit** [2] - 12:8, 37:3
**recruiters** [1] - 48:1
**redacted** [7] - 83:5, 107:15, 111:7, 111:19, 114:2, 117:9, 134:2
**redactions** [8] - 83:2, 83:18, 83:22, 83:25, 107:19, 111:14, 112:14, 112:19
**redirect** [2] - 72:20, 136:22
**REDIRECT** [2] - 2:6, 72:21
**reduced** [1] - 25:22
**reduction** [10] - 26:10, 29:18, 29:20, 30:3, 32:4, 32:8, 32:9, 32:18, 33:2, 33:15
**reenter** [1] - 79:14
**refer** [1] - 75:2
**referred** [3] - 103:10, 104:3, 118:13
**referring** [1] - 130:21
**reflects** [1] - 44:24
**refresh** [2] - 67:8, 67:15
**refreshed** [1] - 67:17
**refused** [1] - 11:19
**regarding** [9] - 93:3, 93:4, 98:20, 100:18, 106:9, 106:10, 106:11, 111:14, 132:10
**regardless** [3] - 14:8, 32:1, 34:15
**region** [2] - 47:21, 47:22
**regularly** [1] - 87:17

**related** [6] - 20:6, 32:3, 54:9, 86:6, 86:19, 90:7
**relates** [2] - 20:8, 26:12
**relating** [2] - 29:3, 29:8
**relation** [1] - 49:22
**relatively** [1] - 106:24
**released** [2] - 9:15, 34:20
**relevance** [1] - 112:23
**relevant** [2] - 6:2, 97:18
**remain** [1] - 112:4
**remainder** [3] - 5:3, 134:13, 135:1
**remaining** [3] - 105:24, 133:4, 134:21
**remember** [6] - 12:19, 50:21, 106:5, 106:23, 123:23, 131:4
**remind** [1] - 5:25
**reminders** [1] - 132:2
**reminding** [2] - 5:20, 132:3
**removable** [1] - 34:5
**removal** [6] - 34:8, 34:9, 34:17, 34:19, 34:22, 35:2
**removing** [1] - 95:11
**rent** [14] - 22:20, 23:3, 23:9, 38:5, 38:8, 63:7, 63:12, 64:25, 65:3, 72:7, 74:10, 74:13, 74:14
**renta** [1] - 22:20
**repeat** [1] - 35:10
**report** [5] - 40:2, 40:3, 40:5, 51:17, 106:16
**REPORTED** [1] - 1:20
**reported** [2] - 94:1, 94:2
**reporter** [2] - 41:3, 119:25
**Reporter** [2] - 1:21, 140:9
**requested** [1] - 26:17
**require** [1] - 28:23
**required** [7] - 6:2, 14:6, 16:17, 37:23, 69:2, 69:23, 76:23
**rescheduling** [1] - 136:14
**research** [2] - 106:9, 132:9
**resell** [1] - 66:2
**resolve** [2] - 69:10, 78:7
**respect** [19] - 14:9, 14:10, 14:23, 15:1, 15:2, 15:4, 34:3, 36:18, 52:25, 53:1, 53:6, 53:22, 57:15, 57:21, 58:2, 58:4, 81:20
**respected** [3] - 57:19, 57:24, 59:12
**respectfully** [1] - 136:12
**responding** [1] - 120:24
**response** [1] - 120:24
**responsibilities** [1] - 85:12
**responsibility** [1] - 47:15
**responsible** [1] - 89:5
**rest** [1] - 72:6
**restitution** [1] - 27:17
**restroom** [4] - 60:1, 60:6, 108:5, 124:12
**result** [8] - 31:18, 31:22, 35:21, 35:25, 81:10, 92:18, 98:2, 99:14
**resulting** [2] - 31:24, 34:8
**retired** [2] - 94:18, 99:5
**return** [1] - 57:1
**review** [2] - 69:21, 91:24
**reviewed** [2] - 87:20, 104:17
**ride** [1] - 63:16
**rights** [11] - 34:22, 69:21, 103:10, 104:4, 104:5, 104:9, 114:19, 115:1, 115:3, 115:6, 115:20
**rise** [9] - 4:20, 7:14, 60:3, 82:15, 84:8, 106:18, 107:8, 124:15, 132:22
**rival** [7] - 12:18, 14:8, 16:17, 16:19, 17:6, 17:16, 20:16
**rivals** [4] - 14:13, 14:18, 37:8, 40:19
**RMR** [2] - 1:21, 140:8
**road** [1] - 85:25
**roads** [1] - 88:11
**robberies** [1] - 86:10
**Robert** [1] - 94:18
**Roberto** [1] - 101:25
**Rodolfo** [1] - 1:22
**RODOLFO** [1] - 1:10
**role** [1] - 76:8
**room** [5] - 106:2, 106:16, 107:5, 131:22, 132:21
**Room** [2] - 1:24, 140:11
**Rosenbaum** [10] - 3:14, 4:12, 24:15, 48:24, 59:20, 60:17, 73:3, 74:20, 104:25, 127:22
**ROSENBAUM** [20] - 1:16, 1:17, 2:6, 3:13, 4:13, 24:17, 48:25, 59:21, 60:18, 60:20, 67:10, 67:13, 72:17, 105:1, 107:3, 111:20, 116:2, 118:21, 122:7, 127:21
**roughly** [2] - 18:12, 23:19
**round** [4] - 4:18, 84:10, 112:3, 124:21
**Ruiz** [1] - 1:22
**RUIZ** [1] - 1:10
**rule** [13] - 14:23, 15:6, 15:16, 16:13, 36:17, 41:14, 52:14, 53:7, 54:16, 81:11, 81:14, 81:16
**Rules** [1] - 112:20
**rules** [41] - 14:2, 14:6, 15:9, 15:11, 15:20, 16:15, 22:17, 36:10, 36:11, 36:12, 36:14, 36:16, 36:18, 39:11, 39:12, 39:14, 41:11, 41:21, 43:9, 44:14, 45:22, 46:10, 51:7, 51:11, 51:13, 52:13, 52:14, 58:23, 61:10, 61:11, 68:1, 76:10, 79:11, 79:13, 80:11, 80:13, 80:17, 80:20, 106:6, 111:12, 113:17
**rulings** [1] - 112:17
**run** [2] - 61:19, 80:1
**running** [5] - 4:6, 11:13, 22:15, 36:9, 132:14
**runs** [1] - 40:9
**rushed** [3] - 17:21, 17:22, 108:5

**S**

**S.E** [1] - 1:18
**Salvador** [26] - 8:7, 8:19, 8:20, 11:4, 11:10, 11:11, 40:5, 40:14, 41:1, 43:24, 44:2, 46:1, 46:19, 51:1, 51:13, 53:23, 56:16, 64:21, 65:18, 69:1, 69:22, 70:3, 71:22, 77:23, 78:3, 80:9
**Salvatrucha** [2] - 13:2, 13:9
**San** [4] - 9:10, 10:1, 11:10, 11:11
**Santa** [1] - 50:19
**saw** [2] - 128:18, 130:6
**scar** [5] - 127:4, 127:6, 127:8, 128:22, 129:2
**Scene** [2] - 101:21, 101:25
**scene** [4] - 91:7, 95:7, 95:21, 95:22
**scenes** [1] - 95:23
**schedule** [1] - 137:23
**scheduling** [2] - 132:6, 136:19
**school** [4] - 10:9, 10:15, 47:23, 47:24
**screen** [2] - 24:21, 128:23
**sealing** [1] - 101:16
**seat** [3] - 79:18, 79:19, 108:11
**seated** [16] - 3:2, 3:25, 4:2, 4:22, 60:9, 60:14, 82:17, 84:9, 84:12, 84:23, 106:20, 108:12, 112:8, 124:17, 124:24, 132:24
**second** [5] - 28:19, 55:21, 77:6, 133:24, 134:4
**seconds** [7] - 44:25, 57:7, 57:9, 77:6, 114:11, 114:16, 116:23
**section** [2] - 96:10, 117:9
**secured** [1] - 95:7
**SECURITY** [9] - 4:20, 60:3, 82:15, 84:8, 106:18, 107:8, 112:4, 124:15, 132:22
**Security** [2] - 35:1, 36:3
**security** [1] - 97:12
**see** [20] - 4:24, 48:19, 67:4, 67:5, 67:14, 95:17, 95:20, 106:17, 107:6, 108:19, 110:25, 114:5, 124:1, 132:20, 136:16, 138:23, 138:24, 138:25, 139:15, 139:22
**seeing** [2] - 24:24, 59:10
**seek** [1] - 29:25
**segments** [1] - 112:13
**seized** [1] - 78:22
**sell** [10] - 22:21, 22:23, 23:1, 39:6, 41:9, 51:4, 65:10, 70:11, 71:24, 73:7
**selling** [6] - 23:22, 39:1, 65:24, 70:9, 73:4, 73:10
**seminars** [3] - 87:12, 87:17, 87:19
**send** [5] - 40:13, 47:21, 51:14, 71:21, 78:6
**sense** [6] - 82:20, 133:3, 133:9, 134:21, 135:2, 135:13
**sentence** [19] - 25:22, 25:25, 26:1, 26:2, 26:4, 26:10, 27:12, 29:19, 29:20, 30:3, 31:3, 31:17, 31:21, 32:8, 32:9, 32:11, 32:18, 33:2, 33:15
**sentenced** [1] - 25:23
**sentences** [2] - 31:12, 31:25
**sentencing** [2] - 106:23, 106:25
**sentencings** [1] - 137:2
**separate** [2] - 6:13, 34:10
**September** [2] - 63:3, 93:7
**Sergeant** [4] - 90:5, 90:13, 90:24, 91:8
**series** [4] - 48:17, 49:6, 51:7, 119:4
**serious** [4] - 13:22, 38:24, 45:1, 45:4
**serve** [1] - 86:4
**services** [1] - 3:19
**set** [5] - 4:3, 5:8, 82:12, 82:18, 84:3
**setting** [1] - 84:2
**settled** [1] - 56:13
**settling** [1] - 124:25
**several** [1] - 86:17
**severity** [4] - 15:14, 45:18, 45:22, 57:8
**sexual** [1] - 86:10
**shame** [1] - 110:8
**share** [1] - 92:6
**Sheriff's** [20] - 84:17, 85:7, 85:16, 85:18, 86:12, 89:19,

90:6, 90:9, 91:19, 93:20, 94:7, 94:19, 94:21, 97:6, 97:11, 99:2, 101:4, 101:14, 101:19, 102:18
**shipments** [1] - 40:24
**shirt** [5] - 101:10, 122:17, 127:12, 130:24, 131:3
**short** [1] - 89:4
**shortage** [1] - 83:15
**shot** [3] - 18:23, 62:11, 130:8
**shot-caller** [2] - 18:23, 62:11
**show** [15] - 7:2, 15:1, 25:4, 48:17, 58:12, 59:5, 67:7, 95:9, 116:7, 118:24, 126:25, 127:25, 128:18
**showed** [2] - 95:22, 128:15
**showing** [7] - 25:2, 49:5, 116:9, 128:9, 128:13, 129:2, 130:22
**shown** [4] - 83:20, 118:11, 122:1, 122:13
**shows** [1] - 88:24
**sic** [2] - 62:11, 120:2
**side** [3] - 107:5, 122:22, 131:2
**sidewalk** [1] - 96:10
**sight** [1] - 81:22
**sign** [4] - 25:20, 103:15, 115:4, 115:9
**signature** [3] - 116:14, 116:16
**signed** [2] - 25:9, 104:6
**significant** [1] - 93:3
**signifies** [1] - 59:4
**signify** [2] - 58:9, 59:3
**Silva** [17] - 90:23, 91:23, 92:7, 92:11, 93:8, 94:24, 95:2, 96:1, 96:17, 96:19, 96:22, 96:23, 97:1, 98:2, 99:15, 99:19, 127:15
**Silva's** [1] - 96:6
**similar** [1] - 6:1
**similarly** [1] - 73:20
**single** [2] - 107:4, 107:5
**situation** [2] - 78:7, 89:2
**six** [11] - 49:6, 49:7, 62:22, 86:2, 118:12, 118:13, 119:3, 119:4, 119:6, 119:7
**six-pack** [2] - 118:13, 119:3
**skip** [2] - 114:11, 130:14
**skipping** [1] - 115:15
**sleep** [1] - 134:8
**slow** [1] - 19:24
**small** [1] - 86:5
**smoking** [3] - 126:7, 128:2, 129:17
**smooth** [2] - 22:15, 36:9
**SMUKLER** [1] - 1:13
**Smukler** [1] - 3:8
**snips** [1] - 133:22
**social** [7] - 19:19, 20:2, 20:5, 20:7, 88:11, 106:11, 132:11
**sold** [1] - 72:24
**soldiers** [3] - 37:14, 37:15, 79:18
**Solitario** [1] - 100:12
**solved** [1] - 90:16
**someone** [9] - 16:4, 16:17, 58:14, 63:12, 63:19, 63:20, 66:8, 68:16, 129:24
**someplace** [1] - 58:24
**sometimes** [16] - 7:5, 38:20, 40:13, 40:20, 40:23, 44:3, 44:4, 44:6, 44:7, 46:6, 58:7, 79:6, 79:16, 108:21, 112:18, 121:4
**somewhere** [3] - 9:9, 18:9, 21:2
**sooner** [1] - 136:15
**sorry** [14] - 9:25, 12:23, 15:18, 23:13, 23:14, 36:21, 65:2, 76:24, 79:21, 91:3, 93:11, 102:3, 119:6, 120:13
**sort** [7] - 9:17, 15:24, 50:7, 86:15, 94:23, 120:16, 132:10
**sound** [4] - 48:1, 90:15, 90:17, 90:18
**source** [1] - 72:14
**sourced** [1] - 71:10
**SOUTHERN** [1] - 1:1
**Southern** [2] - 1:23, 140:10
**space** [1] - 106:24
**Spanish** [9] - 3:20, 103:4, 103:12, 104:7, 115:7, 115:22, 116:12, 117:7, 121:5
**speakers** [1] - 114:5
**speaking** [1] - 120:25
**speaks** [1] - 103:7
**Special** [14] - 3:9, 48:14, 48:16, 93:2, 93:7, 103:6, 104:1, 117:17, 118:12, 119:14, 120:1, 120:15, 122:1, 129:10
**special** [1] - 102:25
**specific** [8] - 15:23, 23:6, 39:11, 41:15, 41:18, 72:8, 78:9, 87:5
**specifically** [6] - 21:11, 22:21, 23:5, 49:23, 52:5, 91:19
**speed** [2] - 133:18, 138:17
**spell** [2] - 7:25, 84:24
**spoken** [1] - 93:2
**spot** [3] - 19:20, 95:17, 96:7
**spots** [1] - 115:4
**stab** [1] - 53:18
**stabbed** [1] - 130:8
**stabbing** [2] - 21:18, 21:22
**stand** [3] - 4:2, 5:9, 84:16
**standby** [1] - 133:5
**standing** [2] - 108:12, 112:4
**start** [28] - 7:14, 11:21, 11:24, 15:23, 21:17, 21:20, 22:18, 36:25, 37:1, 39:4, 39:5, 58:10, 85:19, 105:15, 105:18, 113:5, 113:12, 113:18, 114:16, 116:22, 116:24, 117:6, 119:13, 119:22, 125:9, 131:25, 132:16, 138:12
**started** [15] - 13:12, 14:2, 20:12, 21:10, 21:17, 21:18, 21:22, 55:12, 61:2, 61:8, 73:10, 85:23, 107:23, 112:16, 113:22
**starting** [6] - 4:5, 4:9, 37:3, 117:7, 118:3, 121:21
**starts** [5] - 35:18, 36:24, 116:25, 117:17, 123:12
**State** [1] - 97:10
**state** [3] - 7:25, 13:23, 29:15
**statement** [5] - 29:6, 30:17, 129:23, 133:24, 134:4
**statements** [2] - 31:1, 82:23
**STATES** [5] - 1:1, 1:4, 1:10, 1:14, 1:14
**states** [4] - 27:18, 30:11, 42:16
**States** [21] - 1:22, 3:4, 3:8, 8:8, 8:10, 8:12, 8:15, 8:19, 8:23, 9:2, 9:4, 9:14, 28:22, 34:4, 34:17, 34:19, 46:1, 46:21, 71:8, 107:12, 140:9
**status** [13] - 9:1, 9:13, 9:17, 33:19, 33:20, 34:1, 34:4, 34:14, 36:1, 52:23, 59:4, 59:13, 59:14
**stay** [4] - 9:14, 10:4, 18:16, 79:6
**STENOGRAPHICALLY** [1] - 1:20
**step** [2] - 47:11, 84:2
**steps** [5] - 5:8, 61:1, 91:9, 91:16, 95:1
**Sterling** [2] - 10:3, 10:8
**stick** [3] - 109:10, 110:19, 110:25
**sticks** [1] - 77:17
**still** [14] - 18:4, 18:9, 21:8, 30:18, 33:20, 54:5, 78:20, 80:5, 80:8, 80:13, 81:8, 91:8, 102:17, 136:9
**stomach** [1] - 58:16
**stop** [9] - 9:7, 20:15, 80:17, 113:12, 121:15, 125:14, 125:19, 126:13, 131:11
**stopping** [1] - 114:24
**stops** [1] - 80:19
**store** [1] - 10:25
**story** [1] - 138:11
**streamlined** [1] - 83:19
**street** [1] - 100:5
**Street** [9] - 1:15, 1:18, 14:19, 14:20, 20:6, 21:12, 52:7, 52:9, 81:1
**stressful** [1] - 110:2
**stretch** [1] - 5:17
**strict** [1] - 41:24
**stronghold** [2] - 36:20, 43:10
**structured** [1] - 80:5
**study** [1] - 9:5
**stuff** [4] - 84:4, 111:22, 134:2
**subject** [4] - 106:9, 119:18, 120:5, 122:17
**subjects** [2] - 34:10, 118:14
**submit** [2] - 101:23, 102:12
**subsequent** [1] - 93:4
**substance** [2] - 91:24, 92:2
**substantial** [2] - 35:8, 35:12
**substantive** [1] - 28:3
**sufficient** [1] - 44:12
**Suite** [1] - 1:18
**sum** [2] - 91:24, 92:2
**summarize** [1] - 135:18
**supplied** [1] - 70:18
**supplier** [1] - 66:5
**supply** [1] - 71:7
**support** [1] - 29:7
**supposed** [1] - 41:16
**surveillance** [1] - 87:11
**suspect** [1] - 90:21
**suspect's** [1] - 90:22
**suspected** [1] - 52:8
**suspects** [4] - 89:16, 97:25, 98:3, 127:15
**swap** [2] - 107:14, 107:19
**swear** [2] - 5:9, 84:19
**swinging** [1] - 115:20
**switch** [2] - 116:6, 116:18
**switched** [1] - 55:13
**sworn** [3] - 7:14, 7:17, 84:22
**system** [1] - 92:21

**T**

**tab** [1] - 113:16
**tabbed** [1] - 113:16
**table** [1] - 3:9
**tables** [1] - 106:25

**taca** [1] - 55:7
**talks** [2] - 35:4
**tape** [1] - 101:16
**target** [2] - 134:25, 135:14
**task** [4] - 86:16, 86:17, 86:18, 103:2
**Task** [1] - 86:18
**tattoos** [19] - 54:7, 54:9, 54:13, 55:1, 58:8, 58:11, 58:12, 58:14, 58:19, 59:5, 59:9, 68:15, 68:17, 69:2, 69:4, 77:19, 126:20, 126:22, 128:17
**taxi** [2] - 11:15
**tea** [1] - 91:7
**teach** [1] - 14:3
**team** [1] - 135:25
**teamed** [1] - 94:18
**techniques** [2] - 87:11, 87:20
**technology** [2] - 88:7, 88:18
**telephone** [1] - 97:17
**ten** [1] - 59:23
**ten-minute** [1] - 59:23
**Tenth** [1] - 10:10
**tenth** [1] - 10:11
**term** [3] - 14:18, 26:21, 27:3
**terms** [1] - 25:15
**territorial** [1] - 69:21
**territories** [1] - 36:20
**territory** [14] - 22:22, 23:1, 36:11, 36:22, 36:24, 37:8, 38:12, 42:14, 48:4, 48:11, 49:21, 50:1, 69:10, 74:1
**terrorism** [1] - 87:11
**testified** [2] - 73:15, 79:5
**testify** [5] - 24:11, 26:16, 28:17, 32:6, 35:22
**testifying** [1] - 81:13
**testimony** [18] - 5:20, 6:16, 6:18, 6:19, 7:6, 7:7, 60:21, 90:1, 95:6, 105:24, 124:13, 125:23, 130:9, 133:20, 134:14, 136:8, 138:8, 138:20
**Texas** [2] - 9:8, 9:10
**text** [2] - 78:8, 111:15
**that'll** [1] - 116:3
**THE** [122] - 1:10, 1:13, 1:16, 3:2, 3:11, 3:17, 3:23, 3:24, 4:11, 4:14, 4:20, 4:22, 4:25, 5:1, 7:11, 7:18, 24:15, 24:18, 41:4, 48:24, 49:1, 57:12, 59:19, 59:22, 60:3, 60:5, 60:9, 60:14, 67:11, 67:12, 72:19, 79:23, 82:8, 82:15, 82:17, 82:25, 83:3, 83:6, 83:9, 83:13, 83:16, 83:23, 84:8, 84:9, 84:12, 84:18, 84:20, 84:23, 84:25, 104:25, 105:2, 105:8, 105:16, 106:18, 106:20, 107:4, 107:8, 107:11, 107:21, 107:24, 108:10, 108:15, 108:17, 108:18, 108:25, 109:12, 109:13, 109:14, 109:16, 109:17, 109:20, 109:23, 109:25, 110:12, 110:13, 110:15, 110:16, 110:18, 111:4, 111:9, 111:18, 111:24, 112:4, 112:7, 116:3, 118:20, 118:22, 120:1, 122:8, 123:3, 124:9, 124:15, 124:17, 124:21, 124:24, 127:20, 127:22, 131:12, 131:14, 132:22, 132:24, 133:8, 133:16, 133:19, 134:3, 134:6, 134:9, 135:5, 135:8, 135:12, 135:24, 136:3, 136:7, 136:23, 136:25, 137:17, 138:7, 138:14, 138:21, 139:13, 139:15, 139:21
**thefts** [1] - 86:6
**themselves** [3] - 38:17, 38:19, 76:18
**theory** [1] - 89:12
**therefore** [1] - 6:5
**thinking** [4] - 135:12, 137:9, 137:12, 137:14
**thinks** [1] - 21:1
**third** [4] - 15:6, 26:19, 125:15, 125:24
**thirds** [2] - 117:16, 126:14
**threaten** [2] - 23:25, 38:16
**threatened** [4] - 8:20, 11:3, 63:12, 64:11
**threatening** [2] - 38:18, 74:14
**three** [6] - 49:6, 81:18, 86:5, 86:8, 119:6, 133:25
**throat** [1] - 58:15
**throughout** [5] - 9:17, 79:13, 88:22, 112:14, 121:1
**throw** [1] - 112:2
**ticket** [1] - 10:24
**ties** [1] - 120:3
**time-wise** [1] - 138:2
**timing** [3] - 133:3, 133:9, 139:17
**Tirado** [25] - 6:16, 90:23, 91:5, 91:23, 92:4, 92:7, 92:10, 92:11, 92:22, 93:8, 94:24, 95:2, 95:5, 96:1, 96:6, 96:11, 96:17, 96:19, 96:22, 96:23, 97:1, 98:2, 99:15, 99:19, 127:15
**Tirado's** [1] - 96:11
**Tirado-Silva** [17] - 90:23, 91:23, 92:7, 92:11, 93:8, 94:24, 95:2, 96:1, 96:17, 96:19, 96:22, 96:23, 97:1, 98:2, 99:15, 99:19, 127:15
**Tirado-Silva's** [1] - 96:6
**title** [2] - 42:5, 81:5
**today** [9] - 5:2, 81:5, 90:1, 96:3, 96:5, 108:19, 109:4, 124:12, 131:15
**together** [2] - 56:5
**toll** [2] - 88:10
**tomorrow** [18] - 131:21, 131:23, 131:25, 132:13, 132:18, 132:21, 133:1, 133:7, 134:17, 134:20, 135:17, 136:1, 136:9, 136:11, 137:1, 139:8, 139:15, 139:22
**took** [12] - 10:15, 21:6, 24:5, 63:15, 78:21, 91:13, 95:19, 95:21, 95:22, 99:8, 101:3, 101:4
**top** [5] - 42:18, 51:8, 81:21, 81:23, 118:3
**topic** [1] - 124:5
**touch** [3] - 98:3, 98:5, 128:23
**touched** [1] - 87:25
**tough** [1] - 109:2
**tourist** [3] - 123:19, 126:6, 129:16
**Tovar** [1] - 119:9
**tower** [1] - 88:25
**towers** [1] - 88:22
**track** [2] - 77:7, 135:4
**tracks** [1] - 137:14
**traffic** [2] - 4:6, 5:5
**trailer** [1] - 95:23
**training** [5] - 87:8, 87:20, 119:21, 123:25, 139:10
**transactions** [1] - 40:23
**transcript** [6] - 104:23, 105:6, 112:14, 121:25, 125:6, 135:18
**transcription** [1] - 140:4
**transcripts** [9] - 104:15, 104:18, 105:11, 109:6, 112:10, 112:12, 114:4, 134:14, 137:19
**transferred** [1] - 86:22
**transition** [1] - 126:8
**translating** [1] - 139:4
**translation** [4] - 104:23, 117:8, 121:5, 123:12
**translations** [1] - 113:18
**translator** [2] - 103:3, 104:2
**travel** [3] - 8:24, 92:20, 92:21
**traveled** [1] - 92:9
**traveling** [2] - 13:23, 95:7
**treat** [2] - 15:2, 15:3
**Treces** [1] - 50:20
**trial** [6] - 3:18, 4:1, 31:23, 32:2, 35:22, 136:19
**TRIAL** [1] - 1:9
**trials** [2] - 28:18, 112:18
**tried** [3] - 41:25, 95:12, 99:23
**tries** [1] - 38:6
**trip** [1] - 8:15
**trouble** [2] - 24:24, 138:13
**trust** [2] - 16:24, 79:14
**trusted** [3] - 17:12, 17:20
**truth** [1] - 26:13
**truthful** [2] - 26:15, 32:16
**truthfully** [2] - 28:9, 28:17
**try** [34] - 12:8, 13:22, 23:8, 25:19, 26:10, 30:18, 30:25, 37:17, 38:1, 38:12, 38:20, 40:25, 41:5, 43:19, 47:20, 47:23, 47:24, 51:3, 51:4, 51:5, 51:15, 73:25, 89:2, 92:24, 97:2, 99:22, 101:23, 108:19, 133:12, 133:17, 134:7, 137:5, 138:20, 139:9
**trying** [13] - 9:5, 17:24, 20:9, 20:14, 37:10, 38:10, 50:1, 51:25, 53:3, 77:9, 124:1, 137:9, 138:13
**Tuesday** [2] - 108:15, 135:11
**turn** [8] - 4:16, 7:13, 7:21, 60:15, 112:25, 113:15, 113:20, 125:2
**turned** [1] - 99:3
**turning** [1] - 84:13
**turnpike** [1] - 88:10
**Tutler** [4] - 90:6, 90:13, 90:24, 91:8
**two** [22] - 6:13, 31:12, 49:6, 49:25, 71:15, 72:12, 72:13, 73:9, 77:11, 89:25, 90:5, 92:16, 101:1, 104:15, 117:16, 119:6, 122:22, 126:14, 127:3, 133:4, 137:2
**two-thirds** [2] - 117:16, 126:14
**type** [3] - 22:23, 44:14, 139:17
**types** [4] - 50:16, 54:13, 88:18, 89:8

**U**

**U.S** [7] - 27:18, 28:9, 32:20, 33:4, 33:10, 65:19, 77:22
**ultimately** [5] - 13:4, 24:4, 33:15, 35:22, 96:13
**uncle** [4] - 11:5, 11:6, 11:8, 11:16

**under** [6] - 29:2, 34:5, 42:12, 69:6, 96:10, 108:3
**underneath** [1] - 49:12
**unduly** [1] - 110:2
**unfortunately** [1] - 139:3
**unincorporated** [1] - 94:6
**unique** [1] - 88:6
**Unit** [4] - 85:13, 86:21, 88:1, 89:23
**unit** [2] - 86:23, 87:5
**united** [1] - 43:10
**United** [21] - 1:22, 3:4, 3:8, 8:8, 8:10, 8:12, 8:14, 8:19, 8:23, 9:1, 9:4, 9:14, 28:22, 34:4, 34:17, 34:19, 46:1, 46:20, 71:7, 107:12, 140:9
**UNITED** [5] - 1:1, 1:4, 1:10, 1:14, 1:14
**universe** [2] - 137:17, 137:20
**unless** [1] - 111:1
**unsolved** [2] - 85:14, 87:22
**untoward** [1] - 97:20
**up** [71] - 4:3, 4:18, 5:8, 9:15, 9:18, 13:4, 14:14, 17:14, 18:16, 18:18, 18:19, 18:25, 19:9, 19:17, 19:19, 20:17, 21:2, 22:2, 22:17, 23:10, 23:11, 23:15, 23:23, 24:2, 24:22, 32:24, 36:5, 39:15, 51:25, 52:17, 52:21, 52:22, 58:24, 61:2, 61:5, 61:8, 73:6, 73:9, 78:20, 81:20, 81:22, 82:12, 82:18, 84:2, 84:3, 84:10, 84:18, 86:8, 94:16, 94:18, 97:9, 101:8, 105:22, 108:15, 108:24, 112:3, 112:9, 113:8, 113:20, 119:7, 120:18, 124:12, 124:21, 125:1, 128:3, 131:20, 133:2, 135:17, 138:2, 138:17
**updates** [1] - 51:17
**useful** [1] - 133:23
**uses** [1] - 14:18
**utilized** [1] - 43:25

**V**

**V-I-E-R-A** [1] - 8:2
**various** [3] - 61:1, 69:21, 95:23
**Vasquez** [7] - 98:14, 99:12, 99:18, 100:23, 101:5, 102:22, 103:24
**Vasquez-Portillo** [7] - 98:14, 99:12, 99:18, 100:23, 101:5, 102:22, 103:24
**vehicle** [1] - 54:1
**venue** [2] - 88:25
**verde** [2] - 45:8, 45:10
**verify** [1] - 76:9
**versus** [2] - 3:4, 107:12
**victim** [11] - 20:2, 20:10, 20:21, 21:1, 21:8, 21:9, 53:18, 98:14, 129:19, 129:21, 130:6
**victim's** [1] - 22:1
**Viera** [6] - 2:4, 7:16, 8:2, 24:21, 49:5
**Viera-Gonzalez** [5] - 2:4, 7:16, 8:2, 24:21, 49:5
**Vigil** [14] - 3:4, 3:12, 3:15, 3:19, 6:18, 100:13, 100:21, 102:10, 102:21, 103:9, 103:24, 107:12, 120:12
**VIGIL** [1] - 1:7
**Vigil-Benitez** [14] - 3:4, 3:12, 3:15, 3:19, 6:18, 100:13, 100:21, 102:10, 102:21, 103:9, 103:24, 107:12, 120:12
**VIGIL-BENITEZ** [1] - 1:7
**violate** [2] - 29:15, 81:14
**violated** [1] - 81:11
**violation** [1] - 29:17
**violations** [4] - 44:14, 44:17, 45:2, 68:1
**violence** [4] - 27:24, 27:25, 30:22, 38:15
**violent** [4] - 5:24, 33:23, 93:14, 93:17
**Virgil** [3] - 120:2, 120:4, 120:11
**Virginia** [28] - 10:3, 10:25, 12:10, 13:9, 18:12, 18:13, 18:14, 19:23, 21:3, 23:12, 23:16, 24:6, 25:12, 27:19, 30:25, 31:5, 32:7, 32:19, 33:5, 33:10, 42:17, 43:5, 49:23, 49:24, 50:25, 63:10, 64:15
**virtue** [1] - 85:17
**visible** [3] - 58:24, 127:5, 127:7
**VLS** [42] - 13:9, 13:10, 13:11, 13:20, 18:2, 18:9, 18:17, 18:20, 19:8, 19:18, 20:1, 20:4, 20:15, 22:12, 36:7, 36:8, 37:21, 37:23, 41:24, 42:8, 49:22, 50:19, 53:14, 56:2, 57:24, 61:20, 61:25, 63:6, 66:14, 68:1, 69:15, 72:11, 72:15, 72:24, 72:25, 73:4, 73:7, 73:11, 73:25, 75:19, 80:2
**voided** [2] - 35:14, 35:15
**Volume** [1] - 1:7
**volume** [1] - 113:20
**voluntarily** [1] - 27:15
**voluntary** [1] - 95:6
**vote** [1] - 47:11
**vs** [1] - 1:5

**W**

**waiting** [1] - 131:24
**waive** [2] - 104:9, 115:9
**waived** [2] - 27:9, 34:22
**waiver** [1] - 103:15
**wants** [2] - 31:6, 34:14
**warehouse** [1] - 10:24
**warm** [1] - 5:2
**warned** [1] - 136:18
**watch** [2] - 77:8, 97:24
**ways** [1] - 73:11
**weapons** [3] - 39:6, 40:19, 65:22
**wearing** [2] - 22:8, 122:17
**weather** [3] - 5:2, 5:5, 108:3
**weed** [3] - 71:15, 73:6, 73:9
**week** [2] - 134:23, 135:1
**weeks** [2] - 89:6, 97:13
**weighed** [1] - 6:21
**welcome** [1] - 112:7
**well-armed** [1] - 40:18
**well-respected** [2] - 57:24, 59:12
**west** [3] - 18:13, 42:23, 62:4
**West** [8] - 18:13, 19:23, 21:3, 24:6, 93:22, 94:5, 96:25, 98:14
**WhatsApp** [1] - 51:14
**whereabouts** [2] - 9:8, 21:11
**white** [2] - 122:17, 130:24
**whole** [9] - 20:14, 36:14, 40:11, 43:10, 46:6, 46:15, 46:23, 56:25, 137:12
**WILBER** [1] - 1:7
**Wilber** [9] - 3:4, 3:14, 100:13, 100:21, 102:9, 102:21, 103:9, 103:23, 127:15
**Williams** [1] - 101:21
**willing** [1] - 97:5
**Wilmar** [3] - 2:4, 7:16, 8:2
**Wilson** [6] - 90:23, 91:5, 91:23, 92:7, 92:22, 95:5
**Winchester** [7] - 10:25, 12:11, 18:9, 18:11, 18:12, 23:18, 23:19
**wise** [1] - 138:2
**witness** [28] - 4:2, 4:17, 5:8, 5:9, 5:10, 5:14, 6:11, 6:19, 7:16, 59:18, 68:13, 82:13, 82:19, 83:7, 83:20, 84:14, 84:21, 105:24, 109:6, 113:17, 116:15, 133:11, 134:17, 137:15, 137:24, 138:3, 139:3, 139:8
**Witness** [1] - 36:3
**WITNESS** [5] - 2:3, 41:4, 67:12, 84:25, 120:1
**witness's** [1] - 5:20
**witnesses** [8] - 5:7, 7:6, 83:15, 88:7, 88:15, 88:16, 134:15, 137:21
**woke** [1] - 108:15
**wondering** [1] - 111:10
**wood** [1] - 77:17
**wooded** [2] - 21:7, 21:16
**Word** [13] - 18:21, 36:6, 36:8, 39:19, 61:25, 66:14, 68:24, 69:15, 72:11, 76:5, 76:8, 77:22, 117:18
**word** [2] - 5:18, 103:5
**workers** [1] - 106:8
**Workers'** [1] - 86:18
**works** [5] - 103:2, 133:14, 134:12, 135:13, 139:9
**worried** [1] - 112:19
**worry** [1] - 112:22
**write** [2] - 49:12, 115:4
**writings** [1] - 29:1
**written** [1] - 114:24
**wrongdoing** [1] - 124:2
**wrote** [3] - 116:16, 119:8, 119:9

**Y**

**year** [5] - 46:1, 70:13, 70:14, 70:15, 89:18
**years** [11] - 26:6, 70:12, 72:12, 72:13, 85:18, 86:2, 86:5, 86:8, 86:17, 88:7
**years'** [1] - 26:22
**yesterday** [13] - 4:15, 5:6, 5:13, 5:19, 6:9, 6:15, 106:1, 108:5, 109:1, 109:18, 110:3, 110:23, 113:17
**York** [5] - 42:17, 42:21, 49:23, 92:9, 92:12
**you-all** [5] - 3:17, 4:24, 5:20, 105:19, 132:4
**yourself** [3] - 7:18, 19:13, 82:4
**Yulo** [3] - 12:3, 13:11, 49:18
**yulo/Fearless** [1] - 49:13

**Z**

**zoom** [5] - 24:24, 24:25, 119:1, 122:11, 128:7