UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 22-CR-60078-6

UNITED STATES OF AMERICA,

vs.

WILBER VIGIL-BENITEZ,

Defendant.

Miami, Florida
January 28, 2025
9:26 a.m. - 5:49 p.m.
Volume 6
Pages 1 to 206

---

JURY TRIAL
BEFORE THE HONORABLE RODOLFO A. RUIZ, II
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:
BRIAN DOBBINS
ELENA SMUKLER
ASSISTANT UNITED STATES ATTORNEYS
UNITED STATES ATTORNEY'S OFFICE
99 NE 4th Street
Miami, Florida 33132

FOR THE DEFENDANT:
JOSEPH S. ROSENBAUM
KIMBERLY ACEVEDO
ROSENBAUM & ACEVEDO, LLP
100 S.E. 2nd Street
Suite 3400
Miami, Florida 33131

STENOGRAPHICALLY REPORTED BY:

ILONA LUPOWITZ, RMR, CRR
Official Court Reporter to:
The Honorable Rodolfo A. Ruiz, II
United States District Court
Southern District of Florida
400 North Miami Avenue
Room 11-2
Miami, Florida 33128
(305) 523-5737

# I N D E X


| | Page |
|---|---|
| WITNESS | |
| Jennifer Parker | |
| VOIR DIRE EXAMINATION BY MS. SMUKLER: | 5 |
| DIRECT EXAMINATION BY MS. SMUKLER: | 9 |
| Nathan Ferguson | |
| DIRECT EXAMINATION BY MR. DOBBINS: | 22 |
| CROSS-EXAMINATION BY MR. ROSENBAUM: | 94 |
| REDIRECT EXAMINATION BY MR. DOBBINS: | 99 |

## GOVERNMENT'S EXHIBITS

| Exhibit | Received |
|---|---|
| A through E | 37 |
| 74 | 51 |
| 79-A | 56 |
| 75 | 58 |
| 85-F | 60 |
| 44-G | 69 |
| 45 | 70 |
| 47 | 71 |
| 80-L through 80-R | 79 |

## DEFENDANT'S EXHIBITS

(No exhibits marked.)

(Call to the Order of the Court.)

THE COURT: Good morning, everyone. Please be seated. All right. We are here this morning in Case No. 22-60078, the matter of the United States of America versus Wilber Vigil-Benitez.

Let's go to appearances, please, on behalf of the government.

MR. DOBBINS: Good morning, Your Honor. Brian Dobbins and Elena Smukler on behalf of the United States. Also present at counsel table is Special Agent Nathan Ferguson of the FBI.

THE COURT: All right. Good morning to you-all.

And on behalf of Mr. Vigil-Benitez.

MR. ROSENBAUM: Good morning, Your Honor. Joe Rosenbaum and Kimberly Acevedo on behalf of Wilber Vigil-Benitez, who's present before the Court.

THE COURT: All right. Good morning to you-all.

Okay. So we are set to go today with two remaining witnesses. I believe Jennifer Parker is going to lead off, and then Special Agent Ferguson; is that right, Mr. Dobbins?

MR. DOBBINS: Yes, Your Honor.

THE COURT: All right. All our jurors just arrived, so we have the full head count.

Before I bring them out, any other housekeeping issues on behalf of the government?

MR. DOBBINS: Nothing at this time, Your Honor.

THE COURT: All right. Mr. Rosenbaum, anything else?

MR. ROSENBAUM: Not at this time, Your Honor.

THE COURT: Very good. Let's round them up, please.

THE COURT SECURITY OFFICER: All rise for the jury.

(Jury enters at 9:28 a.m.)

THE COURT: Good morning, ladies and gentlemen. Please be seated. Good to see you-all. I know there were no donuts today. I know, that's on me. I promise donuts tomorrow. I won't forget. But it's good to see everybody. Thank you, guys, for being on time.

Today's moving day. Okay? We are really going to finish up here what looks to be the government's case. So I want you guys to continue to keep an open mind, stay locked in, as you had every single day. We're going to take a break at around 11:00 o'clock, and then we'll come back and go into the lunch hour. And by lunch I'll have a good sense of what the afternoon looks like, and I'll give you guys a little preview. But I can guarantee, again, that we are ahead of schedule, so I just want to let everybody know.

With that, everyone have their notepads? Yeah? Everyone's good to go? All right, guys. I want to go ahead and get started, so we can make some moves.

So with that, I'll turn it back to the government. And, Mr. Dobbins, your next witness. Or Ms. Smukler, my apologies.

MS. SMUKLER: It's okay. The government calls Jennifer Parker.

THE COURT: All right. We'll go ahead and get Ms. Parker in.

Good morning, Ms. Parker. Come on up, and we will swear you in.

(Government witness, Jennifer Parker, duly sworn.)

THE COURT: Please go ahead and have a seat. Make sure you speak into the microphone there. It doesn't really move, so you're going to have to lean a little bit. And you can go ahead and state and spell your name for the record, please.

THE WITNESS: Jennifer Parker, J-e-n-n-i-f-e-r, P-a-r-k-e-r.

THE COURT: Ms. Smukler, the floor is yours.

MS. SMUKLER: Thank you, Your Honor.

VOIR DIRE EXAMINATION

BY MS. SMUKLER:

Q. Good morning, Ms. Parker. Can you tell the jury what you do for a living?

A. So I work at the Broward Sheriff's Office in the crime lab in the DNA unit, and my job title is a Forensic Scientist III or DNA analyst.

Q. Okay. How long have you been working at the Broward Sheriff's Office Crime Laboratory?

A. I was hired in March of 2012, so coming on year 13.

Q. And what -- you had mentioned you're a forensic scientist III; is that what you said?
A. Yes.
Q. What is that?
A. So in our lab, we have Forensic Scientist I, II, and III. I is when you first start out in your training. II is when you become an independent case-working analyst. And III, like myself, you have a certification with the American Board of Criminalistics.
Q. So were you always a Forensic Scientist III?
A. No. I started out as a I when I first got hired in training, went to II, and then got promoted to III in 2017.
Q. And have you always worked at the Broward Sheriff's Office throughout your entire career?
A. Yes, I have.
Q. Okay. Now, what is the Broward Sheriff's Office Crime Lab, and what functions does it perform?
A. So the Broward Sheriff's Office Crime Lab is a crime lab that consists of different units of service for Broward County. We have a Latent Prints Unit, we have Crime Scene, we have the Drug and Chemistry Unit, firearms, and the DNA Analysis Unit.
Q. Okay. And how long did you say you've been working there?
A. Almost 13 years.
Q. Okay. Prior to working there, what was your educational background?

A. I have a Bachelor of Science degree from the University of Central Florida in forensic science.
Q. Now, in addition to your education, have you received any specialized education or training in the field of forensic DNA analysis?
A. So when I was hired at the Broward County Sheriff's Office in March of 2012, I started an in-house training program, which consisted of lots and lots of practice samples, observing other analysts, a lot of readings, oral exams, competency tests, and then I did supervised casework and became an independent case-working analyst, meaning I can do the cases on my own, in May of 2015.
Q. So is it fair to say that before you're permitted to perform DNA analysis on casework samples, that you're required to complete this training?
A. Yes, you are.
Q. Okay. Have you attended any professional conferences or trainings or seminars on forensic DNA analysis?
A. Yes. So every year, we have to have at least eight hours of continuing education credits, and I always far exceed that. And we do that by going to different conferences or trainings that are in the area or out of state, and these are just to stay abreast or current in the current technologies and methods in the field.
Q. So are you trained on new technologies or new updates in

the field of DNA analysis?
A. The ones that pertain to me in my position in my lab that we have validated I do have training on.
Q. Okay. Do you have any certifications?
A. I'm certified with the American Board of Criminalistics.
Q. What does that mean?
A. So it's a -- you have to have so many years in the field, and you have to take a three-hour written exam.
Q. Okay. Now, do you -- as part of your job responsibilities, have you personally performed the procedures involved in forensic DNA analysis?
A. Yes, I have.
Q. Approximately how many times?
A. Thousands.
Q. Okay. Is your proficiency to conduct DNA analysis regularly tested?
A. Yes. So to remain qualified as a DNA analyst, we have to take a proficiency test twice a year and pass it, so it's a third-party company that sends us a DNA case that mirrors an actual case, and we have to get the results correct in order to pass it. And then we do that twice a year to remain qualified.
Q. And what are the results of your proficiency test?
A. I have passed every single one.
Q. Is the Broward Sheriff's Office Crime Lab accredited?
A. Yes, we are accredited through ANAB.

Q. And you mentioned you're certified. Do you have to be certified, or is that something you did in addition to just the regular requirements of being a forensic scientist?

A. That's just in addition. I could have remained a forensic scientist II, but I opted to take the test and become a forensic scientist III because you get extra duties.

Q. Have you previously testified as an expert in the field of forensic biology and DNA analysis?

A. Yes, I have.

MS. SMUKLER: Okay. At this time, the government would tender Jennifer Parker as an expert in DNA analysis and forensic pathology.

THE COURT: You may proceed.

MS. SMUKLER: Okay.

DIRECT EXAMINATION

BY MS. SMUKLER:

Q. Now, does anyone check your work after you've completed it?

A. Yes. Every single one of our cases gets 100 percent reviewed by another qualified analyst. It gets a technical review to make sure that they agree with what our interpretations are and that we followed all the protocols. And then it gets an administrative review to look for grammar, errors, typos, that sort of thing.

Q. Okay. Did you receive any evidence in agency Case No. 90-2302-00710?

A. Yes.
Q. Did you select, yourself, which items of evidence would be analyzed in this case?
A. I did not.
Q. So who decides what's going to be tested?
A. So usually, if it's a case with a lot of items in it, the submitting agency or officer or detective that is in charge of the case gets together with my unit manager, and they decide on how many items to submit or which items would be best. Then those items are submitted to the lab, and then I was assigned the case.
Q. In this case, did you -- did you, yourself, meet with the detectives to determine what evidence would be best to test in this case?
A. I personally did not.
Q. Okay. Did someone from your lab do so?
A. I'm not sure that anyone met with them, but we do have what's called a Cold Case Unit, and we do have a detective that's with that. So we do meet with them routinely to go over cases, and this was one of them.
Q. Okay. Can you tell us what items were submitted for you to test in this case?
A. Would you like me to list every single one?
Q. Yes. And just for the record, are you reviewing -- what are you reviewing right now to be able to testify?

A. My case report.
Q. Okay.
A. The first item I received is the contact swab of right pant leg, item AG-26. The second item is suspected blood spot of right pant leg, item AG-26. The third item is contact swab of left pant lag, AG-26. The fourth item is suspected blood swab of left pant leg, AG-26. The fifth item is contact swab, right sneaker, AG-28. The sixth item is suspected blood swab, right sneaker, item AG-28. The seventh item is contact swab, left sneaker, item AG-28. The eighth item is suspected blood swab, left sneaker, item AG-28. The ninth item is swabs of left ankle from Gerson Vasquez-Portillo. The tenth item is swabs of right ankle from Gerson Vasquez-Portillo. The eleventh item is DNA standards from Gerson Vasquez-Portillo. And the twelfth item was another submission of the DNA standards from Gerson Vasquez-Portillo. The twelfth item is DNA standards from Kevin Gamez-Melendez. The fourteenth item is DNA standards from Melvin Cruz-Ortiz. And the fifteenth item is DNA standards from Wilber Vigil-Benitez.
Q. Okay. So to summarize, it sounds like you received several swabs from a pants -- from a pair of pants?
A. Pair of pants, yes.
Q. Several swabs from sneakers?
A. Yes.
Q. Several swabs from ankles of the victim in this case,

Gerson Vasquez-Portillo?
A. Yes.
Q. DNA standards from Gerson Vasquez-Portillo?
A. That's correct.
Q. And then DNA standards from Kevin Gamez-Melendez, Melvin Cruz-Ortiz, and Wilber Vigil-Benitez.
A. Correct.
Q. Okay. Can you tell the jury what serology is?
A. So serology is just looking for different -- it's different tests to determine if there are different bodily fluids present in the case. So in our lab, we look -- have a presumptive test for blood, so it indicates the possible presence of blood. It's a color change test that we add to samples that may have a reddish-brown staining on them or have indicated that they may have blood on them. And if it turns a pink color, then it indicates the possible presence of blood. It's a presumptive test, not a confirmatory test.
Q. Did you conduct the serology on any of the items that we've just discussed?
A. Yes, I did.
Q. On which items?
A. I did presumptive tests for blood on the suspected blood swab of the right pant leg, the suspected blood swab of the left pant leg, the suspected blood swab from the right sneaker, the suspected blood swab of the left sneaker, and the swab of

left ankle and the swabs of the right ankle, both of Gerson Vasquez-Portillo.

Q. And why did you choose those items to conduct serology on?

A. One, they had suspected blood swab in the description of the item. And two, they had reddish-brown stains on the actual swab that may indicate the possible presence of blood.

Q. Did you confirm whether those items did, in fact, indicate the presence of blood?

A. Yes. The presumptive testing indicated the presence of blood on those items listed.

Q. Okay. Now, you mentioned also receiving several DNA standards.

What is a DNA standard?

A. A DNA standard is from an actual person. So in this case, it's a buccal swab taken from the inner cheek. So that DNA profile, we know who that DNA profile belongs to. We can use it for comparisons of unknown samples in the case.

Q. Now, you received DNA samples from four individuals in this case, correct?

A. That's correct.

Q. Do you know who those individuals are?

A. Not personally.

Q. Okay. Now, I want to talk about your analysis.

Can you tell the jury, what is DNA?

A. So DNA contains your genetic code. You get half of your

DNA from your mother and half from your father, and your DNA profile stays the same throughout your entire life. And it is unique to each individual with the exception of identical twins.
Q. Where in your body can DNA come from?
A. So DNA is in every cell of your body, so excluding red blood cells, so blood, sweat, skin cells.
Q. And in all those places, is DNA the same?
A. Yes, throughout your entire body.
Q. What type of DNA testing does the BSO Crime Lab conduct?
A. So we do a type of DNA testing called short tandem repeat, PCR, or preliminary chain reaction. So it's just looking for short sequences of your DNA on your chromosomes that repeat itself over and over again, which is genetically given to you by your parents, depending on how many times those sequences repeat. So determining that could generate your DNA profile, which is unique to each person.
So we do that type of DNA analysis to look for those locations to then generate a DNA profile using that PCR method, which is amplification, because we're looking at such tiny amounts of DNA, we have to amplify that sample in order to generate a DNA profile.
Q. Has that type of analysis been widely accepted in the scientific community as reliable?
A. Yes, it has.

Q. And have the DNA procedures used by your crime lab been scientifically validated?
A. Yes. So every procedure first goes through a developmental validation before it ever reaches our lab to just determine how the procedure works and the methods. And then we do an internal validation to actually do it on our instruments and we use our chemistry, and we then practice on it and be proficient in that method before ever using it on real cases.
Q. Now the procedure you just mentioned, did you conduct that procedure on the items of evidence that you previously mentioned?
A. Yes. The PCR was used to amplify all the samples in this case.
Q. Okay. Now, did you swab the items -- you mentioned several swabs.
Did you swab those items yourself?
A. No, I did not.
Q. So they were already given to you as swabs, for example, of a pant leg.
A. Yes, they were.
Q. Now, you mentioned DNA standards.
Why do you analyze both items of evidence and DNA standards?
A. So items of evidence are usually from the crime scene, and we don't know the quality of that sample, we don't know how

many contributors there are, and we don't know if we're actually gonna get a DNA profile. So then we use DNA standards, the DNA profile that we get from the individual, to then compare to those unknown profiles in order to determine if they're included or excluded from those samples.

Q. So standards are submitted to you, and then you determine if the items of evidence -- or you compare them to the standard of people who are known?

A. The standards are compared to the items of evidence and the evidentiary samples.

Q. Okay. Now, would you briefly explain how you analyzed the DNA in this case?

A. Yes. So once I receive an item of evidence, we usually get it in the form of swabs. I bring it back to the lab and I will take a cutting of those swabs myself, and I inventory, take pictures, photos, and each one of those cuttings is placed into individual tubes labeled with the case number and item number, and then it goes through a four-step DNA analysis process.

The first step being extraction. So I add some chemicals to the swab in the tube, and it extracts the DNA out from the swab and breaks open the cells, releasing the DNA into the solution.

The second step is quantitation. So it's to determine how much DNA actually is in the sample. Is there enough, is there too much, what is that, you know, number.

So then the third step is amplification. Since we're working with such small amounts of DNA again, we need to amplify that millions of times in order to generate a DNA profile, hopefully.

And step four, which is profile generation. And then I do an interpretation on that profile to see if I can actually determine the number of contributors in that sample or if I can't interpret at all or if there's just not enough data. And then I do the comparisons of those DNA buccal swab standards to those evidentiary samples, and then report out my findings.

Q. Okay. Now, as a result of the testing done on this case and using that procedure, did you produce DNA profiles?

A. Yes, I did.

Q. Did you compare the DNA profiles from the evidence samples to the DNA profiles from the standards that you received?

A. Yes, I did.

Q. And what is the result of your comparison?

I guess let's go through the different items.

Did you lump them into groups?

A. I lumped Items 1, 2, 3, 4, 6, 8, 9, and 10 into one group because they all had the same result.

Q. And what was the result of those first items? Let's talk about that.

A. So all of those items, DNA foreign to Gerson Vasquez-Portillo was not detected. So only his DNA profile was

detected on those items.

Q. Okay. And so can you -- I'm sorry -- repeat which items showed only the DNA of Gerson Vasquez-Portillo?

A. Sure. So Item 1 was a contact swab of the right pant leg. Item 2 was suspected blood swab of the right pant leg. Item 3 was contact swab of the left pant leg. Item 4 was suspected blood swab of the left pant leg. Item 6 was suspected blood swab of the right sneaker. Item 8 was suspected blood swab from the left sneaker. And item 9 was swabs of the left ankle from Gerson Vasquez-Portillo. And Item 10 was swabs of the right ankle from Gerson Vasquez-Portillo.

Q. Okay. So to be clear, you did observe the DNA profile -- or the DNA profile of Gerson Vasquez-Portillo on those items?

A. Yes. So it was a single-source profile, meaning it came from one individual, and everything that was detected, nothing foreign or it was only his DNA results that were in those samples.

Q. Okay. What is the next group of evidence that you compared or that you reported?

A. So Item 5, which is contact swab of right sneaker, assuming that Gerson Vasquez-Portillo is a contributor, since it was his sneaker, we kind of expect his DNA profile to be on his own items of evidence -- you know, clothing, sneakers, that sort of thing. I was able to visualize that, yes, his profile was on there. So assuming his profile is a contributor, the DNA

results were interpreted as a mixture originating from two contributors. And then there was no foreign contributor resolved.

So not a whole lot of information left over besides his profile. And then I compared the standards from Kevin Gamez-Melendez, Melvin Cruz-Ortiz, and Wilber Vigil-Benitez, and they were all excluded from that sample.

Q. So to be clear, was the DNA of Gerson Vasquez-Portillo detected on the right swab of -- the swab of the right sneaker?

A. Yes. So he was one of the two contributors on that sample.

Q. Okay. And you said something about -- there was not a lot of DNA remaining, I think you said?

A. Yes. So there was not a whole lot of information left over besides his DNA profile. So that's why I say no foreign contributor was resolved.

Q. So you're not able to tell who the other contributor was?

A. No. I can still do comparisons to other standards, but this is all that I had to compare so far.

Q. Okay. So based on the standards you received, you were able to exclude those individuals as included in that item of evidence?

A. Yes, correct.

Q. Okay. Now, what is the next group of evidence that you reported on?

A. Item 7, which was contact swab from the left sneaker.

Again, assuming Gerson Vasquez-Portillo is a contributor, the DNA results were interpreted as a mixture originating from two contributors. Again, a foreign contributor was not resolved. Not a lot of information left over besides his profile. And the three individuals, Kevin Gamez-Melendez, Melvin Cruz-Ortiz, and Wilber Vigil-Benitez, were excluded as being contributors to that DNA mixture.

Q. Can you clarify what is a mixture?

A. So a mixture is just a sample that has more than one individual contributing their DNA profile to it. So it could be two contributors, three, four -- you know, on and on.

Q. So for Item 7, the contact swab of the left sneaker you just spoke about, there were two contributors as well?

A. Yes, two contributors detected.

Q. And one of those contributors you determined was the victim, Gerson Vasquez-Portillo?

A. Correct.

Q. And the second contributor, you said that there was not a lot of information, right?

A. Yes. So that's why I said a foreign contributor was not resolved.

Q. Okay. And you were able to exclude the people we previously mentioned: Kevin Gamez-Melendez, Melvin Cruz-Ortiz, and Wilber Vigil-Benitez from that item?

A. Correct.

Q. Now, can you testify whether any of those individuals were on the scene of the crime?
A. I cannot.
Q. Okay. Do your results tell you anything about who was involved in the crime?
A. No, they don't.
Q. And what are factors that could impact whether there is DNA located on an item of evidence?
A. So DNA can be deposited on an item of evidence, but it can also, you know, just because you touch something doesn't mean there's DNA left behind. But there's so many different possibilities and scenarios that I really can't speculate on if there's DNA left behind or not, or who touched it or didn't touch it or how DNA got there. But there are different factors contributing to maybe DNA not being there. So like heat, humidity, bacteria can degrade DNA over time. So those are just some of the factors.
MS. SMUKLER: Okay. One moment.
(Discussion was held off the record.)
MS. SMUKLER: No further questions. Thank you.
THE COURT: Thank you.
Cross-examination.
MR. ROSENBAUM: We have no questions, Your Honor.
THE COURT: Thank you very much. You are excused.
THE WITNESS: Thank you.

THE COURT: Government's next witness?

MR. DOBBINS: Your Honor, at this time the government would call to the stand, Special Agent Nathan Ferguson.

THE COURT: All right.

(Government witness Nathan Ferguson duly sworn.)

THE COURT: You may proceed whenever you're ready.

MR. DOBBINS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. DOBBINS:

Q. Good morning, Special Agent Ferguson.

A. Good morning.

Q. Can you please tell the members of the jury where you're currently employed?

A. With the FBI Miami Field Office.

Q. And how long have you been with the FBI?

A. Since March of 2017.

Q. Where are you currently assigned with the FBI?

A. To the Violent Gang Squad. It operates as a task force focused on Broward County.

Q. Okay. And what are your duties and assignments with the Violent Gang Squad?

A. Our focus is on violent gangs, whether those are local neighborhood-based gangs or national gangs, such as the Bloods, the Zoe Mafia family, or transnational gangs such as MS-13.

Q. When you say "transnational gang," what do you mean by

that?
A. Transnational is a gang that operates in numerous countries. So based on my experience with MS-13 and testimony that you've heard, MS-13 leadership is often found in El Salvador, and they operate and control the cliques within the United States.
Q. Okay. Now, what kind of training did you receive to become an FBI special agent?
A. I attended Quantico, that's the FBI Academy, in Quantico, Virginia. That's approximately six months' long.
Q. And was the Miami Field Office your first assignment?
A. It was.
Q. All right. And have you always been assigned, since being assigned to the Miami Field Office, to the Violent Gang Squad for Broward County?
A. Yes.
Q. All right. Prior to joining the FBI, did you have any law enforcement experience?
A. I did. I worked for approximately 11 and a half years for the Loudoun County Sheriff's Office. That's in Northern Virginia, in the D.C. metro area.
Q. Okay. And what were your assignments with the Loudoun County Sheriff's Office?
A. Initially, I was a patrol deputy. Then I promoted to detective. Initially, in the Major Crimes Unit, and

eventually, I transferred to the Gang and Narcotics Unit.

Q. While you were a detective with Loudoun County Sheriff's Office, were you also cross-designated or assigned to any kind of federal task force?

A. I was. Before I took a position with the FBI, I was a task force officer with the FBI, with their D.C. field office. We focused on MS-13 and then also drug crimes within Northern Virginia and Washington, D.C.

Q. And what kind of training did you receive in investigating gangs in your time in law enforcement?

A. I've attended numerous trainings over the years. Initially, as a patrol officer, you can go back to the regional academy, and it could be one or multiple-day courses. Those could range from MS-13- and 18th Street-focused gang investigations, white supremacist groups, Crips and the Bloods, or neighborhood-based gangs.

Q. Okay. And from the time that you were a detective and working with the task force through your time now with the FBI as a special agent, have you continued to receive trainings on gang activity and/or other illegal activity, such as narcotics trafficking?

A. Yes. I've done numerous trainings, either hosted by the FBI or by regional or local law enforcement agencies that we partner with. A lot of that training has been specific to MS-13, 18th Street, the Sureños, prosecutorial-related

training, when it comes to RICO or VICAR prosecutions, which is often utilized in investigations, such as this one, against MS-13.
Q. Okay. And you used the term "RICO."
Do you know what that stands for?
A. Yes, Racketeer Influenced Corrupt Organizations Act.
Q. All right. And what about VICAR, you used that term?
A. Violent Crime in Aid of Racketeering.
Q. Okay. Now, approximately how many gang-related investigations would you say you've participated in over the course of your career?
A. Many dozens, either with my prior sheriff's office and then now with the FBI.
Q. Okay. And have you interviewed known gang members as part of your investigations?
A. Yes, quite a few hundred.
Q. Okay. And specifically, how many MS-13 cases would you say you worked on?
A. At least a couple dozen.
Q. Okay. And have you interviewed any known MS-13 members or associates?
A. I have, well over 100 MS-13 members, and then many more that are associates or allies of MS-13.
Q. And prior to joining the FBI in Miami, when you were working for the Loudoun County Sheriff's Office, were you

working on MS-13 investigations up there?
A. Yes.
Q. Okay. So I'd like to direct your attention at this time to the summer of 2020.
Did you begin an investigation with the Broward Sheriff's Office into an individual named Wilson Tirado-Silva?
A. Yes.
Q. Okay. Can you tell the members of the jury how that investigation came about?
A. So in some of my investigations that were more broadly focused on MS-13, I began to collect information regarding Tirado, known as Sombra. That led to me talking with the Broward Sheriff's Office, who I understood had Sombra as a suspect in at least two murders. I had looser information indicating he was involved in additional murders.
That's what led me to talking initially with Detective Jimmy Hayes, who Sombra reached out to via a letter from prison, and then due to Detective Hayes' health conditions, I then teamed up with Detective Gianino to do the follow-up interview with Sombra.
Q. Okay. And so did you participate in the first interview of Tirado-Silva, also known as Sombra, with Detective Gianino, on September 11th, 2020?
A. Yes.
Q. Okay. And did you and Detective Gianino interview

Tirado-Silva on multiple occasions?
A. Many times, yes.
Q. Okay. Now, on the first occasion that you interviewed Tirado-Silva, did he tell you about, in addition to the two murders that he was suspected of participating in, some additional murders?
A. Yes, four in total.
Q. Okay. And was he -- did he tell you about some of the other participants in those -- in those murders?
A. He did. He had a great memory, as I would describe it, and he described, either by legal names and/or aliases, all of the MS-13 members involved in the four homicides.
Q. And so based on that first interview, when you went to interview him again, did you start to bring him series of photographs and maps and other things to try to further corroborate his information?
A. Yes.
MR. DOBBINS: If I may have the ELMO, please.
BY MR. DOBBINS:
Q. So -- and obviously, as our case agent, you've been sitting here watching the testimony of all the witnesses in this case, right?
A. Yes.
Q. So you were here for Wilson Tirado-Silva's testimony, right?

A. Yes.
Q. All right. So showing you Government's 21 in evidence.
What is this series of photographs called?
A. A photo lineup.
Q. All right. And who prepared -- let me zoom out.
Who prepared this photographic lineup?
A. I did.
Q. All right. And so specifically as to Government's Exhibit 21, photograph No. 4, who was it that you had placed in that position in photographer No. 4?
A. That is Andy Tovar, known as Fearless.
Q. All right. Turning to Government's Exhibit 22, again, did you prepare this lineup?
A. I did.
Q. All right. Looking at photograph 5.
Who was it that you had inserted in photograph No. 5?
A. That is Kevin Ricardo Gamez-Melendez, known as Ardilla.
Q. Moving on to Government's Exhibit 23.
Again, did you prepare this lineup?
A. I did.
Q. Okay. And turning to photograph 4.
Whose picture did you put in position No. 4?
A. This is Melvin David Cruz-Ortiz, known as Bigfoot.
Q. All right. Turning to No. 24.
Again, did you prepare this lineup?

A. I did.
Q. All right. And turning to photograph No. 3.
Whose photograph did you put into position 3?
A. This is Miguel Angel Cabrera-Granados, known as Mariachi.
Q. All right. Government's 25, did you prepare this lineup?
A. I did.
Q. All right. And showing you, I believe it's position No. 4.
A. Yes. This is José Ezequiel Gamez-Maravilla, known as Chango.
Q. Okay. Now, on some of these, obviously, there's different dates for when Tirado-Silva identifies the individuals; is that correct?
A. Yes. Initially, many of these people were unknown to us. So based on the partial names and/or nicknames he provided, we would do research through social media, police reports, informant interviews, trying to attempt to identify who exactly he's talking about.
Q. Okay. So some of the people that were identified earlier were just because they were easier to figure out who they were?
A. Yes.
Q. All right. Going to Government's Exhibit 26, did you prepare this lineup?
A. Yes.
Q. All right. Going to No. 4.
Who did you place into position 4?

A. This is Hugo Adiel Bermudez-Martinez, known as Blue.
Q. All right. Government's Exhibit 27, did you prepare this lineup?
A. I did.
Q. All right. And going to picture No. 3.
Who had you inserted into picture No. 3?
A. This is Erick Alberto Villatoro-Cruz, known as Discreto. Also Gohan on Facebook.
Q. Government's Exhibit 28, did you prepare this lineup?
A. I did.
Q. Okay. And going to picture 6, whose photograph did you insert as photograph 6?
A. This is Wilber Geovanni Vigil-Benitez, known as Solitario.
Q. Now, based on -- based on all these identifications that Tirado-Silva made, were you able to create a chart that we've seen here in trial so far?
A. Yes.
Q. Showing you Government's Exhibit 82 -- I'm sorry -- 83, is this the chart that you created?
A. It is, yes.
Q. Okay. In addition to their names, it has items listed underneath in red.
What would that indicate?
A. Those indicate the cliques of MS-13 that each member was affiliated with. GLCS being Guanacos Lil Cycos Salvatruchas.

Under Vigil-Benitez, you'll see Delicias clique. Under Gamez-Maravilla and Bermudez-Martinez, you'll see the LA clique. Under Navarro-Escobar is the Bosques clique. And under Villatoro-Cruz is Cabañas clique.

Q. Okay. Let's move on to -- did there come a time when Tirado-Silva also gave you permission to obtain his cell phones?

A. Yes.

Q. All right. And did agents from the FBI go and pick up those cell phones?

A. Yes. Myself and Detective Gianino went to New York City. We met with the designated relative of Sombra, also in collaboration with a New York special agent with the FBI, and we recovered three phones that were in -- previously in possession of Sombra.

Q. All right. Showing you Government's Exhibit 18, front. That's the back.

Do you recognize these photographs?

A. Yes. Those were the three phones we recovered in New York.

Q. Okay. And did he provide -- did Tirado-Silva provide consent to search these phones?

A. He provided consent and then, additionally, we obtained search warrants to dump, if possible, the contents of the cell phones.

Q. Okay. And based on the investigation, was any evidence

able to be retrieved from those phones?
A. Yes. All three had extensive damage, some of which you can see based on the cracked screens. Also, for many years, they had just been sitting there. When we turned these over to the CART Unit within the FBI -- they specialize in extracting forensic data from computers and cell phones -- they advised they would have to attempt to rebuild some of the phones due to the battery swelling and damage over the many years of on use.
Q. Okay. You used a couple of terms there. You said "CART."
What is CART?
A. They handle cell phone and computer extractions, but pretty much most digital forensics within FBI investigations, they go to the CART unit. And then agents who have specialized training in that conduct the forensic extraction.
Q. Okay. So was data recovered from any particular phone, or was it from all three?
A. From one in particular, the black phone on the far left. It was a brand ZTE. After rebuilding the phone, they were able to obtain well over, I believe, 200 photographs. However, the contact list, the call logs, the text message streams, none of that was recoverable.
Q. Okay. And which one do you recall was the ZTE phone?
A. When looking at the screen, it's on the far left on both pictures, the largest black phone.
Q. Also as part of Exhibit 18, what's that we're looking at

there?
A. That is what CART utilized. They used a rebuilt similar model phone. They would piece together pieces of the old damaged phone to a new model, and that's the methodology they used to extract the photos.
Q. Okay. And is it from that phone you were able to obtain the photographs, these exhibits which obviously we had translated, but which were the rules and regulations of GLCS and the points of La Mara that were on Tirado-Silva's phone?
A. Yes.
Q. Was it also from those phones that Government's Exhibit 20-A through 20-I came from, these pictures (indicating)?
A. Yes, pictures of various MS-13 or clique-specific like GLCS graffiti and tattoos.
Q. Including this organizational chart for GLCS in Florida, right?
A. Correct.
Q. Now, were you able to -- based on the interviews with Tirado-Silva, specifically as to one of the two murders, the Joel Canizales-Lara murder, were you able to use this information to ultimately recover the body of Joel Canizales-Lara?
A. Yes. Sombra had given very specific statements about the location in Oakland Park the murder had occurred and where they buried the victim. However, trying to recover the buried body,

especially after we checked the plot of land that he identified on Google Maps, we discovered at that point it had been developed in subsequent years to a townhouse community.

Then we took additional investigative steps such as obtaining his GPS ankle monitor data on the date in question. We obtained a writ to take him out of state prison and do crime scene walks. Again, he had great recall as far as those involved and the locations involved. So he pointed out where he believed the murder had occurred and where the burial had occurred. We cross-checked that with the GPS data from his ankle monitor. Based on that, we did a forensic dig, recovering the remains of Joel.

Q. Now, did you also show Tirado-Silva any maps relating to the murder of Gerson Vasquez-Portillo?

A. We did.

Q. Showing you Government's Exhibit 29, which I've highlighted.

Do you recognize what we're looking at here?

A. Yes. This is a Google map view of the neighborhood in North Lauderdale where Chango was suspected to live. Sombra made this circle and kind of colored in the middle, on the highlighted portion here (indicating), as where he believed the approximate location of Chango's house to be.

Q. And did you also -- in an attempt to corroborate what Tirado-Silva was telling you, did you at some point either

subpoena or get a search warrant for his GPS monitoring location information for the dates surrounding the Gerson Vasquez-Portillo murder?

A. Yes. So based on Sombra's statements, we obtained his GPS ankle monitor data, and then we would cross-check that with the four murders in question. So for the murder of Gerson, the one we're here for today, Sombra was not at the scene in Boca Raton. However, he was part of the plot. Beforehand, he took the victim's bike, as he described it, and then met the rest of the killers back at his trailer, after the murder had occurred.

So based on his description, based on him pointing out locations such as Chango's suspected residence, he pointed out his old residence, which was in a trailer park off of McNab and Andrews Avenue at that time. We cross-checked that and corroborated it with the GPS data from his ankle monitor.

Q. Okay. And we had Ms. Jackson from, I believe it was, Allied Universal now come in and testify about that recording, the GPS marks, right?

A. Yes.

Q. Now, did we learn any of the addresses of any of the other participants or where they were living at the time back in 2015?

A. We did. The day that we took Sombra from state prison and drove him through the different neighborhoods in question, where he pointed out crime scenes, his own residence, suspected

residence of other named co-conspirators, he pointed out the -- where he believed Chango had lived. He pointed out a condominium complex in Tamarac where Blue had lived. And again, his memory recall was corroborated by the GPS data from Allied Monitoring.
Q. Okay. So what did we learn was Chango's address?
A. It was off of Southwest 10th Court, here in North Lauderdale. I believe the numbers were 7871.
Q. Okay. Well, let me ask you this: Did you create a series of maps to better illustrate what you were able to find based off of Tirado-Silva's information?
A. Yes. So based on his statements and based on what he pointed out when we did the crime scene tours, and based on the GPS ankle monitor data, I did a couple of Google map representations of the confirmed address of Chango, the confirmed address of the victim in this homicide, Sombra's confirmed address, the point of location where the murder occurred. That was not based on ankle monitor data. That was based on the Palm Beach Sheriff's Office homicide report, as well as ankle monitor data which was consistent with him.
After he discarded the victim's bicycle that night, he told us he was waiting near Blue or Hugo's house in Tamarac. After they didn't arrive there, he got a taxi and took the taxi back to his trailer. So all of this was corroborated by the GPS data.

MR. DOBBINS: Your Honor, I believe without objection, the government at this time would move into evidence Government's Exhibit A through E.

MR. ROSENBAUM: No objection.

THE COURT: Thank you. That'll be admitted.

(Government Exhibits A through E were received in evidence.)

BY MR. DOBBINS:

Q. I'm going to start with 85-E.

All right. So 85-E, is this the residence addresses that you listed for the different scenes in this specific murder?

A. Yes. On the following pages, all of those address will be represented, with the intent to show the proximity and the approximate path of travel based on Sombra's statements and the ankle monitor data, of his movement on the night in question.

Q. Okay. So what do we have listed as Chango's residence?

A. 7871 Southwest 10th Court, North Lauderdale.

Q. And what about the victim's residence?

A. 7700 SW 10th Court, North Lauderdale.

Q. And just as a refresher, we'll put up 29 again, where Tirado-Silva indicated that Chango's -- Chango lived.

Is that pretty close or in the general vicinity of 7871 Southwest 10th Court?

A. It is.

Q. All right. Now, one of the maps here we have is 85-A.

What is this showing us here?
A. 7871. Here is, again, Chango's residence. I believe this is actually one of the old maps. The updated version would update 7940 to 7700 Southwest 10th Court.
Q. Okay. What was the address for 7940, why was that significant?
A. That was originally listed in one of the PBSO, the Palm Beach Sheriff's Office reports, as the address for Gerson, the victim. However, later it was confirmed that he lived at 7700 Southwest 10th Court. Both of them are very, very close to Chango's residence. However, 7700 is closer to this vicinity.
Q. Okay. Lower right corner?
A. Correct.
Q. All right.
MR. DOBBINS: If we could clear the ELMO.
BY MR. DOBBINS:
Q. All right. We also have listed here as the murder scene, 19677 120th Avenue South in Boca Raton.
What is that indicating?
A. That's where the Palm Beach Sheriff's Office located the victim's body on May 3, 2015.
Q. All right. I'm showing you Government's Exhibit 85-B.
A. Once again, we have Chango's house here. It's unknown or unconfirmed the exact path of travel they took. However, as the suspects who cooperated and confessed, as well as the Palm

Beach Sheriff's police report, they ended up up here at the 19677 120th Avenue South in Boca Raton where the murder occurred and the body was left.

Q. Okay. Now, we also have Hugo's residence listed as 5025 Island Club Drive in Tamarac, Florida.

Why was that significant in the investigation?

A. Sombra had described after all the suspects left in the two vehicles with the victim to go to Boca, he took the victim's bicycle. He started to ride east. He then, like, dumped the bicycle close to where Hugo's condo complex was. He waited for a while in the parking lot of Hugo's residence. After they did not show up back at that location, he finally decided to just get a taxi and go back to his own trailer. And this was corroborated by the ankle monitor data.

Q. Okay. Showing you Government's Exhibit 85-C.

What are we looking at here?

A. So Chango's house at 7871 in North Lauderdale. And then 5025 Island Club Drive was identified as Hugo's building.

Q. Okay.

MR. DOBBINS: If we can clear the ELMO one more time, please?

BY MR. DOBBINS:

Q. And then, finally, we have Sombra's residence listed as 129 Northwest 69th Street in Fort Lauderdale, Florida.

Why was that significant in the investigation?

A. He pointed out his trailer when he -- we took him from state prison to -- to where the crime scenes and point out where crimes had occurred. That address was also listed in his pretrial release or supervised release paperwork. And it's significant because he identified it as his residence here as well as the residence at time of numerous other suspects. And this was also, once again, corroborated by the ankle monitor data.

Q. The home of other suspects, including who?

A. At the time he said he had moved in with Ardilla when Fearless came down from Virginia. Fearless lived there for a while, and Solitario lived there for a while.

Q. All right. Showing you have Government's Exhibit 85-D.

What is this map showing here?

A. Once again, Chango's residence in North Lauderdale. This is Sombra and numerous other suspects in the investigation, where they were staying in Fort Lauderdale, in the trailer park.

Q. Okay. And can you see the area where Hugo's apartment was?

A. Yes. Hugo's condo was over here, close to the turnpike and State Road 7 intersection. That was the Tamarac address (indicating).

Q. Okay.

MR. DOBBINS: All right. If we can clear the ELMO, please.

And if I may have the computer for the lectern?

BY MR. DOBBINS:

Q. Okay. We're showing you Government's Exhibit 30. This was the GPS coordinates here for -- that Ms. Jackson testified about for Tirado-Silva's GPS ankle monitor from May 2nd of 2015 through a certain time period to May 3rd of 2015, right?

A. Correct.

(Video was published.)

BY MR. DOBBINS:

Q. All right. So just starting out here, at approximately 2:08 p.m. on May 2nd of 2015, where is that green dot located?

A. This is in the direct vicinity of 129 Northwest 69th in Fort Lauderdale. The trailer was identified as Sombra and other defendants' residence.

Q. Okay. So I'm going to advance it here.

There we go. All right.

(Video was paused.)

BY MR. DOBBINS:

Q. I'm going to stop it here. So we're kind of -- it's approximately 1:39 a.m. on May 3 of 2015.

Where is that GPS indicating Tirado-Silva is in that general vicinity?

A. This is in the Island Club Drive, Tamarac area, where Hugo or Blue lived (indicating).

(Video was published.)

BY MR. DOBBINS:
Q. Okay. I'm going to move it up to -- now it's on the move. It's about 3:18. Coming up Rock Island Road, Tam O'Shanter. I'll pause it here.
(Video was paused.)
BY MR. DOBBINS:
Q. So now it's approximately 3:39 a.m. on May 3rd of 2015.
Where does it indicate -- the GPS indicate Tirado-Silva -- his ankle bracelet is indicating he's there?
A. This is in the direct vicinity of 7871 Southwest 10th Court, identified as Chango's residence.
Q. Okay.
MR. DOBBINS: If we may clear that dot, please.
BY MR. DOBBINS:
Q. So that was about 3:40 a.m. I'm going to just play it.
(Video was published.)
BY MR. DOBBINS:
Q. I'll pause it when it starts to move again.
We're now at about 4:30 a.m.
Okay. Now it's starting to move. It's about 4:41 a.m.
(Video was paused.)
BY MR. DOBBINS:
Q. Had that GPS location moved from 3:39 a.m. to about 4:40 a.m. from that spot from where Chango's house was?
A. No. And that was indicative that it was consistent with

Sombra's statements to us, that after they had went to Chango's house, they were hanging out there for a while, leading to the encounter with the victim which then led to the subsequent murder. At this point it would be consistent with Sombra's statements that he took the victim's bicycle, not wanting to leave it as evidence to arouse suspicion over Chango's residence. As the other group has left in cars, he is now riding the victim's bicycle away from the scene.

Q. Okay. And on the -- you remember when we went through with Ms. Jackson on the route to get here, we were going through the speeds and how fast the GPS arrow was moving, right, which she said was consistent with being in a vehicle. But now, if you look at the speed, he's going at about nine miles an hour.

We'll just play it for a little bit.

(Video was published.)

BY MR. DOBBINS:

Q. 12, 8, 11, 10, 7, 3. Are these speeds significantly slower than what we had seen previously, when they are traveling between these locations?

(Video was paused.)

A. Yes. And further cooperation for Sombra's statements, when he gave the statement he was riding the victim's bicycle, those speeds would seem to corroborate that.

(Video was published.)

BY MR. DOBBINS:

Q. So I'll just keep hitting play.

Appears to be going eastbound on McNab Road. Now southbound on 441 or State Road 7. Okay.

Okay. Now it's stopped for a bit because there's a green circle, and now it's moving a little bit.

But now where are we back at?

A. This is the area identified as Blue, or Hugo's, residence at the time.

Q. Okay. I believe it's in this -- the GPS indicates that Tirado-Silva remains in this general area for little bit, right?

A. Yes.

Q. And it's about 5:27 a.m. So I'm going to move it up, hopefully about an hour.

All right. Now the time is about 6:10 a.m. And again, the GPS indicates that he's still there around where Hugo's -- where Hugo lived?

A. Yes.

Q. And now it's starting to move. It's going eastbound on McNab Road.

And now it's approximately 7:00 a.m.

And where did the green dot arrive and now turn into a square?

A. And here we are back at Sombra's identified trailer where he met with all of the other subjects who came back from the

homicide in Boca.
Q. Okay.
(Video was paused.)
MR. DOBBINS: If I may have the ELMO, again, please.
BY MR. DOBBINS:
Q. Okay. So after you were able to corroborate all of this information, did there come a time when you obtained arrest warrants for Gamez-Melendez and Cruz-Ortiz in this case?
A. Yes.
Q. All right. And did there come a time when Cruz-Ortiz was arrested by law enforcement?
A. Yes, that was in February of 2023.
Q. And did you and Detective Gianino at that time participate in an interview of Cruz-Ortiz?
A. We did. Once we took custody of him, we gave him a post-Miranda recorded interview.
Q. Well, before we get into that, prior to obtaining charges and arrest warrants for these individuals, did Tirado-Silva agree to participate proactively to try to help either call or have co-conspirators in these murders make incriminating statements?
A. He did. He agreed to do consensually recorded calls. Logistically, that was going to be very difficult without exposing him to risk in the state prison system. So we obtained a writ and brought him to the Broward County Jail on a

federal hold, and he was given limited access to a cellular phone to make these calls. And again, we recorded all of the calls since he was only given access to the phone in the presence of agents.

Q. Okay. Was he also given any directions as to either what to say or how to -- or what we were trying to obtain in these phone calls?

A. Yes. He knew we were looking to obtain evidence or incriminating statements from the co-conspirators involved in the series of murders he had described. However, we directed him -- we didn't want him to lead the conversation too much. So within certain parameters, he knew the basic gist of what we were looking for.

Q. Okay. And so some people he was able to reach out and contact, such as Cruz-Ortiz and Gamez-Melendez, right?

A. Correct.

Q. All right. And then there were other individuals that he couldn't reach out and contact, right?

A. Correct.

Q. All right. And yesterday, at the end of Cruz-Ortiz's testimony, in his redirect we played portions of a controlled call that were between Tirado and Cruz-Ortiz, right?

A. Yes.

Q. That was Government's Exhibit 81.

And can you just explain what a controlled call is to the

jury, please?
A. That was with myself and Detective Gianino present. Due to many of the conversations being in Spanish, we also had a fluent Spanish speaker present just to mitigate any risk of any threats or safety concerns being talked about, because my Spanish is not quite fluent. Neither myself or Detective Gianino or myself were fluent in Spanish, so . . .
Q. Okay. And that call, Government's Exhibit 81, did that occur on June 3rd of 2021?
A. Yes. This was one of the phone calls with Ardilla.
Q. All right. So let's move now to -- you've arrested Bigfoot, Cruz-Ortiz, right?
A. Yes.
Q. All right. And did you also -- in preparation for that interview, after he was arrested, did you also bring in a series of photographic lineups and other items to show him?
A. I did.
Q. Okay. Showing you Government's Exhibit 50 in evidence.
Again, did you prepare this lineup?
A. Yes.
Q. All right. And who is in photograph 5 that you showed to Cruz-Ortiz?
A. That is Kevin Gamez-Melendez, Ardilla.
Q. And then Government's Exhibit 51.
Who did you show in photo No. 3 to Cruz-Ortiz?

A. This is Tirado-Silva, known as Sombra.
Q. Government's Exhibit 52.
Again, did you prepare this lineup?
A. Yes.
Q. And who is in photograph 3 that you showed to Cruz-Ortiz?
A. It is Cabrera-Granados, known as Mariachi.
Q. Showing you Government's Exhibit 53, did you prepare this lineup?
A. Yes.
Q. Who did you put in slot No. 4?
A. This is Gamez-Maravilla, known as Chango.
Q. All right. No. 54, Government's Exhibit 54 in evidence, did you prepare this lineup?
A. I did.
Q. All right. And who did you put in photograph No. 4?
A. That is Bermudez-Martinez, known as Blue.
Q. All right. Government's Exhibit 55, did you prepare this lineup?
A. I did.
Q. And who did you put in No. 3?
A. That is Villatoro-Cruz, known as Discreto.
Q. All right. Moving ahead to Government's Exhibit 56, did you prepare this lineup?
A. I did.
Q. And who did you put into photograph 5?

A. That is Navarro-Escobar, known as Power.
Q. What's Navarro-Escobar's first name?
A. Wilber.
Q. So similar to the defendant's, right?
A. Correct.
Q. All right. Government's Exhibit 57, did you prepare this lineup?
A. I did.
Q. Who did you put into No. 4?
A. That is Andy Tovar, known as Fearless.
Q. And Government's Exhibit 58, did you prepare this lineup?
A. I did.
Q. All right. And who did you put in photograph 6?
A. That is Vigil-Benitez, known as Solitario.
Q. Did you also show Cruz-Ortiz some additional photographs?
A. Yes.
Q. Showing you Government's Exhibit 59 in evidence, who is this a photograph of?
A. This is Joel Antonio Canizales-Cruz [sic], who they called Little Crazy.
Q. All right.
A. He was the first victim in the series of murders.
Q. All right. Is he the one that was buried and had to be found?
A. Yes.

Q. Government's Exhibit 60 in evidence, who is this we're looking at?
A. This is Chrislet Ondina. He was the last defendant in the series of murders.
Q. You said "last defendant."
A. Or, I'm sorry, the last victim.
Q. Okay. Is he the one that Tirado and both Cruz-Ortiz said that they killed?
A. He is.
Q. Okay. And then we go to Government's Exhibit 61 in evidence.
What is this we're looking at?
A. That is a photo of Ardilla's car, the silver 2002 Mitsubishi.
Q. Okay. Did we, at some point, obtain the certified vehicle records for this vehicle?
A. We did.
Q. Okay.
MR. DOBBINS: Your Honor, at this time the government would move into evidence, without objection, Government's Exhibit 74, which are the state-certified records for a Mitsubishi Lancer, with vehicle identification No. JA3AJ86E62U061253.
THE COURT: Any objection?
MR. ROSENBAUM: No, Your Honor.

THE COURT: All right. That'll be admitted.

(Government Exhibit 74 was received in evidence.)

BY MR. DOBBINS:

Q. All right. So, Special Agent Ferguson, showing you Government's Exhibit 74 in evidence.

What is this we're looking at here? We've got the certified seal. What is this whole packet?

A. This is the records for the 2002 Mitsubishi.

Q. Okay. And is this the entire registration and ownership history of that 2002 Mitsubishi?

A. Yes. I -- to my recollection, this reflects numerous owners before and after and including Gamez-Melendez, or Ardilla.

Q. All right. So we're going to flip -- I believe it's page 37, and I'll tab it. I put a blue flag on it so we can find it again if we ever need to.

All right. Let me zoom out a bit.

And what is this document titled?

A. The State of Florida Application for Vehicle/Vessel Certificate of Title.

Q. And again, could you just read the VIN number, for the record?

A. Juliette, Alpha, 3, Alpha, Juliette, 86, Echo, 62, Uniform, 061253.

Q. Sounds cooler when you read it with the military acronyms

than when I do it.
All right. What was the year of this car?
A. 2002.
Q. And who is the manufacturer?
A. Mitsubishi.
Q. All right. And it gives us a body type here.
How many doors did it have?
A. Four doors.
Q. All right. And the date of issue here?
A. March 12, 2014.
Q. Okay. And who's the listed applicant on here?
A. Kevin Ricardo Gamez-Melendez, known as Ardilla.
Q. All right. Now, did there come a time when that vehicle was towed and/or sold?
A. Yes. A short time later -- I believe it was later in 2015 -- Westway Towing had towed the vehicle, and then the DMV records indicated that it was sold at auction to a new owner.
Q. All right. So I'm moving ahead a couple of pages -- because it goes in reverse chronological order, right, the records?
A. Yes.
Q. All right. So I'm just putting this one here. This is a towed-in vehicle inventory receipt form from the Fort Lauderdale Police Department.
And what's the date?

A. September 11, 2015.
Q. Okay.
A. This would have been a little over four months after the murder in Boca.
Q. And who's the registered owner?
A. Ardilla, as evidenced by his legal name.
Q. Which is what?
A. Kevin Ricardo Gamez-Melendez.
Q. All right. It indicates the car was towed?
A. Correct, by Westway Towing there.
Q. Okay. So essentially, it was repossessed, right?
A. That is my understanding.
Q. And then the page next up, in the case -- the same VIN, right?
A. Correct.
Q. It's still the same car, right, a 2002 Mitsubishi four-door?
A. That is correct.
Q. Okay. And now it's a different owner -- registered owner listed with a different date of issue, right?
A. Correct.
Q. What was the date of issue?
A. January 22, 2016.
THE COURT: Mr. Dobbins, are we at a good breaking point here?

MR. DOBBINS: Yes, Judge, we can take a break.

THE COURT: Okay. All right. Ladies and gentlemen of the jury, we're going to go and take about a 30-minute break. I'm going to have you guys come back at 11:30 into the jury room. There should be, if there's not yet there will be, Cuban coffee delivered in there. I know when my jurors need it. So I'm going to get that to you guys. I will push, and we'll push on here to get to lunch break. So go ahead and leave your notepads on the chairs. We'll take a little bit of a break, and we'll resume at 11:30. Be back in the room.

THE COURT SECURITY OFFICER: All rise for the jury.

(Jury exits at 10:55 a.m.)

THE COURT: Please be seated, everyone.

I have a calendar call starting in about five minutes. I have two different cases that are going to be called. So if I could just get a little bit of space on counsels' table so I can call them. We'll take a very brief break. I'll be back on the bench to handle the calendar calls. You're all free, if you wish to take a break until about 11:30 and need to step out, use the restroom.

Mr. Dobbins, for planning purposes, how much more do you think you have on your direct, give or take? I'm just trying to figure out for lunch.

MR. DOBBINS: Roughly an hour, I think.

THE COURT: Okay. So it should take us -- the direct

should be able to finish by the lunch hour. That'd be perfect.

MR. DOBBINS: I would think so, yes.

THE COURT: All right. Very good. We'll take a brief break at this time. Thank you.

THE COURT SECURITY OFFICER: All rise.

(Court recessed at 10:56 a.m.)

(Back on the record at 11:54 a.m.)

THE COURT: All right. Everybody ready to go? Special Agent is here. Okay. Let's see if we can round them up, please.

(Jury enters at 11:54 a.m.)

THE COURT: Please be seated, everyone. Apologies for a little bit more of a delay and a break, but hopefully you guys were able to stretch out and drink a little bit of coffee on that. So hopefully it worked out. I had to do some housekeeping, so I appreciate your patience.

We're going to go for a little bit past 12:30 here and continue on with our examination. Okay? So I'll turn it back over to Mr. Dobbins, whenever you're ready.

MR. DOBBINS: Thank you, Your Honor.

THE COURT: You're welcome.

BY MR. DOBBINS:

Q. So when we left off, I believe we were finishing up talking about the grey or silver Mitsubishi Lancer that belonged to Kevin Gamez-Melendez, right?

A. Yes.
Q. Okay. Now, in addition to that, did Cruz-Ortiz talk about another vehicle that was used in the Gerson Vasquez-Portillo murder?
A. He did. A red Toyota Celica.
Q. All right. And who did you say that the red Toyota Celica belonged to?
A. The individual he knew as Hugo, or Blue. And that would be Hugo Bermudez-Martinez.
Q. Okay. And did you ultimately do a search warrant of any Facebook accounts associated with Hugo Bermudez-Martinez?
A. I did.
Q. All right. What Facebook account was it?
A. His Facebook username was Hugo A. Martinez.
Q. All right.
MR. DOBBINS: Your Honor, I believe without objection we already have 79-B and 79-C in evidence. At this time we'd also move Exhibit 79-A in.
THE COURT: Any objection?
MR. ROSENBAUM: No, Your Honor.
THE COURT: All right. We'll admit 79-A in, as well.
MR. DOBBINS: If I may have the ELMO, please.
(Government Exhibit 79-A was received in evidence.)
BY MR. DOBBINS:
Q. So just showing you 79-A.

Is this a picture that was on that Facebook account that belongs to Hugo Bermudez-Martinez?

A. It is.

Q. All right. And what is this we're looking at here?

A. Tattoo on the top of someone's head. You can see the letters, MS, significant, standing for Mara Salvatrucha.

Q. And do you we know whose head that is?

A. No.

Q. And 79-B and 79-C, what is depicted in those two photographs?

A. The red Toyota Celica, and this was known to be operated by Blue, or Hugo, during that time. And we found that it was registered to a man who shared residence with Blue, and that man was believed to be his uncle.

MR. DOBBINS: All right. Your Honor, I believe without objection --

BY MR. DOBBINS:

Q. Did we, at some point, obtain certified motor vehicle records for that Toyota Celica?

A. We did.

MR. DOBBINS: All right. Your Honor, without objection, the government at this time would move into evidence Government's Exhibit 75.

THE COURT: No objection?

MR. ROSENBAUM: No objection.

THE COURT: All right. That'll be moved in.
(Government Exhibit 75 was received in evidence.)
BY MR. DOBBINS:
Q. Looking at Government's Exhibit 75.
Can you just read for us the vehicle identification number or VIN?
A. Juliet, tango, Delta, Delta, Yankee, 32, tango, 130064216.
Q. All right. And then I believe this is around, roughly, page 26.
And then page 28.
Did these -- did this name for this listed owner here, did this mean anything to the investigation?
A. Yes. Cristobal Rodrigo Centeno-Martinez, he is the person who is identified as the uncle of Hugo. And although this address which is listed, the 4350 Northwest 61st, that's not the Tamarac address in question. Cristobal was found to share residence with Hugo at one point, circa the time of the 2015 murder.
Q. Okay. Was that that address that you had listed on the maps?
A. Yes.
Q. So I'm just going to highlight this.
And again, we have the same VIN, right?
A. Correct.
Q. What year is this?

A. 2003 Toyota -- it's listed as a three-door, I believe, due to having the hatchback.
Q. Okay. And what's the date of issue?
A. November 4, 2014.
Q. Okay. And I'm just going to go ahead and put a flag on it so we can find it later, if need be.
All right. And speaking of maps, we had talked about how 85-A, there was a -- there was a prior address that was used that was incorrect, right?
A. Yes.
Q. That would be which address there?
A. The 7940. That was originally listed in the Palm Beach reports as the residence of Gerson, the victim. However, that was a family or relative address. And then 7700 on Southwest 10th Court, in this area, was his confirmed address.
Q. Okay.
MR. DOBBINS: And if we wouldn't mind clearing that, please.
And did we -- and we created a second map.
Your Honor, without objection, the government would move Government's Exhibit 85-F, as in Frank.
THE COURT: No objection?
MR. ROSENBAUM: No objection.
THE COURT: Thank you, Mr. Rosenbaum. That will be admitted.

(Government Exhibit 85-F was received in evidence.)
BY MR. DOBBINS:
Q. All right. Does this show the correct address for the -- for where the victim was living, Gerson Vasquez-Portillo, in May of 2015?
A. It does.
Q. All right. And so it appears that they're on the same -- in this case it's a court, but it's the same street, right, Southwest 10th Court?
A. Correct.
Q. All right.
All right. So did there come a time when Kevin Gamez-Melendez was arrested?
A. Yes.
Q. Okay. And when approximately was that?
A. I believe it was May 20th of 2022.
Q. Okay. And did you interview him post-Miranda, and then later also interview him after he -- or right before he pled guilty?
A. We did.
Q. Okay. So let's start with Government's Exhibit 64. I'll zoom out.
Did you create this photo lineup?
A. Yes.
Q. And again, who did you put in photo No. 3?

A. This is Wilson Tirado-Silva, also known as Sombra.
Q. And what's this date here?
A. That is the date and the time marked by Gamez, or Ardilla, for when he signed it.
Q. Okay. And so this is around the date that he was arrested?
A. Yes, on the date he was arrested.
Q. Government's 65 in evidence.
Did you create this photo lineup?
A. Yes.
Q. And who did you put in No. 4?
A. This is Melvin David Cruz-Ortiz, also known as Bigfoot.
Q. Okay. And again, when did Gamez-Melendez identify this photo?
A. The day of his arrest.
Q. May 20th, 2022?
A. Correct.
Q. Government's Exhibit 66 in evidence.
Did you create this photo lineup?
A. I did.
Q. Who did you put in Exhibit No. 3?
A. That's Miguel Angel Cabrera-Granados, also known as Mariachi.
Q. All right. And again, does Melendez identify anyone in this one?
A. He did not.

Q. And now Government's Exhibit 67.
Did you create this photo lineup?
A. I did.
Q. And who did you put in Government's Exhibit 4 -- I mean, slot No. 4.
A. This is Hugo Adiel Bermudez-Martinez, also known as Blue.
Q. Now, was this photo lineup also shown to Gamez-Melendez on a different date?
A. Yes, I believe this was in December of last year, after he was agreeing to plead guilty.
Q. All right. Now turning to Government's 68.
Did you create this one?
A. I did.
Q. Showing you -- who did you put in slot No. 4?
A. This is José Ezequiel Gamez-Maravilla, also known as Chango.
Q. Again, this wasn't when he was arrested.
Gamez-Melendez identified this at a later date?
A. He did. December of last year.
Q. Showing you 69, Government's Exhibit 69 in evidence.
Did you create this lineup?
A. I did.
Q. And who did you put in No. 3?
A. That's Eric Alberto Villatoro-Cruz, also known as Discreto.
Q. And same thing. Does Gamez-Melendez identify this back in

December of last year?
A. He did.
Q. All right. Now, Gamez-Melendez was also shown some photo lineups where -- in addition to Mariachi's, where he didn't make an ID, right?
A. Correct.
Q. All right. So showing you Government's Exhibit 73.
Did you create this lineup?
A. I did.
Q. And who did you put in position No. 5?
A. That is Power. His name is Wilber Rosendo Navarro-Escobar.
Q. Okay. All right. And there was one more you showed him. This is Government's Exhibit 71 in evidence.
Did you create this lineup?
A. I did.
Q. All right. And who was in position No. 6?
A. That's Wilber Geovanni Vigil-Benitez, known as Solitario.
Q. All right. Now, is this -- we've seen a couple of other lineups with the defendant's photograph in them.
Is this the same photograph that you'd used in those other lineups?
A. No. This -- this photo was from -- taken, I believe, a later date in his life. As you can notice, the facial hair and the hair on his head are quite different from the buzzed or shaved head version.

Q. Okay. So, for example, the photo lineup you showed to Bigfoot, which was 58, position 6.
Same person but a little different looking, huh?
A. Correct.
Q. And that picture from No. 6, the 58, was the same one you also showed to Tirado-Silva when he also identified the defendant, right?
A. Yes.
Q. Now, we were also shown some other pictures that Kevin Gamez-Melendez did ID.
Showing you Government's Exhibit 72 in evidence.
When was this shown to Gamez-Melendez?
A. This was during his proffer or -- actually, maybe the secondary. So we started in December of 2024, and then the date is indicated next to his initials up top, January 2nd. And then along the bottom, he wrote by the names and/or nicknames that he knew the individuals by, and he further identified himself as the individual who was driving the car and took the photo.
Q. Okay. And where did you get this photo?
A. From Gamez's Facebook page.
Q. And the person he identifies as the defendant sitting in the back seat, does he appear to have any facial hair in that picture?
A. No, clean-shaven.

MR. DOBBINS: If we could clear the ELMO, please.
BY MR. DOBBINS:
Q. All right. Okay. Now, did there come a time when you went to interview the defendant, along with Detective Gianino?
A. Yes.
Q. All right. And one of those days was, I believe, January 18th of 2023?
A. Correct.
Q. All right. Now, during that interview did you show the defendant some photographs, another series of photos?
A. Yes, we did.
Q. Okay. So I'm going to start with Government's Exhibit 33 in evidence.
Did you create this series of photographs?
A. I did.
Q. All right. And who did you put in slot No. 4?
A. Andy Tovar, known as Fearless.
Q. All right. And this is who the defendant identified?
A. It is.
Q. Let's go to 34 in evidence.
Did you create this series of photographs?
A. I did.
Q. Okay. And who did you put in slot No. 3?
A. Wilson Tirado-Silva, known as Sombra.
Q. Okay. And again, did the defendant identify, but just did

not write anything at this one?
A. Yes. He said he couldn't recall Sombra's name or nickname, but he remembered him as someone he had met, I believe, he had said in New York, Virginia, and Florida.
Q. Let's go with 35.
Did you create this photo lineup?
A. I did.
Q. Who did you put in slot No. 4?
A. That's Melvin David Cruz-Ortiz, known as Bigfoot.
Q. Government's Exhibit 36, did you create this lineup?
A. I did.
Q. Okay. And who did you put in slot No. 5?
A. Kevin Ricardo Gamez-Melendez, known as Ardilla.
Q. All right. And did you instruct the defendant to put his initials?
A. Yes. He placed his initials at the bottom.
Q. 37, Government's Exhibit 37 in evidence, did you create this photo lineup?
A. I did.
Q. Who did you put in No. 4?
A. José Ezequiel Gamez-Maravilla, known as Chango. And, once again, he initialed at the bottom.
Q. All right. Government's Exhibit 38 in evidence, did you create this lineup?
A. I did.

Q. Who did you put in No. 3?
A. Erick Alberto Villatoro-Cruz, known as Discreto. Once again, initialed at the bottom.
Q. Government's Exhibit 39 in evidence, did you create this lineup?
A. I did.
Q. All right. And who did you put in slot No. 4?
A. Hugo Adiel Bermudez-Martinez, known as Blue. And once again, initialed at the bottom.
Q. Government's Exhibit 40. And we talked about this with Detective Gianino.
Did you create this lineup?
A. I did.
Q. All right. And who did you put in slot No. 5?
A. Wilber Rosendo Navarro-Escobar, known as Power.
Q. Okay. Now in this one, was the defendant able to make any ID?
A. No, he did not.
Q. On January 18th of 2023.
A. Correct.
Q. Then Government's Exhibit 41-A, B, and C in evidence.
What is this we're looking at?
A. This is the aforementioned photo from Ardilla's Facebook. Vigil-Benitez identified himself sleeping in the middle and stated he recognized the males on both his left and right. But

at the time he could not recall their nicknames.
Q. Okay. And 41-B?
A. He also identified them as some of the guys he knew from Florida and the Virginia, Maryland area.
Q. Okay. And where did we get this photograph?
A. I believe this was from Blue's Facebook page, Hugo Bermudez-Martinez.
Q. And who is in the picture?
A. We have Discreto holding the camera, Hugo in the hat on backwards, and Power on the right, upper right.
Q. And then 41-C.
A. Once again, Discreto up front and a very young Bigfoot in the back.
Q. Now, when you went to interview the defendant again in June of 2023, did you take him a series of photographs?
A. I did.
Q. Showing Government's Exhibit 44-A through F.
And is this the series of photographs you went ahead and showed the defendant when you interviewed him in June of 2023?
A. Yes. And this is comprised of persons that he had identified from photo lineups and/or names during the interview in January.
Q. Okay. Now, also during that first interview and then again in the second interview, did he talk about somebody named Curito?

A. Yes, from the Delicias Locas clique in Maryland. He identified Curito, also known as Insoportable, his legal name is Ever Ferrufino, as the second homeboy when they were both elevated from chequeo to homeboy.
Q. And is that one of the photographs that you showed him, as well?
A. Yes.
MR. DOBBINS: Your Honor, I don't believe it's been admitted yet. So at this time the government would move Government's Exhibit No. 44-G into evidence. It may have been admitted in tandem, but just in case, I wanted to make sure.
THE COURT: Yeah. I think it might have come in through Detective Gianino.
But in any event, any objection?
MR. ROSENBAUM: No.
THE COURT: That will be admitted.
MR. DOBBINS: All right.
(Government Exhibit 44-G was received in evidence.)
BY MR. DOBBINS:
Q. So showing you Government's Exhibit 44-G.
Who is this we're looking at in this picture?
A. That is Curito, or Insoportable.
Q. Now, according to the defendant's statement, is this somebody that was in Florida or somewhere else?
A. Maryland, primarily.

Q. Okay. And was this somebody that was involved or down in Florida or involved in the murder of Gerson Vasquez-Portillo?
A. No. He had no involvement in Gerson's murder.
Q. Now, we've listened to the second statement recording, and during that recording there's a point where, in addition, there's another person that wasn't included in that series of photos. And you said, can I show you a picture -- I think you said on your phone or something like that within the transcript.
A. Yes, I believe that was for Chango.
Q. All right.
MR. DOBBINS: Your Honor, without objection, the government would move into evidence Government's Exhibit 45.
MR. ROSENBAUM: No objection.
THE COURT: All right. That'll be admitted.
(Government Exhibit 45 was received in evidence.)
BY MR. DOBBINS:
Q. Showing you Government's Exhibit 45 in evidence.
Who is this we're looking at?
A. That is Chango, legal name José Ezequiel Gamez-Maravilla.
Q. All right. And is this the photo you showed to the defendant on June 28, 2023?
A. It is, in digital format from a cell phone.
Q. Now, you also showed him Government's Exhibit 46, which was a series of photographs from the crime scene, right?

A. Yes.
Q. All right. And you lettered it so when the jurors read the transcript and they're looking at the letters, that's what the photo is that it's referencing, right?
A. Correct. To make clear what was verbalized during the interview which photo he was viewing at the moment.
Q. Okay. Did you try to show him another photographic lineup?
A. Yes.
MR. DOBBINS: Your Honor, without any objection, the government would move into evidence Government's Exhibit 47 at this time.
THE COURT: No objection on that?
MR. ROSENBAUM: No, Your Honor.
THE COURT: All right. We'll move that in.
(Government Exhibit 47 was received in evidence.)
BY MR. DOBBINS:
Q. Government's 47, do you recognize that exhibit?
A. I do.
Q. All right. Did you create this lineup?
A. I did.
Q. All right. And who did you put in No. 5?
A. This is Wilber Rosendo Navarro-Escobar.
Q. Okay. And what was his nickname?
A. Power.
Q. All right. And on the June 28, 2023, interview, did the

defendant identify this photo?
A. Yes. I believe he could not recall his name, but he did recall that he was from the Bosques clique of MS-13 and that he was often part of that group in the North Lauderdale, Broward area.
Q. Now, did there come a time when you applied for a search warrant for a number of Facebook accounts in this case?
A. Yes.
Q. Okay. And did some of those accounts include any accounts associated with the defendant, Wilber Vigil-Benitez?
A. Yes, they did.
Q. And what was that account that was associated with them?
A. The Facebook username was Locos Ya Estamos.
Q. So when you applied for the search warrant, did Facebook comply with the search warrant and send you the returns?
A. They did.
Q. All right. And for each of these accounts -- who else did you apply for search warrants, what other Facebook accounts?
A. All of the known suspects and one of the victims. So Joel Lara was the only victim whose account we identified. We had anywhere from one up to three or four accounts identified for some of the other suspects.
Q. Okay. And when you received these returns, how large are the returns?
A. Some were very large, especially the accounts that were

active from 2014 up until present, at that point. So the way that's downloaded in like a PDF format, some of the accounts were well over 100,000 pages, maybe over 125,000, I think, for one.

Q. Okay. Now, did you pull some select segments of those returns for the defendant's Facebook account?

A. Yes.

MR. ROSENBAUM: Judge, we have to talk about some of this at sidebar.

THE COURT: Where are we in your -- his remaining direct? How much more you got?

MR. DOBBINS: Not much after. But I'm going to go through these exhibits. If you wanted to take the break now, that'd be okay.

THE COURT: Yeah, I think we're going to have to.

Ladies and gentlemen, let me do this. Before I go ahead and release you-all for lunch, give me about five minutes to see if I can get through this quickly. Go ahead and leave your notepads. Take a break for me, please.

THE COURT SECURITY OFFICER: All rise.

(Jury exits at 12:29 p.m.)

THE COURT: All right. Please be seated, everyone.

So what do we have here in this exhibit, the concerns?

MR. ROSENBAUM: The concern is some of the pages are posts, texts, whatever, communications, and they're in Spanish.

There's no translation.

THE COURT: Okay.

MR. ROSENBAUM: If there was a translation and -- because I don't want the jury -- I mean, it should all be in English. If they're going to put it in, it needs to be translated for the jury.

THE COURT: Okay.

MR. ROSENBAUM: And then I would know what it means.

THE COURT: Mr. Dobbins, what's going on with the untranslated portions?

MR. ROSENBAUM: And the other thing is, a lot of these posts are well after the conspiracy ended. Dates I'm seeing here are 2017 and beyond. 2021. There's dates in 2021, 2017, all post or after the conspiracy ended. People were already arrested. And I'm not sure the relevance, as well.

THE COURT: Okay. Let's take it in turn.

What numbers, again?

MR. DOBBINS: This is Government's Exhibit 80.

THE COURT: 80?

MR. DOBBINS: It's going to be A through R.

THE COURT: Go ahead. Maybe you want to proffer and let us know, Mr. Dobbins, on the parts that are Spanish, any concerns on that? Do we need that?

MR. DOBBINS: I believe 80-D through K already came in, Judge.

THE COURT: D through K already came in? Okay. So those are in.

What are we talking about that's not in? Is it A through C, maybe?

MR. DOBBINS: Right. So A is a list of contacts, essentially friend contacts.

THE COURT: Okay.

MR. DOBBINS: From Facebook.

THE COURT: Okay.

MR. DOBBINS: So those are just names and account numbers.

THE COURT: Okay. So no language problem there. All right.

MR. DOBBINS: Shouldn't be.

MR. ROSENBAUM: But the dates on top of it, on page 52 are 2020, 2021. So we don't know when -- the relevant time period here is 2015, May. So these are years later. And we don't know when these names were added or the relevance of some of the names. So we would be objecting that it's not part of the -- well after the conspiracy ended. And there's no relevance.

THE COURT: Can you proffer to me, Mr. Dobbins, why you need this?

MR. DOBBINS: Yes, Your Honor.

So this account that the agent will testify was created

in 2017, I believe, which is after the date of the murders. However, what this shows is that the defendant is -- Mr. Rosenbaum keeps saying this is after the conspiracy ended. No conspiracy was charged here.

As has been stated by a couple of witnesses, MS-13 is an ongoing enterprise. This shows that the defendant is still actively communicating with members of the -- of MS-13, number one. But number two, also has listed as friend requests and has a communication with at least one of the co-defendants in this case. So the defense has argued in opening that this is just merely present, he didn't know what was going on, he didn't know who these guys were. What we are establishing with this Facebook account is that not only did he -- the argument obviously would be that the testimony shows differently.

But in addition, after -- two years later, at least through 2021, this defendant is still actively on MS-13 group chats. He's still receiving memes, which is 80-D, through 80-K, which came in I believe through the first witness. And then, in addition, he's also receiving -- most of what we focus on, in addition to the memes, are certain things that they -- that he receives texts in this group chat which are basically symbols symbolizing the La Garra, which is the hand sign.

In addition, we do have a communication from the Thiago Silva Facebook account, which Melvin Cruz-Ortiz testified was his account. I believe that's sometime in 2020, I almost want

to say. So again, it establishes that he's somehow, through Facebook, kept in either contact or actually had them on their friends requests and is continuing to receive these Facebook memes.

THE COURT: But again, for the purpose of establishing the continuing enterprise?

MR. DOBBINS: That's correct, Your Honor. Some of the memes have come in. There were one or two that were, you know, depicted, which I think the first witness testified, the expert testified as to what they reflected, which was commenting on what would happen to chavalas. They were memes.

In an abundance of caution, we had two additional photographs that were shared, but it wasn't sent from this defendant's Facebook account. We're not going to try to introduce those. Those depicted some very gory, violent imagery. We're not going to introduce those. But we do have the other memes that were already admitted. And then we do have, like I said, the contact list and so on.

THE COURT: Okay.

MR. ROSENBAUM: The contact list, we don't know when the contacts were made. If you have a Facebook account and you have contacts, let's say, you got early on and you don't delete your Facebook account, people can keep sending you things. They're coming to his account. It's not that he's sending them. It's not that he's communicating with anybody. It's

just he's just receiving it. He may not even be opening his Facebook page anymore. So I don't see the relevance of this.

THE COURT: Understood. That's fodder for cross-examination. So we're going to overrule the objection. The Court finds it to be relevant, certainly probative of a continuing enterprise. Having looked at it, a chunk of this is already in. It doesn't belabor the point too much, and we'll be able to ask some predicate questions to our special agent to explain the timeline, please.

So I'll go ahead and let those in over defense objection. Let's try to ask a few questions. We're going to go about 15 more minutes on this and see where we're at.

Let's round them up, please.

THE COURT SECURITY OFFICER: All rise for the jury.

(Jury enters at 12:37 p.m.)

THE COURT: Please be seated, everyone.

As you come in, we're going to go a little further here and see if we can complete a little more of direct examination before we break.

So turning it back to the government.

MR. DOBBINS: Yes, Your Honor.

At this time the government would move Government's Exhibit 80-A through 80-C. I believe 80-D through 80-K were already admitted.

And then we would move 80-L through 80-R into evidence

at this time.

THE COURT: Correct. Understanding prior objection, those will be admitted at this time over the defense objection.

(Government Exhibits 80-L through 80-R were received in evidence.)

BY MR. DOBBINS:

Q. So the first thing I'd like to show you, Special Agent Ferguson, is Government's Exhibit 80-A.

What is the name of the user of this Facebook account?

A. Locos Ya Estamos.

Q. And if we jump ahead to 80-N, as in Nancy, what does this information tell us here?

A. So on page 1 of the return, you can see the username that was generated for the account, Locos Ya Estamos. You see an email address affiliated with it, LocosYaEstamos13@gmail.com.

Q. And what about when the account type was generated? Or when was -- does it show here where the -- I'm sorry -- where the account was registered or it began?

A. There is a page that shows that, unless -- oh, here, on the very bottom, if you move it up a little. Yes. I believe there kind of --

Q. Read -- I'm sorry. Before you answer.

MR. DOBBINS: Can we just clear the ELMO, please?

BY MR. DOBBINS:

Q. You can just tell me where to highlight. I think that

might be easier.
A. At the very bottom, registration date January 6, 2017.
Q. Now, are you familiar with the term "attribution"?
A. Yes.
Q. All right. What is attribution?
A. When it comes to a social media account like Facebook, especially sometimes it can be confusing or difficult to know who exactly is the owner or operator. So attribution, we seek to identify, maybe through their friends list, photographs, selfies, et cetera, who the user of that account would be.
Q. All right. Directing your attention to Government's Exhibit 80-P.
What is this we're looking at here?
A. This is a photo of Solitario, or Mr. Vigil-Benitez.
Q. All right. What does it say was -- what does it say under "album name" here?
A. Profile pictures. Uploaded on 11/25, November 25th of 2018.
Q. And again, what's the account?
A. Locos Ya Estamos.
Q. Okay. We'll go to 80-Q. It's a two-page exhibit.
What's the account?
A. Locos Ya Estamos.
Q. What's the body?
A. A photo that was sent.

Q. Okay. And showing you the second page, Government's Exhibit 80-Q.
Who are we looking at in that photograph?
A. Mr. Vigil-Benitez, Solitario.
Q. So based on the profile picture, who did you attribute this Locos Ya Estamos Facebook account to?
A. Mr. Vigil-Benitez.
Q. All right. So going back to Government's 80-A, page 4, which is really page 55.
Do we find some of the people that we've been talking about in this case?
A. Yes. About a third down from the top, you'll see Andy Tovar. That would be Fearless.
Q. Okay. Have we heard of an individual by the name of Gohan? Has that been used before?
A. Yes, that is one of the Facebook pages for Discreto.
Q. And if we go to the -- I believe it's the last page. It's page 58 of the return, but it's the seventh page in the exhibit. We have a continuation here.
Do we see any names that are significant to the investigation?
A. Yes. Hugo A. Bermudez was the Facebook page for Blue. And at the very bottom, Wilber Quinteros, and that's the partial name for Power.
Q. Okay. Now, were you also able to determine if the

defendant's Facebook account was in a group chat?
A. Yes.
Q. Okay. But in addition, were there times where you were able to pull whether the defendant had sent any messages?
A. Yes. It would be reflected who the sender was. So in some of the group chats, it'll be very clear that he would receive images or messages. And then vice-versa. If he sent something, it would be reflected in the record.
Q. So I'm showing you Government's Exhibit 80-B, as in boy, which is two pages.
Do you see any Facebook accounts, other than the defendants, where there are messages either sent or received that pertained to this investigation?
A. Yes. So second from the top, sender Locos Ya Estamos from Mr. Vigil-Benitez to Wilber Quinteros, which was the Facebook page for Power.
Q. And what was the date?
A. January 6, 2017. That was also, as you saw, the date of origin or creation for the account.
Q. Okay. And any others?
A. Yes. Right below that is Locos Ya Estamos to Thiago Silva, on the day after creation, January 7, 2017. And the Thiago account was operated by Bigfoot.
Q. Okay. Flipping to the second page.
Any other names?

A. Yes. In the middle we have Alberto Villatoro. That was one of the Facebook pages operated by Discreto.
Q. And when was that sent?
A. The day after creation, January 7, 2017.
Q. All right. So just to be clear, again, this is the Locos Ya Estamos Facebook account you attribute to the defendant with those selfies that's sending these messages out to these people?
A. Correct.
Q. Showing you Government's Exhibit 80-C. This is another two-page document.
We were talking about the group chats. What did you mean by that?
A. Where, you know, it could be similar to multiple social media sites, or like a WhatsApp or text message group chat, where anywhere from three to dozens of people may be on the same thread sending and receiving messages.
Q. Okay. And so on these returns, is this things that the defendant is posting, or somebody else is posting within the group chat?
A. I believe these pages indicate what other people are posting.
Q. Okay. And do we see any Facebook account that is relevant to the investigation posting in here?
A. Yes. Right there in the middle, the Thiago Silva account,

once again, was operated by Bigfoot.
Q. And what day was that posted?
A. On August 13, 2017.
Q. Okay. Now, it says it's a comment.
Is this a comment to something else that was posted?
A. I believe, based on my understanding, it would be -- yeah, I mean, it's not referenced directly under a photo, but the text that is shared or sent from Thiago Silva, Bigfoot, to Solitario's account.
Q. Okay. Now, we've seen some of these before. This is 80-D, as in David.
What is this we're looking at again?
A. Some MS graphic art shared amongst what appears to be a group chat. And this was obtained from Solitario's account.
Q. Okay. Government's Exhibit 80-E.
What is this we're looking at?
A. Some more MS artwork, indicated by the "MS" at the top and the bottom. Also, the author is a different account than Solitario's, but is part of this group thread or group chat that he's on.
Q. Okay. Government's Exhibit 80-F. We've seen this before, right? So we saw this with the first witness, which was Detective Nelsen.
But just to be clear, did the defendant send this, or is this something he's receiving on this -- what appears to be a

group chat?
A. Yeah, something he's receiving.
Q. Okay. And 80-G. I think there's supposed to be a second image there.
Here you go.
Again, is this the defendant sending it, or is somebody sending it to --
A. Someone else sending it.
Q. Okay. Government's Exhibit 80-H. We've seen this meme before.
Was this something that the defendant sent or somebody sent to the group chat that the defendant was on?
A. Someone else sent that to the group.
Q. 80-I, what's --
A. Once again, MS artwork sent by someone to the group.
Q. There's an additional picture. It's a series of photos.
Is this something that the defendant sent or something he received on the group chat?
A. Something he received.
Q. And that's page 1477 of Exhibit 80-I.
1478, something that the defendant sent or received?
A. Received.
Q. Okay.
MR. DOBBINS: Judge, I don't know how much longer you wanted me to go or . . .

THE COURT: How much more you got?

MR. DOBBINS: Just a couple more questions.

THE COURT: All right. Let's try to wrap it up.

BY MR. DOBBINS:

Q. 80-J. Primarily, what we're looking at here -- sorry, that was 80-K.

80-J, these are texts he's receiving in the group chat?

A. Yes.

Q. Okay. And 80-K, primarily we're looking at these symbols here (indicating).

What do you know those symbols to be?

A. So following the "buenas noches" greeting from Locos Ya Estamos, you see the La Garra popular for, like, Facebook or text messaging as a way to flash what MS-13 describes as the devil horns, the La Garra symbol.

Once again, you have the left and right hashes surrounding MS there. And then SWC 13 is Southwest Cholos 13. They're a Sureños gang in Houston, Texas, and they're at war with MS-13. And then below that you'll see 18, so they would seem to be referencing chavalas or rivals of MS.

Q. Okay. That was 80-K.

80-L, the email, what's the significance of Hollywood Locos?

A. The Hollywood Locos is one of the bigger cliques of MS-13 within the United States.

Q. And is this something, again, that the defendant said or something that he received in the group chat?
A. He received.
Q. Okay. 80-M, again, this is something that the defendant posted or something that somebody else posted for him?
A. Something he received.
Q. Okay. We already went through 80-N.
80-O, something that he's receiving through the group chat?
A. Yes.
Q. Okay. But it looks like he's posted something here, right?
A. Correct. And then above and below him are different Facebook user accounts also sending messages.
Q. Okay. We've already went through P and Q.
So finally, R. These are things he's receiving from the group?
A. It is.
Q. Okay. And here we have -- we know this is in Spanish.
We have reference to La Mara Salvatrucha, which is what?
A. The long form name for MS-13.
Q. All right. And finally, based on your training and experience and your investigation, is MS-13 an ongoing operation and enterprise from the time of 2015 until even today?
A. It is. We have numerous active cases.
MR. DOBBINS: One moment, Your Honor.

THE COURT: Sure.

(Discussion was held off the record.)

MR. DOBBINS: Nothing further, Your Honor. Thank you.

THE COURT: Thank you.

Ladies and gentlemen of the jury, we're going to go ahead and take our lunch at this time. Thanks for hanging in there so I could have an organic break with the witness. When we get back, we'll go into cross-examination, and then we'll finish up this witness in the afternoon.

It's just little bit before 1:00 o'clock. I would ask that everybody be back in the jury room at 2:15. Let's go ahead and give you guys about an hour and 15 minutes. Stretch out, check in, of course, never talking about the case, but if you've got to check in with home, check in with employers as to scheduling, you can do that.

Remember, of course, all the rules that I keep reminding you of each time we meet every day. Do not discuss this case with one another. Do not discuss this case with family or friends. We are truly in the homestretch. Continue to keep an open mind and stay focused for me. If you see the lawyers out when you're at lunch, please take no offense if they avoid you, as they must. And then, of course, stay off social media and no independent research.

Go ahead and leave the notepads in the jury room since we're going to take more of an extended break. I'll see you

guys back in there at 2:15. You are excused.

THE COURT SECURITY OFFICER: All rise.

(Jury exits at 12:58 p.m.)

THE COURT: All right. Everyone, please be seated.

We will go ahead and take our break, as well. There are no meetings or hearings during this window, so no one needs to accommodate anything on counsels' tables. We will pick it up at 2:15. All right? We'll see everybody then. We're in recess.

THE COURT SECURITY OFFICER: All rise.

(Court recessed at 12:59 p.m.)

(Back on the record at 2:37 p.m.)

THE COURT: Please be seated, everyone. All our jurors are accounted for, so let's go ahead and bring them in, please.

THE COURT SECURITY OFFICER: Please stand for the jury.

MR. ROSENBAUM: Judge, before the jury comes in -- we have one matter.

THE COURT: Hang on one second.

Yeah, get on the mic.

MR. ROSENBAUM: I'm sorry. I have one matter before the jury comes in.

THE COURT: Sure.

MR. ROSENBAUM: In reviewing the exhibit that was admitted that we objected to, more specifically, our objections hold for all of 80, but 80-C -- do you have a copy of that up

there, Judge?

THE COURT: I'm sure I can get one out of here, yeah.

Okay. I'm there.

MR. ROSENBAUM: 80-C, this one has absolutely no probative value at all, and it's covered by other exhibits that they've introduced. But the problem with this one, and why it's prejudicial and has no probative value, it has some status updates that talk just about devil and devil worship, but it's also in Spanish. And we do have jurors that speak Spanish and can read Spanish and some that can't, and they'll be relying on the other jurors in order to interpret this.

But it talks about, on the second page, it talks about -- halfway down, before the user text and time that's indented in bold, it says: "Busos karma es pesado viva satan."

And then after the indentation, it says: Status -- I'm going to have Ms. Acevedo read it. Her Spanish is a little better.

THE COURT: I can read it.

MR. ROSENBAUM: Your Spanish is better than mine, for sure.

THE COURT: I can read it. But I guess the issue is if it's the contents of the message, because I don't think -- correct me if I'm wrong, Mr. Dobbins -- that the substance of the discussion was as relevant as connecting individuals who were MS-13 affiliated with one another.

MR. DOBBINS: That's correct, Your Honor. On that second page where he read the message, it's commented on by the Thiago Silva account, which, as was testified by Melvin Cruz-Ortiz, that that was his Facebook account.

THE COURT: So I guess my point would be on this is I am certain that we could do a redaction of 80-C so as to take out just some of the status updates that are in Spanish to avoid any sort of undue prejudice, but keep in them user and time, because it's really the connection, more than anything else, between individuals as opposed to them discussing what is primarily satanic messages. I mean, that's really what it is. It's referencing, you know, following Satan and things of that nature. I wouldn't want anybody to read that and have it misguide them or inflame any passions of the jury if they're not -- that's not really what they're being offered to show.

MR. ROSENBAUM: Correct. Six or seven lines get redacted and then that would cure the objection.

THE COURT: Yeah. It's not a big deal.

MR. ROSENBAUM: Except for the other objection that we have. But since it's in, I just --

THE COURT: I agree.

MR. ROSENBAUM: Over the break, we really went over this in detail. And my Spanish isn't very good, and that's when I was able to pick this up.

THE COURT: No, no, it's a fair point. I've objected

in terms of the enterprise objection. It is in. I see no reason why we couldn't do a brief redaction of 80-C, keep the tags and the individuals. You know, it's not a problem to keep Locos Ya Estamos updated a profile picture. That's not what worries me. And the names of reposts don't worry me because it's communication of MS-13 affiliated individuals.

It's just, in particular, page 227 of 80-C, at the top it says 227, that page in particular has all sorts of random devil worship comments that aren't even really connected in the name. There's just a bunch of them. So I'm certain we can redact that, and that way we don't have our jurors reading through that in Spanish.

MR. DOBBINS: That's not a problem, Your Honor.

THE COURT: So I'll sustain that, and we'll make sure that whatever goes back on 80-C is redacted.

MR. ROSENBAUM: Thank you, Your Honor.

THE COURT: Yeah, absolutely.

MR. DOBBINS: Judge, just so we're clear, the status -- where it says status, and it'll say things like "busos karma es pesado viva satan," that would be redacted.

THE COURT: Correct. User, Thiago Silva, for example, would not.

MR. DOBBINS: Right. That text has no objectionable material as far as I can tell. It says, "La viva realidad" --

THE COURT: "Realidad perro."

I mean, look, I think go through it. It's really just 227. I don't have a problem if you want to show me what you think and still make it through a redaction, but I will tell you that the majority of the comments -- I'm reading them here to myself -- would be redacted.

MR. DOBBINS: Right. So we would leave the fact that something was posted, and we'd just redact the message.

THE COURT: Right, right. It's the messages. It's Mr. Rosenbaum's point. It's the content of the message in Spanish that is making references to Satan worship and things of that nature. Yeah.

MR. DOBBINS: Okay. I'll meet with him, and we'll go through that and redact it.

THE COURT: Perfect. All right. Very good. Thank you, Mr. Rosenbaum.

Okay. We can go get our jurors now.

THE COURT SECURITY OFFICER: Please stand for the jury.

(Jury enters at 2:43 p.m.)

THE COURT: Please be seated, everyone. I hope everyone had a good lunch break.

At this time, we are going to turn it over to the defense for their cross-examination of the witness. All right. Everyone have their notepads? Yes? Very good.

All right. Mr. Rosenbaum, the floor is yours.

MR. ROSENBAUM: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ROSENBAUM:

Q. Agent Ferguson, good afternoon.

A. Good afternoon, sir.

Q. Okay. You've been a law enforcement officer for, what, almost 20 years?

A. Yes.

Q. Okay. And in part of your training in your job, they -- you're taught and you learn how to make up lineups to show individuals, photographic lineups, correct?

A. Correct.

Q. Okay. And we've been through a bunch of photographic lineups here today, right?

A. Yes.

Q. Okay. And these are the ones you made, correct?

A. They are, yes.

Q. Okay. So what is the rules or what do you do -- what do you look for to make a photographic lineup fair?

A. You're looking to use substantially similar photographs, not necessarily twin-looking images, but you don't want to have, let's say, one male with numerous tattoos and everyone else has zero or vice-versa. If it's Latino male subject in the photo lineup, you would want other Latino males, not mixing a bunch of Asian or black males or white males who would strike a very definitive difference between the person in question and

the other people that are mixed in.
Q. Okay. You don't want to have pictures of a rabbit, an elephant, a duck, and a refrigerator, right? Is that the type of thing you're trying to avoid?
A. Correct. Drastic differences you're trying to avoid, yes.
Q. Okay. You want people of similar skin color types, same hair color, facial hair; you want them all kind of to be the same, correct?
A. Yes, sir, similar.
Q. Okay.
MR. ROSENBAUM: Can I have the ELMO, please?
BY MR. ROSENBAUM:
Q. Okay. This is Government's Exhibit 28. And I believe Government's Exhibit 28 was shown to Wilson Tirado-Silva; is that correct?
A. That would sound correct. But we can confirm based on the writing.
Q. Let's look at picture No. 6. Is that his signature there? Do you recall?
A. Can you zoom out a little bit? I can't see the signature.
Yes, that would be Wilson Tirado.
Q. Okay. So in this lineup, you have a picture in there of Wilber Vigil-Benitez, correct?
A. I do.
Q. Okay. So you have a picture of this fellow with neck

tattoos, correct?
A. Correct, he does have some --
Q. Black shirt?
A. Yes.
Q. And some facial hair, right?
A. Yes, a little bit.
Q. Number 2, facial hair, black shirt, bald. Right? Very little hair.
A. Correct, very short haircut.
Q. Number 3, facial hair, black shirt, correct?
A. Correct.
Q. Four, white shirt, little bit of facial hair on the chin, right?
A. Yes, sir.
Q. And a tattoo, as well, by the neck.
Five, facial hair, short haircut, black shirt?
A. Yes.
Q. And 6, the background. This is the only one with a background that's not plain, correct?
A. Correct.
Q. And doesn't this emphasize a difference and, therefore, could affect the ability of the person to freely pick out what they believe is the person that you're asking to identify?
A. I could see how that would be presented as a concern. And this is also why later on, like in the photo lineup to Ardilla,

for example, we used a later-taken photograph, which is the one where he has quite a bit more hair.

Q. And that's the one he did not identify.

A. Correct.

Q. Okay. Let me show you exhibit number -- Government's Exhibit 58. This is a lineup that you showed M.D.C.O. -- that's Cruz?

A. Cruz-Ortiz.

Q. That's Bigfoot?

A. Bigfoot. Yes, sir.

Q. Okay. So let's go through this one.

Again, we have a picture with a guy with a black shirt, a tattoo on the neck, and something above the left eye, correct?

A. Yes, sir.

Q. Okay. Number 2, same number 2. I think it's the same lineup that you showed Bigfoot, that we just looked at. Facial hair, black shirt.

Three, facial hair, black shirt.

Four, little bit of facial hair and a light shirt.

Five, black shirt.

And six, it says M.D.C.O., Solitario. Again, the only one with a background that's totally different than the others, correct?

A. It is correct.

Q. Not the best picture you could have used, right?

A. No. In retrospect it would be preferable to have similar or exact backgrounds.

(Discussion was held off the record.)

BY MR. ROSENBAUM:

Q. And this is Government's 71.

This is the lineup you showed Ardilla, correct?

A. I'll concede that. I would just want to confirm based on the markings on the page.

Q. There's no markings on this one. But we have this photograph that we talked about before.

A. Correct. So this is when I updated it from the inch-mark lines behind him to a more recent booking photo I was able to obtain.

Q. Okay. And in this one, you used the same photographs that you used in the other two we've gone through -- one, two, three, four, five, and six -- except you changed the picture of Wilber Vigil-Benitez, correct?

A. That's correct.

Q. And Ardilla was not able to make an identification out of this lineup, correct?

A. Correct.

MR. ROSENBAUM: That's all I have, Your Honor.

THE COURT: Thank you.

Redirect?

MR. DOBBINS: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. DOBBINS:

Q. So you were asked about these lineups and how that last Photo in 28 and 58 might draw somebody's attention to it.

Do you recall that line of questioning?

A. Yes.

Q. Now, do you pick out these photos yourself, or are they generated somehow?

A. I go through hundreds of -- as I'm creating different lineups, hundreds of booking photos. These are in the national index. It's an abbreviation for the national law enforcement exchange. It's a compiled network or database hosted by the FBI. So all of these booking photos come from different agencies across the country.

Q. Okay. So with the photos you pick out, though, we heard, for example, this transcript and we heard the recording of you showing similar lineups -- obviously you didn't show the defendant a lineup of himself. But you showed similar lineups to the defendant for the other participants in this murder, right?

A. I did.

Q. Okay. Now, when you show these photos, what are the instructions you give the witness?

A. We ask them to look at them one at a time, to keep in mind that these photos may have been taken before -- before the time

they knew the subject. If there's someone they may recognize, during the time or after the time, to take into account that tan, facial hair, weight gain, or weight loss can all be factors to consider.

Q. Okay. And when you're showing them are you saying, In this six-pack is somebody you're going to recognize, so tell us who it is.

Do you say something like that?

A. No. It's a generic open-ended, If you recognize anyone in this six-person photo lineup, please point out which one it is.

Q. So when you show these pictures, did you -- when you showed Government's Exhibit 28 to Tirado, did you say, Here's a six-pack. See if you can see Solitario in there.

A. No.

Q. You don't tell them anything about who might be in the photographic lineup.

A. Correct.

Q. You just want to know if they can recognize anybody within that lineup.

A. Correct.

Q. And with Solitario -- I'm sorry -- with Sombra, Wilson Tirado-Silva, he was shown several of these six-pack sequences, right?

A. He was.

Q. And each time he was just instructed the same way, only

tell me if you see somebody you recognize, not giving a hint as to who it might be that was contained within the six-pack?

A. Correct.

Q. So even though this background may have drawn their attention to it, that wouldn't necessarily tell them who is in that photo, right?

A. Correct.

Q. In addition, you've sat here in court and you saw that Tirado-Silva identified the defendant in open court, right?

A. He did.

Q. And does the defendant look significantly different from the photo that Tirado-Silva identified back in January of 2021?

A. With the change in hair, some may consider that somewhat significant. I would say facial structure is essentially the same.

Q. Okay.

MR. DOBBINS: One moment.

THE COURT: Sure.

(Discussion was held off the record.)

MR. DOBBINS: No further questions, Your Honor. Thank you.

THE COURT: Okay. Thank you very much, Agent. You're free to rejoin counsel's table. You're excused.

Government's next witness?

MR. DOBBINS: Your Honor, at this time the government

rests.

THE COURT: Ladies and gentlemen, the United States has rested. Inside the jury room there are two coladas waiting for you to have a little bit of coffee, while I sit here with the lawyers and plan out the next steps. Go ahead and leave your notepads in your chairs. Enjoy your coffee. We'll bring you back in in just a moment.

THE COURT SECURITY OFFICER: All rise for the jury.

(Jury exits at 2:58 p.m.)

THE COURT: Please be seated, everyone.

All right. The government has now rested. At this time, my understanding is that you guys on the defense team have had a moment to speak to your client about his willingness to testify. But I do want to confirm with you if you need any more time before I colloquy and ask what his decision is.

Have we spoken to him already?

MR. ROSENBAUM: Oh, yeah, more than a moment too.

THE COURT: I'm sorry?

MR. ROSENBAUM: And it was more than a moment.

THE COURT: Okay, I figured. All right.

So at this point, is the intention for him to testify, Mr. Rosenbaum?

MR. ROSENBAUM: No. I don't -- he does not wish to testify.

THE COURT: Okay. Gracie, if you could please put the

defendant, Mr. Vigil-Benitez, under oath for me.

THE COURTROOM DEPUTY: Yes, Your Honor. Please raise your right hand.

(Defendant, Wilber Vigil-Benitez, duly sworn.)

THE COURT: All right. So, Mr. Vigil-Benitez, your lawyers have advised me that you do not wish to testify. The first thing I want to confirm is: Have you had sufficient time to speak to your lawyers, Ms. Acevedo and Mr. Rosenbaum, about your decision?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Is it true that you do not wish to testify?

THE DEFENDANT: Yes.

THE COURT: Okay. And while counsel is excellent, do you understand it is your decision whether or not to testify?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are you making a decision not to be a witness on your own behalf freely and voluntarily?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Is anyone, whether it be your attorneys, family, friends, or anyone else, forcing you or threatening you so that you do not testify?

THE DEFENDANT: No, no one.

THE COURT: Okay. And you know that I will let you testify even if counsel tells you not to, correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: So who is making the decision that you will not testify?

THE DEFENDANT: I am, myself.

THE COURT: Very good. Thank you. Please be seated.

The Court finds that the defendant, Mr. Wilber Vigil-Benitez, is alert and intelligent, and does understand his right to testify. I find that he is fully informed and has freely and voluntarily chosen not to testify after sufficient discussion with his counsel.

Now that we have done that, my thinking on the rest of the afternoon is as follows: I believe that we are in a position to have the jury come back out, allow the defense to rest in the presence of the jury, excuse the jury, and then we will have a brief charge conference, and we can get the instructions ready to go so that we can do closings tomorrow. And that way, it'll give you the rest of the evening to prepare.

On the defense side, I don't believe you have any witnesses you intend on calling.

MR. ROSENBAUM: No. But as far as moving for a Rule 29, I can wait until I rest in front of the jury and do it all at once, or I can break it up into two separate parts, whatever the Court's pleasure.

THE COURT: I would prefer the former. Let's just go ahead and let the jury get out, and then we can do it all at

once. I'll hear the argument -- we'll hear some argument on the Rule 29, and then we can let -- well, we'll already have them go, but then we can move to the charge conference. So that's easier.

So all I'm going to do is, in a moment, we'll go ahead and bring the jurors back in. We'll let them know that tomorrow they will come back and be ready to go at 9:00 a.m. and that will be, of course, after I prompt the defense to rest in front of the jury. Okay? Everyone good? Yeah? All right.

Let's round them up, please.

THE COURT SECURITY OFFICER: All rise for the jury.

(Jury enters at 3:03 p.m.)

THE COURT: Please be seated, everyone.

So, ladies and gentlemen, as you know, the government just rested. I will now prompt the defense and check in with them. Remember, of course, that the defense does not have to put on any witnesses. It is only the government's burden to prove guilt beyond a reasonable doubt. But they have the option, if they wish. All right?

So at this time I will ask: Any witnesses on behalf of the defense?

MR. ROSENBAUM: The defense rests, Your Honor.

THE COURT: Thank you, Mr. Rosenbaum.

Ladies and gentlemen of the jury, the government and the defense have rested. That means that we are done for

today. All we have left are instructions on the law, closing arguments, and you guys begin deliberating. We're going to let you go early. It's just about 3:00 o'clock. Me and the lawyers are going to stick around. We're going to get everything ready to go for tomorrow. We're going to have the instructions ready.

When you guys arrive tomorrow morning at 9:00 a.m., you're going to have in your chairs instructions on the law that you're going to have to follow. I'm going to read that law with you guys. Then I'm going to turn it over to the lawyers. They're going to do a closing argument. And then you guys are going to be free to begin deliberations tomorrow. I expect that by lunchtime, you guys will be in the jury room. We will provide food for you. And you will be able to begin deliberations. So it's going to be in your hands tomorrow afternoon. We are, obviously, very much ahead of schedule, as promised.

So this is the last phase of the case. Very important, before I let you guys go. Even though both sides have rested now, there's been a lot of evidence presented over the course of last week and this week. It is very important that every single one of you keep an open mind. Closing arguments for the lawyers are crucial to go over all the evidence that's been introduced, try to explain where it fits in, summarize it, and make argument related to the instructions in the law that I'm

going to give you. So I want you guys not to shut down. I want you to keep an open mind, even though we're at the last phase of the case.

Scheduling wise: You can already advise some of your employers that you are at the last phases of the case. Tomorrow are closing arguments. You can share that. But, of course, that's only for scheduling for home, for work. Do not tell anybody anything about the case. Remember, we are now at, arguably, one of the most crucial points because all the evidence is in. So that means we're at the very, very last stage. So for the sanctity of the trial, all the work we have done over the last week, it is vital that over this next 24/48-hour period you guys remember all those rules once again.

Do not discuss what you've seen or what you've heard with anyone, with family or friends, employers, whoever, with each other. In about not even 24 hours you guys are going to get the chance, for the first time, to talk to each other about everything you've heard. Continue to keep the rule that that's the first time you should be doing that. No one should be talking to each other about what they've seen and what they've heard. Remember that all of the evidence is going to go back to you guys in the jury room. You're going to get a chance of reviewing all the transcripts, everything we admitted, all the photos, et cetera. Remember, of course, to stay off social media, no posting about your involvement in the case.

Remember, of course, also not to do any independent research. Please remember all of those things. I know I repeat them every day multiple times, but it is perhaps now more important than ever because we really are at that last phase, and I want you guys to stay focused and with an open mind.

But tomorrow our goal is put this in your hands, folks. So I thank you guys for your attention. At least we give you guys a little break today, so you can get home, get some rest. I know everyone is tired. Recharge because we have a big day tomorrow before you guys begin deliberating.

So with that, make sure you put your notepads in the jury room. And I'll see you guys at 9:00 a.m. for closings. You are excused.

(Jury exits at 3:07 p.m.)

THE COURT: All right. Everyone please be seated.

At this time, Mr. Rosenbaum, we can go ahead on the Rule 29.

MR. ROSENBAUM: Thank you, Your Honor. The evidence presented by the government is insufficient to sustain a conviction. What we have are -- boils down to two witnesses, boils down to Bigfoot and Ardilla. They were the only two witnesses that testified who were eyewitnesses to the murder of Gerson. And based upon the evidence, the lack of, and the conflict of the evidence, plus you have to put into play Mr. Wilber Vigil-Benitez's statement which is in evidence, in

record evidence, that he was there that night, but it's really questionable whether or not he participated or not. If he's merely present and did not do anything, he did not aid and assist in the death of Gerson, either by stabbing him, dragging him, or anything like that, then he is not guilty.

Also, two witnesses that were there, one of -- both of them, Ardilla and Bigfoot, failed to identify Mr. Vigil-Benitez in the courtroom. There was no identification of him by those two. There was by Tirado, Sombra, but he wasn't there. He was at the house, and he doesn't know what happened at the murder scene.

So based upon that and the fact that one of the elements of the crime that he's charged with is that the government has to prove that the defendant's general purpose was to maintain or increase his position in the enterprise, and he was already a homeboy, so he didn't need -- like the ones that really went at Gerson, they were all lessers, looking to move up and get credit for the kill to move up to a higher status. He didn't need to do anything that night, and it's questionable whether he did or not.

So based upon the lack of identifications, the conflicts of the evidence that he was there, the role that Ardilla said versus Bigfoot is totally different with what happened that night. They conflict in the evidence, and it's questionable what they saw. So therefore, based upon the law,

as the jury has to consider it, the lack of identifications, the conflict of their evidence of what happened there that night by their two eyewitnesses, cooperators, we believe it's insufficient to get a conviction in front of a jury, and ask Your Honor to issue a Rule 29.

THE COURT: Thank you for that.

Government's response on the Rule 29?

MR. DOBBINS: Yes, Your Honor. Taking the standard of in the light most favorable to the government, the government believes that it has surpassed any hurdle for a Rule 29 motion for a verdict of acquittal -- judgment of acquittal in this case. The government has introduced numerous witnesses to testify that MS-13 was a criminal enterprise, that it was an ongoing enterprise at the time in 2015, which satisfies the first element.

That the second element was that the enterprise was engaged in or its activities affected interstate or foreign commerce. We had testimony from both Tirado-Silva, Viera-Gonzalez, as well as even Ardilla, Gamez-Melendez testified they would sell drugs and extort people, and that money would go to be collected by Tirado, and then Tirado would send some of that down to the leadership in El Salvador. Viera-Gonzalez testified that GLCS and the Delicias clique, of which this defendant is a member or a homeboy, were part of the East Coast program.

The East Coast program would try to pool its money to purchase controlled substances, such as marijuana and cocaine, for resale. And then they would collect dues from different cliques to send down to the leadership in El Salvador, as well. As well as pooling the money in an attempt to assist the different cliques with either purchasing weapons to further the criminal enterprise and/or buying more drugs to sell, to make more money for the enterprise. And as you heard, the East Coast program from as far south as North Carolina all the way up to -- I believe it was Massachusetts and as far west as Ohio. It included over 32 cliques that were involved. And so, therefore, it had an effect on interstate commerce and foreign commerce, as well.

In addition, you heard that the enterprise engaged in racketeering activity, which included, from Viera-Gonzalez, Tirado-Silva, Gamez-Melendez, and Cruz-Ortiz all testified that the something was to sell marijuana to use that money to pool it to try to purchase weapons to further what they needed to do.

They also talked about extortion, charging rent to drug dealers. Gamez-Melendez also said they did it to businesses, both illegal and legal businesses in the community, which was a protection racket. That's commonly seen where they say if you pay us the rent, then nothing will happen to you. But if you don't, we can't protect you, which really means they're going

to come, and it's a threat to come and destroy the property and/or damage the property and/or hurt the individuals running the business.

So we satisfied the third element.

As to the fourth element, you heard that this was -- this defendant participated in a crime of violence. We charged it under a theory, also, of aiding and abetting. I think, at the very least, we have aiding and abetting here. You know, the defendant's statement at times is self-serving, but he does put himself at the scene. He does put himself in the car with the victim sitting next to him. He also talks about the fact that they were discussing the fact that this was a potential chavala. And in the defendant's statement also says, quite clearly, that he knew that when you -- when you see a chavala, you have to attack. That's what's required. That's one of the rules. And he knew it.

He also said they had been out hunting when he was down in Florida, that when he was hanging out with the GLCS clique, they would go out hunting, was his term, for chavalas. So he knew what they were engaged in that night. And he also -- obviously he tries to claim in his statement that he did not -- that he was smoking too much marijuana which was contradicted, of course, by both Cruz-Ortiz and Gamez-Melendez, that he smoked marijuana on a regular basis. And they also shotgunned marijuana on a regular basis, so that was not anything unusual

to him. But what he talked about was that at some point he did see everybody stabbing him and somebody handed him a knife, and that he believed he did stab the victim a couple times so he could do his piece because if he didn't, he could possibly be killed.

So when you throw that in with both Tirado-Silva's testimony, which is corroborated by a number of things, including the other witnesses, but also by his GPS, and then the fact that there were statements made, he observed that the defendant had been cut and that they talked about the killing. He said everybody was talking about it. That included the defendant. He collected the clothes so that they can be disposed of.

And then you have Bigfoot and Cruz-Ortiz and Ardilla, Gamez-Melendez, who both testified that they saw the defendant participate in the murder by stabbing him numerous times. They may have differed on some details, but on the overall details they were -- they were consistent. They stated that everybody was doing it. They described it as a frenzy. That everybody was in a circle, the victim was moving around trying to protect himself. He was unable to do so, and they were all looking for a spot to stab.

And finally, as far as the fifth element, that it's to gain entrance to or maintain or increase position in the enterprise, again, I notice that we keep focusing on increasing

position and/or gaining entrance to. We're not disputing that the defendant did not need to gain entrance to. He was already a full member and/or homeboy at the time. But we did charge it as an aiding and abetting, so he is aiding and abetting the others for trying to gain entrance too.

But in addition, as was testified by numerous witnesses, that there is status increase even when you're a homeboy, one, for the more kills you have, you get to start escalating your tattoos and putting them in more visible places. You're able to get permission from the Ranfla or leadership down in El Salvador, and it is a sign of even more respect, and respect is very, very important in this gang, as they talked about. And so, therefore, the fact that somebody would participate, even though they're a homeboy, they would still be required to participate and get a kill, is to increase their respect and their status as somebody who has killed many chavalas.

And on the maintain level, obviously, it was discussed by a number of witnesses what would happen if someone did not participate. They could either be killed, or they would be disciplined by the clique -- by their own clique, if they were from another clique, and they would lose respect was how it was put. So that would be an effort to maintain one's status within MS-13, and that would be what the government submits that we have satisfied the fifth element as well. Therefore,

we submit that we have provided enough evidence in the light most favorable to the government that the jury should decide this and that this should not be a verdict of acquittal.

THE COURT: Thank you for that, Mr. Dobbins.

So I think, of course, as noted by the government, we must start with the applicable standard, and we have to be very mindful that when we are analyzing the evidence under a Rule 29 rubric, we're looking at the evidence in a light most favorable to the government. And when we're viewing the evidence most favorable to the government, if we see that there's more than sufficient evidence for the jury reasonably to find the defendant guilty beyond a reasonable doubt, then the Rule 29 motion must be denied. In doing so, we have to be mindful not to view the evidence in isolation, but in conjunction with other evidence in the case. And really, again, we have to really focus on making sure that there's not a judicial usurpation of the jury function.

Looking at the elements the government needs to prove under 18 U.S.C. 1959 (a)(1), I find, especially with that standard in mind, and knowing that we are not to assess the credibility of a witness or weigh the evidence on a motion for judgment of acquittal, I find that all five of the elements that the government has to prove have been satisfied for purposes of a Rule 29. I think we've had sufficient evidence of the enterprise's existence at or about the time of the

events charged in Count 3. I think it's beyond question that the enterprise was engaged in interstate and foreign commerce. We know about the international scope and interstate scope of MS-13. Racketeering activity evidence has been introduced through multiple different witnesses.

The crime -- the core of Count 3, that the defendant committed the alleged crime of violence, I think it's important to know it has been charged as aiding and abetting. I agree, as the defense has pointed out, there are certainly some conflicts in the evidence in that he talks about potentially being involved in the stabbing in his own statements, the pressure that was on him to do so, due to threats that he may himself experience given his status in MS-13, combined with the testimony of two witnesses who one of them, the most recent cooperator, Ardilla, I think said that he led the stabbing, he was the first one I believe to stab in the neck.

So we have ample evidence of defendant's commission of the crime of violence that is the core of Count 3. And the aiding and abetting at a minimum would get us there anyway, even if we give all credibility to the defendant's own self-serving statements in the audio recordings.

And lastly, you know, I understand that there's this idea that he was already made within MS-13 in a homeboy status. But I think to Mr. Dobbins' point, we have ample evidence that this idea of maintaining -- it's not just gaining entrance to,

but element five talks about maintaining or increasing position in the enterprise. We heard it from all the cooperators and the defendant himself, the way MS-13 functions is even at homeboy status, there's an expectation of committing crimes or continuing to commit crimes or participate in crimes. And the decision to disavow that or not do anything with that could actually lead to someone getting greenlit themselves. So there's sufficient evidence in the record that at a minimum he was attempting to maintain or had to maintain his status by participating in the stabbing of the victim.

So for all of those reasons, the Rule 29 motion will be denied, given the Court's analysis of the evidence and the record.

So now that Rule 29 has been addressed, I think we can proceed to charge conference.

The last I saw -- Mr. Dobbins, you circulated an updated version of the murder in aid of racketeering, 075.1. I have a copy of it here, and I, presumably, will be swapping that into the version that you originally circulated before trial, right?

MR. DOBBINS: Yes, Your Honor. The reason for this is, as I was -- you know, I tried to modify -- I believe 75.1 is actually a substantive RICO charge, which had a couple of things that were incorrect. For a substantive RICO charge, you have to establish a pattern of racketeering activities, whereas

for this one, for murder in aid of racketeering, you just have to show that the enterprise engaged in racketeering activity. We specified -- the other problem was that we specified what those racketeering activities were in the second superseding indictment, as well as we listed the crime of violence under Florida statute, and we did not, I believe, amply define those -- what those crimes were.

So I believe that those also needed to be described in the instructions so that the jury knows what it is. Obviously, we don't have to prove, you know, the elements of controlled substance offense under 846 or 21 U.S.C. 846 or 841, but we do still, I believe, need to give them just a definition of what that charge entails. Same thing with Hobbs Act, extortion, murder and extortion, and under Florida State law, as well as money laundering, federal money laundering.

And then, for the charges -- the specific charge under count -- under element 4, we cited to the statute in the Florida statutes, which includes first-degree murder, as well as second-degree murder. So I want -- and also, there's an aiding and abetting, but I didn't feel like we needed to confuse the jury with that one.

THE COURT: Because we had it separate, anyway.

MR. DOBBINS: Since we already have an separate aiding and abetting.

THE COURT: Right.

MR. DOBBINS: So, but I did just want to put certain definitions and details in there. So that's why I substituted it. So --

THE COURT: So I'm moving that into the draft here.

And what I'll do, so that we can all follow along is -- my thinking is to hear some argument on defense's proposed instruction. I'll print out a fresh copy of this for everybody so you-all can read it together here, and we can make sure we don't have any typos or anything of that nature. But I swapped in that instruction.

The one thing that I was going to mention, on the government's original version, I don't think that the government ever gave me a completed introduction to offense instructions. It was essentially not filled out. And I didn't fill it out. I was -- I mean, we can do it together, but I wanted to make sure, now that you have that revised version that you just gave me on the substantive instruction --

MR. DOBBINS: Oh, I see.

THE COURT: You see what I'm saying? It's the introduction part. So I didn't want to start drafting that on my own. I thought maybe you guys might want to take a look at that first and see what you want to do. I mean we can plug in a couple of the things ourselves. You know, it's Count 3, for example, and then we get into the substantive offenses. So, I mean, I think it's going to be pretty quick. We might want to

just do it right now.

And I don't know if -- Ms. Acevedo, do you see where I'm at on this?

MS. ACEVEDO: Yes, Your Honor.

THE COURT: Yeah. It was a blank -- there wasn't a filled-in version. It's the only thing that I haven't gotten. It's introduction --

MR. DOBBINS: I believe it's page 15.

THE COURT: Yeah. I think I probably changed the pagination myself, but you're probably right. I have been reformatting it a little bit. But it just says: Introduction offense instructions. It starts with the indictment charges, blank separate crimes, called counts, against the defendant. You know, we'd obviously make it clear it's one -- you know we're only charging one. I would say something like the indictment charges one count against defendant. And I would delete some of this. You'll be given a copy of the indictment to refer to in your deliberations.

So let's see here. Indictment charges one count, Count 3, against defendant. All right. Count 3 charges the defendant, that the defendant knowingly and willfully conspired -- and then we need to drop in our murder in aid of racketeering. Murder in aid of racketeering.

Yeah. See, you see guys have it still with a conspiracy, so that's not really -- we need to just overhaul

that. I got to tell you, it might just need to just -- it might be custom because it doesn't make sense the way it's drafted right now.

MR. DOBBINS: Yeah. Because I don't believe you need to describe what a substantive offense --

THE COURT: We don't.

MR. DOBBINS: -- is versus a conspiracy because --

THE COURT: Let me ask you, do we need it? I think it just got plugged in, guys, on the pattern. And I'm looking at it now. I don't think we need it because it really would just be for objects and substantive offenses. And we have straight up, Count 3. I don't think you need it. I think it's confusing. I think we go straight from caution punishment, conjunctively charge, and then get into the substantive offense. I mean, there's no conspiracy, so --

MR. DOBBINS: Right. I think that's fine unless you wanted to just keep the top paragraph that he's charged with one count, and you'll be given a copy of the indictment or something like that.

THE COURT: Yeah. Maybe I'm just going to put the indictment charges one count, Count 3, against the defendant. You'll be given a copy of the indictment to refer to during your deliberations, and that would be it. Why would we put the rest of this?

Defense with me on that? This is confusing.

MR. ROSENBAUM: We're with you.

THE COURT: All right. I'm going to delete all that.

So once I have that in there and now the revised one, defense, I know you're getting it for the first time, as am I. Do you guys have any concerns? And if you want to wait to read it together when I print it for you on the revised one that he gave us today, that murder in aid of racketeering.

MR. ROSENBAUM: I'd like to go over it again.

THE COURT: Yeah, so I'll give you a chance.

Why don't we though -- because I'll give you guys a chance to do it here in the courtroom. I'll step off. Why don't we talk about the main instruction that the defense has asked me to address, which is you guys have a mere presence instruction that you filed, right?

MR. ROSENBAUM: Correct. And now, based upon your ruling today on the Rule 29, we'd also like a duress instruction from the pattern.

THE COURT: Okay.

MR. ROSENBAUM: Because I think that falls in line with you ruling on denying the Rule 29 that he even said at the end that he would be greenlit if he didn't do it. And, therefore, we'd like that in there, as well.

THE COURT: Very well. I understand. We'll take it in turn.

Go ahead, Mr. Dobbins. And you want to argue -- we

have -- and I know Ms. Smukler also made a filing as to mere presence a couple days ago. Why don't we deal with -- it's two instructions, right? The defense wants two instructions in their theory of defense. They want the mere presence, and they're also asking for a duress instruction at this time.

We could take them in however the government wants to respond.

MR. DOBBINS: I'll let Ms. Smukler --

THE COURT: You want to do the mere presence first?

MS. SMUKLER: Sure, Judge.

THE COURT: Okay. Go ahead.

MS. SMUKLER: I filed objections to the defendant's proposed instruction, and there's case law to support that a mere presence instruction is not appropriate, one where the government's case rests upon more than mere presence. That's not the government's theory in this case. It's not that the defendant was just there. It's much more. It's that he actually participated. He was involved in stabbing the victim. But also, where the pattern jury instructions actually address that the defendant be a willful participant, then that is covered.

And I want to turn to the proposed jury instructions. Particularly, the aiding and abetting instruction, which itself says that not just proof that the defendant was simply present at the scene of the crime or knew about it is what we're

required to prove. It's the pattern instruction that was provided. It's originally page 23, S7, aiding and abetting. So the instructions provided already address the fact that the defendant cannot simply be present.

THE COURT: Mmm-hmm.

MS. SMUKLER: And again, this is not the government's theory of the case. And the pattern instructions already address that the defendant has to be a willful participant and not just a spectator in this. So I think that making a separate instruction almost makes it seem like this is a -- like an affirmative defense. That's not covered by the instructions.

THE COURT: Yeah. I will just add, so that we can read it, the aiding and abetting instruction says specifically, second-to-last paragraph: But finding that a defendant is criminally responsible for the acts of another person requires proof that the defendant intentionally associated with or participated in the crime, not just proof that the defendant was simply present at the scene of a crime or knew about it.

So that is on point with what may be some of the closing argument. The other issue I have is what you mentioned earlier, Ms. Smukler. And, you know, I understand the defense's view on this, but, you know, the mere presence instruction that's proposed is talking about him having to be a participant and not merely a knowing spectator. Again, there's

quite a bit of evidence that he was not a mere spectator.

And even with aiding and abetting theory, it's making it clear that if the jury were somehow inclined to find he was merely present at the scene of the crime, even though he, himself, in his statements, albeit goes back and forth on it, seems to suggest that he did engage in some of the stabbing. And then we have other, obviously, witnesses saying he absolutely led off with some of the stabbing.

I don't know that I don't cover, with aiding and abetting, enough of the defense's concerns. And I've got to tell you, that that mere presence instruction, to me, it seems to me that it's subsumed in aiding and abetting. And I don't -- again, it's really the defense's -- I know it's the defense's theory, but I'm just trying to understand from the defense perspective how we're not covering that already with aiding and abetting. I guess that's my question. It seems like it's already been covered in aiding and abetting. You can highlight it, you can drag it out, you can point to it. Adding it as another additional instruction, I think, may not be necessary. What do you guys think?

MR. ROSENBAUM: The only language that troubles me in the aiding and abetting paragraph, that is the second-to-last paragraph, it says: But finding that a defendant is criminally responsible for the acts of another person requires proof that the defendant intentionally associated with, and then it's

disjunctive, or participated in a crime. That troubles me because the jury can interpret that as association, his being there, is enough. Even though it then says being knowingly present isn't enough. That's language, to me that's troubling. Our theory-of-defense instruction, using mere presence, is a little stronger.

THE COURT: How about if we -- and I get what you're saying. Because we have so much general testimony regarding association with MS-13, the jury could perhaps read into intentional association, not in the way that we know it legally, which would be he's in the car or on the scene, even though, perhaps, they may not be certain if he participated, but just being associated, more generally, with MS-13 would be enough.

One thing -- I mean, I think we have that -- that last line that continues to qualify. And it's actually the line -- the same line, by the way, that's in the mere presence instruction.

In other words, you must find beyond a reasonable doubt that the defendant was a willful participant and not merely a knowing spectator. That's actually the same line that we have in your mere presence instruction. So I get what you're saying, but I think -- again, that next line will eliminate the concern, that you can't just be there. You've got to be a willing participant. Does that --

MR. ROSENBAUM: How about if we delete "associated with," and the word "or."

THE COURT: I guess the problem I have with that is, legally, I mean, there could be a situation where he's associated with the transportation -- I mean, this is really out there because I don't know they would do this. But if a jury were to find he didn't do any stabbing at all, but he's in the car, and he does have part in getting him to a certain location, that, to me, you know -- and let's say they believe, for whatever reason, he never leaves the car.

Let's say, you know, he never -- he's associated enough that he's criminally liable for the acts of the murder. We know that there is testimony that he was aware of what they were going to do. They were no longer making a drug run at that point. No matter how high anybody was, they knew what they were probably going to do because they were hunting.

So I think that that would mislead the jury because there is clearly a theory there that he could be found culpable, without direct participation, because of the association of transporting the victim to the field and, ultimately, him getting killed there.

So I'll tell you what. I think that we leave it as it is. If I didn't feel like aiding and abetting had enough of mere presence in it already, I would double down and give it to you again. But I think there is enough. So I think you guys

can draw out your theory of the case through aiding and abetting. I mean, it's literally the exact same language from one or the other. I mean, I don't see a difference.

So I'm not going to add mere presence. I'm going to keep aiding and abetting. I know it's their theory. They're capturing the defense theory in aiding and abetting. And they're going to be able to use that same language that he can't be found culpable as a mere spectator. And I think that's consistent because intentional association crosses the line. Just happening to be in a place when things are happening doesn't. And that's what the instruction is trying to tell us. So I'm not going to give the additional instruction. Aiding and abetting is going to cover the defense's theory.

Let's talk about the duress they're asking for now. Now, the only thing I'm thinking about on duress -- and I'll pull the pattern. You know, I get the argument.

I think Mr. Rosenbaum, the argument is, you know -- and I did mention it because he did say in his statement, at certain points, that if you didn't participate in the stabbing, he faced a reprisal, right? I mean, that was kind of one of the theories.

So what's the government's view on duress? I'm going to pull up the duress instruction now.

MS. SMUKLER: Judge, so there's significant amount of

case law of duress in organized crime cases. And I actually have some of them pulled up.

THE COURT: Can you give me a couple?

MS. SMUKLER: Yes.

THE COURT: Because this wasn't one that we had discussed beforehand, but I'd love to hear it if you --

MS. SMUKLER: Yes. The defense had mentioned it, so I anticipated this. And I had looked it up, but then since they didn't propose it, I never filed a brief on this. But there's a case, *United States v. Howe.* It's 289 F. App'x 74. It's a Sixth Circuit case from 2008. In that case, the defendant was an inmate in a federal penitentiary, and he was a Latin King member within the prison. He appealed his case based, in part, on the fact that the district court precluded his defense of duress.

And the Sixth Circuit ruled against the defendant, holding: Defense of duress is unavailable to a person who contends that he has joined either voluntarily or under compulsion a criminal organization, even if he asserts that he acted under the orders of that organization or in fear for his life.

I also have United *States v. Hernandez*. It's a Second Circuit case from 2018. The citation is 894 F.3d 496. And the quote from the case that's relevant is: We note that we also tend to agree with the district court that Hernandez probably

was not entitled to a duress instruction at all, since he admitted that he knew the MS-13 rules prior to becoming a member, and in voluntarily joining a gang, you can't later claim that you were required to do something violent for the gang.

I have also a series of other cases I can cite to Your Honor. I think the general idea is that someone who's involved in organized crime or a gang and who willingly joins the gang can't later say that they acted under duress for participating in that gang's activities.

In this case, the defense in opening -- I think it's stated that the defendant is a member of MS-13. I think that's not up for discussion. So he voluntarily joined the gang. He talked in a statement about understanding the rules of MS-13. And to claim later that you're required to do something violent for the gang is just not a valid defense.

There is also a secondary argument, Judge, that we've charged this as being a violation of Florida law. My understanding -- and I didn't research this as much, but I did find some cases that discuss that duress is not a defense to murder under Florida law. So because we've charged this as being a violation of Florida murder, I believe that he cannot receive the duress defense because it is not a defense to murder under Florida law.

And so I did find some other circuits that address that

and some Florida cases that also address the fact that because duress is not a defense to Florida murder, it cannot be raised as an affirmative defense in a case where a defendant is charged with VICAR murder.

THE COURT: Yeah. I will say, I will confirm -- there's some old case law about Florida law not allowing duress as a defense to the murder. But let's take the first step: And, you know, there's a case -- I mean, they're in the habeas context, no surprise there. But I can cite to you *United States v. Lynch*, 605 F. App'x 963, that: "Under Florida law, duress is not an available defense to those charged" in a murder such as this. So, you know, I think that's established.

But that earlier point, you know, about being in a gang, I mean, the idea that you might face retaliation based upon your affiliation in a gang, such as MS-13, to me, I think, forecloses kind of the decision to now advance a duress argument in that, you know, this isn't someone who is attempting to get out of MS-13 for days, weeks, or months before this episode.

He's not being told, you've got to get in the car and get out there because we're gonna do this killing, and if you don't get in the car, we're going to go ahead and kill you, as well. I mean, I can see it crossing the line with trying to disavow gang activity, such as this, and then being forced to stay in the gang or participate.

But this is, from all the evidence I've heard, someone who clearly was aware of the MS-13 rules. I mean, we talked a lot about what happened that day and what they were looking to do that day.

I guess my question for the defense is, you know, what do I do with that narrative and that fact that, you know, as far as I can tell, there was a complete understanding by the defendant here about the rules within MS-13, and to try now at the eleventh hour when one of those rules is being effectuated by the killing of another, he is someone who has been named, so he knows what that means. He knows that it means taking the life of another.

How do I now say, well, he had a change of heart, if you will, at the eleventh hour, on this particular killing, and now would be able to rely on duress. I mean, I don't think the case law supports duress in that fashion because of the affiliated gang activity.

There's some cases, obviously, read -- did you want to add something on that?

MS. SMUKLER: Yes, Judge.

THE COURT: Yeah.

MS. SMUKLER: In fact, I remember when I was reading the cases that it discusses the second element of duress, which is that the defendant's own negligent or reckless conduct did not create a situation where the defendant would be forced to

engage in a crime. And here, the fact that he has voluntarily joined MS-13 is itself, you know, what we would call reckless conduct that created a situation where he would be forced to engage in a crime. I mean, that's clear.

THE COURT: Basically, in other words, putting yourself in the situation of being MS-13 affiliated, stands to reason that you're going to find yourself, unfortunately, in this type of episode, and, therefore, to say that now you can rely on duress is going to be foreclosed, right? I mean, okay.

MS. SMUKLER: Yes, Your Honor.

THE COURT: All right. So on the defense side, what would you-all say to this line of cases? Because it does seem -- and I understand the argument, because there's some testimony that he really wasn't necessary on board with what was going on in the heat of the moment. That's his own testimony.

You know, we have other witnesses that have said he was one of the first ones to use his knife on the neck of the victim. But, you know, in terms of being MS-13 affiliated, I think we have a bit of a problem looking at a defense of duress because one is absolutely going to assume they're going to be participating in this type of activity. There's knowledge of the rules and what MS-13 does. What do I do with that? I mean, is there an argument on that?

MR. ROSENBAUM: Well, you would add in there that Andy

Tovar, Fearless, from Ardilla's mouth, told everybody to move, to, you know, get involved. And he was overseeing it as the head person there at the time of the homicide. But him further saying words like that that people heard further emphasized the fact that it was -- you better get in there or there's consequence. So you add that to everything else, maybe that pushes it over the line? We're still going to request it. I know what the case law says.

THE COURT: No. You're right. You have a very good faith argument to request it. And I get exactly -- you're right. There was evidence of that statement being made that would kind of push it over the line. I think that based on the case law, not only the government's, but the case law that I'm seeing in terms of affiliating yourself with a gang activity, it appears that our Eleventh Circuit, and others, have foreclosed the duress under these circumstances because of that reckless -- we'll call it, like, a reckless affiliation with MS-13. It doesn't appear to be available. You preserved it.

I'm not going to grant it. I think the case law is not in favor of it, given the circumstances of his gang affiliation. So, I think, if my memory serves me right, those are the only two specials -- or not really specials -- but the two that defense requested.

There weren't any other instructions, I don't think, that the defense asked for, right? Those are the two main

ones?

MR. ROSENBAUM: We asked for another one but it's in the government's --

THE COURT: In their proposal?

MR. ROSENBAUM: -- proposed jury instruction murder in the aid of racketeering activity. They added that element in there.

THE COURT: Okay, good. So here's what I'll do. To make sure we don't have any typos, make sure no one is in disagreement with any of it, I've dropped in the revised. And I'm going to go slip back into chambers here for a moment and do a final run through. I'll print out four sets and hand them out to everybody. And give you guys a bit of time to read through them all carefully. And then I'll come back out in a little bit, and you guys can flag for me any typos or any other issues we may have.

On the government's side, also, we got everything you guys were asking for, right?

MR. DOBBINS: Judge, when Ms. Smukler filed her objection to the defense mere presence sheet, she submitted a proposed instruction. I incorporated that into the revised offense -- substantive offense instruction, so that's included in there too.

THE COURT: Okay, yeah. That was -- I think it's docketed under 291, if my memory serves me right. That was the

objection that was filed for the record. But, yes, I think what you had proposed got added in, right?

MR. DOBBINS: That's correct, Your Honor. It's the last few paragraphs of the offense instruction.

THE COURT: Okay. Got it, yeah. All right. Good. So I can work with that. And I don't think we need to add anything else. I've incorporated your revised version into the draft.

All right. So with that, I will go ahead and just make some quick edits on formatting, and I'll have Gracie bring you guys some copies here, so we can go over them together. All right?

Just give me a few minutes. If you guys need to use the restroom, go ahead while I'm editing this.

THE COURT SECURITY OFFICER: All rise.

MR. DOBBINS: Thank you.

THE COURT: You got it.

(Court recessed at 3:47 p.m.)

(Back on the record at 4:51 p.m.)

THE COURT: Let's go back on the record. Before we talk about the duress instruction, let me confirm that I have no other edits, typos, or the like, on the remaining instructions.

Starting with the government, did you guys catch anything?

MR. DOBBINS: Yes, Judge.

THE COURT: Tell me. Unfortunately, I couldn't seem to get a pagination on it, so you might have to just tell me the title.

MR. DOBBINS: I should have tabbed it. I apologize. There are just two very minor things.

THE COURT: Okay.

MR. DOBBINS: And it's probably my fault, since I think they're both in the defense instruction. So it's the murder in aid of racketeering.

THE COURT: Okay.

MR. DOBBINS: The opening two lines it says: It's a federal crime to knowingly participate in committing a violent crime in furtherance -- and then it says in aid of --

THE COURT: In furtherance of an enterprise.

MR. DOBBINS: Yes, I believe.

THE COURT: So "in aid" is taken out.

MR. DOBBINS: Yes.

THE COURT: Yep, okay.

MR. DOBBINS: And then the second thing I noticed was just, again, I'm sure it was my typo. If you keep flipping through the last page of the defense instruction, the second full paragraph where it starts with: First degree murder.

THE COURT: I'm there.

MR. DOBBINS: It says -- if you go down to the third

sentence: The law does not --

THE COURT: Oh, fixed. There's a random "T."

MR. DOBBINS: Yeah. Random "T" in there.

THE COURT: Yeah, thank you.

MR. DOBBINS: Again, I'm sure those were my fault.

THE COURT: No, good catches. Were those the only two, Mr. Dobbins, you spotted?

MR. DOBBINS: Yes, Your Honor.

THE COURT: Okay. On the defense side, any typos, any other little nits that you guys caught?

MR. ROSENBAUM: No typos or things like that. However, I have some other issues with it.

THE COURT: Okay. What are the other issues?

MR. ROSENBAUM: So on the murder in aid of racketeering --

THE COURT: Okay.

MR. ROSENBAUM: -- on the last page -- let's see how I put this, the fourth element: The government has to prove that the defendant committed the violent crime alleged in the second superseding indictment. The government has alleged that the violent crime was first-degree murder and second-degree murder under Florida law and aiding and abetting first-degree and second-degree murder under Florida law.

Now, the way it's alleged in the indictment -- where's the indictment? It says: Count 3, on May 3, 2015, in Broward

and Palm Beach Counties, in the Southern District of Florida, and it lists the defendants, along with others known and unknown to the grand jury for the purpose of gaining entrance to and maintaining an increasing position in MS-13, an enterprise engaged in racketeering activity while aiding and abetting each other did knowingly and intentionally murder GVP. And then it gives both the first first-degree murder Florida statute and the second-degree murder Florida statute.

And that is in contradiction to it because knowingly and intentionally is first-degree murder. Second-degree murder -- and it's written in the jury instructions that they've given the Court under the last paragraph: Is the unlawful killing of a human being when perpetrated by any act imminently dangerous to another, and evincing a depraved mind regardless of human life. It's not knowingly and intentionally. So there becomes the problem, the way they alleged it in the indictment, knowing and intentionally goes only to first-degree murder, not to second-degree murder.

THE COURT: Let me pull it up because there is an intent element for both first and second-degree murder, an intentional element. It's obviously not a manslaughter. It's not a gross negligence. And the intent is -- the only difference is premeditation in one versus two under Florida law.

MR. ROSENBAUM: Well, in second-degree murder, you

don't have to intend to kill the person to commit second-degree murder. You can do an act that's imminently dangerous, and if the person dies, it's second-degree murder.

THE COURT: I'm going to pull up the Florida instruction on second-degree murder, and we'll confirm it. While I'm doing that, do we have -- I don't know if you guys have it on the state side. I'm pulling it up now -- or the government side, sorry.

I want to look up the instruction to make sure that your second-degree murder description matches the Florida law version of it.

MR. ROSENBAUM: The jury instructions on Supreme Court website.

THE COURT: Yeah, that's where I'm at.

MR. ROSENBAUM: Easy reference.

THE COURT: To prove the crime of second-degree murder, the state must prove the following three elements beyond a reasonable doubt: Victim is dead, the death was caused by the criminal act of defendant, there was an unlawful killing of victim by an act imminently dangerous to another, and demonstrating a depraved without regard for human life.

That is the standard definition. And then imminently dangerous to another and demonstrating a depraved mind is defined: As a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to

another, is done from ill will, hatred, spite, or an evil intent. That was my recollection, again, why I'm saying it's an intent driven. And is of such a nature that the act itself indicates an indifference to human life.

Now, you don't have to have the intent to cause death, but you have to have the ill will, hatred, spite, or evil intent. So I don't know if we want to make that clearer. Certainly, we have a very abbreviated definition here of second-degree murder. I think it's tracking the right statute in the indictment.

So the question is, how much of second-degree murder, as defined by Florida law under 782.04(2), do we want to include?

You know, I don't know if there's a particular part, Mr. Rosenbaum, that you want to incorporate from Florida law. I mean, right now we definitely have the key elements in it, right? We have -- it's quoting exactly what it says: Imminently dangerous to another and demonstrating a depraved mind.

So that's -- that is straight from the pattern.

MR. ROSENBAUM: Correct.

THE COURT: Right?

MR. ROSENBAUM: My bone to pick is the way the indictment is worded --

THE COURT: Well, the indictment is worded as engaging

in racketeering activity while aiding and abetting each other, did knowingly and intentionally murder, in violation -- and, then, of course, we have all three versions, right? They can try to do it as premeditated under sub (1) of 782.04 and sub (2), which would be second degree, and/or aiding and abetting, which is 777.011.

So your argument is -- I think you're saying that there's an inconsistency in the indictment, even though they properly cite the second-degree murder, the fact that they have a knowing and intentionally in the language somehow contradicts second-degree murder?

MR. ROSENBAUM: Correct.

THE COURT: Is that what you're trying to argue?

MR. ROSENBAUM: Yeah, that's it.

THE COURT: Okay. All right. So let me get a response of the government as to whether or not there is a contradiction -- and, again, knowingly and intentionally, you know, we can talk about an "and" or an "or." So I don't know, necessarily, you know, is that modifying and what it's modifying. Again, I don't know that it's a defect in the indictment because you're citing the statute, so . . .

MR. DOBBINS: Yeah. I don't think it is because I think that what it's -- because I think you can knowingly and intentionally murder someone with -- under second-degree murder, as well, and that's basically --

THE COURT: Correct.

MR. DOBBINS: It's the matter of the premeditation, so that's why it's phrased that way. So I don't think there's a defect in the indictment. If Your Honor wishes to add the pattern jury instructions for second-degree murder and first-degree murder to distinguish them within the jury instructions, the government would be fine with that. But I don't see how -- that one doesn't -- one is somehow precluded by the language of the indictment.

THE COURT: So I guess stated another way, you can absolutely commit second-degree murder with -- intentionally, right? I mean, there are -- there is plenty of case law that can differentiate the lack of premeditation, which is really all that distinguishes the two degrees. And you could still have a level of intent to kill without a premeditated design. So I don't think that knowing and intentionally somehow negates second-degree murder. If anything, perhaps it elevates a little bit of what second-degree murder requires in the way it's been charged in the indictment. But it references the statute.

So again, I don't know -- I mean the only other argument I can think of is there's an argument that more is going to need to be added to the second-degree murder instruction because it was charged as unintentional second-degree murder. I don't know if that's the argument. I

guess that's what you're trying to argue.

I don't know, Mr. Rosenbaum. I think that they're tracking 782.04(2) in true fashion. So the only thing I can think of is, there needs -- they're going to have to have an intent to cause death when they are establishing second-degree murder. I mean, right? Is that what you're trying to say, that because it's been charged with a knowingly and intentionally?

MR. ROSENBAUM: What I'm saying is, because -- even though they cited the statute for second-degree murder, the wording is inconsistent with it. So I think you should eliminate the second-degree murder from the jury instruction altogether.

THE COURT: Okay. Well, that we're not going to do. I mean, it's been properly cited. I mean, this is not an indictment defect that would eliminate second-degree murder. I'm denying that.

I will say this: I don't think that the knowing and intentionally somehow eliminates or limits the applicability of second-degree murder in the indictment as long as second-degree murder's elements are met, as spelled out in the jury instructions, and second-degree murder was properly charged in the indictment. I don't see a way in which we're being inconsistent. The government is not required, in my opinion, to -- or they don't have inconsistency, in my opinion, simply

because knowingly and intentionally murdered GVP comes before the reference to second-degree murder.

So let me just take a step back. I will not be denying or striking their ability to establish second-degree murder. I don't know, at this point, if the instruction should be expanded. I don't imagine the defense would want to put more into the instruction. But I can say right now that it's not inconsistent.

Second-degree murder, as defined by Florida law, is the unlawful killing of a human being when perpetrated by any act imminently dangerous to another and demonstrating or evincing -- I can even change it if we want to make it really track -- it would be dangerous to another and demonstrating a depraved mind without regard for human life. I'll make the changes so that it's exactly what we see in the pattern for Florida law. But I don't think we need to add anything about what imminent dangerousness is. I mean, if we have a question of that, we all know we can give them the definitions if something comes back.

But I think, to your point -- and I think this benefits the defense, Mr. Rosenbaum -- we're not including the language about the defendant did not have to have an intent to cause death. So that benefits the defense. I mean, they've cabined it. They haven't put that in there, and I'm not going to give it.

MR. ROSENBAUM: Based upon your ruling of what I've asked for, then I'd like to leave it alone or just change the one word that you were going to change.

THE COURT: I'll change the one word.

MR. ROSENBAUM: Based upon your ruling. We're not giving up our objection.

THE COURT: I got you. And I will say this: Because of your concern with the way in which the indictment tracks, the fact that I'm not being asked to include the second half of the definition, which says that: To convict for second-degree murder, it is not necessary for the state to prove the defendant had an intent to cause death, given that I'm not giving that instruction as part of what the government has requested, I'm actually not creating a direct conflict in the minds of the jurors between the instruction I've got and what's been charged with knowingly and intentionally. They are going to approach this as knowingly and intentionally committing either first degree or second-degree murder, or aiding and abetting first degree and second-degree murder.

So I don't know if you follow my logic here, Mr. Dobbins, but I think we've eliminated it because I'm not having the intent -- Mr. Rosenbaum's point is well-taken that it almost is back-dooring in no intent required when you've charged in Count 3 intent. But since I'm not giving them that instruction, I'm not going to mention it, and I think we don't

have an inconsistency.

MR. DOBBINS: That's fine, Your Honor.

THE COURT: All right. Okay. So I'm with you, and I know you preserved the objection.

What else did you spot before we get to duress, Mr. Rosenbaum, anything else?

MR. ROSENBAUM: No.

THE COURT: Okay. And I will show you this latest draft with these edits.

All right. So let me tell you what's going on with the issue with duress. And I wanted it printed, and we can debate it a little bit more, because it's actually quite -- it's a little bit complicated.

So the first thing that, Ms. Smukler, you raised was you cited this case, *United States v. Howe.* That's at 289 F. App'x 74, at 78, Sixth Circuit, 2008. The problem is Howe actually is quite distinguishable. I'm reading from Howe. Howe says that the testimony that Howe offered in reliance or asking for the instruction for duress: Didn't identify any specific threats made to Howe. In fact, there the Sixth Circuit said, quote: When a defendant supports his request for a necessity instruction only with speculation and conjecture, the defendant does not establish the presence of an imminent or immediate threat necessary for defense of duress.

And the problem with the opinion in Howe was that the

threats were, in their words, amorphous, so they didn't qualify as imminent and immediate. Now, Howe relies on a different case called *Riffe*, that's R-i-f-f-e, is how you spell it, 28 F.3d 565, 570, almost from the Sixth Circuit, in 1994, appears to have been somewhat abrogated by Dixon from the Supreme Court in 2006. But in any event, *Riffe* is a lot more like what we have here. In Riffe, we were talking about sufficient evidence of threats of immediate harm in the prison context where gang members threatened to kill the defendant in order to force him to carry out an illegal act.

And there, in the Riffe case, distinguishable from Howe, a defense witness, quote: Testified that he saw and heard gang members threatening defendant with knives, strikingly similar to our case, over the smuggling of marijuana, and that defendant was reasonably afraid for his life. And so they noted that because it was a specific threat made against Riffe, it was appropriate to give a duress instruction as opposed to Howe, where it's generalized and you can't.

I think we can all agree here the threat is certainly more like Riffe than Howe. It's specific enough from other members of MS-13 at the time of the murder that if the defendant did not participate, he, himself, would face either a green light or could get hurt or stabbed. And we do know he was ultimately stabbed, although not obviously fatal.

So Howe is not enough for me to eliminate a duress instruction. And in fact, in Riffe, the district court was reversed because the Sixth Circuit said it should not have taken the question of duress from the jury in that context. So that's not going to work.

The Eleventh Circuit, I have not found, while we were working on this, an opinion right on point with duress. I will say that the notes to the duress instruction give a little more guidance, and they tell us that the defense is available in extraordinary circumstances and obviously requires nothing less than immediate emergency. You know, my recollection of the evidence here, there was enough for immediacy. I mean, I'm going to back over my mind here about what we heard around the stabbing. But my recollection, at least from his own testimony, was that there was an immediacy that if he didn't participate, he, himself, would face violence, is my recollection.

So I guess before we get to the Florida law part of it, what's the government's view on the duress here based on what I've read to you that distinguishes how from what I got here? What do you think.

MS. SMUKLER: Sure, Judge. So I think there's a lot of issues at play here. So I think the government's stronger argument is that the defendant's -- it's the defendant's own conduct that created the situation where he would be forced to

engage in this conduct, in this crime. And I did find other cases that I can cite to Your Honor.

THE COURT: Yeah, give me the case that stands for that proposition, because I think in specificity and Howe isn't going to be one that carries the day. So what case would you rely on?

MS. SMUKLER: Here's the issue. It's all kind of courts talking about this issue of this reckless involvement. I had cited to you Hernandez previously, where --

THE COURT: What's the Hernandez cite again?

MS. SMUKLER: 894 F.3d 496.

THE COURT: Yeah, go ahead.

MS. SMUKLER: And it -- they determined he was not entitled to duress instructions since he admitted he knew the MS-13 rules prior to becoming a member, and in voluntarily joining a gang, you can't later claim you're required to do something violent for the gang.

I have another case --

THE COURT: And that's from a Second Circuit, right? That's Hernandez? Okay.

MS. SMUKLER: I couldn't find anything from the Eleventh Circuit.

THE COURT: I don't think there is any. I will tell you, I just looked independently, and I don't find anything in this context that's on point. I agree with you. So we're out

of circuit. By the way, I'm looking at Hernandez here just to get a better sense of the facts. But you said there was another one that you --

MS. SMUKLER: Yes. There's other district court cases. So there's an *Evans v. Hutchinson*. It's an Eastern District opinion -- or a District Court opinion where it says petitioner was an admitted gang member who placed himself in a position to kill by attending the meeting that resulted in the victim's murder and cannot claim duress.

THE COURT: What was the cite on that one?

MS. SMUKLER: Sure. It's 2019 WS 5790959.

THE COURT: Okay.

MS. SMUKLER: There's another case here, *United States v. Campbell*, 609 F.2d 922. It says: We also do not agree with the defendant's contention on appeal that testimony stating either defendant would have immediately killed the other in the event of disobedience of gang rules satisfied the immediacy or surrender requirements of the defense. Therefore, the trial courts probably excluded any instruction on duress. There's some cases on opportunity to escape -- one moment.

There's -- I mean, there's also, like, state court cases. There's this -- it's a state court case. It's *Madrid v. State*, 474 Maryland 273. And it says -- it's discussing MS-13 specifically. And it says: Madrid

voluntarily and recklessly placed himself in a position where it was reasonably foreseeable that he would be subject to coercion and is, therefore, not entitled to a jury instructions on defense. And again, this is an MS-13 gang murder.

I think the overall issue, Judge, is that this would be -- allowing a defense instruction on duress would be elevating the rules of the gang above the law. So it would be saying that the only members of MS-13 that could ever be found guilty of VICAR murder or a RICO conspiracy would be the highest ranking members of MS-13 who are in prison in El Salvador, because everyone else could be murdered or -- all of our witnesses said that. If they don't participate when there is a rival, they could be murdered. So every single murder that occurs as a result of killing a chavala with MS-13 could be subject to a defense duress because they could be killed for doing it.

THE COURT: Yeah, but no. But wait. Let's back it up.

We know that the duress instruction itself would foreclose that because -- and Howe says it, right? The first element defendant must prove by a preponderance of the evidence is that there was an unlawful and present, immediate, and impending threat of death or serious bodily harm. Generalized threats, like Howe said, are insufficient. And general membership in MS-13 certainly wouldn't permit a duress instruction. And so the only reason why I'm even entertaining

it is because the specific facts of immediacy, meaning that during the stabbing the defense theory is that there was duress and that other members of MS-13 essentially told him if you don't stab, you will be stabbed. If you don't participate in this particular murder, you will be greenlit or you will face death.

So I want to be very clear. I would agree with you, if I read it that broadly, MS-13 members simply always knowing the rules and no participation in gang activity could result in their being killed. I mean, that -- that's not going to be enough. I have to have an episode, which defense believes we have here, that would show the immediacy. And we know he was actually stabbed. I mean, this is not something that is being extracted from the record or based on speculation, like Howe talks about. So I guess we have a second element. And you've pointed out, defendant's own negligent and/or reckless conduct did not create a situation.

My point is, let's assume I gave it to them. You give them a theory of defense. Let the government come up and say, he put himself there. He got in the car. He's part of MS-13. You know, I'm with you. But all of the guardrails are here. Think about it.

So you can't -- you have to have an immediate and impending. Let's say they get through that. Defendant's own negligence or recklessness cannot create a situation where he's

forced to engage in a crime, giving the government ample argument that he put himself in the situation, and there's evidence of that.

Third, the defendant had no reasonable legal alternative to violating the law. I mean, arguably he gets in the car, he knows they're on a hunt. I mean, that argument could be made.

And fourth, avoiding the threat and harm caused a criminal action.

So I guess my point is, there's a lot of steps that you're accurately pointing out that are guardrails for duress not swallowing kind of the rule here on terms of mental state and the mens rea in a homicide context. But I don't know that not giving it at all is appropriate. I mean, that's where I'm concerned.

So, you're right. I mean, if there's negligence and recklessness and he put himself there, he's not going to get the benefit of this instruction. The defendant won't be able to carry the day. But that's what seems to me, the jury should make that call and not the Court in not giving a theory of defense. I don't think there's a blanket rule. If it was MS-13 membership generally, I'm with you. My concern is that it's a specific incident here dealing with the stabbing and him getting stabbed that would suggest that he didn't intend to participate but for the fact that, if he didn't, they would

kill him. I mean, that's what I think the theory is.

So that's where I'm at. So I'm trying to figure out where would I extrapolate something that says, well, MS-13 membership, and putting yourself in a bad situation because you're hanging out with known MS-13 members means you can't be put into a duress issue. That's where I'm struggling.

MS. SMUKLER: So a few things also, Judge.

So I agree that every member of MS-13 had knives and that Fearless did make some kind of -- or there was testimony that Fearless made some kind of comment of get in there or you're next or something. But I think it was more limited than, you know, they weren't told they would be greenlit if he didn't participate. In fact, I don't think there was any testimony that this defendant was threatened specifically. In fact, the testimony was that he did this -- you know, he was the first one to grab the victim out of the car and that he chased after the victim and then stabbed him right away. So I don't think there's any testimony about threats made to this defendant.

But the bigger issue is that when I was researching this, in order for the defendant to get this instruction, the defendant has to make a prima facie showing of duress and that's all the elements of duress. So to say they should just get the instruction because the government would be able to dispute the second element in a closing argument, they

shouldn't get this instruction because they haven't made a prima facie showing that the defendant's own negligence or reckless conduct was not what created the situation where the defendant would be forced to engage in a crime.

THE COURT: But I guess my response to that is, I don't see that required. Meaning, where have we seen any case law -- I mean, you give me this one Second Circuit case.

MR. DOBBINS: Sure.

THE COURT: But where is there a gateway issue in the annotations and comments? I don't see anything relying on harm and in other cases from the Eleventh that would suggest you cannot get a duress instruction at the end of the case if you have, I guess, not rebutted -- anticipatorily rebutted negligence or reckless conduct. You're elevating a gateway issue, meaning that the defense has to show an absence of negligence or recklessness in order to ask for the instruction. I don't believe that's what it requires. The defendant has to carry the burden that they weren't negligent or reckless; if not, they can't carry the day. But to get the instruction we know that if there is evidence in the record of a defense instruction, you know, our circuit and then pretty much all circuits would be very clear that we should entertain a defense theory.

You know, I -- that's -- I mean, that's pretty well settled. So that's why, I mean, if there's evidence in the

record, certainly. I'm with you. If it was totally generalized, I don't -- I don't really think I'd be giving it. My problem is we've got a lot of people saying they know full well in MS-13 what it means when they say you're next or you're up. When Fearless says that, that doesn't mean, you know, I'm going to have a stern talking with you after this is over. I mean, we have evidence of that.

In fact, the government's used it multiple times in pointing out that's what it means. When they say you better do this or do that, the repercussion as every witness has said is I'm going to be greenlit. I'm with you. Fearless didn't say, I'm going to kill you. But I remember -- and again, it's been days of testimony. I do remember Fearless saying, if you're not in it with it -- you know, if you're not with this, either we're going to have a problem -- I don't know if Ms. Acevedo or Mr. Rosenbaum remember the exact language, but there was testimony about what Fearless said to him in the midst of this.

Do you guys remember? Maybe -- I don't want to misstate it.

MR. ROSENBAUM: I think I remember was -- he said -- at one point he said, move. I think that was the testimony.

THE COURT: Right.

MR. ROSENBAUM: Also, there's testimony in the record that -- conflicting testimony that Wilber did not have a knife and someone had to give him a knife. And -- which was go

participate. Don't forget there's also testimony even though Ardilla said that Wilber was the first one to attack him, there's other testimony from the other eyewitness that Ardilla was the first to chop the victim. So there's conflict in the evidence as well. But I think there's enough there that Andy Tovar was overseeing it, had a gun, and said move, and then other people gave Wilber the knife.

So there's conflicts in the testimony -- in the evidence, but there's enough here to give this instruction and let the jury sort it out.

MS. SMUKLER: Your Honor asked about whether the defense has to rebut.

THE COURT: Yeah, before getting it. I don't know -- right, whether the defense has to show that there was an absence of negligence or reckless conduct in justifying the request, I guess is my question.

MS. SMUKLER: And the government believes it is. This is an affirmative defense. As I said, I just looked up duress prima facie, and the first case is *United States v. Ibarra Pino*. It's a Ninth Circuit case. I have it as -- I don't have the Eleventh Circuit separated right now, but I'm sure I can find an Eleventh Circuit case. This one is 657 F.3d 1000.

It says: The Defendant is not entitled to present a duress defense at trial or receive a jury instruction on

duress, unless the defendant makes a prima facie showing of duress in a pretrial offer of proof or in evidence presented at trial.

THE COURT: Yeah, but wait a minute. Come on, that's not the same thing. You just told me that it's about showing an absence of negligence or reckless conduct. That's not right. What they have to show is there's an actual imminency of threat. That's what they have to show. They can't do a generalized thing like Howe said, right? They can't just say generalized membership means if I don't roll with the crew, they're going to kill me. There has to be an imminence at the time of the crime that would show that he actually is facing, right, some sort of legitimate threat to his life at the time of the stabbing.

I'm with you, you're right. But let's not confuse the two things. The prima facie case is, is there evidence in the record to show that he was forced to commit the crime? If there's evidence in the record that would show that, they can ask in good faith for that duress instruction. What I'm saying is they don't have to show that there's negligence on behalf of their own client, and that there's an absence of that negligence to get the instruction, only that there's some actual threat or forcing to commit the crime. That's what I need before I --

MS. SMUKLER: Sure. If I can continue.

It says: In order to make a prima facie showing for a duress offense or a jury instructions, a defendant must establish, one, an immediate threat of death or serious bodily injury. Two, well-grounded fear that the threat will be carried out. And three --

THE COURT: Start from the top of the elements that were read.

Go ahead.

MS. SMUKLER: Sure.

One, an immediate threat of death or serious bodily injury. Two, a well-grounded fear that the threat would be carried on you. And three, lack of a reasonable opportunity to escape the threatened harm. In the absence of a prima facie showing of duress, evidence of duress is irrelevant and may be excluded and a jury instruction is not appropriate.

THE COURT: But just to be clear, you just read those elements. None of them talk about putting themselves in a negligent or reckless conduct. Right? It was, you have an immediate threat which is what Mr. Rosenbaum believes Fearless or Tirado made. Well-rounded fear that the threat will be carried out on you. I think his own testimony suggests that; he was stabbed. And three, lack of reasonable opportunity to escape the threat and harm. He's there surrounded by MS-13. One car brings them there.

I mean, those are all in the record. What you didn't

read and what I want to be clear we don't need is, what I'm seeing in some of these cases that would suggest that defendant's own negligence or reckless conduct forecloses the ability to ask for such a defense. And if they don't overcome that purported negligence, they can't get it. I think the three things you read me are correct, but they don't talk about defendant's own negligence.

So I just want to be clear, they got to show me the ones you just read though. If there's nothing in the record on those, they don't get it. So I guess I go back -- we may have a difference of opinion on whether Fearless was making a threat by saying move and having a firearm, and you saying, you know, Judge, that -- and someone handing him a knife, and whether or not that is enough to show immediacy and show that, you know, someone is actually putting him under duress. That may be the argument. I mean, I understand that.

MS. SMUKLER: So really the argument is -- goes to element three, the lack of a reasonable opportunity to escape the threatened harm. And I think that's what goes to element two, which is that the defendant's own negligent or reckless conduct did not create a situation where he would be forced to engage in a crime. Because the defendant gets in a car with MS-13 members and a chavala knowing that there's a plan or a plan that's been discussed for them to interrogate this rival, and knowing that it is a key rule of MS-13 that you kill rival

members. So he -- he had a reasonable opportunity to escape the threatened harm. He didn't have to get in the car with other members and a rival gang member.

THE COURT: What do I do about my recollection of the testimony -- and again, we've had a lot of testimony so I may be getting it wrong.

My understanding, we knew that they were on the hunt that day. But I recall that, you know, he was under the guise of getting more marijuana. I'm trying to remember if there's testimony in the record to support that he recognized, meaning, Mr. Vigil-Benitez recognized, that this was going to be a killing of this individual. Meaning, I don't recall him knowing this before he got in the car. It seems that he was in the vehicle and once he's in the vehicle and they realize where they're going, he immediately recognizes that they're going to go kill this guy. I mean, I'm trying to remember. Maybe I'm wrong. Maybe that he knew before he got in the car. It's been a while. So maybe you can clarify the record.

What did the record show about when he was aware of it?

MR. DOBBINS: Well, I think the problem, Your Honor, is that his statement is a shifting transition.

THE COURT: I agree. It's all over the place.

MR. DOBBINS: So he starts with, I was never there.

THE COURT: Right. That's how it started.

MR. DOBBINS: I was never there. I was never in

Florida. Then he started, well, I was there, but I was so high, I couldn't possibly remember what happened. And then it became -- then he shifts into I was there, and I didn't participate. I saw it happening. And then I thought I was shot. And then he says, well, I wasn't -- they confronted him and said, well, you weren't really shot. And then that's when he says somebody came up to him and hugs him, and then he hears a shot and he feels pain and he thinks -- but that's because he hasn't committed the crime. He hasn't participated in the stabbing.

So he says initially that he got stabbed because he didn't participate. It's only later that he says I -- oh, maybe they did hand me a knife. Oh, maybe I did stab. Then it's only later that that happens. So it's a shifting thing, right? His story keeps changing to try to get himself out of culpability. So the whole part about, like, I did it because I was threatened isn't what his story was. His story was, I got stabbed because I didn't do it. And then, it became, well, I -- yeah, maybe I did stab him -- I mean, only God knows what I did. But maybe I did stab him. And if I did stab him, here's where I would have stabbed him. And then you're right, I just wanted to show I was doing my piece, so that's why I stabbed him. There's never a time really where he says as a result of this, because of my lack of participation, I was threatened to be killed. It's just I didn't participate, and I got cut. And

then I didn't know why, but I guess it's because I didn't participate.

So like there's a -- to base the duress instruction on -- based on his statement -- now, you're correct that when the other -- the two eyewitnesses, which would have been Bigfoot and Ardilla.

THE COURT: Right.

MR. DOBBINS: Which would be Gamez-Melendez. I believe the phrase was, you-all better get in there.

THE COURT: Right.

MR. DOBBINS: That's what the phrase was.

THE COURT: Right.

MR. DOBBINS: But I believe Ardilla also testified that he thought that was directed to the associates because --

THE COURT: They weren't made.

MR. DOBBINS: -- they were the ones that were expected to get in there to start earning their stripes, if you will.

THE COURT: Right. Right.

MR. DOBBINS: They're not directed to the defendant or anybody other than the people that were participating. Because according to Ardilla, the defendant stabs first. So there's no reason to say to the defendant, you better get in there. It's to the other people. Right.

THE COURT: Right.

MR. DOBBINS: And I believe Bigfoot, which was

Cruz-Ortiz, also testified that basically he was hanging back, and what Tovar said to him was, Big, you get in there now.

THE COURT: Right.

MR. DOBBINS: And that's what Bigfoot did. But it was not directed to anybody other than Cruz-Ortiz. So like -- I feel like to some extent, to try to base the duress, it's kind of like they're trying to have their cake and eat it too. Right? I was merely present, but if I wasn't merely present, I was under duress -- when that's not even really what the statement was.

The statement was that he got stabbed initially because he didn't participate. It's only after we have a Rule 29 argument that he says that based on, I guess, something I said and that Your Honor said was that they knew what the consequences of not participating were, that then he would like -- Mr. Rosenbaum now moves for a duress instruction. And based on the evidence, the testimony, and the defendant's statement, I'm not sure that we get there at all with this because it is an affirmative defense.

THE COURT: Well, remember, I think the important thing, to your argument here, is imminency. That is what's required. It's given in extraordinary circumstances. Right?

So to your point, you know, we do have a shifting narrative, without question. If I eliminate all the noise, I have to see in this record because the Eleventh Circuit has

made it clear, it's given in extraordinary circumstances, and we know we need that immediacy to be there. Impending -- remember, it's impending threat of death or serious bodily harm.

You know, are we even looking at a record that would support this instruction if it's simply just get in there and someone's handed a knife. You know, most of the case law would be a little more direct than that. And I think the only time I even see it is, you know, Fearless generally saying, move. You know, not to Monday-morning quarterback it, but my recollection is, didn't we have a statement from one of them saying after the fact that if the next time you don't get into this, we're going to have a problem. I remember that being said after, or maybe I'm getting my theories messed up.

MR. DOBBINS: I believe that's what the defendant says in his statement and --

THE COURT: I'm going by what his own self-serving statements are, but it's what I need to look at to determine the appropriateness of the instruction. So -- but again, to your point, there needs to be something -- I don't want to say necessarily objective, but some piece of testimony that would indicate an immediacy of harm or serious bodily harm to the defendant if he didn't participate.

So the argument here really turns on, is there enough in the record to allow that instruction to go forward because

it's an impending threat of death or serious bodily harm. I go back to my other point, whether you want to call it a result of the melee or not, he ultimately does get stabbed. But in any event, it really turns on Fearless saying, you know, move. Someone saying, everybody get in there. Someone else handing him a knife.

And so the question is with those elements, do we have enough to justify the instruction. I think that's really the big question. I don't think it's -- I don't think it goes to this issue of reckless conduct. I think that's -- defense is gonna run headlong into that for a jury trying to determine if it's appropriate because he got in the car, he's part of the ride, all of that other stuff that we heard.

MS. SMUKLER: As to the prima facie case -- so I realize that the case I read you I think it relies on the duress instruction that's different. So I found *U.S. v. Johnson*. It's a Sixth Circuit case. It's 416 F.3d 464.

It says: To state a prima facie case of duress, a defendant must offer some evidence in support of each of the following five elements. One, that the defendant was under unlawful and present imminent and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury. Two, that the defendant had not recklessly or negligently placed himself in a situation in

which it was probable that he would be forced to choose the criminal conduct. Three, that the defendant had no reasonable legal alternative to violating the law, a chance to refuse doing the criminal act, and also to avoid the threat and harm. Four, that a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm. And five, that the defendant did not maintain the illegal conduct any longer than absolutely necessary.

And that's actually citing to the Riffe case that Your Honor mentioned earlier, I think. So I think that comes from the Riffe case.

So again, I do think that the defense has to establish a prima facie case for each -- and provide evidence. It's their burden to provide evidence in support of each of those elements. And I don't think that they've done that here.

And again, speaking to what Mr. Dobbins said, I think that even looking at it from the defendant's statement, I don't think that they've established through that alone that there is evidence to support the elements of duress to give this to the jury.

THE COURT: I would just point out, we can stay within our circuit with the elements. I'll read from *United States v. Luis*, 157 F. App'x 165, from 2005.

In order to have the defense of duress submitted to a

jury, a defendant must first produce or proffer evidence sufficient to prove the essential elements of the defense. Quote, the threshold burden is extremely low. The defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence. To establish a defense of duress the defendant must show that she performed or consented to the unlawful act because, one, the defendant was under unlawful and present imminent and impending threat of death or serious bodily injury, which I think we just heard is a quite low burden on these facts we see.

The defendant did not negligently or recklessly place herself in a situation where she would be forced to engage in criminal conduct. The defendant had no reasonable legal alternative to violating the law. And there was a direct causal relationship between the criminal action and the avoidance of the threat and harm.

Now let me be clear, that's to establish a defense. That's not to have entitlement to present the instruction. The burden is on the defense to show all of those things as I have read. They carry that burden. But I want to be very clear that there's a difference between meeting the burden that is the instruction and asking for the instruction under the facts of this case.

Now I will note the Eleventh Circuit goes on to say that the requirement of immediacy of the threat is a rigorous

one, and it is clear that fear of future bodily harm to one's self or to others will not suffice. In order that the danger to be viewed as imminent and impending, it is ordinarily necessary to show the coercing party was present. Moreover, the apprehension of immediate danger must continue during the whole time the crime is committed.

Finally, if the accused had a reasonable opportunity to avoid committing the illegal act without subjecting himself to the threat and harm, or subsequently ignored a reasonable opportunity to state the sources of the compulsion, the defense of duress is no longer available.

Again, I think that everything I'm hearing in this record, because it's not a high burden to request and be entitled to present the instruction, I think we're arguing over elevating what the defense must prove, not the gateway issue of whether they should get it in the first place. It's very different.

And I will just note. I mean, again, under any definition -- and it goes on in Luis and it says: If there was a reasonable legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threat and harm, the defense will fail. I think that there's enough in this record for them to ask for it. I am very weary, even if it's a close call of getting into a situation where we're going to start weighing the facts and what happened with

Fearless and everyone saying to jump in there, that's for a jury to decide.

So I'm going to give that duress instruction. I think it's appropriate. I think that it's a theory of the defense. I think there's enough evidence for it. I think it's the prudent thing to do under the case law.

The one thing I will say, separate and distinct. I mean, look, Mr. Dobbins is absolutely right. There's a shifting story all over the place, and I know that in closing you will draw it out. But it doesn't mean that the shifting story forecloses whatever portion they may want to highlight rising to the level with the low burden the Eleventh Circuit has explained of them advancing this theory.

Now, this secondary argument that was made is very unique and interesting, and it's one based on underlying Florida law. I will just put my findings on the record on this. I find it to be very, very unique.

It is correct, having looked at the case law, that -- and there's a very old case that talks about this, one of the few that we found here. This is *Wright v. State of Florida*, 402 So.2d 493. The bottom line here is when it comes to first- or second-degree murder, duress has not been held to be a valid defense under Florida law because it doesn't negate the state of mind. And this Wright case from the Third District Court of Appeal makes that pretty clear and cites to some very

antiquated case law.

Going beyond that, we have an aiding and abetting either first- or second-degree murder. It appears that Florida law has extended the concept that duress cannot be offered as a defense to aiding and abetting first-degree or second-degree murder because the mental state is still -- the mens rea is still the same, at least close enough that duress isn't going to negate -- or be allowed to negate that mental state.

So you were right, Ms. Smukler, that there is some case law that would suggest duress is not a viable defense under Florida law in this type of case. My only problem with that is, trying to extrapolate that to a murder RICO charge so that duress cannot be invoked as a defense in a federal murder RICO indictment like this one, I can't find a single case that would even suggest that I carry over that concept under Florida law to negate duress in a federal case like this because the violent act is Florida law-governed murder.

I don't -- it's a very unique -- I've not encountered it before. You're not wrong. I think you've preserved it. So there may be an argument this should never be given when the crime is Florida law first- or second-degree murder or aiding or abetting first- or second-degree murder under some pretty old 1980s and older Florida law. My only problem is, I don't know how comfortable I feel taking that Florida law and grafting it onto an 18 U.S.C. 1959 (a)(1) charge and saying

that because it's a Florida law-governed murder, you can't rely on duress as an instruction.

MS. SMUKLER: Judge, for what it's worth, I also found a case that says that duress is not a valid defense to federal first-degree murder. That's *United States v. LaFleur*, which is 971 F.2d 200. And I found some cases that discuss the applicability or availability defenses and what law governs in RICO conspiracy and VICAR murder charges.

THE COURT: Okay.

MS. SMUKLER: Again, the issue with this being sprung on us today is that some of this is last-minute research.

And I would also just bring to Your Honor's attention that the government feels that we really sanitized this case because of the case that was -- we are presenting and the defense that was raised in opening statement. Well, we would potentially move to reopen our case, Your Honor, because there were things that were left out because duress was not raised as a defense before trial. We spoke to defense counsel before trial. We asked for jury instructions numerous times.

For example, the defendant in his statement, we redacted a portion where he talks about another incident where he goes in the car with Fearless and a murder has occurred, and he drives away the murderers from the scene of the murder. And I think that just goes against this argument that he's -- he's coincidentally recklessly just putting himself on the scene of

every murder.

And there's other testimony from the cooperators that we didn't introduce where this defendant admits to being involved in other murders. And I think that would have been -- that would have been relevant to rebut a defense of duress that was not raised until after this date, the government -- I'm sorry -- and the Defense rested. And so I just state that because I do think this is last minute and it is unfair to the government in terms of its presentation of this case, but also how we argue this.

But having not reviewed this case as well, I can give Your Honor some citations that I know discuss this issue. If Your Honor wants to look into them, they're *United States v. Houston*, 648 F.3d 806. And that's a Ninth Circuit case. I think there was one more. *United States v. Muskovsky*, it's M-u-s-k-o-v-s-k-y. It's 863 F.2d 1319. And again, the case of LaFleur says that duress is not a defense under -- for first-degree murder federally either. So I think that this is not a valid defense that can be raised under federal law or state law.

THE COURT: Okay.

MS. SMUKLER: And I also want to point out -- just to go back to the argument a little bit on Riffe discusses that -- that's the case Your Honor raised from the Sixth Circuit, R-i-f-f-e, that there are five factors that control whether a

jury's instruction presenting a duress defense should even be given, and it discusses the same five instructions I previously gave. So I do think there's multiple reasons why this defense should not be given.

One, that the defense has not presented a prima facie case that these elements of duress have been met. Two, that under Florida law and federal law duress is not a valid defense. And three, that we were not presented or given sufficient notice of this affirmative defense, and the government was precluded from producing evidence and introducing evidence to the jury that would have been relevant to rebut this defense.

And again, we would potentially request to reopen our case, Your Honor, so that we can present evidence rebutting this defense.

THE COURT: Understood. That's denied. The duress defense will be in there. Prepare your closings accordingly.

The Court finds this has been sufficiently presented. I've looked at the case law. I'm convinced at this point that it would be unwise not to afford the defense an ability to raise duress. I think it's been framed by the facts and they've met their showing in what is necessary to ask for it. I think it's enough of a feature in what they've raised and what we've heard throughout the testimony. There's no basis here to reopen the case. We've all rested. I think that we're

going to be including it. And I'll be very clear. Again, it is going to be included.

But there is plenty of evidence in this record, most of which has already been discussed, that would suggest that the defense will not be able to meet their burden by a preponderance of the evidence with the four elements that are required by law because, at the end of the day, as you've already highlighted, the negligent and reckless conduct that the defendant engaged in by being a member and accompanying his MS-13 associates in and of itself I think is going to be a problematic hurdle. Not to mention the conflict in the evidence about the impending threat of death or serious bodily harm.

And then you go on, and we know that there are arguably more reasonable alternatives to violating the law such as not participating in the stabbing of the victim. So there's a lot here. I don't think the defendant -- or, excuse me -- the government is somewhat hamstrung in their ability to highlight the evidence that they believe would rebut any type of duress instruction. So I will make some of these minor tweaks. And if you guys want to just hang tight, I will run one more copy of the instructions for everybody so you have one. Or perhaps if it's easier, if you would like, I could send everyone via email one last draft because you may want to be using it in blowups or demonstratives.

How would you like -- do you want me just to get you an email copy?

MR. ROSENBAUM: Email.

THE COURT: That might be easier?

All right. Let me email everybody a revised draft that will incorporate Mr. Dobbins's edits. It will also make that small change to the murder instruction under Florida law without adding more so we don't have a problem with the jury instructions from Florida law. And then, of course, we'll have that little extra piece on --

MR. DOBBINS: Second-degree murder.

THE COURT: Second degree -- yeah. Thank you -- that I need to add.

All right, everybody, so 9:00 a.m. tomorrow. Just so I can plan ahead, how much time does each side need for closing?

Government, what do you think?

MS. SMUKLER: We're requesting an hour and a half between both closing arguments.

THE COURT: Okay. Hour and a half. Okay. You'll get the same time if you need it, an hour and a half for the defense. And you guys obviously all keep time in terms of splitting it between first and second close for the government.

All right. We can go ahead and break. We don't have anybody come in tomorrow morning. So to the extent there's any concerns about clearing the courtroom, you don't have to. You

can leave anything you need. No one will be here.

We pick up at 9:00 a.m. I'll have this email to you guys in just a moment.

MR. DOBBINS: Judge, is it your practice to read the instructions prior to the closings?

THE COURT: First, yeah. So you guys are going to have time. I'm going to have the instructions ready and printed in the morning. They'll be sitting in everybody's chairs. I'll print extras for you guys too. I'm going to read the instructions, and then turn it over to you guys for closings.

MR. DOBBINS: Thank you, Your Honor.

THE COURT: You got it.

All right, everybody. See everybody in the morning.

THE COURT SECURITY OFFICER: All rise.

(Court recessed at 5:49 p.m.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: January 29, 2024

/s/Ilona Lupowitz
ILONA LUPOWITZ, RMR, CRR
Official Court Reporter
United States District Court
Southern District of Florida
400 North Miami Avenue
Room 11-2
Miami, Florida 33128
(305) 523-5737

## /

**/s/Ilona** [1] - 178:21

## 0

**061253** [1] - 51:24
**075.1** [1] - 117:17

## 1

**1** [5] - 1:8, 17:20, 18:4, 79:13, 142:4
**10** [3] - 17:20, 18:10, 43:17
**100** [3] - 1:18, 9:18, 25:22
**100,000** [1] - 73:3
**1000** [1] - 158:23
**10:55** [1] - 54:12
**10:56** [1] - 55:6
**10th** [9] - 36:7, 37:17, 37:19, 37:23, 38:4, 38:10, 42:10, 59:15, 60:9
**11** [3] - 23:19, 43:17, 53:1
**11-2** [2] - 1:24, 178:24
**11/25** [1] - 80:17
**11:00** [1] - 4:15
**11:30** [3] - 54:4, 54:10, 54:19
**11:54** [2] - 55:7, 55:11
**11th** [1] - 26:23
**12** [2] - 43:17, 52:10
**120th** [2] - 38:18, 39:2
**125,000** [1] - 73:3
**129** [2] - 39:23, 41:12
**12:29** [1] - 73:21
**12:30** [1] - 55:17
**12:37** [1] - 78:15
**12:58** [1] - 89:3
**12:59** [1] - 89:11
**13** [5] - 5:25, 6:23, 84:3, 86:17
**130064216** [1] - 58:7
**1319** [1] - 174:17
**1477** [1] - 85:20
**1478** [1] - 85:21
**15** [3] - 78:12, 88:12, 120:8
**157** [1] - 168:24
**165** [1] - 168:24
**18** [5] - 31:16, 32:25, 86:19, 115:19, 172:25
**18th** [4] - 24:14, 24:25, 65:7, 67:19
**1959** [2] - 115:19, 172:25
**19677** [2] - 38:18, 39:2
**1980s** [1] - 172:23
**1994** [1] - 148:4
**1:00** [1] - 88:10
**1:39** [1] - 41:20

## 2

**2** [6] - 17:20, 18:5, 96:7, 97:15, 142:5
**20** [1] - 94:6
**20-A** [1] - 33:12
**20-I** [1] - 33:12
**200** [2] - 32:19, 173:6
**2002** [5] - 50:13, 51:8, 51:10, 52:3, 53:16
**2003** [1] - 59:1
**2005** [1] - 168:24
**2006** [1] - 148:6
**2008** [2] - 129:11, 147:16
**2012** [2] - 5:25, 7:7
**2014** [3] - 52:10, 59:4, 73:1
**2015** [16] - 7:12, 35:22, 38:21, 41:5, 41:6, 41:11, 41:20, 42:7, 52:16, 53:1, 58:17, 60:5, 75:17, 87:22, 110:14, 138:25
**2016** [1] - 53:23
**2017** [10] - 6:12, 22:16, 74:13, 76:1, 80:2, 82:18, 82:22, 83:4, 84:3
**2018** [2] - 80:18, 129:23
**2019** [1] - 151:11
**2020** [4] - 26:4, 26:23, 75:16, 76:25
**2021** [6] - 47:9, 74:13, 75:16, 76:16, 101:12
**2022** [2] - 60:16, 61:15
**2023** [7] - 45:12, 65:7, 67:19, 68:15, 68:19, 70:22, 71:25
**2024** [2] - 64:14, 178:21
**2025** [1] - 1:5
**20th** [2] - 60:16, 61:15
**21** [3] - 28:2, 28:9, 118:11
**22** [3] - 2:8, 28:12, 53:23
**22-60078** [1] - 3:3
**22-CR-60078-6** [1] - 1:2
**227** [3] - 92:7, 92:8, 93:2
**23** [2] - 28:18, 124:2
**24** [2] - 28:24, 107:16
**24/48-hour** [1] - 107:13
**25** [1] - 29:5
**25th** [1] - 80:17
**26** [2] - 29:21, 58:9
**27** [1] - 30:2
**273** [1] - 151:24
**28** [10] - 1:5, 30:9, 58:10, 70:22, 71:25, 95:13, 95:14, 99:4, 100:12, 148:4
**289** [2] - 129:10, 147:15
**29** [17] - 34:16, 37:20, 104:21, 105:2, 108:17, 110:5, 110:7, 110:10, 115:7, 115:12, 115:24, 117:11, 117:14, 122:16, 122:20, 165:12, 178:21
**291** [1] - 135:25
**2:08** [1] - 41:11
**2:15** [3] - 88:11, 89:1, 89:8
**2:37** [1] - 89:12
**2:43** [1] - 93:18
**2:58** [1] - 102:9
**2nd** [4] - 1:18, 41:5, 41:11, 64:15

## 3

**3** [30] - 17:20, 18:5, 29:2, 29:3, 30:5, 30:6, 38:21, 41:20, 43:17, 47:25, 48:5, 48:20, 51:23, 60:25, 61:20, 62:23, 65:23, 67:1, 96:10, 116:1, 116:6, 116:18, 119:23, 120:20, 121:12, 121:21, 138:25, 146:24
**30** [1] - 41:3
**30-minute** [1] - 54:3
**305** [2] - 1:25, 178:25
**32** [2] - 58:7, 111:11
**33** [1] - 65:12
**33128** [2] - 1:24, 178:24
**33131** [1] - 1:19
**33132** [1] - 1:15
**34** [1] - 65:20
**3400** [1] - 1:18
**35** [1] - 66:5
**36** [1] - 66:10
**37** [4] - 2:13, 51:15, 66:17
**38** [1] - 66:23
**39** [1] - 67:4
**3:00** [1] - 106:3
**3:03** [1] - 105:12
**3:07** [1] - 108:14
**3:18** [1] - 42:3
**3:39** [2] - 42:7, 42:23
**3:40** [1] - 42:15
**3:47** [1] - 136:18
**3rd** [3] - 41:6, 42:7, 47:9

## 4

**4** [23] - 17:20, 18:6, 28:9, 28:10, 28:21, 28:22, 29:7, 29:24, 29:25, 48:10, 48:15, 49:9, 59:4, 61:10, 62:4, 62:5, 62:14, 65:16, 66:8, 66:20, 67:7, 81:8, 118:17
**40** [1] - 67:10
**400** [2] - 1:23, 178:23
**402** [1] - 171:21
**41-A** [1] - 67:21
**41-B** [1] - 68:2
**41-C** [1] - 68:11
**416** [1] - 167:17
**4350** [1] - 58:15
**44-A** [1] - 68:17
**44-G** [4] - 2:16, 69:10, 69:18, 69:20
**441** [1] - 44:3
**45** [4] - 2:16, 70:13, 70:16, 70:18
**46** [1] - 70:24
**464** [1] - 167:18
**47** [4] - 2:17, 71:10, 71:15, 71:17
**474** [1] - 151:24
**493** [1] - 171:21
**496** [2] - 129:23, 150:11
**4:30** [1] - 42:19
**4:40** [1] - 42:24
**4:41** [1] - 42:20
**4:51** [1] - 136:19
**4th** [1] - 1:15

## 5

**5** [10] - 2:5, 18:20, 28:15, 28:16, 47:21, 48:25, 63:10, 66:12, 67:14, 71:21
**50** [1] - 47:18
**5025** [2] - 39:4, 39:18
**51** [2] - 2:14, 47:24
**52** [2] - 48:2, 75:15
**523-5737** [2] - 1:25, 178:25
**53** [1] - 48:7
**54** [2] - 48:12
**55** [2] - 48:17, 81:9
**56** [2] - 2:14, 48:22
**565** [1] - 148:4
**57** [1] - 49:6
**570** [1] - 148:4
**5790959** [1] - 151:11
**58** [7] - 2:15, 49:11, 64:2, 64:5, 81:18, 97:6, 99:4
**59** [1] - 49:17
**5:27** [1] - 44:13
**5:49** [2] - 1:6, 178:15

## 6

**6** [13] - 1:7, 17:20, 18:7, 30:11, 30:12, 49:13, 63:16, 64:2, 64:5, 80:2, 82:18, 95:18, 96:18
**60** [2] - 2:15, 50:1
**605** [1] - 131:10
**609** [1] - 151:14
**61** [1] - 50:10
**61st** [1] - 58:15
**62** [1] - 51:23
**64** [1] - 60:21
**648** [1] - 174:14
**65** [1] - 61:7
**657** [1] - 158:23

**66** [1] - 61:17
**67** [1] - 62:1
**68** [1] - 62:11
**69** [3] - 2:16, 62:20
**69th** [2] - 39:24, 41:12
**6:10** [1] - 44:15

## 7

**7** [7] - 19:25, 20:12, 40:21, 43:17, 44:3, 82:22, 83:4
**70** [1] - 2:16
**71** [3] - 2:17, 63:13, 98:5
**72** [1] - 64:11
**73** [1] - 63:7
**74** [6] - 2:14, 50:21, 51:2, 51:5, 129:10, 147:16
**75** [4] - 2:15, 57:23, 58:2, 58:4
**75.1** [1] - 117:22
**7700** [5] - 37:19, 38:4, 38:9, 38:11, 59:14
**777.011** [1] - 142:6
**78** [1] - 147:16
**782.04** [1] - 142:4
**782.04(2** [2] - 141:12, 144:3
**7871** [6] - 36:8, 37:17, 37:22, 38:2, 39:17, 42:10
**79** [1] - 2:17
**79-A** [5] - 2:14, 56:18, 56:21, 56:23, 56:25
**79-B** [2] - 56:17, 57:9
**79-C** [2] - 56:17, 57:9
**7940** [3] - 38:4, 38:5, 59:12
**7:00** [1] - 44:21

## 8

**8** [3] - 17:20, 18:8, 43:17
**80** [3] - 74:18, 74:19, 89:25
**80-A** [3] - 78:23, 79:8, 81:8
**80-B** [1] - 82:9
**80-C** [8] - 78:23, 83:10, 89:25, 90:4, 91:6, 92:2, 92:7, 92:15
**80-D** [4] - 74:24, 76:17, 78:23, 84:10
**80-E** [1] - 84:15
**80-F** [1] - 84:21
**80-G** [1] - 85:3
**80-H** [1] - 85:9
**80-I** [2] - 85:14, 85:20
**80-J** [2] - 86:5, 86:7
**80-K** [5] - 76:18, 78:23, 86:6, 86:9, 86:21
**80-L** [4] - 2:17, 78:25, 79:4, 86:22
**80-M** [1] - 87:4
**80-N** [2] - 79:11, 87:7
**80-O** [1] - 87:8
**80-P** [1] - 80:12
**80-Q** [2] - 80:21, 81:2
**80-R** [3] - 2:17, 78:25, 79:4
**806** [1] - 174:14
**81** [2] - 46:24, 47:8
**82** [1] - 30:18
**83** [1] - 30:18
**841** [1] - 118:11
**846** [2] - 118:11
**85-A** [2] - 37:25, 59:8
**85-B** [1] - 38:22
**85-C** [1] - 39:15
**85-D** [1] - 40:13
**85-E** [2] - 37:9, 37:10
**85-F** [3] - 2:15, 59:21, 60:1
**86** [1] - 51:23
**863** [1] - 174:16
**894** [2] - 129:23, 150:11

## 9

**9** [3] - 2:6, 17:20, 18:9
**90-2302-00710** [1] - 9:25
**922** [1] - 151:14
**94** [1] - 2:8
**963** [1] - 131:10
**971** [1] - 173:6
**99** [2] - 1:15, 2:9
**9:00** [5] - 105:7, 106:7, 108:12, 177:14, 178:2
**9:26** [1] - 1:6
**9:28** [1] - 4:5

## A

**a)(1** [2] - 115:19, 172:25
**a.m** [21] - 1:6, 4:5, 41:20, 42:7, 42:15, 42:19, 42:20, 42:23, 42:24, 44:13, 44:15, 44:21, 54:12, 55:6, 55:7, 55:11, 105:7, 106:7, 108:12, 177:14, 178:2
**abbreviated** [1] - 141:8
**abbreviation** [1] - 99:11
**abetting** [30] - 112:7, 112:8, 114:4, 116:8, 116:19, 118:20, 118:24, 123:23, 124:2, 124:14, 125:2, 125:10, 125:12, 125:16, 125:17, 125:22, 127:23, 128:2, 128:5, 128:6, 128:13, 138:22, 139:6, 142:1, 142:5, 146:19, 172:2, 172:5, 172:22
**ability** [5] - 96:22, 145:4, 161:4, 175:20, 176:18
**able** [30] - 10:25, 18:24, 19:16, 19:20, 20:22, 30:15, 32:1, 32:18, 33:6, 33:18, 33:20, 36:10, 45:6, 46:14, 55:1, 55:14, 67:16, 78:8, 81:25, 82:4, 91:24, 98:12, 98:19, 106:14, 114:10, 128:7, 132:15, 154:18, 155:24, 176:5
**above-entitled** [1] - 178:19
**abreast** [1] - 7:23
**abrogated** [1] - 148:5
**absence** [5] - 156:15, 158:15, 159:6, 159:21, 160:13
**absolutely** [7] - 90:4, 92:17, 125:8, 133:21, 143:11, 168:8, 171:8
**abundance** [1] - 77:12
**Academy** [1] - 23:9
**academy** [1] - 24:13
**accepted** [1] - 14:23
**access** [2] - 46:1, 46:3
**accommodate** [1] - 89:7
**accompanying** [1] - 176:9
**according** [2] - 69:23, 164:21
**accordingly** [1] - 175:17
**account** [35] - 56:13, 57:1, 72:12, 72:20, 73:6, 75:10, 75:25, 76:13, 76:24, 76:25, 77:14, 77:21, 77:23, 77:24, 79:9, 79:14, 79:16, 79:18, 80:6, 80:10, 80:19, 80:22, 81:6, 82:1, 82:19, 82:23, 83:6, 83:23, 83:25, 84:9, 84:14, 84:18, 91:3, 91:4, 100:2
**accounted** [1] - 89:14
**accounts** [11] - 56:11, 72:7, 72:9, 72:17, 72:18, 72:21, 72:25, 73:2, 82:11, 87:12
**accredited** [2] - 8:24, 8:25
**accurate** [1] - 178:18
**accurately** [1] - 154:11
**accused** [1] - 170:7
**Acevedo** [5] - 3:14, 90:16, 103:8, 120:2, 157:15
**ACEVEDO** [3] - 1:17, 1:17, 120:4
**acquittal** [4] - 110:11, 115:3, 115:22
**acronyms** [1] - 51:25
**Act** [2] - 25:6, 118:13
**act** [12] - 139:13, 140:2, 140:19, 140:20, 141:3, 145:10, 148:10, 168:4, 169:7, 170:8, 170:21, 172:17
**acted** [2] - 129:20, 130:9
**action** [3] - 154:9, 168:6, 169:15
**active** [2] - 73:1, 87:24
**actively** [2] - 76:7, 76:16
**activities** [4] - 110:17, 117:25, 118:4, 130:10
**activity** [13] - 24:20, 111:15, 116:4, 118:2, 131:24, 132:17, 133:22, 134:14, 135:6, 139:5, 142:1, 153:9
**acts** [3] - 124:16, 125:24, 127:12
**actual** [5] - 8:20, 13:5, 13:14, 159:7, 159:23
**add** [11] - 12:13, 16:19, 124:13, 128:4, 132:19, 133:25, 134:6, 136:6, 143:4, 145:16, 177:13
**added** [4] - 75:18, 135:6, 136:2, 143:23
**adding** [2] - 125:18, 177:8
**addition** [16] - 7:3, 9:2, 9:4, 27:4, 30:21, 56:2, 63:4, 70:5, 76:15, 76:19, 76:20, 76:23, 82:3, 101:8, 111:14, 114:6
**additional** [8] - 26:15, 27:6, 34:4, 49:15, 77:12, 85:16, 125:19, 128:12
**additionally** [1] - 31:22
**address** [24] - 36:6, 36:15, 36:16, 36:17, 37:12, 38:5, 38:8, 40:3, 40:21, 58:15, 58:16, 58:19, 59:8, 59:11, 59:14, 59:15, 60:3, 79:15, 122:13, 123:19, 124:3, 124:8, 130:25, 131:1
**addressed** [1] - 117:14
**addresses** [2] - 35:20, 37:10
**Adiel** [3] - 30:1, 62:6, 67:8
**administrative** [1] - 9:22
**admit** [1] - 56:21
**admits** [1] - 174:3
**admitted** [15] - 37:5, 51:1, 59:25, 69:9, 69:11, 69:16, 70:15, 77:17, 78:24, 79:3, 89:24, 107:23, 130:2, 150:14, 151:7
**advance** [2] - 41:15, 131:16
**advancing** [1] - 171:13
**advise** [1] - 107:4
**advised** [2] - 32:6, 103:6
**affect** [1] - 96:22
**affected** [1] - 110:17
**affiliated** [7] - 30:25, 79:15, 90:25, 92:6, 132:17, 133:6, 133:19
**affiliating** [1] - 134:14
**affiliation** [3] - 131:15, 134:17, 134:21
**afford** [1] - 175:20
**aforementioned** [1] - 67:23
**afraid** [1] - 148:15
**afternoon** [6] - 4:17, 88:9, 94:3, 94:4, 104:11, 106:16
**AG-26** [4] - 11:4, 11:5, 11:6,

11:7
**AG-28** [4] - 11:8, 11:9, 11:10, 11:11
**agencies** [2] - 24:23, 99:14
**agency** [2] - 9:24, 10:7
**agent** [7] - 23:8, 24:19, 27:20, 31:13, 75:25, 78:8, 94:3
**Agent** [8] - 3:10, 3:19, 22:3, 22:10, 51:4, 55:9, 79:7, 101:22
**agents** [3] - 31:9, 32:13, 46:4
**ago** [1] - 123:2
**agree** [11] - 9:20, 45:19, 91:21, 116:8, 129:25, 148:20, 150:25, 151:15, 153:7, 155:8, 162:22
**agreed** [1] - 45:22
**agreeing** [1] - 62:10
**ahead** [34] - 4:18, 4:21, 5:3, 5:8, 5:11, 48:22, 52:18, 54:8, 59:5, 68:18, 73:17, 73:18, 74:21, 78:10, 79:11, 88:6, 88:12, 88:24, 89:5, 89:14, 102:5, 104:25, 105:5, 106:16, 108:16, 122:25, 123:11, 131:22, 136:9, 136:14, 150:12, 160:8, 177:15, 177:23
**aid** [11] - 109:3, 117:17, 118:1, 120:22, 120:23, 122:7, 135:6, 137:10, 137:14, 137:17, 138:14
**Aid** [1] - 25:8
**aiding** [30] - 112:7, 112:8, 114:4, 116:8, 116:19, 118:20, 118:23, 123:23, 124:2, 124:14, 125:2, 125:9, 125:12, 125:16, 125:17, 125:22, 127:23, 128:1, 128:5, 128:6, 128:13, 138:22, 139:5, 142:1, 142:5, 146:18, 172:2, 172:5, 172:21
**albeit** [1] - 125:5
**Alberto** [4] - 30:7, 62:24, 67:2, 83:1
**album** [1] - 80:16
**alert** [1] - 104:6
**aliases** [1] - 27:11
**alleged** [5] - 116:7, 138:19, 138:20, 138:24, 139:16
**Allied** [2] - 35:17, 36:5
**allies** [1] - 25:23
**allow** [2] - 104:12, 166:25
**allowed** [1] - 172:8
**allowing** [2] - 131:6, 152:6
**almost** [6] - 6:23, 76:25, 94:6, 124:10, 146:23, 148:4
**alone** [2] - 146:2, 168:19
**Alpha** [2] - 51:23
**alternative** [4] - 154:5, 168:3, 169:14, 170:20
**alternatives** [1] - 176:15
**altogether** [1] - 144:13
**America** [1] - 3:4
**AMERICA** [1] - 1:4
**American** [2] - 6:8, 8:5
**amorphous** [1] - 148:1
**amount** [1] - 128:25
**amounts** [2] - 14:21, 17:2
**ample** [3] - 116:17, 116:24, 154:1
**amplification** [2] - 14:20, 17:1
**amplify** [3] - 14:21, 15:12, 17:3
**amply** [1] - 118:6
**ANAB** [1] - 8:25
**Analysis** [1] - 6:21
**analysis** [13] - 7:5, 7:14, 7:18, 8:1, 8:11, 8:15, 9:8, 9:11, 13:23, 14:18, 14:23, 16:18, 117:12
**analyst** [5] - 5:22, 6:7, 7:11, 8:17, 9:19
**analysts** [1] - 7:9
**analyze** [1] - 15:22
**analyzed** [2] - 10:3, 16:11
**analyzing** [1] - 115:7
**Andrews** [1] - 35:14
**Andy** [6] - 28:11, 49:10, 65:17, 81:12, 133:25, 158:5
**Angel** [2] - 29:4, 61:21
**ankle** [18] - 11:12, 11:13, 13:1, 18:9, 18:11, 34:5, 34:11, 35:5, 35:15, 36:14, 36:18, 36:20, 37:15, 39:14, 40:7, 41:5, 42:9
**ankles** [1] - 11:25
**annotations** [1] - 156:10
**answer** [1] - 79:22
**anticipated** [2] - 129:8, 168:6
**anticipatorily** [1] - 156:13
**antiquated** [1] - 172:1
**Antonio** [1] - 49:19
**anyway** [2] - 116:19, 118:22
**apartment** [1] - 40:19
**apologies** [2] - 4:25, 55:12
**apologize** [1] - 137:5
**App'x** [4] - 129:10, 131:10, 147:16, 168:24
**Appeal** [1] - 171:25
**appeal** [1] - 151:15
**appealed** [1] - 129:13
**appear** [2] - 64:23, 134:18
**appearances** [1] - 3:6
**APPEARANCES** [1] - 1:11
**applicability** [2] - 144:19, 173:7
**applicable** [1] - 115:6
**applicant** [1] - 52:11
**Application** [1] - 51:19
**applied** [2] - 72:6, 72:14
**apply** [1] - 72:18
**appreciate** [1] - 55:16
**apprehension** [2] - 167:23, 170:5
**approach** [1] - 146:17
**appropriate** [6] - 123:14, 148:17, 154:14, 160:15, 167:12, 171:4
**appropriateness** [1] - 166:19
**approximate** [2] - 34:23, 37:14
**Ardilla** [23] - 28:17, 40:10, 47:10, 47:23, 51:13, 52:12, 53:6, 61:3, 66:13, 96:25, 98:6, 98:19, 108:21, 109:7, 109:23, 110:19, 113:14, 116:15, 158:2, 158:3, 164:6, 164:13, 164:21
**Ardilla's** [3] - 50:13, 67:23, 134:1
**area** [9] - 7:22, 23:21, 40:19, 41:23, 44:7, 44:10, 59:15, 68:4, 72:5
**arguably** [3] - 107:9, 154:5, 176:14
**argue** [4] - 122:25, 142:13, 144:1, 174:10
**argued** [1] - 76:10
**arguing** [1] - 170:14
**argument** [31] - 76:13, 105:1, 106:11, 106:25, 119:6, 124:21, 128:17, 128:18, 130:17, 131:17, 133:13, 133:24, 134:10, 142:7, 143:22, 143:25, 149:24, 154:2, 154:6, 155:25, 161:16, 161:17, 165:13, 165:21, 166:24, 171:14, 172:20, 173:24, 174:23
**arguments** [4] - 106:2, 106:22, 107:6, 177:18
**arouse** [1] - 43:6
**arrest** [3] - 45:7, 45:18, 61:14
**arrested** [8] - 45:11, 47:11, 47:15, 60:13, 61:5, 61:6, 62:17, 74:15
**arrive** [3] - 36:23, 44:22, 106:7
**arrived** [1] - 3:21
**arrow** [1] - 43:11
**art** [1] - 84:13
**artwork** [2] - 84:17, 85:15
**Asian** [1] - 94:24
**asserts** [1] - 129:19
**assess** [1] - 115:20
**assigned** [5] - 10:10, 22:17, 23:13, 23:14, 24:3
**assignment** [1] - 23:11
**assignments** [2] - 22:20, 23:22
**assist** [2] - 109:4, 111:5
**ASSISTANT** [1] - 1:14
**associated** [9] - 56:11, 72:10, 72:12, 124:17, 125:25, 126:13, 127:1, 127:5, 127:11
**associates** [4] - 25:21, 25:23, 164:14, 176:10
**association** [5] - 126:2, 126:9, 126:10, 127:20, 128:9
**assume** [2] - 133:21, 153:18
**assuming** [3] - 18:20, 18:25, 20:1
**attack** [2] - 112:15, 158:2
**attempt** [4] - 29:16, 32:7, 34:24, 111:5
**attempting** [2] - 117:9, 131:18
**attended** [3] - 7:17, 23:9, 24:11
**attending** [1] - 151:8
**attention** [6] - 26:3, 80:11, 99:4, 101:5, 108:7, 173:12
**ATTORNEY'S** [1] - 1:14
**attorneys** [1] - 103:19
**ATTORNEYS** [1] - 1:14
**attribute** [2] - 81:5, 83:6
**attribution** [3] - 80:3, 80:5, 80:8
**auction** [1] - 52:17
**audio** [1] - 116:21
**August** [1] - 84:3
**author** [1] - 84:18
**availability** [1] - 173:7
**available** [4] - 131:11, 134:18, 149:9, 170:11
**Avenue** [5] - 1:23, 35:14, 38:18, 39:2, 178:23
**avoid** [7] - 88:22, 91:8, 95:4, 95:5, 168:4, 170:8, 170:21
**avoidance** [2] - 168:6, 169:16
**avoiding** [1] - 154:8
**aware** [3] - 127:13, 132:2, 162:19

## B

**Bachelor** [1] - 7:1

**back-dooring** [1] - 146:23
**background** [5] - 6:25, 96:18, 96:19, 97:22, 101:4
**backgrounds** [1] - 98:2
**backwards** [1] - 68:10
**bacteria** [1] - 21:16
**bad** [1] - 155:4
**bald** [1] - 96:7
**base** [2] - 164:3, 165:6
**based** [43] - 19:19, 22:23, 23:3, 24:16, 27:13, 29:14, 30:14, 31:25, 32:3, 33:18, 34:11, 35:4, 35:11, 36:10, 36:12, 36:13, 36:18, 36:19, 37:14, 81:5, 84:6, 87:20, 95:16, 98:7, 108:23, 109:12, 109:21, 109:25, 122:15, 129:13, 131:14, 134:12, 146:1, 146:5, 149:19, 153:14, 164:4, 165:13, 165:17, 171:15
**basic** [1] - 46:12
**basis** [3] - 112:24, 112:25, 175:24
**battery** [1] - 32:8
**Beach** [6] - 36:19, 38:8, 38:20, 39:1, 59:12, 139:1
**became** [3] - 7:10, 163:3, 163:18
**become** [3] - 6:7, 9:5, 23:7
**becomes** [1] - 139:15
**becoming** [2] - 130:2, 150:15
**BEFORE** [1] - 1:10
**beforehand** [2] - 35:8, 129:6
**began** [2] - 26:11, 79:18
**begin** [5] - 26:5, 106:2, 106:12, 106:14, 108:10
**behalf** [8] - 3:6, 3:9, 3:12, 3:14, 3:24, 103:17, 105:20, 159:20
**behind** [3] - 21:11, 21:13, 98:12
**belabor** [1] - 78:7
**believes** [4] - 110:10, 153:11, 158:17, 160:19
**belonged** [2] - 55:24, 56:7
**belongs** [2] - 13:16, 57:2
**below** [3] - 82:21, 86:19, 87:11
**bench** [1] - 54:18
**benefit** [1] - 154:18
**benefits** [2] - 145:20, 145:23
**BENITEZ** [1] - 1:7
**Benitez** [26] - 3:5, 3:12, 3:15, 11:19, 12:6, 19:6, 20:6, 20:24, 30:13, 31:1, 49:14, 63:17, 67:24, 72:10, 80:14, 81:4, 81:7, 82:15, 95:23, 98:17, 103:1, 103:4, 103:5, 104:6, 109:7, 162:11
**Benitez's** [1] - 108:25
**Bermudez** [10] - 30:1, 31:2, 48:16, 56:9, 56:11, 57:2, 62:6, 67:8, 68:7, 81:22
**Bermudez-Martinez** [9] - 30:1, 31:2, 48:16, 56:9, 56:11, 57:2, 62:6, 67:8, 68:7
**best** [3] - 10:9, 10:13, 97:25
**better** [8] - 36:10, 90:17, 90:19, 134:5, 151:2, 157:9, 164:9, 164:22
**between** [10] - 43:19, 46:22, 91:10, 94:25, 146:15, 168:6, 169:15, 169:21, 177:18, 177:22
**beyond** [7] - 74:13, 105:18, 115:12, 116:1, 126:19, 140:17, 172:2
**bicycle** [6] - 36:21, 39:9, 39:10, 43:5, 43:8, 43:22
**big** [3] - 91:18, 108:9, 167:9
**Big** [1] - 165:2
**Bigfoot** [19] - 28:23, 47:12, 61:11, 64:2, 66:9, 68:12, 82:23, 84:1, 84:8, 97:9, 97:10, 97:16, 108:21, 109:7, 109:23, 113:14, 164:5, 164:25, 165:4
**bigger** [2] - 86:24, 155:20
**bike** [1] - 35:9
**biology** [1] - 9:8
**bit** [27] - 5:10, 43:14, 44:4, 44:5, 44:10, 51:17, 54:9, 54:16, 55:13, 55:14, 55:17, 88:10, 95:20, 96:6, 96:12, 97:2, 97:19, 102:4, 120:11, 125:1, 133:20, 135:13, 135:15, 143:18, 147:12, 147:13, 174:23
**black** [11] - 32:17, 32:24, 94:24, 96:3, 96:7, 96:10, 96:16, 97:12, 97:17, 97:18, 97:20
**blank** [2] - 120:5, 120:13
**blanket** [1] - 154:21
**blood** [23] - 11:4, 11:6, 11:8, 11:10, 12:12, 12:15, 12:16, 12:22, 12:23, 12:24, 12:25, 13:4, 13:6, 13:8, 13:10, 14:7, 18:5, 18:7, 18:8
**Bloods** [2] - 22:23, 24:15
**blowups** [1] - 176:25
**blue** [1] - 51:15
**Blue** [12] - 30:1, 36:3, 36:22, 41:24, 44:7, 48:16, 56:8, 57:12, 57:13, 62:6, 67:8, 81:22
**Blue's** [1] - 68:6
**board** [1] - 133:14
**Board** [2] - 6:8, 8:5
**Boca** [6] - 35:7, 38:18, 39:2, 39:8, 45:1, 53:4
**bodily** [12] - 12:10, 140:25, 152:22, 160:3, 160:10, 166:3, 166:22, 167:1, 167:24, 169:9, 170:1, 176:12
**body** [9] - 14:5, 14:6, 14:9, 33:21, 33:25, 38:21, 39:3, 52:6, 80:24
**boils** [2] - 108:20, 108:21
**bold** [1] - 90:14
**bone** [1] - 141:23
**booking** [3] - 98:12, 99:10, 99:13
**Bosques** [2] - 31:3, 72:3
**bottom** [10] - 64:16, 66:16, 66:22, 67:3, 67:9, 79:20, 80:2, 81:23, 84:18, 171:21
**boy** [1] - 82:9
**bracelet** [1] - 42:9
**brand** [1] - 32:18
**break** [20] - 4:14, 54:1, 54:3, 54:8, 54:9, 54:17, 54:19, 55:4, 55:13, 73:13, 73:19, 78:19, 88:7, 88:25, 89:5, 91:22, 93:20, 104:22, 108:8, 177:23
**breaking** [1] - 53:24
**breaks** [1] - 16:21
**Brian** [1] - 3:8
**BRIAN** [1] - 1:13
**brief** [5] - 54:17, 55:3, 92:2, 104:14, 129:9
**briefly** [1] - 16:11
**bring** [9] - 3:23, 16:14, 27:14, 47:15, 89:14, 102:6, 105:6, 136:10, 173:12
**brings** [1] - 160:24
**broadly** [2] - 26:10, 153:8
**brought** [1] - 45:25
**Broward** [15] - 5:20, 5:23, 6:13, 6:16, 6:18, 6:19, 7:6, 8:24, 22:19, 23:15, 26:5, 26:13, 45:25, 72:4, 138:25
**brown** [2] - 12:14, 13:5
**BSO** [1] - 14:10
**buccal** [2] - 13:15, 17:9
**buenas** [1] - 86:12
**building** [1] - 39:18
**bunch** [3] - 92:10, 94:12, 94:24
**burden** [11] - 105:17, 156:18, 168:15, 169:3, 169:10, 169:19, 169:20, 169:21, 170:13, 171:12, 176:5
**burial** [1] - 34:9
**buried** [3] - 33:25, 49:23
**business** [1] - 112:3
**businesses** [2] - 111:21, 111:22
**busos** [2] - 90:14, 92:19
**buying** [1] - 111:7
**buzzed** [1] - 63:24
**BY** [41] - 1:20, 2:5, 2:6, 2:8, 2:8, 2:9, 5:17, 9:16, 22:9, 27:19, 37:8, 38:16, 39:22, 41:2, 41:9, 41:18, 42:1, 42:6, 42:14, 42:17, 42:22, 43:16, 43:25, 45:5, 51:3, 55:22, 56:24, 57:17, 58:3, 60:2, 65:2, 69:19, 70:17, 71:16, 79:6, 79:24, 86:4, 94:2, 95:12, 98:4, 99:2

## C

**Cabañas** [1] - 31:4
**cabined** [1] - 145:23
**Cabrera** [3] - 29:4, 48:6, 61:21
**Cabrera-Granados** [3] - 29:4, 48:6, 61:21
**cake** [1] - 165:7
**calendar** [2] - 54:14, 54:18
**camera** [1] - 68:9
**Campbell** [1] - 151:14
**Canizales** [3] - 33:20, 33:22, 49:19
**Canizales-Cruz** [1] - 49:19
**Canizales-Lara** [2] - 33:20, 33:22
**cannot** [9] - 21:3, 124:4, 130:22, 131:2, 151:9, 153:25, 156:12, 172:4, 172:13
**capturing** [1] - 128:6
**car** [21] - 50:13, 52:2, 53:9, 53:16, 64:18, 112:10, 126:11, 127:8, 127:10, 131:20, 131:22, 153:20, 154:6, 155:16, 160:24, 161:22, 162:2, 162:13, 162:17, 167:12, 173:22
**career** [2] - 6:14, 25:11
**carefully** [1] - 135:14
**Carolina** [1] - 111:9
**carried** [3] - 160:5, 160:12, 160:21
**carries** [1] - 150:5
**carry** [6] - 148:10, 154:19, 156:18, 156:19, 169:20, 172:15
**cars** [1] - 43:7
**CART** [5] - 32:5, 32:9, 32:10, 32:13, 33:2
**Case** [3] - 3:3, 9:25, 10:18

**CASE** [1] - 1:2
**case** [110] - 4:12, 6:7, 7:11, 8:19, 8:20, 10:3, 10:6, 10:8, 10:11, 10:12, 10:14, 10:22, 11:1, 11:25, 12:11, 13:14, 13:17, 13:19, 15:13, 16:12, 16:17, 17:11, 27:20, 27:21, 45:8, 53:13, 60:8, 69:11, 72:7, 76:10, 81:11, 88:13, 88:18, 106:18, 107:3, 107:5, 107:8, 107:25, 110:12, 115:15, 123:13, 123:15, 123:16, 124:7, 128:1, 129:1, 129:10, 129:11, 129:13, 129:23, 129:24, 130:11, 131:3, 131:6, 131:8, 132:16, 134:8, 134:13, 134:19, 143:12, 147:15, 148:3, 148:11, 148:14, 150:3, 150:5, 150:18, 151:13, 151:23, 156:6, 156:7, 156:12, 158:19, 158:20, 158:22, 159:16, 166:7, 167:14, 167:15, 167:17, 167:19, 168:10, 168:12, 168:14, 169:23, 171:6, 171:18, 171:19, 171:24, 172:1, 172:9, 172:11, 172:14, 172:16, 173:4, 173:13, 173:14, 173:16, 174:9, 174:11, 174:15, 174:17, 174:24, 175:6, 175:14, 175:19, 175:25
**case-working** [2] - 6:7, 7:11
**cases** [21] - 7:11, 9:18, 10:20, 15:8, 25:17, 54:15, 87:24, 129:1, 130:6, 130:20, 131:1, 132:18, 132:23, 133:12, 150:2, 151:4, 151:20, 151:23, 156:11, 161:2, 173:6
**casework** [2] - 7:10, 7:14
**catch** [1] - 136:24
**catches** [1] - 138:6
**caught** [1] - 138:10
**causal** [2] - 168:5, 169:15
**caused** [2] - 140:18, 154:8
**caution** [2] - 77:12, 121:13
**Celica** [4] - 56:5, 56:6, 57:11, 57:19
**cell** [7] - 14:6, 31:6, 31:10, 31:23, 32:6, 32:11, 70:23
**cells** [3] - 14:7, 16:21
**cellular** [1] - 46:1
**Centeno** [1] - 58:13
**Centeno-Martinez** [1] - 58:13
**Central** [1] - 7:2
**certain** [10] - 41:6, 46:12, 76:20, 91:6, 92:10, 119:1, 126:12, 127:8, 128:20, 140:25
**certainly** [6] - 78:5, 116:9, 141:8, 148:20, 152:24, 157:1
**Certificate** [1] - 51:20
**certification** [1] - 6:8
**certifications** [1] - 8:4
**certified** [7] - 8:5, 9:1, 9:2, 50:15, 50:21, 51:7, 57:18
**certify** [1] - 178:17
**cetera** [2] - 80:10, 107:24
**chain** [1] - 14:12
**chairs** [4] - 54:9, 102:6, 106:8, 178:8
**chambers** [1] - 135:11
**chance** [6] - 107:17, 107:22, 122:9, 122:11, 168:3, 170:20
**change** [8] - 12:13, 101:13, 132:13, 145:12, 146:2, 146:3, 146:4, 177:7
**changed** [2] - 98:16, 120:9
**changes** [1] - 145:15
**changing** [1] - 163:15
**Chango** [10] - 29:9, 34:20, 36:2, 36:15, 37:21, 48:11, 62:16, 66:21, 70:10, 70:20
**Chango's** [14] - 34:23, 35:12, 36:6, 37:16, 37:21, 38:2, 38:11, 38:23, 39:17, 40:15, 42:11, 42:24, 43:1, 43:6
**charge** [12] - 10:7, 104:14, 105:3, 114:3, 117:15, 117:23, 117:24, 118:13, 118:16, 121:14, 172:12, 172:25
**charged** [16] - 76:4, 109:13, 112:6, 116:1, 116:8, 121:17, 130:18, 130:21, 131:4, 131:11, 143:19, 143:24, 144:7, 144:22, 146:16, 146:24
**charges** [8] - 45:17, 118:16, 120:12, 120:16, 120:19, 120:20, 121:21, 173:8
**charging** [2] - 111:20, 120:15
**chart** [3] - 30:15, 30:19, 33:15
**chased** [1] - 155:17
**chat** [12] - 76:21, 82:1, 83:15, 83:20, 84:14, 84:19, 85:1, 85:12, 85:18, 86:7, 87:2, 87:8
**chats** [3] - 76:17, 82:6, 83:12
**chavala** [4] - 112:13, 112:14, 152:14, 161:23
**chavalas** [4] - 77:11, 86:20, 112:19, 114:17
**check** [6] - 9:17, 35:5, 88:13, 88:14, 105:15
**checked** [3] - 34:1, 34:10, 35:14
**cheek** [1] - 13:15
**chemicals** [1] - 16:19
**Chemistry** [1] - 6:21
**chemistry** [1] - 15:7
**chequeo** [1] - 69:4
**chin** [1] - 96:12
**Cholos** [1] - 86:17
**choose** [2] - 13:3, 168:1
**chop** [1] - 158:4
**chosen** [1] - 104:8
**Chrislet** [1] - 50:3
**chromosomes** [1] - 14:13
**chronological** [1] - 52:19
**chunk** [1] - 78:6
**circa** [1] - 58:17
**circle** [3] - 34:21, 44:5, 113:20
**circuit** [3] - 151:1, 156:21, 168:23
**Circuit** [21] - 129:11, 129:16, 129:23, 134:15, 147:16, 147:21, 148:4, 149:3, 149:6, 150:19, 150:22, 156:7, 158:20, 158:21, 158:22, 165:25, 167:17, 169:24, 171:12, 174:15, 174:24
**circuits** [2] - 130:25, 156:22
**circulated** [2] - 117:16, 117:19
**circumstances** [5] - 134:16, 134:20, 149:10, 165:22, 166:1
**citation** [1] - 129:23
**citations** [1] - 174:12
**cite** [6] - 130:6, 131:9, 142:9, 150:2, 150:10, 151:10
**cited** [5] - 118:17, 144:10, 144:15, 147:15, 150:9
**cites** [1] - 171:25
**citing** [2] - 142:21, 168:10
**City** [1] - 31:11
**claim** [5] - 112:21, 130:4, 130:15, 150:16, 151:9
**clarify** [2] - 20:8, 162:18
**clean** [1] - 64:25
**clean-shaven** [1] - 64:25
**clear** [27] - 18:12, 19:8, 38:15, 39:20, 40:24, 42:13, 65:1, 71:5, 79:23, 82:6, 83:5, 84:24, 92:18, 120:14, 125:3, 133:4, 153:7, 156:22, 160:16, 161:1, 161:8, 166:1, 169:17, 169:20, 170:1, 171:25, 176:1
**clearer** [1] - 141:7
**clearing** [2] - 59:17, 177:25
**clearly** [3] - 112:14, 127:18, 132:2
**client** [2] - 102:13, 159:21
**clique** [12] - 31:1, 31:3, 31:4, 33:13, 69:1, 72:3, 110:23, 112:18, 114:21, 114:22
**clique-specific** [1] - 33:13
**cliques** [6] - 23:5, 30:24, 86:24, 111:4, 111:6, 111:11
**close** [7] - 37:22, 38:10, 39:10, 40:20, 170:24, 172:7, 177:22
**closer** [1] - 38:11
**closing** [9] - 106:1, 106:11, 106:22, 107:6, 124:21, 155:25, 171:9, 177:15, 177:18
**closings** [5] - 104:15, 108:12, 175:17, 178:5, 178:10
**clothes** [1] - 113:12
**clothing** [1] - 18:23
**Club** [3] - 39:5, 39:18, 41:23
**co** [4] - 36:1, 45:20, 46:9, 76:9
**co-conspirators** [3] - 36:1, 45:20, 46:9
**co-defendants** [1] - 76:9
**Coast** [3] - 110:25, 111:1, 111:9
**cocaine** [1] - 111:2
**code** [1] - 13:25
**coercing** [1] - 170:4
**coercion** [1] - 152:3
**coffee** [4] - 54:6, 55:14, 102:4, 102:6
**coincidentally** [1] - 173:25
**coladas** [1] - 102:3
**Cold** [1] - 10:18
**collaboration** [1] - 31:13
**collect** [2] - 26:11, 111:3
**collected** [2] - 110:21, 113:12
**colloquy** [1] - 102:15
**color** [4] - 12:13, 12:15, 95:6, 95:7
**colored** [1] - 34:21
**combined** [1] - 116:13
**comfortable** [1] - 172:24
**coming** [3] - 5:25, 42:3, 77:24
**comment** [3] - 84:4, 84:5, 155:10
**commented** [1] - 91:2
**commenting** [1] - 77:10

**comments** [3] - 92:9, 93:4, 156:10
**commerce** [4] - 110:18, 111:12, 111:13, 116:2
**commission** [1] - 116:17
**commit** [5] - 117:5, 140:1, 143:11, 159:17, 159:23
**committed** [4] - 116:7, 138:19, 163:9, 170:6
**committing** [4] - 117:4, 137:13, 146:17, 170:8
**commonly** [1] - 111:23
**communicating** [2] - 76:7, 77:25
**communication** [3] - 76:9, 76:23, 92:6
**communications** [1] - 73:25
**community** [3] - 14:24, 34:3, 111:22
**company** [1] - 8:19
**compare** [4] - 16:4, 16:7, 17:14, 19:18
**compared** [3] - 16:9, 18:18, 19:5
**comparison** [1] - 17:17
**comparisons** [3] - 13:17, 17:9, 19:17
**competency** [1] - 7:9
**compiled** [1] - 99:12
**complete** [3] - 7:15, 78:18, 132:7
**completed** [2] - 9:17, 119:13
**complex** [2] - 36:3, 39:10
**complicated** [1] - 147:13
**comply** [1] - 72:15
**comprised** [1] - 68:20
**compulsion** [2] - 129:19, 170:10
**computer** [2] - 32:11, 41:1
**computers** [1] - 32:6
**concede** [1] - 98:7
**concept** [2] - 172:4, 172:15
**concern** [5] - 73:24, 96:24, 126:24, 146:8, 154:22
**concerned** [1] - 154:15
**concerns** [6] - 47:5, 73:23, 74:23, 122:5, 125:10, 177:25
**conditions** [1] - 26:18
**condo** [2] - 39:10, 40:20
**condominium** [1] - 36:3
**conduct** [23] - 8:15, 12:18, 13:3, 14:10, 15:9, 32:14, 132:24, 133:3, 149:25, 150:1, 153:16, 156:3, 156:14, 158:15, 159:6, 160:18, 161:3, 161:21, 167:10, 168:2, 168:8, 169:13, 176:8
**conference** [3] - 104:14, 105:3, 117:15
**conferences** [2] - 7:17, 7:21
**confessed** [1] - 38:25
**confirm** [8] - 13:7, 95:16, 98:7, 102:14, 103:7, 131:5, 136:21, 140:5
**confirmatory** [1] - 12:17
**confirmed** [5] - 36:15, 36:16, 36:17, 38:9, 59:15
**conflict** [6] - 108:24, 109:24, 110:2, 146:14, 158:4, 176:11
**conflicting** [1] - 157:24
**conflicts** [3] - 109:22, 116:10, 158:8
**confronted** [1] - 163:5
**confuse** [2] - 118:21, 159:15
**confusing** [3] - 80:7, 121:13, 121:25
**conjecture** [1] - 147:22
**conjunction** [1] - 115:14
**conjunctively** [1] - 121:14
**connected** [1] - 92:9
**connecting** [1] - 90:24
**connection** [1] - 91:9
**consensually** [1] - 45:22
**consent** [2] - 31:21, 31:22
**consented** [1] - 169:7
**consequence** [1] - 134:6
**consequences** [1] - 165:15
**consider** [3] - 100:4, 101:13, 110:1
**consisted** [1] - 7:8
**consistent** [6] - 36:20, 42:25, 43:4, 43:12, 113:18, 128:9
**consists** [1] - 6:19
**conspiracy** [10] - 74:12, 74:14, 75:20, 76:3, 76:4, 120:25, 121:7, 121:15, 152:9, 173:8
**conspirators** [3] - 36:1, 45:20, 46:9
**conspired** [1] - 120:21
**contact** [15] - 11:3, 11:5, 11:7, 11:9, 18:4, 18:6, 18:20, 19:25, 20:12, 32:20, 46:15, 46:18, 77:2, 77:18, 77:20
**contacts** [4] - 75:5, 75:6, 77:21, 77:22
**contained** [1] - 101:2
**contains** [1] - 13:25
**contends** [1] - 129:18
**content** [1] - 93:9
**contention** [1] - 151:15
**contents** [2] - 31:23, 90:22
**context** [5] - 131:9, 148:9, 149:4, 150:25, 154:13
**continuation** [1] - 81:19
**continue** [6] - 4:13, 55:18, 88:19, 107:18, 159:25, 170:5
**continued** [1] - 24:19
**continues** [1] - 126:16
**continuing** [5] - 7:20, 77:3, 77:6, 78:6, 117:5
**contradicted** [1] - 112:22
**contradiction** [2] - 139:9, 142:16
**contradicts** [1] - 142:10
**contributing** [2] - 20:10, 21:15
**contributor** [9] - 18:21, 18:25, 19:2, 19:15, 19:16, 20:1, 20:3, 20:18, 20:20
**contributors** [10] - 16:1, 17:7, 19:2, 19:10, 20:3, 20:6, 20:11, 20:13, 20:14, 20:15
**control** [2] - 23:5, 174:25
**controlled** [4] - 46:21, 46:25, 111:2, 118:10
**conversation** [1] - 46:11
**conversations** [1] - 47:3
**convict** [1] - 146:10
**conviction** [2] - 108:20, 110:4
**convinced** [1] - 175:19
**cooler** [1] - 51:25
**cooperated** [1] - 38:25
**cooperation** [1] - 43:21
**cooperator** [1] - 116:15
**cooperators** [3] - 110:3, 117:2, 174:2
**coordinates** [1] - 41:4
**copies** [1] - 136:11
**copy** [8] - 89:25, 117:18, 119:7, 120:17, 121:18, 121:22, 176:21, 177:2
**core** [2] - 116:6, 116:18
**corner** [1] - 38:12
**correct** [74] - 8:20, 12:4, 12:7, 13:19, 13:20, 19:22, 20:17, 20:25, 29:12, 33:17, 38:13, 41:7, 46:16, 46:19, 49:5, 53:10, 53:15, 53:18, 53:21, 58:24, 60:3, 60:10, 61:16, 63:6, 64:4, 65:8, 67:20, 71:5, 77:7, 79:2, 83:9, 87:11, 90:23, 91:1, 91:16, 92:21, 94:10, 94:11, 94:15, 95:5, 95:8, 95:15, 95:16, 95:23, 96:1, 96:2, 96:9, 96:10, 96:11, 96:19, 96:20, 97:4, 97:13, 97:23, 97:24, 98:6, 98:11, 98:17, 98:18, 98:20, 98:21, 100:17, 100:20, 101:3, 101:7, 103:24, 122:15, 136:3, 141:21, 142:12, 143:1, 161:6, 164:4, 171:18
**corroborate** [4] - 27:16, 34:24, 43:23, 45:6
**corroborated** [6] - 35:15, 36:4, 36:24, 39:14, 40:7, 113:7
**Corrupt** [1] - 25:6
**counsel** [5] - 3:10, 103:13, 103:24, 104:9, 173:18
**counsel's** [1] - 101:23
**counsels'** [2] - 54:16, 89:7
**Count** [10] - 116:1, 116:6, 116:18, 119:23, 120:20, 121:12, 121:21, 138:25, 146:24
**count** [6] - 3:22, 118:17, 120:16, 120:19, 121:18, 121:21
**Counties** [1] - 139:1
**countries** [1] - 23:3
**country** [1] - 99:14
**counts** [1] - 120:13
**County** [9] - 6:19, 7:6, 22:19, 23:15, 23:20, 23:23, 24:2, 25:25, 45:25
**couple** [12] - 25:19, 32:9, 36:14, 52:18, 63:18, 76:5, 86:2, 113:3, 117:23, 119:23, 123:2, 129:3
**course** [14] - 25:11, 88:13, 88:16, 88:22, 105:8, 105:16, 106:20, 107:7, 107:24, 108:1, 112:23, 115:5, 142:3, 177:9
**courses** [1] - 24:13
**Court** [28] - 1:21, 1:22, 3:1, 3:15, 36:7, 37:17, 37:19, 37:23, 38:4, 38:10, 42:11, 55:6, 59:15, 60:9, 78:5, 89:11, 104:5, 136:18, 139:12, 140:12, 148:6, 151:6, 154:20, 171:24, 175:18, 178:15, 178:22, 178:22
**court** [9] - 60:8, 101:8, 101:9, 129:14, 129:25, 149:2, 151:4, 151:22, 151:23
**COURT** [211] - 1:1, 3:2, 3:11, 3:16, 3:21, 4:1, 4:3, 4:4, 4:6, 5:3, 5:8, 5:14, 9:13, 21:21, 21:24, 22:1, 22:4, 22:6, 37:5, 50:24, 51:1, 53:24, 54:2, 54:11, 54:13, 54:25, 55:3, 55:5, 55:8, 55:12, 55:21, 56:19, 56:21, 57:24, 58:1, 59:22, 59:24, 69:12, 69:16, 70:15, 71:12, 71:14, 73:10, 73:15, 73:20, 73:22, 74:2, 74:7, 74:9,

74:16, 74:19, 74:21, 75:1, 75:7, 75:9, 75:12, 75:22, 77:5, 77:19, 78:3, 78:14, 78:16, 79:2, 86:1, 86:3, 88:1, 88:4, 89:2, 89:4, 89:10, 89:13, 89:15, 89:18, 89:22, 90:2, 90:18, 90:21, 91:5, 91:18, 91:21, 91:25, 92:14, 92:17, 92:21, 92:25, 93:8, 93:14, 93:17, 93:19, 98:23, 101:18, 101:22, 102:2, 102:8, 102:10, 102:18, 102:20, 102:25, 103:5, 103:11, 103:13, 103:16, 103:19, 103:23, 104:1, 104:4, 104:24, 105:11, 105:13, 105:23, 108:15, 110:6, 115:4, 118:22, 118:25, 119:4, 119:19, 120:5, 120:9, 121:6, 121:8, 121:20, 122:2, 122:9, 122:18, 122:23, 123:9, 123:11, 124:5, 124:13, 126:7, 127:3, 129:3, 129:5, 131:5, 132:21, 133:5, 133:11, 134:9, 135:4, 135:8, 135:24, 136:5, 136:15, 136:17, 136:20, 137:2, 137:7, 137:11, 137:15, 137:17, 137:19, 137:24, 138:2, 138:4, 138:6, 138:9, 138:13, 138:16, 139:19, 140:4, 140:14, 140:16, 141:22, 141:25, 142:13, 142:15, 143:1, 143:10, 144:14, 146:4, 146:7, 147:3, 147:8, 150:3, 150:10, 150:12, 150:19, 150:23, 151:10, 151:12, 152:17, 156:5, 156:9, 157:22, 158:13, 159:4, 160:6, 160:16, 162:4, 162:22, 162:24, 164:7, 164:10, 164:12, 164:15, 164:18, 164:24, 165:3, 165:20, 166:17, 168:22, 173:9, 174:21, 175:16, 177:4, 177:12, 177:19, 178:6, 178:12, 178:14
**Court's** [2] - 104:23, 117:12
**courtroom** [3] - 109:8, 122:11, 177:25
**COURTROOM** [1] - 103:2
**courts** [2] - 150:8, 151:19
**cover** [2] - 125:9, 128:13
**covered** [4] - 90:5, 123:21, 124:11, 125:17
**covering** [1] - 125:15
**cracked** [1] - 32:3
**Crazy** [1] - 49:20
**create** [23] - 30:15, 36:9, 60:23, 61:8, 61:18, 62:2, 62:12, 62:21, 63:8, 63:14, 65:14, 65:21, 66:6, 66:10, 66:17, 66:24, 67:4, 67:12, 71:19, 132:25, 153:17, 153:25, 161:21
**created** [6] - 30:19, 59:19, 75:25, 133:3, 149:25, 156:3
**creating** [2] - 99:9, 146:14
**creation** [3] - 82:19, 82:22, 83:4
**credibility** [2] - 115:21, 116:20
**credit** [1] - 109:18
**credits** [1] - 7:20
**crew** [1] - 159:10
**Crime** [7] - 5:24, 6:16, 6:18, 6:20, 8:24, 14:10, 25:8
**crime** [41] - 5:20, 6:18, 15:1, 15:24, 21:2, 21:5, 34:6, 35:25, 36:13, 40:2, 70:25, 109:13, 112:6, 116:6, 116:7, 116:18, 118:5, 123:25, 124:18, 124:19, 125:4, 126:1, 129:1, 130:8, 133:1, 133:4, 137:13, 137:14, 138:19, 138:21, 140:16, 150:1, 154:1, 156:4, 159:12, 159:17, 159:23, 161:22, 163:9, 170:6, 172:21
**Crimes** [1] - 23:25
**crimes** [7] - 24:7, 40:3, 117:4, 117:5, 118:7, 120:13
**criminal** [11] - 110:13, 111:7, 129:19, 140:19, 154:9, 168:2, 168:4, 168:6, 169:13, 169:15, 170:21
**Criminalistics** [2] - 6:9, 8:5
**criminally** [3] - 124:16, 125:23, 127:12
**Crips** [1] - 24:15
**Cristobal** [2] - 58:13, 58:16
**CROSS** [2] - 2:8, 94:1
**cross** [8] - 21:22, 24:3, 34:10, 35:5, 35:14, 78:4, 88:8, 93:22
**cross-check** [1] - 35:5
**cross-checked** [2] - 34:10, 35:14
**cross-designated** [1] - 24:3
**cross-examination** [4] - 21:22, 78:4, 88:8, 93:22
**CROSS-EXAMINATION** [2] - 2:8, 94:1
**crosses** [1] - 128:9
**crossing** [1] - 131:23
**CRR** [2] - 1:21, 178:21
**crucial** [2] - 106:23, 107:9
**Cruz** [36] - 11:18, 12:6, 19:6, 20:5, 20:23, 28:23, 30:7, 31:4, 45:8, 45:10, 45:14, 46:15, 46:20, 46:22, 47:12, 47:22, 47:25, 48:5, 48:21, 49:15, 49:19, 50:7, 56:2, 61:11, 62:24, 66:9, 67:2, 76:24, 91:4, 97:7, 97:8, 111:16, 112:23, 113:14, 165:1, 165:5
**Cruz-Ortiz** [28] - 11:18, 12:6, 19:6, 20:5, 20:23, 28:23, 45:8, 45:10, 45:14, 46:15, 46:22, 47:12, 47:22, 47:25, 48:5, 49:15, 50:7, 56:2, 61:11, 66:9, 76:24, 91:4, 97:8, 111:16, 112:23, 113:14, 165:1, 165:5
**Cruz-Ortiz's** [1] - 46:20
**Cuban** [1] - 54:5
**culpability** [1] - 163:16
**culpable** [2] - 127:19, 128:8
**cure** [1] - 91:17
**Curito** [3] - 68:25, 69:2, 69:22
**current** [2] - 7:23
**custody** [1] - 45:15
**custom** [1] - 121:2
**cut** [2] - 113:10, 163:25
**cutting** [1] - 16:15
**cuttings** [1] - 16:16
**Cycos** [1] - 30:25

**D**

**D.C** [3] - 23:21, 24:6, 24:8
**damage** [3] - 32:2, 32:8, 112:2
**damaged** [1] - 33:4
**danger** [2] - 170:2, 170:5
**dangerous** [7] - 139:13, 140:2, 140:20, 140:23, 141:18, 145:11, 145:13
**dangerousness** [1] - 145:17
**data** [15] - 17:8, 32:6, 32:15, 34:5, 34:10, 35:5, 35:15, 36:4, 36:14, 36:18, 36:20, 36:25, 37:15, 39:14, 40:8
**database** [1] - 99:12
**DATE** [1] - 178:21
**date** [19] - 34:5, 52:9, 52:25, 53:20, 53:22, 59:3, 61:2, 61:3, 61:5, 61:6, 62:8, 62:18, 63:23, 64:15, 76:1, 80:2, 82:17, 82:18, 174:6
**dates** [5] - 29:11, 35:2, 74:12, 74:13, 75:15
**David** [4] - 28:23, 61:11, 66:9, 84:11
**days** [4] - 65:6, 123:2, 131:18, 157:13
**dead** [1] - 140:18
**deal** [2] - 91:18, 123:2
**dealers** [1] - 111:21
**dealing** [1] - 154:23
**death** [15] - 109:4, 140:18, 141:5, 144:5, 145:23, 146:12, 152:22, 153:6, 160:3, 160:10, 166:3, 167:1, 167:23, 169:9, 176:12
**debate** [1] - 147:11
**December** [4] - 62:9, 62:19, 63:1, 64:14
**decide** [3] - 10:8, 115:2, 171:2
**decided** [1] - 39:12
**decides** [1] - 10:5
**decision** [7] - 102:15, 103:9, 103:14, 103:16, 104:1, 117:6, 131:16
**defect** [3] - 142:20, 143:4, 144:16
**defendant** [110] - 50:3, 50:5, 64:7, 64:22, 65:4, 65:10, 65:18, 65:25, 66:14, 67:16, 68:14, 68:19, 70:22, 72:1, 72:10, 76:2, 76:6, 76:16, 82:4, 83:6, 83:19, 84:24, 85:6, 85:11, 85:12, 85:17, 85:21, 87:1, 87:4, 99:18, 99:19, 101:9, 101:11, 103:1, 104:5, 110:24, 112:6, 113:10, 113:12, 113:15, 114:2, 115:12, 116:6, 117:3, 120:13, 120:16, 120:20, 120:21, 121:21, 123:17, 123:20, 123:24, 124:4, 124:8, 124:15, 124:17, 124:18, 125:23, 125:25, 126:20, 129:11, 129:16, 130:12, 131:3, 132:8, 132:25, 138:19, 140:19, 145:22, 146:12, 147:21, 147:23, 148:9, 148:13, 148:15, 148:23, 151:16, 152:20, 154:4, 154:18, 155:14, 155:19, 155:21, 155:22, 156:4, 156:17, 159:1, 160:2, 161:22, 164:19, 164:21, 164:22, 166:15, 166:23, 167:20, 167:21, 167:24, 168:2, 168:7, 169:1, 169:3, 169:6, 169:8, 169:11, 169:13, 173:20, 174:3, 176:9, 176:17
**Defendant** [3] - 1:8, 103:4, 158:24
**DEFENDANT** [8] - 1:16, 103:10, 103:12, 103:15,

103:18, 103:22, 103:25, 104:3
**DEFENDANTS** [1] - 2:20
**Defendant's** [1] - 153:24
**defendant's** [23] - 49:4, 63:19, 69:23, 73:6, 77:14, 82:1, 109:14, 112:9, 112:13, 116:17, 116:20, 123:12, 132:24, 149:24, 151:15, 153:16, 156:2, 161:3, 161:7, 161:20, 165:17, 168:18
**defendants** [3] - 76:9, 82:12, 139:2
**defendants'** [1] - 41:14
**Defense** [1] - 174:7
**defense** [101] - 76:10, 78:10, 79:3, 93:22, 102:12, 104:12, 104:18, 105:8, 105:15, 105:16, 105:21, 105:22, 105:25, 116:9, 121:25, 122:4, 122:12, 123:3, 123:4, 124:11, 125:15, 126:5, 128:6, 129:7, 129:14, 129:17, 130:11, 130:16, 130:20, 130:23, 131:2, 131:3, 131:7, 131:11, 132:5, 133:11, 133:20, 134:23, 134:25, 135:20, 137:9, 137:22, 138:9, 145:6, 145:21, 145:23, 147:24, 148:12, 149:9, 151:19, 152:4, 152:6, 152:15, 153:2, 153:11, 153:19, 154:21, 156:15, 156:20, 156:22, 158:12, 158:14, 158:18, 158:25, 161:4, 165:19, 167:10, 168:13, 168:25, 169:2, 169:5, 169:6, 169:17, 169:19, 170:10, 170:15, 170:22, 171:4, 171:23, 172:5, 172:10, 172:13, 173:4, 173:15, 173:18, 174:5, 174:18, 174:19, 175:1, 175:3, 175:5, 175:8, 175:9, 175:12, 175:15, 175:17, 175:20, 176:5, 177:21
**defense's** [6] - 119:6, 124:23, 125:10, 125:13, 125:14, 128:14
**defenses** [1] - 173:7
**define** [1] - 118:6
**defined** [3] - 140:24, 141:12, 145:9
**definitely** [1] - 141:16
**definition** [5] - 118:12, 140:22, 141:8, 146:10, 170:19
**definitions** [2] - 119:2, 145:18
**definitive** [1] - 94:25
**degrade** [1] - 21:16
**degree** [59] - 7:1, 118:18, 118:19, 137:23, 138:21, 138:22, 138:23, 139:7, 139:8, 139:10, 139:17, 139:18, 139:20, 139:25, 140:1, 140:3, 140:5, 140:10, 140:16, 141:9, 141:11, 142:5, 142:9, 142:11, 142:24, 143:5, 143:6, 143:11, 143:17, 143:18, 143:23, 143:25, 144:5, 144:10, 144:12, 144:16, 144:20, 144:22, 145:2, 145:4, 145:9, 146:10, 146:18, 146:19, 171:22, 172:3, 172:5, 172:21, 172:22, 173:5, 174:18, 177:11, 177:12
**degrees** [1] - 143:14
**delay** [1] - 55:13
**delete** [4] - 77:22, 120:17, 122:2, 127:1
**deliberating** [2] - 106:2, 108:10
**deliberations** [4] - 106:12, 106:15, 120:18, 121:23
**Delicias** [3] - 31:1, 69:1, 110:23
**delivered** [1] - 54:6
**Delta** [2] - 58:7
**demonstrating** [5] - 140:21, 140:23, 141:18, 145:11, 145:13
**demonstratives** [1] - 176:25
**denied** [3] - 115:13, 117:12, 175:16
**denying** [3] - 122:20, 144:17, 145:3
**Department** [1] - 52:24
**depicted** [3] - 57:9, 77:9, 77:15
**deposited** [1] - 21:9
**depraved** [5] - 139:14, 140:21, 140:23, 141:18, 145:14
**DEPUTY** [1] - 103:2
**deputy** [1] - 23:24
**describe** [2] - 27:10, 121:5
**described** [6] - 27:11, 35:9, 39:7, 46:10, 113:19, 118:8
**describes** [1] - 86:14
**description** [3] - 13:4, 35:11, 140:10
**design** [1] - 143:15
**designated** [2] - 24:3, 31:12
**destroy** [1] - 112:1
**detail** [1] - 91:23
**details** [3] - 113:17, 119:2
**detected** [5] - 17:25, 18:1, 18:15, 19:9, 20:14
**Detective** [13] - 26:16, 26:18, 26:19, 26:22, 26:25, 31:11, 45:13, 47:2, 47:6, 65:4, 67:11, 69:13, 84:23
**detective** [5] - 10:7, 10:18, 23:25, 24:2, 24:17
**detectives** [1] - 10:13
**determine** [10] - 10:13, 12:10, 15:4, 16:4, 16:6, 16:23, 17:7, 81:25, 166:18, 167:11
**determined** [2] - 20:15, 150:13
**determining** [1] - 14:16
**developed** [1] - 34:3
**developmental** [1] - 15:3
**devil** [4] - 86:15, 90:8, 92:9
**dies** [1] - 140:3
**differed** [1] - 113:17
**difference** [6] - 94:25, 96:21, 128:3, 139:23, 161:11, 169:21
**differences** [1] - 95:5
**different** [30] - 6:19, 7:21, 12:9, 12:10, 17:18, 21:11, 21:14, 29:10, 35:24, 37:11, 53:19, 53:20, 54:15, 62:8, 63:24, 64:3, 84:18, 87:11, 97:22, 99:9, 99:13, 101:11, 109:23, 111:3, 111:6, 116:5, 148:2, 167:16, 170:17
**differentiate** [1] - 143:13
**differently** [1] - 76:14
**difficult** [2] - 45:23, 80:7
**dig** [1] - 34:11
**digital** [2] - 32:12, 70:23
**DIRE** [2] - 2:5, 5:16
**direct** [12] - 26:3, 41:12, 42:10, 54:22, 54:25, 73:11, 78:18, 127:19, 146:14, 166:8, 168:5, 169:14
**DIRECT** [4] - 2:6, 2:8, 9:15, 22:8
**directed** [4] - 46:10, 164:14, 164:19, 165:5
**directing** [1] - 80:11
**directions** [1] - 46:5
**directly** [1] - 84:7
**disagreement** [1] - 135:10
**disavow** [2] - 117:6, 131:24
**discarded** [1] - 36:21
**disciplined** [1] - 114:21
**discovered** [1] - 34:2
**Discreto** [8] - 30:7, 48:21, 62:24, 67:2, 68:9, 68:12, 81:16, 83:2
**discuss** [6] - 88:17, 88:18, 107:14, 130:20, 173:6, 174:12
**discussed** [5] - 12:19, 114:18, 129:6, 161:24, 176:4
**discusses** [3] - 132:23, 174:23, 175:2
**discussing** [3] - 91:10, 112:12, 151:25
**Discussion** [4] - 21:19, 88:2, 98:3, 101:19
**discussion** [3] - 90:24, 104:9, 130:13
**disjunctive** [1] - 126:1
**disobedience** [1] - 151:17
**disposed** [1] - 113:13
**dispute** [1] - 155:25
**disputing** [1] - 114:1
**distinct** [1] - 171:7
**distinguish** [1] - 143:6
**distinguishable** [2] - 147:17, 148:11
**distinguishes** [2] - 143:14, 149:20
**DISTRICT** [3] - 1:1, 1:1, 1:10
**district** [4] - 129:14, 129:25, 149:2, 151:4
**District** [8] - 1:22, 1:23, 139:1, 151:5, 151:6, 171:24, 178:22, 178:23
**DIVISION** [1] - 1:2
**Dixon** [1] - 148:5
**DMV** [1] - 52:16
**DNA** [79] - 5:21, 5:22, 6:21, 7:4, 7:14, 7:18, 8:1, 8:11, 8:15, 8:17, 8:19, 9:8, 9:11, 11:14, 11:15, 11:16, 11:17, 11:18, 12:3, 12:5, 13:11, 13:13, 13:14, 13:15, 13:16, 13:18, 13:24, 13:25, 14:1, 14:5, 14:6, 14:8, 14:10, 14:11, 14:13, 14:16, 14:18, 14:19, 14:21, 14:22, 15:1, 15:21, 15:22, 16:2, 16:3, 16:12, 16:18, 16:20, 16:21, 16:24, 17:2, 17:3, 17:9, 17:12, 17:14, 17:15, 17:24, 17:25, 18:3, 18:12, 18:13, 18:16, 18:22, 18:25, 19:8, 19:12, 19:14, 20:2, 20:7, 20:10, 21:7, 21:9, 21:11, 21:13, 21:14, 21:15, 21:16
**Dobbins** [17] - 3:8, 3:19, 4:24, 53:24, 54:21, 55:19, 74:9, 74:22, 75:22, 90:23, 115:4, 117:16, 122:25, 138:7, 146:21, 168:17, 171:8
**DOBBINS** [128] - 1:13, 2:8, 2:9, 3:8, 3:20, 3:25, 22:2,

22:7, 22:9, 27:18, 27:19, 37:1, 37:8, 38:15, 38:16, 39:20, 39:22, 40:24, 41:2, 41:9, 41:18, 42:1, 42:6, 42:13, 42:14, 42:17, 42:22, 43:16, 43:25, 45:4, 45:5, 50:19, 51:3, 54:1, 54:24, 55:2, 55:20, 55:22, 56:16, 56:22, 56:24, 57:15, 57:17, 57:21, 58:3, 59:17, 60:2, 65:1, 65:2, 69:8, 69:17, 69:19, 70:12, 70:17, 71:9, 71:16, 73:12, 74:18, 74:20, 74:24, 75:5, 75:8, 75:10, 75:14, 75:24, 77:7, 78:21, 79:6, 79:23, 79:24, 85:24, 86:2, 86:4, 87:25, 88:3, 91:1, 92:13, 92:18, 92:23, 93:6, 93:12, 98:25, 99:2, 101:17, 101:20, 101:25, 110:8, 117:21, 118:23, 119:1, 119:18, 120:8, 121:4, 121:7, 121:16, 123:8, 135:19, 136:3, 136:16, 137:1, 137:5, 137:8, 137:12, 137:16, 137:18, 137:20, 137:25, 138:3, 138:5, 138:8, 142:22, 143:2, 147:2, 156:8, 162:20, 162:23, 162:25, 164:8, 164:11, 164:13, 164:16, 164:19, 164:25, 165:4, 166:15, 177:11, 178:4, 178:11
**Dobbins'** [1] - 116:24
**Dobbins's** [1] - 177:6
**docketed** [1] - 135:25
**document** [2] - 51:18, 83:11
**done** [7] - 17:11, 24:22, 104:10, 105:25, 107:12, 141:1, 168:16
**donuts** [2] - 4:7, 4:8
**door** [2] - 53:17, 59:1
**dooring** [1] - 146:23
**doors** [2] - 52:7, 52:8
**dot** [3] - 41:11, 42:13, 44:22
**double** [1] - 127:24
**doubt** [4] - 105:18, 115:12, 126:19, 140:18
**down** [13] - 40:11, 70:1, 81:12, 90:13, 107:1, 108:20, 108:21, 110:22, 111:4, 112:17, 114:11, 127:24, 137:25
**downloaded** [1] - 73:2
**dozen** [1] - 25:19
**dozens** [2] - 25:12, 83:16
**draft** [5] - 119:4, 136:8, 147:9, 176:24, 177:5
**drafted** [1] - 121:3
**drafting** [1] - 119:20
**drag** [1] - 125:18
**dragging** [1] - 109:4
**drastic** [1] - 95:5
**draw** [3] - 99:4, 128:1, 171:10
**drawn** [1] - 101:4
**drink** [1] - 55:14
**Drive** [3] - 39:5, 39:18, 41:23
**driven** [1] - 141:3
**drives** [1] - 173:23
**driving** [1] - 64:18
**drop** [1] - 120:22
**dropped** [1] - 135:10
**drove** [1] - 35:24
**drug** [3] - 24:7, 111:20, 127:14
**Drug** [1] - 6:21
**drugs** [2] - 110:20, 111:7
**duck** [1] - 95:3
**due** [5] - 26:18, 32:7, 47:2, 59:1, 116:12
**dues** [1] - 111:3
**duly** [3] - 5:7, 22:5, 103:4
**dump** [1] - 31:23
**dumped** [1] - 39:9
**duress** [84] - 122:16, 123:5, 128:15, 128:16, 128:23, 128:24, 129:1, 129:15, 129:17, 130:1, 130:9, 130:20, 130:23, 131:2, 131:6, 131:11, 131:16, 132:15, 132:16, 132:23, 133:9, 133:20, 134:16, 136:21, 147:5, 147:11, 147:19, 147:24, 148:17, 149:1, 149:4, 149:7, 149:8, 149:19, 150:14, 151:9, 151:20, 152:6, 152:15, 152:18, 152:24, 153:2, 154:11, 155:6, 155:22, 155:23, 156:12, 158:18, 158:25, 159:1, 159:2, 159:19, 160:2, 160:14, 161:15, 164:3, 165:6, 165:9, 165:16, 167:16, 167:19, 168:20, 168:25, 169:6, 170:11, 171:3, 171:22, 172:4, 172:7, 172:10, 172:13, 172:16, 173:2, 173:4, 173:17, 174:5, 174:17, 175:1, 175:6, 175:7, 175:16, 175:21, 176:19
**during** [12] - 57:12, 64:13, 65:9, 68:21, 68:23, 70:5, 71:5, 89:6, 100:2, 121:22, 153:2, 170:5
**duties** [2] - 9:6, 22:20

## E

**early** [2] - 77:22, 106:3
**earning** [1] - 164:17
**easier** [5] - 29:19, 80:1, 105:4, 176:23, 177:4
**east** [1] - 39:9
**East** [3] - 110:25, 111:1, 111:8
**eastbound** [2] - 44:2, 44:19
**Eastern** [1] - 151:5
**Easy** [1] - 140:15
**eat** [1] - 165:7
**Echo** [1] - 51:23
**editing** [1] - 136:14
**edits** [4] - 136:10, 136:22, 147:9, 177:6
**education** [3] - 7:3, 7:4, 7:20
**educational** [1] - 6:24
**effect** [1] - 111:12
**effectuated** [1] - 132:9
**effort** [1] - 114:23
**eight** [1] - 7:19
**eighth** [1] - 11:10
**either** [18] - 24:22, 25:12, 27:11, 34:25, 45:19, 46:5, 77:2, 82:12, 109:4, 111:6, 114:20, 129:18, 146:18, 148:23, 151:16, 157:14, 172:3, 174:19
**El** [5] - 23:5, 110:22, 111:4, 114:11, 152:11
**element** [18] - 110:15, 110:16, 112:4, 112:5, 113:23, 114:25, 117:1, 118:17, 132:23, 135:6, 138:18, 139:20, 139:21, 152:20, 153:15, 155:25, 161:18, 161:19
**elements** [18] - 109:13, 115:18, 115:22, 118:10, 140:17, 141:16, 144:21, 155:23, 160:6, 160:17, 167:7, 167:21, 168:16, 168:20, 168:23, 169:2, 175:6, 176:6
**Elena** [1] - 3:9
**ELENA** [1] - 1:13
**elephant** [1] - 95:3
**elevated** [1] - 69:4
**elevates** [1] - 143:17
**elevating** [3] - 152:7, 156:14, 170:15
**eleventh** [3] - 11:13, 132:9, 132:14
**Eleventh** [9] - 134:15, 149:6, 150:22, 156:11, 158:21, 158:22, 165:25, 169:24, 171:12
**eliminate** [5] - 126:23, 144:12, 144:16, 149:1, 165:24
**eliminated** [1] - 146:21
**eliminates** [1] - 144:19
**ELMO** [9] - 27:18, 38:15, 39:20, 40:24, 45:4, 56:22, 65:1, 79:23, 95:11
**email** [7] - 79:15, 86:22, 176:24, 177:2, 177:3, 177:5, 178:2
**emergency** [1] - 149:11
**emphasize** [1] - 96:21
**emphasized** [1] - 134:4
**employed** [1] - 22:13
**employers** [3] - 88:14, 107:5, 107:15
**encounter** [1] - 43:3
**encountered** [1] - 172:18
**end** [4] - 46:20, 122:20, 156:12, 176:7
**ended** [6] - 39:1, 74:12, 74:14, 75:20, 76:3, 100:9
**enforcement** [6] - 23:18, 24:10, 24:23, 45:11, 94:5, 99:11
**engage** [8] - 125:6, 133:1, 133:4, 150:1, 154:1, 156:4, 161:22, 169:12
**engaged** [7] - 110:17, 111:14, 112:20, 116:2, 118:2, 139:5, 176:9
**engaging** [1] - 141:25
**English** [1] - 74:5
**enjoy** [1] - 102:6
**entails** [1] - 118:13
**enterprise** [18] - 76:6, 77:6, 78:6, 87:22, 92:1, 109:15, 110:13, 110:14, 110:16, 111:7, 111:8, 111:14, 113:25, 116:2, 117:2, 118:2, 137:15, 139:5
**enterprise's** [1] - 115:25
**enters** [5] - 4:5, 55:11, 78:15, 93:18, 105:12
**entertain** [1] - 156:22
**entertaining** [1] - 152:25
**entire** [4] - 6:14, 14:2, 14:9, 51:9
**entitled** [7] - 130:1, 150:14, 152:3, 158:24, 169:4, 170:14, 178:19
**entitlement** [1] - 169:18
**entrance** [6] - 113:24, 114:1, 114:2, 114:5, 116:25, 139:3
**episode** [3] - 131:19, 133:8, 153:11
**Eric** [1] - 62:24
**Erick** [2] - 30:7, 67:2

**errors** [1] - 9:23
**es** [2] - 90:14, 92:19
**escalating** [1] - 114:9
**escape** [5] - 151:21, 160:13, 160:23, 161:18, 162:1
**Escobar** [5] - 31:3, 49:1, 63:11, 67:15, 71:22
**Escobar's** [1] - 49:2
**especially** [4] - 34:1, 72:25, 80:7, 115:19
**essential** [1] - 169:2
**essentially** [5] - 53:11, 75:6, 101:14, 119:14, 153:3
**establish** [7] - 117:25, 145:4, 147:23, 160:3, 168:13, 169:6, 169:17
**established** [2] - 131:12, 168:19
**establishes** [1] - 77:1
**establishing** [3] - 76:12, 77:5, 144:5
**Estamos** [11] - 72:13, 79:10, 79:14, 80:20, 80:23, 81:6, 82:14, 82:21, 83:6, 86:13, 92:4
**et** [2] - 80:10, 107:24
**Evans** [1] - 151:5
**evening** [1] - 104:16
**event** [4] - 69:14, 148:6, 151:17, 167:4
**events** [1] - 116:1
**eventually** [1] - 24:1
**evidence** [113] - 9:24, 10:2, 10:13, 15:10, 15:22, 15:24, 16:7, 16:9, 16:13, 17:14, 18:18, 18:23, 19:21, 19:23, 21:8, 21:9, 28:2, 31:25, 37:2, 37:7, 43:6, 46:8, 47:18, 48:12, 49:17, 50:1, 50:11, 50:20, 51:2, 51:5, 56:17, 56:23, 57:22, 58:2, 60:1, 61:7, 61:17, 62:20, 63:13, 64:11, 65:13, 65:20, 66:17, 66:23, 67:4, 67:21, 69:10, 69:18, 70:13, 70:16, 70:18, 71:10, 71:15, 78:25, 79:5, 106:20, 106:23, 107:10, 107:21, 108:18, 108:23, 108:24, 108:25, 109:1, 109:22, 109:24, 110:2, 115:1, 115:7, 115:8, 115:9, 115:11, 115:14, 115:15, 115:21, 115:24, 116:4, 116:10, 116:17, 116:24, 117:8, 117:12, 125:1, 132:1, 134:11, 148:8, 149:12, 152:20, 154:3, 156:20, 156:25, 157:7, 158:5, 158:9, 159:2, 159:16, 159:18, 160:14, 165:17, 167:20, 168:14, 168:15, 168:20, 169:1, 169:5, 171:5, 175:10, 175:11, 175:14, 176:3, 176:6, 176:12, 176:19
**evidenced** [1] - 53:6
**evidentiary** [2] - 16:10, 17:10
**evil** [2] - 141:1, 141:6
**evincing** [2] - 139:14, 145:12
**exact** [4] - 38:24, 98:2, 128:2, 157:16
**exactly** [5] - 29:16, 80:8, 134:10, 141:17, 145:15
**exam** [1] - 8:8
**examination** [6] - 21:22, 55:18, 78:4, 78:18, 88:8, 93:22
**EXAMINATION** [10] - 2:5, 2:6, 2:8, 2:8, 2:9, 5:16, 9:15, 22:8, 94:1, 99:1
**example** [7] - 15:18, 64:1, 92:21, 97:1, 99:16, 119:24, 173:20
**exams** [1] - 7:9
**exceed** [1] - 7:20
**excellent** [1] - 103:13
**except** [2] - 91:19, 98:16
**exception** [1] - 14:3
**exchange** [1] - 99:12
**exclude** [2] - 19:20, 20:22
**excluded** [5] - 16:5, 19:7, 20:6, 151:19, 160:15
**excluding** [1] - 14:6
**excuse** [2] - 104:13, 176:17
**excused** [4] - 21:24, 89:1, 101:23, 108:13
**Exhibit** [82] - 2:12, 28:9, 28:12, 28:18, 29:21, 30:2, 30:9, 30:18, 31:16, 32:25, 33:11, 34:16, 37:3, 38:22, 39:15, 40:13, 41:3, 46:24, 47:8, 47:18, 47:24, 48:2, 48:7, 48:12, 48:17, 48:22, 49:6, 49:11, 49:17, 50:1, 50:10, 50:21, 51:2, 51:5, 56:18, 56:23, 57:23, 58:2, 58:4, 59:21, 60:1, 60:21, 61:17, 61:20, 62:1, 62:4, 62:20, 63:7, 63:13, 64:11, 65:12, 66:10, 66:17, 66:23, 67:4, 67:10, 67:21, 68:17, 69:10, 69:18, 69:20, 70:13, 70:16, 70:18, 70:24, 71:10, 71:15, 74:18, 78:23, 79:8, 80:12, 81:2, 82:9, 83:10, 84:15, 84:21, 85:9, 85:20, 95:13, 95:14, 97:6, 100:12
**exhibit** [6] - 71:17, 73:23, 80:21, 81:19, 89:23, 97:5
**exhibits** [4] - 2:21, 33:7, 73:13, 90:5
**Exhibits** [2] - 37:6, 79:4
**EXHIBITS** [2] - 2:10, 2:20
**existence** [1] - 115:25
**exits** [5] - 54:12, 73:21, 89:3, 102:9, 108:14
**expanded** [1] - 145:6
**expect** [2] - 18:22, 106:13
**expectation** [1] - 117:4
**expected** [1] - 164:16
**experience** [4] - 23:3, 23:18, 87:21, 116:13
**expert** [3] - 9:7, 9:11, 77:9
**explain** [4] - 16:11, 46:25, 78:9, 106:24
**explained** [1] - 171:13
**exposing** [1] - 45:24
**extended** [2] - 88:25, 172:4
**extensive** [1] - 32:2
**extent** [2] - 165:6, 177:24
**extort** [1] - 110:20
**extortion** [3] - 111:20, 118:13, 118:14
**extra** [2] - 9:6, 177:10
**extract** [1] - 33:5
**extracted** [1] - 153:14
**extracting** [1] - 32:5
**extraction** [2] - 16:19, 32:14
**extractions** [1] - 32:11
**extracts** [1] - 16:20
**extraordinary** [3] - 149:10, 165:22, 166:1
**extrapolate** [2] - 155:3, 172:12
**extras** [1] - 178:9
**extremely** [1] - 169:3
**eye** [1] - 97:13
**eyewitness** [1] - 158:3
**eyewitnesses** [3] - 108:22, 110:3, 164:5
**Ezequiel** [4] - 29:8, 62:15, 66:21, 70:20

## F

**F.2d** [3] - 151:14, 173:6, 174:17
**F.3d** [6] - 129:23, 148:4, 150:11, 158:23, 167:17, 174:14
**face** [4] - 131:14, 148:23, 149:16, 153:5
**Facebook** [36] - 30:8, 56:11, 56:13, 56:14, 57:1, 64:21, 67:23, 68:6, 72:7, 72:13, 72:14, 72:18, 73:6, 75:8, 76:13, 76:24, 77:2, 77:3, 77:14, 77:21, 77:23, 78:2, 79:9, 80:6, 81:6, 81:16, 81:22, 82:1, 82:11, 82:15, 83:2, 83:6, 83:23, 86:13, 87:12, 91:4
**faced** [1] - 128:21
**facial** [13] - 63:23, 64:23, 95:7, 96:5, 96:7, 96:10, 96:12, 96:16, 97:16, 97:18, 97:19, 100:3, 101:14
**facie** [11] - 155:22, 156:2, 158:19, 159:1, 159:16, 160:1, 160:13, 167:14, 167:19, 168:14, 175:5
**facing** [1] - 159:12
**fact** [23] - 13:7, 93:6, 109:12, 112:11, 112:12, 113:9, 114:13, 124:3, 129:14, 131:1, 132:6, 132:22, 133:1, 134:5, 142:9, 146:9, 147:20, 149:2, 154:25, 155:13, 155:15, 157:8, 166:12
**factors** [5] - 21:7, 21:14, 21:17, 100:4, 174:25
**facts** [6] - 151:2, 153:1, 169:10, 169:22, 170:25, 175:21
**fail** [1] - 170:22
**failed** [1] - 109:7
**fair** [3] - 7:13, 91:25, 94:18
**faith** [2] - 134:10, 159:19
**falls** [1] - 122:19
**familiar** [1] - 80:3
**family** [5] - 22:24, 59:14, 88:19, 103:20, 107:15
**far** [12] - 7:20, 19:18, 30:16, 32:17, 32:23, 34:7, 92:24, 104:20, 111:9, 111:10, 113:23, 132:7
**fashion** [2] - 132:16, 144:3
**fast** [1] - 43:11
**fatal** [1] - 148:25
**father** [1] - 14:1
**fault** [2] - 137:8, 138:5
**favor** [1] - 134:20
**favorable** [4] - 110:9, 115:2, 115:8, 115:10
**FBI** [18] - 3:10, 22:14, 22:15, 22:17, 23:8, 23:9, 23:17, 24:5, 24:6, 24:18, 24:23, 25:13, 25:24, 31:9, 31:13, 32:5, 32:12, 99:13
**fear** [5] - 129:20, 160:4, 160:11, 160:20, 170:1
**Fearless** [19] - 28:11, 40:11, 49:10, 65:17, 81:13, 134:1, 155:9, 155:10, 157:5, 157:11, 157:13, 157:17, 160:19, 161:11, 166:9,

167:4, 171:1, 173:22
**feature** [1] - 175:23
**February** [1] - 45:12
**federal** [10] - 24:4, 46:1, 118:15, 129:12, 137:13, 172:13, 172:16, 173:4, 174:20, 175:7
**federally** [1] - 174:18
**fellow** [1] - 95:25
**Ferguson** [9] - 2:7, 3:10, 3:19, 22:3, 22:5, 22:10, 51:4, 79:8, 94:3
**Ferrufino** [1] - 69:3
**few** [6] - 25:16, 78:11, 136:4, 136:13, 155:7, 171:20
**field** [7] - 7:4, 7:24, 8:1, 8:7, 9:7, 24:6, 127:20
**Field** [3] - 22:14, 23:11, 23:14
**fifteenth** [1] - 11:18
**fifth** [3] - 11:7, 113:23, 114:25
**figure** [3] - 29:19, 54:23, 155:2
**figured** [1] - 102:20
**filed** [5] - 122:14, 123:12, 129:9, 135:19, 136:1
**filing** [1] - 123:1
**fill** [1] - 119:15
**filled** [2] - 119:14, 120:6
**filled-in** [1] - 120:6
**final** [1] - 135:12
**finally** [6] - 39:12, 39:23, 87:14, 87:20, 113:23, 170:7
**findings** [2] - 17:10, 171:16
**fine** [3] - 121:16, 143:7, 147:2
**finish** [3] - 4:12, 55:1, 88:9
**finishing** [1] - 55:23
**firearm** [1] - 161:12
**firearms** [1] - 6:21
**first** [57] - 6:6, 6:11, 11:3, 15:3, 16:19, 17:22, 23:11, 26:21, 27:3, 27:13, 49:2, 49:22, 68:23, 76:18, 77:9, 79:7, 84:22, 103:7, 107:17, 107:19, 110:15, 116:16, 118:18, 119:22, 122:4, 123:9, 131:7, 133:18, 137:23, 138:21, 138:22, 139:7, 139:10, 139:17, 139:20, 143:6, 146:18, 146:19, 147:14, 152:19, 155:16, 158:2, 158:4, 158:19, 164:21, 169:1, 170:16, 171:21, 172:3, 172:5, 172:21, 172:22, 173:5, 174:18, 177:22, 178:6
**first-degree** [10] - 118:18, 138:21, 138:22, 139:7, 139:10, 139:17, 143:6, 172:5, 173:5, 174:18
**fits** [1] - 106:24
**five** [11] - 54:14, 73:17, 96:16, 97:20, 98:16, 115:22, 117:1, 167:21, 168:7, 174:25, 175:2
**fixed** [1] - 138:2
**flag** [3] - 51:15, 59:5, 135:15
**flash** [1] - 86:14
**flip** [1] - 51:14
**flipping** [2] - 82:24, 137:21
**floor** [2] - 5:14, 93:24
**FLORIDA** [1] - 1:1
**Florida** [56] - 1:4, 1:15, 1:19, 1:23, 1:24, 7:2, 33:15, 39:5, 39:24, 51:19, 66:4, 68:4, 69:24, 70:2, 112:18, 118:6, 118:14, 118:18, 130:18, 130:21, 130:22, 130:24, 131:1, 131:2, 131:6, 131:10, 138:22, 138:23, 139:1, 139:7, 139:8, 139:23, 140:4, 140:10, 141:12, 141:15, 145:9, 145:16, 149:18, 163:1, 171:16, 171:20, 171:23, 172:3, 172:11, 172:15, 172:17, 172:21, 172:23, 172:24, 173:1, 175:7, 177:7, 177:9, 178:23, 178:24
**fluent** [3] - 47:4, 47:6, 47:7
**fluids** [1] - 12:10
**focus** [3] - 22:22, 76:19, 115:16
**focused** [6] - 22:19, 24:7, 24:14, 26:11, 88:20, 108:5
**focusing** [1] - 113:25
**fodder** [1] - 78:3
**folks** [1] - 108:6
**follow** [4] - 26:19, 106:9, 119:5, 146:20
**follow-up** [1] - 26:19
**followed** [1] - 9:21
**following** [5] - 37:12, 86:12, 91:12, 140:17, 167:21
**follows** [1] - 104:11
**food** [1] - 106:14
**FOR** [2] - 1:13, 1:16
**force** [5] - 22:18, 24:4, 24:6, 24:18, 148:10
**forced** [10] - 131:24, 132:25, 133:3, 149:25, 154:1, 156:4, 159:17, 161:21, 168:1, 169:12
**forcing** [2] - 103:20, 159:23
**foreclose** [1] - 152:19
**foreclosed** [2] - 133:9, 134:16
**forecloses** [3] - 131:16, 161:3, 171:11
**foregoing** [1] - 178:17
**foreign** [9] - 17:24, 18:16, 19:2, 19:14, 20:3, 20:20, 110:17, 111:12, 116:2
**Forensic** [3] - 5:21, 6:5, 6:10
**forensic** [13] - 6:1, 7:2, 7:4, 7:18, 8:11, 9:3, 9:4, 9:6, 9:8, 9:12, 32:6, 32:14, 34:11
**forensics** [1] - 32:12
**foreseeable** [1] - 152:2
**forget** [2] - 4:9, 158:1
**form** [3] - 16:14, 52:23, 87:19
**format** [2] - 70:23, 73:2
**formatting** [1] - 136:10
**former** [1] - 104:24
**Fort** [4] - 39:24, 40:17, 41:13, 52:23
**FORT** [1] - 1:2
**forth** [1] - 125:5
**forward** [1] - 166:25
**foundation** [1] - 169:5
**four** [17] - 13:18, 16:18, 17:5, 20:11, 27:7, 27:12, 35:6, 52:8, 53:3, 53:17, 72:21, 96:12, 97:19, 98:16, 135:12, 168:5, 176:6
**four-door** [1] - 53:17
**four-step** [1] - 16:18
**fourteenth** [1] - 11:17
**fourth** [4] - 11:6, 112:5, 138:18, 154:8
**framed** [1] - 175:21
**Frank** [1] - 59:21
**free** [3] - 54:18, 101:23, 106:12
**freely** [3] - 96:22, 103:17, 104:8
**frenzy** [1] - 113:19
**fresh** [1] - 119:7
**friend** [2] - 75:6, 76:8
**friends** [5] - 77:3, 80:9, 88:19, 103:20, 107:15
**front** [5] - 31:16, 68:12, 104:21, 105:9, 110:4
**full** [4] - 3:22, 114:3, 137:23, 157:3
**fully** [1] - 104:7
**function** [1] - 115:17
**functions** [2] - 6:17, 117:3
**furtherance** [2] - 137:14, 137:15
**future** [1] - 170:1

## G

**gain** [4] - 100:3, 113:24, 114:2, 114:5
**gaining** [3] - 114:1, 116:25, 139:3
**Gamez** [35] - 11:17, 12:5, 19:6, 20:5, 20:23, 28:17, 29:8, 31:2, 45:8, 46:15, 47:23, 48:11, 51:12, 52:12, 53:8, 55:25, 60:13, 61:3, 61:12, 62:7, 62:15, 62:18, 62:25, 63:3, 64:10, 64:12, 66:13, 66:21, 70:20, 110:19, 111:16, 111:21, 112:23, 113:15, 164:8
**Gamez's** [1] - 64:21
**Gamez-Maravilla** [6] - 29:8, 31:2, 48:11, 62:15, 66:21, 70:20
**Gamez-Melendez** [28] - 11:17, 12:5, 19:6, 20:5, 20:23, 28:17, 45:8, 46:15, 47:23, 51:12, 52:12, 53:8, 55:25, 60:13, 61:12, 62:7, 62:18, 62:25, 63:3, 64:10, 64:12, 66:13, 110:19, 111:16, 111:21, 112:23, 113:15, 164:8
**Gang** [4] - 22:18, 22:21, 23:14, 24:1
**gang** [31] - 22:25, 23:2, 24:14, 24:20, 25:9, 25:14, 86:18, 114:12, 130:3, 130:5, 130:8, 130:13, 130:16, 131:14, 131:15, 131:24, 131:25, 132:17, 134:14, 134:20, 148:9, 148:13, 150:16, 150:17, 151:7, 151:17, 152:4, 152:7, 153:9, 162:3
**gang's** [1] - 130:10
**gang-related** [1] - 25:9
**gangs** [6] - 22:22, 22:23, 22:24, 24:10, 24:16
**Garra** [3] - 76:22, 86:13, 86:15
**gateway** [3] - 156:9, 156:14, 170:15
**general** [7] - 37:22, 41:22, 44:10, 109:14, 126:8, 130:7, 152:23
**generalized** [5] - 148:18, 152:22, 157:2, 159:9, 159:10
**generally** [3] - 126:13, 154:22, 166:9
**generate** [4] - 14:16, 14:19, 14:22, 17:3
**generated** [3] - 79:14, 79:16, 99:8
**generation** [1] - 17:5
**generic** [1] - 100:9
**genetic** [1] - 13:25

**genetically** [1] - 14:14
**gentlemen** [7] - 4:6, 54:2, 73:16, 88:5, 102:2, 105:14, 105:24
**Geovanni** [2] - 30:13, 63:17
**Gerson** [27] - 11:12, 11:13, 11:14, 11:15, 12:1, 12:3, 13:1, 17:24, 18:3, 18:10, 18:11, 18:13, 18:21, 19:8, 20:1, 20:16, 34:14, 35:2, 35:6, 38:8, 56:3, 59:13, 60:4, 70:2, 108:23, 109:4, 109:17
**Gerson's** [1] - 70:3
**Gianino** [10] - 26:19, 26:22, 26:25, 31:11, 45:13, 47:2, 47:7, 65:4, 67:11, 69:13
**gist** [1] - 46:12
**given** [20] - 14:14, 15:18, 33:23, 46:1, 46:3, 46:5, 116:13, 117:12, 120:17, 121:18, 121:22, 134:20, 139:11, 146:12, 165:22, 166:1, 172:20, 175:2, 175:4, 175:8
**GLCS** [6] - 30:25, 33:8, 33:13, 33:15, 110:23, 112:18
**goal** [1] - 108:6
**God** [1] - 163:19
**Gohan** [2] - 30:8, 81:14
**gonna** [3] - 16:2, 131:21, 167:11
**Gonzalez** [3] - 110:19, 110:23, 111:15
**Google** [3] - 34:2, 34:19, 36:14
**gory** [1] - 77:15
**governed** [2] - 172:17, 173:1
**government** [61] - 3:7, 3:24, 4:23, 5:1, 9:10, 22:2, 37:2, 37:6, 50:19, 51:2, 56:23, 57:22, 58:2, 59:20, 60:1, 69:9, 69:18, 70:13, 70:16, 71:10, 71:15, 78:20, 78:22, 79:4, 101:25, 102:11, 105:14, 105:24, 108:19, 109:14, 110:9, 110:12, 114:24, 115:2, 115:5, 115:9, 115:10, 115:18, 115:23, 119:13, 123:6, 136:24, 138:18, 138:20, 140:8, 142:16, 143:7, 144:24, 146:13, 153:19, 154:1, 155:24, 158:17, 173:13, 174:6, 174:9, 175:10, 176:18, 177:16, 177:22
**Government** [2] - 5:7, 22:5
**GOVERNMENT** [1] - 1:13
**Government's** [76] - 28:2, 28:8, 28:12, 28:18, 29:5, 29:21, 30:2, 30:9, 30:18, 31:16, 33:11, 34:16, 37:3, 38:22, 39:15, 40:13, 41:3, 46:24, 47:8, 47:18, 47:24, 48:2, 48:7, 48:12, 48:17, 48:22, 49:6, 49:11, 49:17, 50:1, 50:10, 50:20, 51:5, 57:23, 58:4, 59:21, 60:21, 61:7, 61:17, 62:1, 62:4, 62:11, 62:20, 63:7, 63:13, 64:11, 65:12, 66:10, 66:17, 67:4, 67:10, 67:21, 68:17, 69:10, 69:20, 70:13, 70:18, 70:24, 71:10, 71:17, 74:18, 78:22, 79:8, 80:11, 81:1, 81:8, 82:9, 83:10, 84:15, 84:21, 85:9, 95:13, 95:14, 97:5, 98:5, 100:12
**government's** [17] - 4:12, 22:1, 66:23, 101:24, 105:17, 110:7, 119:12, 123:15, 123:16, 124:6, 128:23, 134:13, 135:3, 135:17, 149:19, 149:23, 157:8
**GOVERNMENT'S** [1] - 2:10
**governs** [1] - 173:7
**GPS** [18] - 34:5, 34:10, 35:1, 35:4, 35:15, 35:18, 36:4, 36:14, 36:24, 41:4, 41:5, 41:21, 42:8, 42:23, 43:11, 44:9, 44:16, 113:8
**grab** [1] - 155:16
**Gracie** [2] - 102:25, 136:10
**graffiti** [1] - 33:14
**grafting** [1] - 172:25
**grammar** [1] - 9:22
**Granados** [3] - 29:4, 48:6, 61:21
**grand** [1] - 139:3
**grant** [1] - 134:19
**graphic** [1] - 84:13
**great** [2] - 27:10, 34:7
**green** [4] - 41:11, 44:4, 44:22, 148:24
**greenlit** [5] - 117:7, 122:21, 153:5, 155:12, 157:11
**greeting** [1] - 86:12
**grey** [1] - 55:24
**gross** [1] - 139:22
**grounded** [3] - 160:4, 160:11, 167:23
**group** [24] - 17:20, 18:18, 19:23, 43:7, 72:4, 76:16, 76:21, 82:1, 82:6, 83:12, 83:15, 83:20, 84:14, 84:19, 85:1, 85:12, 85:13, 85:15, 85:18, 86:7, 87:2, 87:8, 87:15
**groups** [2] - 17:19, 24:15
**Guanacos** [1] - 30:25
**guarantee** [1] - 4:18
**guardrails** [2] - 153:21, 154:11
**guess** [17] - 17:18, 90:21, 91:5, 125:16, 127:3, 132:5, 143:10, 144:1, 149:18, 153:15, 154:10, 156:5, 156:13, 158:16, 161:10, 164:1, 165:13
**guidance** [1] - 149:9
**guilt** [1] - 105:18
**guilty** [5] - 60:19, 62:10, 109:5, 115:12, 152:9
**guise** [1] - 162:8
**gun** [1] - 158:6
**guy** [2] - 97:12, 162:16
**guys** [50] - 4:10, 4:13, 4:17, 4:21, 54:4, 54:7, 55:14, 68:3, 76:12, 88:12, 89:1, 102:12, 106:2, 106:7, 106:10, 106:12, 106:13, 106:19, 107:1, 107:13, 107:16, 107:22, 108:5, 108:7, 108:8, 108:10, 108:12, 119:21, 120:24, 121:9, 122:5, 122:10, 122:13, 125:20, 127:25, 135:13, 135:15, 135:18, 136:11, 136:13, 136:24, 138:10, 140:6, 157:18, 176:21, 177:21, 178:3, 178:6, 178:9, 178:10
**GVP** [2] - 139:6, 145:1

## H

**habeas** [1] - 131:8
**hair** [17] - 63:23, 63:24, 64:23, 95:7, 96:5, 96:7, 96:8, 96:10, 96:12, 96:16, 97:2, 97:17, 97:18, 97:19, 100:3, 101:13
**haircut** [2] - 96:9, 96:16
**half** [7] - 13:25, 14:1, 23:19, 146:9, 177:17, 177:19, 177:20
**halfway** [1] - 90:13
**hamstrung** [1] - 176:18
**hand** [4] - 76:22, 103:3, 135:12, 163:13
**handed** [2] - 113:2, 166:7
**handing** [2] - 161:13, 167:5
**handle** [2] - 32:11, 54:18
**hands** [2] - 106:15, 108:6
**hang** [1] - 176:21
**Hang** [1] - 89:18
**hanging** [5] - 43:2, 88:6, 112:18, 155:5, 165:1
**harm** [19] - 148:8, 152:22, 154:8, 156:10, 160:13, 160:23, 161:19, 162:2, 166:4, 166:22, 167:1, 168:4, 168:7, 169:16, 170:1, 170:9, 170:22, 176:13
**hashes** [1] - 86:16
**hat** [1] - 68:9
**hatchback** [1] - 59:2
**hatred** [2] - 141:1, 141:6
**Hayes** [1] - 26:17
**Hayes'** [1] - 26:18
**head** [6] - 3:22, 57:5, 57:7, 63:24, 63:25, 134:3
**headlong** [1] - 167:11
**health** [1] - 26:18
**hear** [4] - 105:1, 119:6, 129:6
**heard** [18] - 23:4, 81:14, 99:15, 99:16, 107:14, 107:18, 107:21, 111:8, 111:14, 112:5, 117:2, 132:1, 134:4, 148:13, 149:13, 167:13, 169:10, 175:24
**hearing** [1] - 170:12
**hearings** [1] - 89:6
**hears** [1] - 163:7
**heart** [1] - 132:13
**heat** [2] - 21:15, 133:15
**held** [5] - 21:19, 88:2, 98:3, 101:19, 171:22
**help** [1] - 45:19
**hereby** [1] - 178:17
**Hernandez** [6] - 129:22, 129:25, 150:9, 150:10, 150:20, 151:1
**herself** [1] - 169:12
**high** [3] - 127:15, 163:2, 170:13
**higher** [1] - 109:18
**highest** [1] - 152:10
**highlight** [5] - 58:22, 79:25, 125:18, 171:11, 176:18
**highlighted** [3] - 34:17, 34:22, 176:8
**himself** [20] - 64:18, 67:24, 99:18, 112:10, 113:21, 116:13, 117:3, 125:5, 148:23, 149:16, 151:7, 152:1, 153:20, 154:2, 154:17, 163:15, 167:25, 170:8, 173:25
**hint** [1] - 101:1
**hired** [3] - 5:25, 6:11, 7:6
**history** [1] - 51:10
**hitting** [1] - 44:1
**hmm** [1] - 124:5
**Hobbs** [1] - 118:13
**hold** [2] - 46:1, 89:25
**holding** [2] - 68:9, 129:17
**Hollywood** [2] - 86:22, 86:24
**home** [4] - 40:9, 88:14,

107:7, 108:8
**homeboy** [9] - 69:3, 69:4, 109:16, 110:24, 114:3, 114:8, 114:14, 116:23, 117:4
**homestretch** [1] - 88:19
**homicide** [5] - 36:16, 36:19, 45:1, 134:3, 154:13
**homicides** [1] - 27:12
**Honor** [63] - 3:8, 3:13, 3:20, 3:25, 4:2, 5:15, 21:23, 22:2, 22:7, 37:1, 50:19, 50:25, 55:20, 56:16, 56:20, 57:15, 57:21, 59:20, 69:8, 70:12, 71:9, 71:13, 75:24, 77:7, 78:21, 87:25, 88:3, 91:1, 92:13, 92:16, 93:25, 98:22, 98:25, 101:20, 101:25, 103:2, 103:10, 103:15, 103:18, 103:25, 105:22, 108:18, 110:5, 110:8, 117:21, 120:4, 130:7, 133:10, 136:3, 138:8, 143:4, 147:2, 150:2, 158:11, 162:20, 165:14, 168:11, 173:16, 174:12, 174:13, 174:24, 175:14, 178:11
**Honor's** [1] - 173:12
**Honorable** [1] - 1:22
**HONORABLE** [1] - 1:10
**hope** [1] - 93:19
**hopefully** [4] - 17:4, 44:14, 55:13, 55:15
**horns** [1] - 86:15
**hosted** [2] - 24:22, 99:12
**hour** [12] - 4:16, 8:8, 43:13, 44:14, 54:24, 55:1, 88:12, 132:9, 132:14, 177:17, 177:19, 177:20
**hours** [2] - 7:19, 107:16
**house** [8] - 7:7, 34:23, 36:22, 38:23, 39:17, 42:24, 43:2, 109:10
**housekeeping** [2] - 3:23, 55:16
**Houston** [2] - 86:18, 174:14
**Howe** [18] - 129:10, 147:15, 147:16, 147:17, 147:18, 147:20, 147:25, 148:2, 148:12, 148:18, 148:21, 149:1, 150:4, 152:19, 152:23, 153:14, 159:9
**Hugo** [16] - 30:1, 41:23, 44:17, 56:8, 56:9, 56:11, 56:14, 57:2, 57:12, 58:14, 58:17, 62:6, 67:8, 68:6, 68:9, 81:22
**Hugo's** [9] - 36:22, 39:4, 39:10, 39:11, 39:18, 40:19, 40:20, 44:7, 44:16
**hugs** [1] - 163:7
**human** [6] - 139:13, 139:14, 140:21, 141:4, 145:10, 145:14
**humidity** [1] - 21:16
**hundred** [1] - 25:16
**hundreds** [2] - 99:9, 99:10
**hunt** [2] - 154:6, 162:7
**hunting** [3] - 112:17, 112:19, 127:16
**hurdle** [2] - 110:10, 176:11
**hurt** [2] - 112:2, 148:24
**Hutchinson** [1] - 151:5

## I

**Ibarra** [1] - 158:20
**ID** [3] - 63:5, 64:10, 67:17
**idea** [4] - 116:23, 116:25, 130:7, 131:14
**identical** [1] - 14:3
**identification** [4] - 50:22, 58:5, 98:19, 109:8
**identifications** [3] - 30:14, 109:21, 110:1
**identified** [21] - 29:18, 34:1, 39:18, 40:5, 41:13, 42:11, 44:7, 44:24, 58:14, 62:18, 64:6, 64:18, 65:18, 67:24, 68:3, 68:21, 69:2, 72:20, 72:21, 101:9, 101:12
**identifies** [2] - 29:11, 64:22
**identify** [11] - 29:16, 61:12, 61:23, 62:25, 65:25, 72:1, 80:9, 96:23, 97:3, 109:7, 147:19
**ignored** [1] - 170:9
**II** [6] - 1:10, 1:22, 6:5, 6:6, 6:12, 9:5
**III** [7] - 5:21, 6:2, 6:5, 6:7, 6:10, 6:12, 9:6
**ill** [2] - 141:1, 141:6
**illegal** [5] - 24:20, 111:22, 148:10, 168:8, 170:8
**illustrate** [1] - 36:10
**ILONA** [2] - 1:21, 178:21
**image** [1] - 85:4
**imagery** [1] - 77:16
**images** [2] - 82:7, 94:20
**imagine** [1] - 145:6
**immediacy** [9] - 149:12, 149:15, 151:18, 153:1, 153:12, 161:14, 166:2, 166:22, 169:25
**immediate** [10] - 147:24, 148:2, 148:8, 149:11, 152:21, 153:23, 160:3, 160:10, 160:19, 170:5
**immediately** [2] - 151:16, 162:15
**imminence** [1] - 159:11
**imminency** [2] - 159:7, 165:21
**imminent** [6] - 145:17, 147:23, 148:2, 167:22, 169:8, 170:3
**imminently** [6] - 139:13, 140:2, 140:20, 140:22, 141:18, 145:11
**impact** [1] - 21:7
**impending** [9] - 152:22, 153:24, 166:2, 166:3, 167:1, 167:22, 169:8, 170:3, 176:12
**important** [6] - 106:18, 106:21, 108:3, 114:12, 116:7, 165:20
**in-house** [1] - 7:7
**inch** [1] - 98:11
**inch-mark** [1] - 98:11
**incident** [2] - 154:23, 173:21
**inclined** [1] - 125:3
**include** [3] - 72:9, 141:13, 146:9
**included** [8] - 16:5, 19:20, 70:6, 111:11, 111:15, 113:11, 135:22, 176:2
**includes** [1] - 118:18
**including** [6] - 33:15, 40:9, 51:12, 113:8, 145:21, 176:1
**inconsistency** [3] - 142:8, 144:25, 147:1
**inconsistent** [3] - 144:11, 144:24, 145:8
**incorporate** [2] - 141:15, 177:6
**incorporated** [2] - 135:21, 136:7
**incorrect** [2] - 59:9, 117:24
**increase** [4] - 109:15, 113:24, 114:7, 114:15
**increasing** [3] - 113:25, 117:1, 139:4
**incriminating** [2] - 45:20, 46:9
**indentation** [1] - 90:15
**indented** [1] - 90:14
**independent** [4] - 6:7, 7:10, 88:23, 108:1
**independently** [1] - 150:24
**index** [1] - 99:11
**indicate** [8] - 13:6, 13:7, 30:23, 30:24, 42:8, 83:21, 166:22
**indicated** [6] - 12:14, 13:9, 37:21, 52:17, 64:15, 84:17
**indicates** [6] - 12:12, 12:16, 44:9, 44:16, 53:9, 141:4
**indicating** [6] - 26:15, 33:12, 34:22, 38:19, 41:21, 42:9
**indicating)** [3] - 40:22, 41:24, 86:10
**indicative** [1] - 42:25
**indictment** [25] - 118:5, 120:12, 120:16, 120:17, 120:19, 121:18, 121:21, 121:22, 138:20, 138:24, 138:25, 139:16, 141:10, 141:24, 141:25, 142:8, 142:20, 143:4, 143:9, 143:19, 144:16, 144:20, 144:23, 146:8, 172:14
**indifference** [1] - 141:4
**individual** [10] - 14:3, 16:3, 16:17, 18:15, 20:10, 26:6, 56:8, 64:18, 81:14, 162:12
**individuals** [15] - 13:18, 13:21, 19:20, 20:5, 21:1, 29:11, 45:18, 46:17, 64:17, 90:24, 91:10, 92:3, 92:6, 94:10, 112:2
**induce** [1] - 167:23
**inflame** [1] - 91:14
**Influenced** [1] - 25:6
**informant** [1] - 29:16
**information** [12] - 19:4, 19:13, 20:4, 20:19, 26:11, 26:14, 27:16, 33:21, 35:2, 36:11, 45:7, 79:12
**informed** [1] - 104:7
**initialed** [3] - 66:22, 67:3, 67:9
**initials** [3] - 64:15, 66:15, 66:16
**injury** [5] - 140:25, 160:4, 160:11, 167:24, 169:9
**inmate** [1] - 129:12
**inner** [1] - 13:15
**insert** [1] - 30:12
**inserted** [2] - 28:16, 30:6
**inside** [1] - 102:3
**Insoportable** [2] - 69:2, 69:22
**instruct** [1] - 66:14
**instructed** [1] - 100:25
**instruction** [77] - 119:7, 119:10, 119:17, 122:12, 122:14, 122:17, 123:5, 123:13, 123:14, 123:23, 124:1, 124:10, 124:14, 124:24, 125:11, 125:19, 126:5, 126:18, 126:22, 128:11, 128:13, 128:24, 130:1, 135:5, 135:21, 135:22, 136:4, 136:21, 137:9, 137:22, 140:5, 140:9, 143:24, 144:12, 145:5, 145:7, 146:13, 146:15, 146:25, 147:19, 147:22, 148:18, 149:2, 149:8,

151:20, 152:6, 152:18, 152:25, 154:18, 155:21, 155:24, 156:1, 156:12, 156:16, 156:19, 156:21, 158:9, 158:25, 159:19, 159:22, 160:15, 164:3, 165:16, 166:6, 166:19, 166:25, 167:8, 167:16, 169:18, 169:22, 170:14, 171:3, 173:2, 175:1, 176:20, 177:7
**instructions** [34] - 99:23, 104:15, 106:1, 106:6, 106:8, 106:25, 118:9, 119:14, 120:12, 123:3, 123:19, 123:22, 124:3, 124:7, 124:12, 134:24, 136:23, 139:11, 140:12, 143:5, 143:7, 144:22, 150:14, 152:3, 160:2, 169:4, 173:19, 175:2, 176:22, 177:9, 178:5, 178:7, 178:10
**instruments** [1] - 15:6
**insufficient** [3] - 108:19, 110:4, 152:23
**intelligent** [1] - 104:6
**intend** [3] - 104:19, 140:1, 154:24
**intent** [14] - 37:13, 139:20, 139:22, 141:2, 141:3, 141:5, 141:7, 143:15, 144:5, 145:22, 146:12, 146:22, 146:23, 146:24
**intention** [1] - 102:21
**intentional** [3] - 126:10, 128:9, 139:21
**intentionally** [17] - 124:17, 125:25, 139:6, 139:10, 139:15, 139:17, 142:2, 142:10, 142:17, 142:24, 143:11, 143:16, 144:8, 144:19, 145:1, 146:16, 146:17
**interesting** [1] - 171:15
**internal** [1] - 15:6
**international** [1] - 116:3
**interpret** [3] - 17:8, 90:11, 126:2
**interpretation** [1] - 17:6
**interpretations** [1] - 9:21
**interpreted** [2] - 19:1, 20:2
**interrogate** [1] - 161:24
**intersection** [1] - 40:21
**interstate** [4] - 110:17, 111:12, 116:2, 116:3
**interview** [18] - 26:20, 26:21, 26:25, 27:13, 27:14, 45:14, 45:16, 47:15, 60:17, 60:18, 65:4, 65:9, 68:14, 68:21, 68:23, 68:24, 71:6, 71:25
**interviewed** [4] - 25:14, 25:20, 27:3, 68:19
**interviews** [2] - 29:16, 33:18
**introduce** [3] - 77:15, 77:16, 174:3
**introduced** [4] - 90:6, 106:24, 110:12, 116:4
**introducing** [1] - 175:11
**introduction** [4] - 119:13, 119:20, 120:7, 120:11
**inventory** [2] - 16:15, 52:23
**investigating** [1] - 24:9
**investigation** [11] - 26:5, 26:9, 31:25, 39:6, 39:25, 40:16, 58:12, 81:21, 82:13, 83:24, 87:21
**investigations** [7] - 24:15, 25:2, 25:10, 25:15, 26:1, 26:10, 32:12
**investigative** [1] - 34:4
**invoked** [1] - 172:13
**involved** [15] - 8:10, 21:5, 26:15, 27:12, 34:8, 46:9, 70:1, 70:2, 111:11, 116:11, 123:18, 130:7, 134:2, 174:4
**involvement** [3] - 70:3, 107:25, 150:8
**irrelevant** [1] - 160:14
**Island** [4] - 39:5, 39:18, 41:23, 42:3
**isolation** [1] - 115:14
**issue** [19] - 52:9, 53:20, 53:22, 59:3, 90:21, 110:5, 124:21, 147:11, 150:7, 150:8, 152:5, 155:6, 155:20, 156:9, 156:15, 167:10, 170:15, 173:10, 174:12
**issues** [5] - 3:23, 135:16, 138:12, 138:13, 149:23
**it'll** [3] - 82:6, 92:19, 104:16
**Item** [10] - 18:4, 18:5, 18:6, 18:7, 18:8, 18:10, 18:20, 19:25, 20:12
**item** [28] - 11:3, 11:4, 11:5, 11:6, 11:7, 11:8, 11:9, 11:10, 11:11, 11:12, 11:13, 11:15, 11:16, 11:17, 11:18, 13:5, 16:13, 16:17, 18:9, 19:20, 20:24, 21:8, 21:9
**items** [27] - 10:2, 10:6, 10:9, 10:10, 10:21, 12:18, 12:21, 13:3, 13:7, 13:10, 15:10, 15:14, 15:16, 15:22, 15:24, 16:7, 16:9, 17:18, 17:22, 17:24, 18:1, 18:2, 18:13, 18:23, 30:21, 47:16
**Items** [1] - 17:20
**itself** [6] - 14:14, 123:23, 133:2, 141:3, 152:18, 176:10

## J

**JA3AJ86E62U061253** [1] - 50:23
**Jackson** [3] - 35:16, 41:4, 43:10
**Jail** [1] - 45:25
**January** [12] - 1:5, 53:23, 64:15, 65:7, 67:19, 68:22, 80:2, 82:18, 82:22, 83:4, 101:12, 178:21
**Jennifer** [6] - 2:4, 3:18, 5:1, 5:7, 5:12, 9:11
**JENNIFER** [1] - 5:12
**Jimmy** [1] - 26:17
**job** [3] - 5:21, 8:9, 94:8
**Joe** [1] - 3:13
**Joel** [5] - 33:20, 33:21, 34:12, 49:19, 72:19
**Johnson** [1] - 167:17
**joined** [3] - 129:18, 130:13, 133:2
**joining** [4] - 23:17, 25:24, 130:3, 150:16
**joins** [1] - 130:8
**JOSEPH** [1] - 1:16
**José** [4] - 29:8, 62:15, 66:21, 70:20
**judge** [6] - 73:8, 85:24, 89:16, 128:25, 173:3, 178:4
**Judge** [13] - 54:1, 74:25, 90:1, 92:18, 123:10, 130:17, 132:20, 135:19, 137:1, 149:22, 152:5, 155:7, 161:13
**JUDGE** [1] - 1:10
**judgment** [3] - 110:11, 115:22, 140:24
**judicial** [1] - 115:16
**Juliet** [1] - 58:7
**Juliette** [2] - 51:23
**jump** [2] - 79:11, 171:1
**June** [5] - 47:9, 68:14, 68:19, 70:22, 71:25
**jurors** [10] - 3:21, 54:6, 71:2, 89:13, 90:9, 90:11, 92:11, 93:16, 105:6, 146:15
**JURY** [1] - 1:9
**jury** [70] - 4:4, 5:18, 12:8, 13:24, 22:12, 26:8, 47:1, 54:3, 54:4, 54:11, 74:4, 74:6, 78:14, 88:5, 88:11, 88:24, 89:15, 89:16, 89:21, 91:14, 93:17, 102:3, 102:8, 104:12, 104:13, 104:21, 104:25, 105:9, 105:11, 105:24, 106:13, 107:22, 108:12, 110:1, 110:4, 115:2, 115:11, 115:17, 118:9, 118:21, 123:19, 123:22, 125:3, 126:2, 126:9, 127:7, 127:17, 135:5, 139:3, 139:11, 140:12, 143:5, 143:6, 144:12, 144:21, 149:4, 152:3, 154:19, 158:10, 158:25, 160:2, 160:15, 167:11, 168:21, 169:1, 171:2, 173:19, 175:11, 177:8
**Jury** [10] - 4:5, 54:12, 55:11, 73:21, 78:15, 89:3, 93:18, 102:9, 105:12, 108:14
**jury's** [1] - 175:1
**justify** [1] - 167:8
**justifying** [1] - 158:15

## K

**karma** [2] - 90:14, 92:19
**keep** [17] - 4:13, 44:1, 77:23, 88:16, 88:20, 91:8, 92:2, 92:3, 99:24, 106:22, 107:2, 107:18, 113:25, 121:17, 128:5, 137:21, 177:21
**keeps** [2] - 76:3, 163:15
**kept** [1] - 77:2
**Kevin** [13] - 11:16, 12:5, 19:5, 20:5, 20:23, 28:17, 47:23, 52:12, 53:8, 55:25, 60:12, 64:9, 66:13
**key** [2] - 141:16, 161:25
**kill** [13] - 109:18, 114:15, 131:22, 140:1, 140:25, 143:15, 148:9, 151:8, 155:1, 157:12, 159:11, 161:25, 162:16
**killed** [9] - 50:8, 113:5, 114:16, 114:20, 127:21, 151:17, 152:16, 153:10, 163:25
**killers** [1] - 35:10
**killing** [9] - 113:10, 131:21, 132:10, 132:14, 139:12, 140:19, 145:10, 152:14, 162:12
**kills** [1] - 114:8
**KIMBERLY** [1] - 1:17
**Kimberly** [1] - 3:14
**kind** [16] - 18:22, 23:7, 24:3, 24:9, 34:21, 41:19, 79:21, 95:7, 128:21, 131:16, 134:12, 150:7, 154:12, 155:9, 155:10, 165:6
**King** [1] - 129:12
**knife** [9] - 113:2, 133:18, 157:24, 157:25, 158:7, 161:13, 163:13, 166:7, 167:6
**knives** [2] - 148:13, 155:8
**knowing** [11] - 115:20,

124:25, 126:21, 139:16, 142:10, 143:16, 144:18, 153:8, 161:23, 161:25, 162:13
**knowingly** [13] - 120:21, 126:3, 137:13, 139:6, 139:9, 139:15, 142:2, 142:17, 142:23, 144:7, 145:1, 146:16, 146:17
**knowledge** [1] - 133:22
**known** [42] - 16:8, 25:14, 25:20, 26:12, 26:22, 28:11, 28:17, 28:23, 29:4, 29:8, 30:1, 30:7, 30:13, 48:1, 48:6, 48:11, 48:16, 48:21, 49:1, 49:10, 49:14, 52:12, 57:11, 61:1, 61:11, 61:21, 62:6, 62:15, 62:24, 63:17, 65:17, 65:24, 66:9, 66:13, 66:21, 67:2, 67:8, 67:15, 69:2, 72:19, 139:2, 155:5
**knows** [5] - 118:9, 132:11, 154:6, 163:19

## L

**LA** [1] - 31:2
**Lab** [4] - 6:16, 6:18, 8:24, 14:10
**lab** [10] - 5:20, 6:5, 6:18, 8:2, 10:10, 10:16, 12:11, 15:1, 15:4, 16:14
**labeled** [1] - 16:17
**Laboratory** [1] - 5:24
**lack** [8] - 108:23, 109:21, 110:1, 143:13, 160:12, 160:22, 161:18, 163:24
**ladies** [7] - 4:6, 54:2, 73:16, 88:5, 102:2, 105:14, 105:24
**LaFleur** [2] - 173:5, 174:17
**lag** [1] - 11:6
**Lancer** [2] - 50:22, 55:24
**land** [1] - 34:1
**language** [9] - 75:12, 125:21, 126:4, 128:2, 128:7, 142:10, 143:9, 145:21, 157:16
**Lara** [3] - 33:20, 33:22, 72:20
**large** [2] - 72:23, 72:25
**largest** [1] - 32:24
**last** [26] - 50:3, 50:5, 50:6, 62:9, 62:19, 63:1, 81:17, 99:3, 106:18, 106:21, 107:2, 107:5, 107:10, 107:12, 108:4, 117:16, 124:15, 125:22, 126:15, 136:4, 137:22, 138:17, 139:12, 173:11, 174:8, 176:24
**last-minute** [1] - 173:11
**lastly** [1] - 116:22
**Latent** [1] - 6:20
**later-taken** [1] - 97:1
**latest** [1] - 147:8
**Latin** [1] - 129:12
**Latino** [2] - 94:22, 94:23
**LAUDERDALE** [1] - 1:2
**Lauderdale** [11] - 34:20, 36:8, 37:17, 37:19, 39:17, 39:24, 40:15, 40:17, 41:13, 52:24, 72:4
**laundering** [2] - 118:15
**law** [67] - 23:17, 24:10, 24:23, 45:11, 94:5, 99:11, 106:1, 106:8, 106:10, 106:25, 109:25, 118:14, 123:13, 129:1, 130:18, 130:21, 130:24, 131:6, 131:11, 132:16, 134:8, 134:13, 134:19, 138:1, 138:22, 138:23, 139:24, 140:10, 141:12, 141:15, 143:12, 145:9, 145:16, 149:18, 152:7, 154:5, 156:6, 166:7, 168:3, 169:14, 170:20, 171:6, 171:16, 171:18, 171:23, 172:1, 172:4, 172:10, 172:11, 172:15, 172:17, 172:21, 172:23, 172:24, 173:1, 173:7, 174:20, 175:7, 175:19, 176:7, 176:15, 177:7, 177:9
**law-governed** [2] - 172:17, 173:1
**lawyers** [7] - 88:21, 102:5, 103:6, 103:8, 106:4, 106:11, 106:23
**lead** [3] - 3:18, 46:11, 117:7
**leadership** [4] - 23:4, 110:22, 111:4, 114:11
**leading** [1] - 43:2
**lean** [1] - 5:10
**learn** [3] - 35:20, 36:6, 94:9
**least** [9] - 7:19, 25:19, 26:14, 76:9, 76:15, 108:7, 112:8, 149:14, 172:7
**leave** [9] - 43:6, 54:8, 73:18, 88:24, 93:6, 102:5, 127:22, 146:2, 178:1
**leaves** [1] - 127:10
**lectern** [1] - 41:1
**led** [5] - 26:12, 26:16, 43:3, 116:15, 125:8
**left** [30] - 11:6, 11:7, 11:9, 11:11, 12:24, 12:25, 13:1, 18:6, 18:7, 18:9, 19:4, 19:13, 19:25, 20:4, 20:12, 21:11, 21:13, 32:17, 32:23, 39:3, 39:7, 43:7, 55:23, 67:25, 86:16, 97:13, 106:1, 173:17
**leg** [10] - 11:4, 11:5, 11:7, 12:23, 12:24, 15:19, 18:4, 18:5, 18:6, 18:7
**legal** [9] - 27:11, 53:6, 69:2, 70:20, 111:22, 154:4, 168:3, 169:13, 170:20
**legally** [2] - 126:11, 127:4
**legitimate** [1] - 159:13
**less** [1] - 149:10
**lessers** [1] - 109:17
**letter** [1] - 26:17
**lettered** [1] - 71:2
**letters** [2] - 57:6, 71:3
**level** [3] - 114:18, 143:15, 171:12
**liable** [1] - 127:12
**life** [10] - 14:2, 63:23, 129:21, 132:12, 139:15, 140:21, 141:4, 145:14, 148:16, 159:13
**light** [5] - 97:19, 110:9, 115:1, 115:8, 148:24
**Lil** [1] - 30:25
**limited** [2] - 46:1, 155:11
**limits** [1] - 144:19
**line** [13] - 99:5, 122:19, 126:16, 126:17, 126:21, 126:23, 128:10, 131:23, 133:12, 134:7, 134:12, 171:21
**lines** [3] - 91:16, 98:12, 137:12
**lineup** [46] - 28:4, 28:6, 28:13, 28:19, 28:25, 29:5, 29:22, 30:3, 30:9, 47:19, 48:3, 48:8, 48:13, 48:18, 48:23, 49:7, 49:11, 60:23, 61:8, 61:18, 62:2, 62:7, 62:21, 63:8, 63:14, 64:1, 66:6, 66:10, 66:18, 66:24, 67:5, 67:12, 71:7, 71:19, 94:18, 94:23, 95:22, 96:25, 97:6, 97:16, 98:6, 98:20, 99:18, 100:10, 100:16, 100:19
**lineups** [12] - 47:16, 63:4, 63:19, 63:21, 68:21, 94:9, 94:10, 94:13, 99:3, 99:10, 99:17, 99:18
**list** [6] - 10:23, 32:20, 75:5, 77:18, 77:20, 80:9
**listed** [18] - 13:10, 30:21, 37:11, 37:16, 38:7, 38:17, 39:4, 39:23, 40:3, 52:11, 53:20, 58:11, 58:15, 58:19, 59:1, 59:12, 76:8, 118:5
**listened** [1] - 70:4
**lists** [1] - 139:2
**literally** [1] - 128:2
**live** [1] - 34:20
**lived** [8] - 36:2, 36:3, 37:21, 38:9, 40:11, 40:12, 41:24, 44:17
**living** [3] - 5:19, 35:21, 60:4
**LLP** [1] - 1:17
**local** [2] - 22:22, 24:23
**Locas** [1] - 69:1
**located** [3] - 21:8, 38:20, 41:11
**location** [7] - 33:24, 34:23, 35:2, 36:17, 39:12, 42:23, 127:9
**locations** [4] - 14:19, 34:8, 35:12, 43:19
**locked** [1] - 4:13
**Locos** [13] - 72:13, 79:10, 79:14, 80:20, 80:23, 81:6, 82:14, 82:21, 83:5, 86:12, 86:23, 86:24, 92:4
**LocosYaEstamos13@gmail.com** [1] - 79:15
**logic** [1] - 146:20
**logistically** [1] - 45:23
**logs** [1] - 32:20
**look** [14] - 9:22, 12:11, 14:18, 43:13, 93:1, 94:18, 95:18, 99:24, 101:11, 119:21, 140:9, 166:18, 171:8, 174:13
**looked** [7] - 78:6, 97:16, 129:8, 150:24, 158:18, 171:18, 175:19
**looking** [38] - 12:9, 14:12, 14:20, 28:15, 32:23, 32:25, 34:18, 39:16, 46:8, 46:13, 50:2, 50:12, 51:6, 57:4, 58:4, 64:3, 67:22, 69:21, 70:19, 71:3, 80:13, 81:3, 84:12, 84:16, 86:5, 86:9, 94:19, 94:20, 109:17, 113:21, 115:8, 115:18, 121:9, 132:3, 133:20, 151:1, 166:5, 168:18
**looks** [3] - 4:12, 4:17, 87:10
**looser** [1] - 26:14
**lose** [1] - 114:22
**loss** [1] - 100:3
**Loudoun** [4] - 23:20, 23:22, 24:2, 25:25
**love** [1] - 129:6
**low** [3] - 169:3, 169:10, 171:12
**lower** [1] - 38:12
**Luis** [2] - 168:24, 170:19
**lump** [1] - 17:19
**lumped** [1] - 17:20
**lunch** [9] - 4:16, 54:8, 54:23, 55:1, 73:17, 88:6, 88:21, 93:20
**lunchtime** [1] - 106:13

**Lupowitz** [1] - 178:21
**LUPOWITZ** [2] - 1:21, 178:21
**Lynch** [1] - 131:10

## M

**M-u-s-k-o-v-s-k-y** [1] - 174:16
**M.D.C.O** [2] - 97:6, 97:21
**Madrid** [2] - 151:24, 151:25
**Mafia** [1] - 22:24
**main** [2] - 122:12, 134:25
**maintain** [7] - 109:15, 113:24, 114:18, 114:23, 117:9, 168:8
**maintaining** [3] - 116:25, 117:1, 139:4
**Major** [1] - 23:25
**majority** [1] - 93:4
**male** [2] - 94:21, 94:22
**males** [4] - 67:25, 94:23, 94:24
**man** [2] - 57:13, 57:14
**manager** [1] - 10:8
**manslaughter** [1] - 139:21
**manufacturer** [1] - 52:4
**map** [4] - 34:19, 36:14, 40:14, 59:19
**maps** [7] - 27:15, 34:13, 36:10, 37:25, 38:3, 58:20, 59:7
**Maps** [1] - 34:2
**Mara** [3] - 33:9, 57:6, 87:18
**Maravilla** [6] - 29:8, 31:2, 48:11, 62:15, 66:21, 70:20
**March** [4] - 5:25, 7:7, 22:16, 52:10
**Mariachi** [3] - 29:4, 48:6, 61:22
**Mariachi's** [1] - 63:4
**marijuana** [7] - 111:2, 111:17, 112:22, 112:24, 112:25, 148:15, 162:9
**mark** [1] - 98:11
**marked** [2] - 2:21, 61:3
**markings** [2] - 98:8, 98:9
**marks** [1] - 35:18
**Martinez** [11] - 30:1, 31:2, 48:16, 56:9, 56:11, 56:14, 57:2, 58:13, 62:6, 67:8, 68:7
**Maryland** [4] - 68:4, 69:1, 69:25, 151:24
**Massachusetts** [1] - 111:10
**matches** [1] - 140:10
**material** [1] - 92:24
**matter** [6] - 3:4, 89:17, 89:20, 127:15, 143:2, 178:19
**McNab** [3] - 35:13, 44:2, 44:20
**mean** [57] - 8:6, 21:10, 22:25, 58:12, 62:4, 74:4, 83:12, 84:7, 91:11, 93:1, 119:15, 119:22, 119:25, 121:15, 126:15, 127:4, 127:5, 128:2, 128:3, 128:21, 131:8, 131:14, 131:23, 132:2, 132:15, 133:4, 133:9, 133:24, 141:16, 143:12, 143:21, 144:6, 144:15, 145:17, 145:23, 149:12, 151:22, 153:10, 153:13, 154:5, 154:6, 154:14, 154:16, 155:1, 156:7, 156:24, 156:25, 157:5, 157:7, 160:25, 161:16, 162:16, 163:19, 170:18, 171:8, 171:10
**meaning** [7] - 7:11, 18:14, 153:1, 156:6, 156:15, 162:10, 162:12
**means** [10] - 74:8, 105:25, 107:10, 111:25, 132:11, 155:5, 157:4, 157:9, 159:10
**media** [5] - 29:15, 80:6, 83:15, 88:23, 107:25
**meet** [5] - 10:12, 10:19, 88:17, 93:12, 176:5
**meeting** [2] - 151:8, 169:21
**meetings** [1] - 89:6
**melee** [1] - 167:3
**Melendez** [29] - 11:17, 12:5, 19:6, 20:5, 20:23, 28:17, 45:8, 46:15, 47:23, 51:12, 52:12, 53:8, 55:25, 60:13, 61:12, 61:23, 62:7, 62:18, 62:25, 63:3, 64:10, 64:12, 66:13, 110:19, 111:16, 111:21, 112:23, 113:15, 164:8
**Melvin** [10] - 11:18, 12:5, 19:6, 20:5, 20:23, 28:23, 61:11, 66:9, 76:24, 91:3
**member** [11] - 30:24, 110:24, 114:3, 129:13, 130:3, 130:12, 150:15, 151:7, 155:8, 162:3, 176:9
**members** [18] - 22:12, 25:14, 25:20, 25:22, 26:8, 27:12, 76:7, 148:9, 148:13, 148:22, 152:8, 152:10, 153:3, 153:8, 155:5, 161:23, 162:1, 162:3
**membership** [4] - 152:24, 154:22, 155:4, 159:10
**meme** [1] - 85:9
**memes** [6] - 76:17, 76:20, 77:4, 77:8, 77:11, 77:17
**memory** [4] - 27:10, 36:4, 134:21, 135:25
**mens** [2] - 154:13, 172:6
**mental** [3] - 154:12, 172:6, 172:8
**mention** [4] - 119:11, 128:19, 146:25, 176:11
**mentioned** [11] - 6:1, 9:1, 13:11, 15:9, 15:11, 15:14, 15:21, 20:23, 124:21, 129:7, 168:11
**mere** [16] - 122:13, 123:1, 123:4, 123:9, 123:14, 123:15, 124:23, 125:1, 125:11, 126:5, 126:17, 126:22, 127:24, 128:4, 128:8, 135:20
**merely** [7] - 76:11, 109:3, 124:25, 125:4, 126:20, 165:8
**message** [6] - 32:20, 83:15, 90:22, 91:2, 93:7, 93:9
**messages** [8] - 82:4, 82:7, 82:12, 83:7, 83:17, 87:12, 91:11, 93:8
**messaging** [1] - 86:14
**messed** [1] - 166:14
**met** [8] - 10:17, 31:12, 35:9, 44:25, 66:3, 144:21, 175:6, 175:22
**method** [2] - 14:19, 15:8
**methodology** [1] - 33:4
**methods** [2] - 7:23, 15:5
**metro** [1] - 23:21
**Miami** [11] - 1:4, 1:15, 1:19, 1:23, 1:24, 22:14, 23:11, 23:14, 25:24, 178:23, 178:24
**mic** [1] - 89:19
**microphone** [1] - 5:9
**middle** [4] - 34:21, 67:24, 83:1, 83:25
**midst** [1] - 157:17
**might** [12] - 69:12, 80:1, 99:4, 100:15, 101:2, 119:21, 119:25, 121:1, 121:2, 131:14, 137:3, 177:4
**Miguel** [2] - 29:4, 61:21
**miles** [1] - 43:13
**military** [1] - 51:25
**millions** [1] - 17:3
**mind** [14] - 4:13, 59:17, 88:20, 99:24, 106:22, 107:2, 108:5, 115:20, 139:14, 140:23, 141:19, 145:14, 149:13, 171:24
**mindful** [2] - 115:7, 115:13
**minds** [1] - 146:15
**mine** [1] - 90:19
**minimum** [2] - 116:19, 117:8
**minor** [2] - 137:6, 176:20
**minute** [3] - 159:4, 173:11, 174:8
**minutes** [5] - 54:14, 73:17, 78:12, 88:12, 136:13
**Miranda** [2] - 45:16, 60:17
**mirrors** [1] - 8:19
**misguide** [1] - 91:14
**mislead** [1] - 127:17
**misstate** [1] - 157:19
**mitigate** [1] - 47:4
**Mitsubishi** [7] - 50:14, 50:22, 51:8, 51:10, 52:5, 53:16, 55:24
**mixed** [1] - 95:1
**mixing** [1] - 94:23
**mixture** [5] - 19:1, 20:2, 20:7, 20:8, 20:9
**mmm-hmm** [1] - 124:5
**model** [2] - 33:3, 33:4
**modify** [1] - 117:22
**modifying** [2] - 142:19
**moment** [13] - 21:18, 71:6, 87:25, 101:17, 102:7, 102:13, 102:17, 102:19, 105:5, 133:15, 135:11, 151:21, 178:3
**Monday** [1] - 166:10
**Monday-morning** [1] - 166:10
**money** [7] - 110:21, 111:1, 111:5, 111:8, 111:17, 118:15
**monitor** [11] - 34:5, 34:11, 35:5, 35:15, 36:14, 36:18, 36:20, 37:15, 39:14, 40:7, 41:5
**monitoring** [1] - 35:1
**Monitoring** [1] - 36:5
**months** [2] - 53:3, 131:18
**months'** [1] - 23:10
**moreover** [1] - 170:4
**morning** [16] - 3:2, 3:3, 3:8, 3:11, 3:13, 3:16, 4:6, 5:5, 5:18, 22:10, 22:11, 106:7, 166:10, 177:24, 178:8, 178:13
**most** [10] - 32:12, 76:19, 107:9, 110:9, 115:2, 115:8, 115:9, 116:14, 166:7, 176:3
**mother** [1] - 14:1
**motion** [4] - 110:10, 115:13, 115:21, 117:11
**motor** [1] - 57:18
**mouth** [1] - 134:1
**move** [31] - 5:9, 31:5, 37:2, 42:2, 42:18, 42:20, 44:13, 44:19, 47:11, 50:20, 56:18, 57:22, 59:21, 69:9, 70:13, 71:10, 71:14, 78:22, 78:25, 79:20, 105:3, 109:18, 134:1, 157:21, 158:6, 161:12, 166:9, 167:4, 173:16
**moved** [3] - 40:10, 42:23,

58:1
**movement** [1] - 37:15
**moves** [2] - 4:22, 165:16
**moving** [9] - 4:11, 28:18, 43:11, 44:5, 48:22, 52:18, 104:20, 113:20, 119:4
**MR** [193] - 2:8, 2:8, 2:9, 3:8, 3:13, 3:20, 3:25, 4:2, 21:23, 22:2, 22:7, 22:9, 27:18, 27:19, 37:1, 37:4, 37:8, 38:15, 38:16, 39:20, 39:22, 40:24, 41:2, 41:9, 41:18, 42:1, 42:6, 42:13, 42:14, 42:17, 42:22, 43:16, 43:25, 45:4, 45:5, 50:19, 50:25, 51:3, 54:1, 54:24, 55:2, 55:20, 55:22, 56:16, 56:20, 56:22, 56:24, 57:15, 57:17, 57:21, 57:25, 58:3, 59:17, 59:23, 60:2, 65:1, 65:2, 69:8, 69:15, 69:17, 69:19, 70:12, 70:14, 70:17, 71:9, 71:13, 71:16, 73:8, 73:12, 73:24, 74:3, 74:8, 74:11, 74:18, 74:20, 74:24, 75:5, 75:8, 75:10, 75:14, 75:15, 75:24, 77:7, 77:20, 78:21, 79:6, 79:23, 79:24, 85:24, 86:2, 86:4, 87:25, 88:3, 89:16, 89:20, 89:23, 90:4, 90:19, 91:1, 91:16, 91:19, 91:22, 92:13, 92:16, 92:18, 92:23, 93:6, 93:12, 93:25, 94:2, 95:11, 95:12, 98:4, 98:22, 98:25, 99:2, 101:17, 101:20, 101:25, 102:17, 102:19, 102:23, 104:20, 105:22, 108:18, 110:8, 117:21, 118:23, 119:1, 119:18, 120:8, 121:4, 121:7, 121:16, 122:1, 122:8, 122:15, 122:19, 123:8, 125:21, 127:1, 133:25, 135:2, 135:5, 135:19, 136:3, 136:16, 137:1, 137:5, 137:8, 137:12, 137:16, 137:18, 137:20, 137:25, 138:3, 138:5, 138:8, 138:11, 138:14, 138:17, 139:25, 140:12, 140:15, 141:21, 141:23, 142:12, 142:14, 142:22, 143:2, 144:9, 146:1, 146:5, 147:2, 147:7, 156:8, 157:20, 157:23, 162:20, 162:23, 162:25, 164:8, 164:11, 164:13, 164:16, 164:19, 164:25, 165:4, 166:15, 177:3, 177:11, 178:4, 178:11
**MS** [46] - 2:5, 2:6, 5:1, 5:15, 5:17, 9:10, 9:14, 9:16, 21:18, 21:20, 57:6, 84:13, 84:17, 85:15, 86:17, 86:20, 120:4, 123:10, 123:12, 124:6, 128:25, 129:4, 129:7, 132:20, 132:22, 133:10, 149:22, 150:7, 150:11, 150:13, 150:21, 151:4, 151:11, 151:13, 155:7, 158:11, 158:17, 159:25, 160:9, 161:17, 167:14, 173:3, 173:10, 174:22, 177:17
**MS-13** [68] - 22:24, 23:3, 23:4, 24:7, 24:14, 24:25, 25:3, 25:17, 25:20, 25:22, 25:23, 26:1, 26:11, 27:12, 30:24, 33:13, 72:3, 76:5, 76:7, 76:16, 86:14, 86:18, 86:24, 87:19, 87:21, 90:25, 92:6, 110:13, 114:24, 116:4, 116:13, 116:23, 117:3, 126:9, 126:13, 130:2, 130:12, 130:14, 131:15, 131:18, 132:2, 132:8, 133:2, 133:6, 133:19, 133:23, 134:18, 139:4, 148:22, 150:15, 151:25, 152:4, 152:8, 152:10, 152:14, 152:24, 153:3, 153:8, 153:20, 154:22, 155:3, 155:5, 155:8, 157:4, 160:23, 161:23, 161:25, 176:10
**multiple** [7] - 24:13, 27:1, 83:14, 108:3, 116:5, 157:8, 175:3
**multiple-day** [1] - 24:13
**Murder** [1] - 120:23
**murder** [106] - 33:20, 33:24, 34:9, 34:14, 35:3, 35:6, 35:10, 36:17, 37:11, 38:17, 39:2, 43:4, 53:4, 56:4, 58:18, 70:2, 70:3, 99:19, 108:22, 109:10, 113:16, 117:17, 118:1, 118:14, 118:18, 118:19, 120:22, 122:7, 127:12, 130:21, 130:22, 130:24, 131:2, 131:4, 131:7, 131:12, 135:5, 137:9, 137:23, 138:14, 138:21, 138:23, 139:6, 139:7, 139:8, 139:10, 139:17, 139:18, 139:20, 139:25, 140:2, 140:3, 140:5, 140:10, 140:16, 141:9, 141:11, 142:2, 142:9, 142:11, 142:24, 142:25, 143:5, 143:6, 143:11, 143:17, 143:18, 143:23, 143:25, 144:6, 144:10, 144:12, 144:16, 144:20, 144:22, 145:2, 145:4, 145:9, 146:11, 146:18, 146:19, 148:22, 151:9, 152:4, 152:9, 152:14, 153:5, 171:22, 172:3, 172:6, 172:12, 172:13, 172:17, 172:21, 172:22, 173:1, 173:5, 173:8, 173:22, 173:23, 174:1, 174:18, 177:7, 177:11
**murder's** [1] - 144:21
**murdered** [3] - 145:1, 152:11, 152:13
**murderers** [1] - 173:23
**murders** [13] - 26:14, 26:15, 27:5, 27:6, 27:9, 33:19, 35:6, 45:20, 46:10, 49:22, 50:4, 76:1, 174:4
**Muskovsky** [1] - 174:16
**must** [12] - 88:22, 115:6, 115:13, 126:19, 140:17, 152:20, 160:2, 167:20, 169:1, 169:6, 170:5, 170:15

## N

**name** [15] - 5:11, 49:2, 53:6, 58:11, 63:11, 66:2, 69:2, 70:20, 72:2, 79:9, 80:16, 81:14, 81:24, 87:19, 92:10
**named** [4] - 26:6, 36:1, 68:24, 132:10
**names** [11] - 27:11, 29:14, 30:21, 64:16, 68:21, 75:10, 75:18, 75:19, 81:20, 82:25, 92:5
**Nancy** [1] - 79:11
**Narcotics** [1] - 24:1
**narcotics** [1] - 24:20
**narrative** [2] - 132:6, 165:24
**Nathan** [4] - 2:7, 3:10, 22:3, 22:5
**national** [3] - 22:23, 99:10, 99:11
**nature** [5] - 91:13, 93:11, 119:9, 141:3, 167:23
**Navarro** [6] - 31:3, 49:1, 49:2, 63:11, 67:15, 71:22
**Navarro-Escobar** [5] - 31:3, 49:1, 63:11, 67:15, 71:22
**Navarro-Escobar's** [1] - 49:2
**NE** [1] - 1:15
**near** [1] - 36:22
**necessarily** [4] - 94:20, 101:5, 142:18, 166:21
**necessary** [7] - 125:20, 133:14, 146:11, 147:24, 168:9, 170:4, 175:22
**necessity** [1] - 147:22
**neck** [5] - 95:25, 96:15, 97:13, 116:16, 133:18
**need** [31] - 17:2, 51:16, 54:6, 54:19, 59:6, 74:23, 75:23, 102:14, 109:16, 109:19, 114:2, 118:12, 120:22, 120:25, 121:1, 121:4, 121:8, 121:10, 121:12, 136:6, 136:13, 143:23, 145:16, 159:24, 161:1, 166:2, 166:18, 177:13, 177:15, 177:20, 178:1
**needed** [3] - 111:18, 118:8, 118:20
**needs** [5] - 74:5, 89:6, 115:18, 144:4, 166:20
**negate** [4] - 171:23, 172:8, 172:16
**negates** [1] - 143:16
**negligence** [13] - 139:22, 153:25, 154:16, 156:2, 156:14, 156:16, 158:15, 159:6, 159:20, 159:22, 161:3, 161:5, 161:7
**negligent** [6] - 132:24, 153:16, 156:18, 160:18, 161:20, 176:8
**negligently** [2] - 167:25, 169:11
**neighborhood** [3] - 22:23, 24:16, 34:19
**neighborhood-based** [2] - 22:23, 24:16
**neighborhoods** [1] - 35:24
**Nelsen** [1] - 84:23
**network** [1] - 99:12
**never** [9] - 88:13, 127:10, 127:11, 129:9, 162:23, 162:25, 163:23, 172:20
**new** [4] - 7:25, 33:4, 52:17
**New** [4] - 31:11, 31:13, 31:19, 66:4
**next** [14] - 4:24, 18:18, 19:23, 22:1, 53:13, 64:15, 101:24, 102:5, 107:12, 112:11, 126:23, 155:11, 157:4, 166:12
**nickname** [2] - 66:2, 71:23
**nicknames** [3] - 29:14, 64:17, 68:1
**night** [7] - 36:21, 37:15, 109:1, 109:19, 109:24, 110:3, 112:20
**nine** [1] - 43:13
**ninth** [1] - 11:11
**Ninth** [2] - 158:20, 174:14
**nits** [1] - 138:10
**NO** [1] - 1:2

**noches** [1] - 86:12
**noise** [1] - 165:24
**none** [2] - 32:20, 160:17
**North** [10] - 1:23, 34:20, 36:7, 37:17, 37:19, 39:17, 40:15, 72:4, 111:9, 178:23
**Northern** [2] - 23:20, 24:7
**Northwest** [3] - 39:24, 41:12, 58:15
**note** [3] - 129:24, 169:24, 170:18
**noted** [2] - 115:5, 148:16
**notepads** [7] - 4:20, 54:9, 73:19, 88:24, 93:23, 102:6, 108:11
**notes** [1] - 149:8
**nothing** [6] - 3:25, 18:15, 88:3, 111:24, 149:10, 161:9
**notice** [3] - 63:23, 113:25, 175:9
**noticed** [1] - 137:20
**November** [2] - 59:4, 80:17
**Number** [1] - 96:7
**number** [15] - 16:17, 16:25, 17:7, 51:21, 58:5, 72:7, 76:7, 76:8, 96:10, 97:5, 97:15, 113:7, 114:19
**numbers** [3] - 36:8, 74:17, 75:11
**numerous** [12] - 23:2, 24:11, 24:22, 40:6, 40:16, 51:11, 87:24, 94:21, 110:12, 113:16, 114:6, 173:19

## O

**o'clock** [3] - 4:15, 88:10, 106:3
**O'Shanter** [1] - 42:3
**Oakland** [1] - 33:24
**oath** [1] - 103:1
**objected** [2] - 89:24, 91:25
**objecting** [1] - 75:19
**objection** [29] - 37:1, 37:4, 50:20, 50:24, 56:16, 56:19, 57:16, 57:22, 57:24, 57:25, 59:20, 59:22, 59:23, 69:14, 70:12, 70:14, 71:9, 71:12, 78:4, 78:11, 79:2, 79:3, 91:17, 91:19, 92:1, 135:20, 136:1, 146:6, 147:4
**objectionable** [1] - 92:23
**objections** [2] - 89:24, 123:12
**objective** [1] - 166:21
**objects** [1] - 121:11
**observe** [1] - 18:12
**observed** [1] - 113:9
**observing** [1] - 7:8
**obtain** [8] - 31:6, 32:19, 33:6, 46:6, 46:8, 50:15, 57:18, 98:13
**obtained** [6] - 31:22, 34:6, 35:4, 45:7, 45:25, 84:14
**obtaining** [2] - 34:5, 45:17
**obviously** [16] - 27:20, 29:10, 33:7, 76:14, 99:17, 106:16, 112:21, 114:18, 118:9, 120:14, 125:7, 132:18, 139:21, 148:25, 149:10, 177:21
**occasion** [1] - 27:3
**occasions** [1] - 27:1
**occur** [1] - 47:9
**occurred** [8] - 33:24, 34:9, 34:10, 35:10, 36:18, 39:3, 40:3, 173:22
**occurs** [1] - 152:14
**OF** [2] - 1:1, 1:4
**offense** [10] - 88:21, 118:11, 119:13, 120:12, 121:5, 121:15, 135:22, 136:4, 160:2
**offenses** [2] - 119:24, 121:11
**offer** [2] - 159:2, 167:20
**offered** [3] - 91:15, 147:18, 172:4
**Office** [19] - 5:20, 5:24, 6:13, 6:16, 6:18, 7:6, 8:24, 22:14, 23:11, 23:14, 23:20, 23:23, 24:3, 25:25, 26:6, 26:13, 36:19, 38:8, 38:20
**OFFICE** [1] - 1:14
**office** [2] - 24:6, 25:12
**officer** [4] - 10:7, 24:6, 24:12, 94:5
**OFFICER** [13] - 4:4, 54:11, 55:5, 73:20, 78:14, 89:2, 89:10, 89:15, 93:17, 102:8, 105:11, 136:15, 178:14
**Official** [2] - 1:21, 178:22
**often** [3] - 23:4, 25:2, 72:4
**Ohio** [1] - 111:11
**old** [6] - 33:3, 35:13, 38:3, 131:6, 171:19, 172:23
**older** [1] - 172:23
**once** [17] - 16:13, 38:23, 40:7, 40:15, 45:15, 66:21, 67:2, 67:8, 68:12, 84:1, 85:15, 86:16, 104:22, 105:1, 107:13, 122:3, 162:14
**Ondina** [1] - 50:3
**one** [128] - 8:23, 9:18, 10:20, 10:23, 13:4, 16:16, 17:20, 18:15, 19:10, 20:9, 20:15, 21:18, 24:13, 25:2, 32:17, 32:22, 33:19, 35:6, 37:25, 38:3, 38:7, 39:20, 47:10, 49:23, 50:7, 52:22, 58:17, 61:24, 62:12, 63:12, 64:5, 65:6, 66:1, 67:16, 69:5, 72:19, 72:21, 73:4, 76:8, 76:9, 77:8, 81:16, 83:2, 86:24, 87:25, 88:18, 89:6, 89:17, 89:18, 89:20, 90:2, 90:4, 90:6, 90:25, 94:21, 96:18, 97:1, 97:3, 97:11, 97:21, 98:9, 98:14, 98:15, 99:24, 100:10, 101:17, 103:22, 106:22, 107:9, 107:19, 109:6, 109:12, 112:15, 114:8, 116:14, 116:16, 118:1, 118:21, 119:11, 120:14, 120:15, 120:16, 120:19, 121:18, 121:21, 122:3, 122:6, 123:14, 126:15, 128:3, 128:21, 129:5, 132:9, 133:18, 133:21, 135:2, 135:9, 139:23, 143:8, 146:3, 146:4, 150:5, 151:3, 151:10, 151:21, 155:16, 156:7, 157:21, 158:2, 158:23, 160:3, 160:10, 160:24, 166:11, 167:21, 169:7, 170:1, 171:7, 171:15, 171:19, 172:14, 174:15, 175:5, 176:21, 176:22, 176:24, 178:1
**one's** [2] - 114:23, 170:1
**ones** [7] - 8:2, 94:15, 109:16, 133:18, 135:1, 161:9, 164:16
**ongoing** [3] - 76:6, 87:21, 110:14
**open** [8] - 4:13, 16:21, 88:20, 100:9, 101:9, 106:22, 107:2, 108:5
**open-ended** [1] - 100:9
**opening** [5] - 76:10, 78:1, 130:11, 137:12, 173:15
**operate** [1] - 23:5
**operated** [4] - 57:11, 82:23, 83:2, 84:1
**operates** [2] - 22:18, 23:2
**operation** [1] - 87:22
**operator** [1] - 80:8
**opinion** [7] - 144:24, 144:25, 147:25, 149:7, 151:6, 161:11
**opportunity** [7] - 151:20, 160:12, 160:22, 161:18, 162:1, 170:7, 170:10
**opposed** [2] - 91:10, 148:18
**opted** [1] - 9:5
**option** [1] - 105:19
**oral** [1] - 7:9
**Order** [1] - 3:1
**order** [12] - 8:20, 14:21, 16:4, 17:3, 52:19, 90:11, 148:10, 155:21, 156:16, 160:1, 168:25, 170:2
**orders** [1] - 129:20
**ordinarily** [1] - 170:3
**ordinary** [1] - 140:24
**organic** [1] - 88:7
**organization** [2] - 129:19, 129:20
**organizational** [1] - 33:15
**Organizations** [1] - 25:6
**organized** [2] - 129:1, 130:8
**origin** [1] - 82:19
**original** [1] - 119:12
**originally** [4] - 38:7, 59:12, 117:19, 124:2
**originating** [2] - 19:1, 20:2
**Ortiz** [28] - 11:18, 12:6, 19:6, 20:5, 20:23, 28:23, 45:8, 45:10, 45:14, 46:15, 46:22, 47:12, 47:22, 47:25, 48:5, 49:15, 50:7, 56:2, 61:11, 66:9, 76:24, 91:4, 97:8, 111:16, 112:23, 113:14, 165:1, 165:5
**Ortiz's** [1] - 46:20
**ourselves** [1] - 119:23
**overall** [2] - 113:17, 152:5
**overcome** [1] - 161:4
**overhaul** [1] - 120:25
**overrule** [1] - 78:4
**overseeing** [2] - 134:2, 158:6
**own** [22] - 7:11, 18:22, 35:25, 39:13, 103:17, 114:21, 116:11, 116:20, 119:21, 132:24, 133:15, 149:14, 149:24, 153:16, 153:24, 156:2, 159:21, 160:21, 161:3, 161:7, 161:20, 166:17
**owner** [6] - 52:17, 53:5, 53:19, 58:11, 80:8
**owners** [1] - 51:12
**ownership** [1] - 51:9

## P

**P-a-r-k-e-r** [1] - 5:13
**p.m** [14] - 1:6, 41:11, 73:21, 78:15, 89:3, 89:11, 89:12, 93:18, 102:9, 105:12, 108:14, 136:18, 136:19, 178:15
**pack** [4] - 100:6, 100:13, 100:22, 101:2
**packet** [1] - 51:7
**Page** [1] - 2:2

**page** [31] - 51:15, 53:13, 58:9, 58:10, 64:21, 68:6, 75:15, 78:2, 79:13, 79:19, 80:21, 81:1, 81:8, 81:9, 81:17, 81:18, 81:22, 82:16, 82:24, 83:11, 85:20, 90:12, 91:2, 92:7, 92:8, 98:8, 120:8, 124:2, 137:22, 138:17
**pages** [8] - 37:12, 52:18, 73:3, 73:24, 81:16, 82:10, 83:2, 83:21
**Pages** [1] - 1:8
**pagination** [2] - 120:10, 137:3
**pain** [1] - 163:8
**pair** [2] - 11:21, 11:22
**Palm** [6] - 36:19, 38:7, 38:20, 38:25, 59:12, 139:1
**pant** [11] - 11:3, 11:5, 11:6, 11:7, 12:23, 12:24, 15:19, 18:4, 18:5, 18:6, 18:7
**pants** [3] - 11:21, 11:22
**paperwork** [1] - 40:4
**paragraph** [6] - 121:17, 124:15, 125:22, 125:23, 137:23, 139:12
**paragraphs** [1] - 136:4
**parameters** [1] - 46:12
**parents** [1] - 14:15
**Park** [1] - 33:24
**park** [2] - 35:13, 40:18
**Parker** [9] - 2:4, 3:18, 5:2, 5:4, 5:5, 5:7, 5:12, 5:18, 9:11
**parking** [1] - 39:11
**part** [18] - 8:9, 25:14, 32:25, 35:8, 72:4, 75:19, 84:19, 94:8, 110:24, 119:20, 127:8, 129:13, 141:14, 146:13, 149:18, 153:20, 163:16, 167:12
**partial** [2] - 29:14, 81:23
**participant** [5] - 123:20, 124:8, 124:25, 126:20, 126:25
**participants** [3] - 27:9, 35:21, 99:19
**participate** [24] - 26:21, 45:13, 45:19, 113:16, 114:14, 114:15, 114:20, 117:5, 128:20, 131:25, 137:13, 148:23, 149:16, 152:12, 153:4, 154:25, 155:13, 158:1, 163:4, 163:12, 163:25, 164:2, 165:12, 166:23
**participated** [8] - 25:10, 109:2, 112:6, 123:18, 124:18, 126:1, 126:12, 163:9
**participating** [7] - 27:5, 117:10, 130:9, 133:22, 164:20, 165:15, 176:16
**participation** [3] - 127:19, 153:9, 163:24
**particular** [7] - 32:15, 32:17, 92:7, 92:8, 132:14, 141:14, 153:5
**particularly** [1] - 123:23
**partner** [1] - 24:24
**parts** [2] - 74:22, 104:22
**party** [2] - 8:19, 170:4
**pass** [2] - 8:18, 8:21
**passed** [1] - 8:23
**passions** [1] - 91:14
**past** [1] - 55:17
**path** [2] - 37:14, 38:24
**pathology** [1] - 9:12
**patience** [1] - 55:16
**patrol** [2] - 23:24, 24:12
**pattern** [10] - 117:25, 121:9, 122:17, 123:19, 124:1, 124:7, 128:17, 141:20, 143:5, 145:15
**pause** [2] - 42:4, 42:18
**paused** [5] - 41:17, 42:5, 42:21, 43:20, 45:3
**pay** [1] - 111:24
**PBSO** [1] - 38:7
**PCR** [3] - 14:12, 14:19, 15:12
**PDF** [1] - 73:2
**penitentiary** [1] - 129:12
**people** [19] - 16:8, 20:22, 29:13, 29:18, 46:14, 74:14, 77:23, 81:10, 83:8, 83:16, 83:21, 95:1, 95:6, 110:20, 134:4, 157:3, 158:7, 164:20, 164:23
**percent** [1] - 9:18
**perfect** [2] - 55:1, 93:14
**perform** [2] - 6:17, 7:14
**performed** [2] - 8:10, 169:7
**perhaps** [5] - 108:3, 126:9, 126:12, 143:17, 176:22
**period** [3] - 41:6, 75:17, 107:13
**permission** [2] - 31:6, 114:10
**permit** [1] - 152:24
**permitted** [1] - 7:13
**perpetrated** [2] - 139:13, 145:10
**perro** [1] - 92:25
**person** [17] - 13:14, 14:17, 58:13, 64:3, 64:22, 70:6, 94:25, 96:22, 96:23, 100:10, 124:16, 125:24, 129:17, 134:3, 140:1, 140:3, 140:24
**personally** [3] - 8:10, 10:15, 13:22
**persons** [1] - 68:20
**perspective** [1] - 125:15
**pertain** [1] - 8:2
**pertained** [1] - 82:13
**pesado** [2] - 90:14, 92:20
**petitioner** [1] - 151:6
**phase** [3] - 106:18, 107:3, 108:4
**phases** [1] - 107:5
**phone** [16] - 32:11, 32:15, 32:17, 32:18, 32:22, 32:24, 33:3, 33:4, 33:6, 33:9, 46:2, 46:3, 46:7, 47:10, 70:8, 70:23
**phones** [10] - 31:7, 31:10, 31:14, 31:19, 31:21, 31:24, 32:1, 32:6, 32:7, 33:11
**Photo** [1] - 99:4
**photo** [32] - 28:4, 47:25, 50:13, 60:23, 60:25, 61:8, 61:13, 61:18, 62:2, 62:7, 63:3, 63:22, 64:1, 64:19, 64:20, 66:6, 66:18, 67:23, 68:21, 70:21, 71:4, 71:6, 72:1, 80:14, 80:25, 84:7, 94:23, 96:25, 98:12, 100:10, 101:6, 101:12
**photograph** [20] - 28:9, 28:15, 28:16, 28:21, 29:2, 29:3, 30:11, 30:12, 47:21, 48:5, 48:15, 48:25, 49:13, 49:18, 63:19, 63:20, 68:5, 81:3, 97:1, 98:10
**photographer** [1] - 28:10
**photographic** [7] - 28:6, 47:16, 71:7, 94:10, 94:12, 94:18, 100:16
**photographs** [18] - 27:15, 28:3, 31:18, 32:19, 33:7, 49:15, 57:10, 65:10, 65:14, 65:21, 68:15, 68:18, 69:5, 70:25, 77:13, 80:9, 94:19, 98:14
**photos** [12] - 16:16, 33:5, 65:10, 70:7, 85:16, 99:7, 99:10, 99:13, 99:15, 99:22, 99:25, 107:24
**phrase** [2] - 164:9, 164:11
**phrased** [1] - 143:3
**pick** [8] - 31:9, 89:7, 91:24, 96:22, 99:7, 99:15, 141:23, 178:2
**picture** [19] - 28:22, 30:5, 30:6, 30:11, 57:1, 64:5, 64:24, 68:8, 69:21, 70:7, 81:5, 85:16, 92:4, 95:18, 95:22, 95:25, 97:12, 97:25, 98:16
**pictures** [8] - 16:16, 32:24, 33:12, 33:13, 64:9, 80:17, 95:2, 100:11
**piece** [5] - 33:3, 113:4, 163:22, 166:21, 177:10
**pieces** [1] - 33:3
**pink** [1] - 12:15
**Pino** [1] - 158:20
**place** [6] - 29:25, 128:10, 162:22, 169:11, 170:16, 171:9
**placed** [6] - 16:16, 28:9, 66:16, 151:7, 152:1, 167:25
**places** [2] - 14:8, 114:10
**plain** [1] - 96:19
**plan** [4] - 102:5, 161:23, 161:24, 177:15
**planning** [1] - 54:21
**play** [5] - 42:15, 43:14, 44:1, 108:24, 149:23
**played** [1] - 46:21
**plead** [1] - 62:10
**pleasure** [1] - 104:23
**pled** [1] - 60:18
**plenty** [2] - 143:12, 176:3
**plot** [2] - 34:1, 35:8
**plug** [1] - 119:22
**plugged** [1] - 121:9
**plus** [1] - 108:24
**point** [37] - 34:2, 34:25, 36:17, 40:2, 43:4, 50:15, 53:25, 57:18, 58:17, 70:5, 73:1, 78:7, 91:5, 91:25, 93:9, 100:10, 102:21, 113:1, 116:24, 124:20, 125:18, 127:15, 131:13, 145:5, 145:20, 146:22, 149:7, 150:25, 153:18, 154:10, 157:21, 165:23, 166:20, 167:2, 168:22, 174:22, 175:19
**pointed** [9] - 34:8, 35:12, 35:25, 36:1, 36:2, 36:13, 40:1, 116:9, 153:16
**pointing** [3] - 35:11, 154:11, 157:9
**points** [3] - 33:9, 107:9, 128:20
**Police** [1] - 52:24
**police** [2] - 29:15, 39:1
**pool** [2] - 111:1, 111:17
**pooling** [1] - 111:5
**popular** [1] - 86:13
**Portillo** [21] - 11:12, 11:13, 11:14, 11:16, 12:1, 12:3, 13:2, 17:25, 18:3, 18:10, 18:11, 18:13, 18:21, 19:8, 20:1, 20:16, 34:14, 35:3, 56:3, 60:4, 70:2
**portion** [3] - 34:22, 171:11, 173:21
**portions** [2] - 46:21, 74:10

**position** [18] - 8:2, 24:5, 28:10, 28:22, 29:3, 29:7, 29:25, 63:10, 63:16, 64:2, 104:12, 109:15, 113:24, 114:1, 117:1, 139:4, 151:7, 152:1
**possession** [1] - 31:15
**possibilities** [1] - 21:12
**possible** [4] - 12:12, 12:16, 13:6, 31:23
**possibly** [2] - 113:4, 163:2
**post** [3] - 45:16, 60:17, 74:14
**post-Miranda** [2] - 45:16, 60:17
**posted** [6] - 84:2, 84:5, 87:5, 87:10, 93:7
**posting** [5] - 83:19, 83:22, 83:24, 107:25
**posts** [2] - 73:25, 74:12
**potential** [1] - 112:12
**potentially** [3] - 116:10, 173:16, 175:13
**Power** [6] - 49:1, 63:11, 67:15, 68:10, 81:24, 82:16
**power** [1] - 71:24
**practice** [3] - 7:8, 15:7, 178:4
**precluded** [3] - 129:14, 143:8, 175:10
**predicate** [1] - 78:8
**prefer** [1] - 104:24
**preferable** [1] - 98:1
**prejudice** [1] - 91:8
**prejudicial** [1] - 90:7
**preliminary** [1] - 14:12
**premeditated** [2] - 142:4, 143:15
**premeditation** [3] - 139:23, 143:2, 143:13
**preparation** [1] - 47:14
**prepare** [17] - 28:13, 28:19, 28:25, 29:5, 29:22, 30:2, 30:9, 47:19, 48:3, 48:7, 48:13, 48:17, 48:23, 49:6, 49:11, 104:17, 175:17
**prepared** [2] - 28:5, 28:6
**preponderance** [2] - 152:20, 176:6
**presence** [22] - 12:12, 12:16, 13:6, 13:8, 13:9, 46:4, 104:13, 122:13, 123:2, 123:4, 123:9, 123:14, 123:15, 124:23, 125:11, 126:5, 126:17, 126:22, 127:24, 128:4, 135:20, 147:23
**present** [23] - 3:9, 3:15, 12:10, 47:2, 47:4, 73:1, 76:11, 109:3, 123:24, 124:4, 124:19, 125:4, 126:4, 152:21, 158:24, 165:8, 167:22, 169:8, 169:18, 170:4, 170:14, 175:14
**presentation** [1] - 174:9
**presented** [8] - 96:24, 106:20, 108:19, 159:2, 169:4, 175:5, 175:8, 175:18
**presenting** [2] - 173:14, 175:1
**preserved** [3] - 134:18, 147:4, 172:19
**pressure** [1] - 116:12
**presumably** [1] - 117:18
**presumptive** [4] - 12:11, 12:16, 12:22, 13:9
**pretrial** [2] - 40:4, 159:2
**pretty** [7] - 32:11, 37:22, 119:25, 156:21, 156:24, 171:25, 172:22
**preview** [1] - 4:17
**previously** [7] - 9:7, 15:10, 20:23, 31:14, 43:18, 150:9, 175:2
**prima** [11] - 155:22, 156:2, 158:19, 159:1, 159:16, 160:1, 160:13, 167:14, 167:19, 168:14, 175:5
**primarily** [4] - 69:25, 86:5, 86:9, 91:11
**print** [4] - 119:7, 122:6, 135:12, 178:9
**printed** [2] - 147:11, 178:7
**Prints** [1] - 6:20
**prison** [8] - 26:18, 34:6, 35:23, 40:2, 45:24, 129:13, 148:8, 152:10
**proactively** [1] - 45:19
**probable** [1] - 168:1
**probative** [3] - 78:5, 90:5, 90:7
**problem** [18] - 75:12, 90:6, 92:3, 92:13, 93:2, 118:3, 127:3, 133:20, 139:16, 147:16, 147:25, 157:3, 157:15, 162:20, 166:13, 172:11, 172:23, 177:8
**problematic** [1] - 176:11
**procedure** [5] - 15:3, 15:5, 15:9, 15:10, 17:12
**procedures** [2] - 8:10, 15:1
**proceed** [3] - 9:13, 22:6, 117:15
**proceedings** [1] - 178:18
**process** [1] - 16:18
**produce** [2] - 17:12, 169:1
**producing** [1] - 175:10
**professional** [1] - 7:17
**proffer** [4] - 64:13, 74:21, 75:22, 169:1
**proficiency** [3] - 8:15, 8:18, 8:22
**proficient** [1] - 15:7
**profile** [25] - 13:16, 14:2, 14:16, 14:19, 14:22, 16:2, 16:3, 17:4, 17:5, 17:6, 17:25, 18:12, 18:13, 18:14, 18:22, 18:24, 18:25, 19:5, 19:14, 20:4, 20:10, 80:17, 81:5, 92:4
**profiles** [4] - 16:4, 17:12, 17:14, 17:15
**program** [4] - 7:7, 110:25, 111:1, 111:9
**promise** [1] - 4:8
**promised** [1] - 106:17
**promoted** [2] - 6:12, 23:24
**prompt** [2] - 105:8, 105:15
**proof** [5] - 123:24, 124:17, 124:18, 125:24, 159:2
**properly** [3] - 142:9, 144:15, 144:22
**property** [2] - 112:1, 112:2
**proposal** [1] - 135:4
**propose** [1] - 129:9
**proposed** [7] - 119:6, 123:13, 123:22, 124:24, 135:5, 135:21, 136:2
**proposition** [1] - 150:4
**prosecutions** [1] - 25:1
**prosecutorial** [1] - 24:25
**prosecutorial-related** [1] - 24:25
**protect** [2] - 111:25, 113:20
**protection** [1] - 111:23
**protocols** [1] - 9:21
**prove** [13] - 105:18, 109:14, 115:18, 115:23, 118:10, 124:1, 138:18, 140:16, 140:17, 146:11, 152:20, 169:2, 170:15
**provide** [5] - 31:20, 106:14, 168:14, 168:15
**provided** [5] - 29:14, 31:22, 115:1, 124:2, 124:3
**proximity** [1] - 37:13
**prudent** [1] - 171:6
**published** [5] - 41:8, 41:25, 42:16, 43:15, 43:24
**pull** [6] - 73:5, 82:4, 128:17, 128:24, 139:19, 140:4
**pulled** [1] - 129:2
**pulling** [1] - 140:7
**punishment** [1] - 121:13
**purchase** [2] - 111:2, 111:18
**purchasing** [1] - 111:6
**purported** [1] - 161:5
**purpose** [3] - 77:5, 109:14, 139:3
**purposes** [2] - 54:21, 115:24
**push** [3] - 54:7, 134:12
**pushes** [1] - 134:7
**put** [48] - 28:22, 29:3, 37:20, 48:10, 48:15, 48:20, 48:25, 49:9, 49:13, 51:15, 59:5, 60:25, 61:10, 61:20, 62:4, 62:14, 62:23, 63:10, 65:16, 65:23, 66:8, 66:12, 66:14, 66:20, 67:1, 67:7, 67:14, 71:21, 74:5, 102:25, 105:17, 108:6, 108:11, 108:24, 112:10, 114:23, 119:1, 121:20, 121:23, 138:18, 145:6, 145:24, 153:20, 154:2, 154:17, 155:6, 171:16
**putting** [7] - 52:22, 114:9, 133:5, 155:4, 160:17, 161:15, 173:25

## Q

**qualified** [3] - 8:17, 8:21, 9:19
**qualify** [2] - 126:16, 148:1
**quality** [1] - 15:25
**Quantico** [2] - 23:9
**quantitation** [1] - 16:23
**quarterback** [1] - 166:10
**questionable** [3] - 109:2, 109:20, 109:25
**questioning** [1] - 99:5
**questions** [6] - 21:20, 21:23, 78:8, 78:11, 86:2, 101:20
**quick** [2] - 119:25, 136:10
**quickly** [1] - 73:18
**Quinteros** [2] - 81:23, 82:15
**quite** [9] - 25:16, 47:6, 63:24, 97:2, 112:13, 125:1, 147:12, 147:17, 169:10
**quote** [4] - 129:24, 147:21, 148:12, 169:3
**quoting** [1] - 141:17

## R

**rabbit** [1] - 95:2
**racket** [1] - 111:23
**Racketeer** [1] - 25:6
**racketeering** [15] - 111:15, 116:4, 117:17, 117:25, 118:1, 118:2, 118:4, 120:23, 122:7, 135:6, 137:10, 138:15, 139:5, 142:1
**Racketeering** [1] - 25:8
**raise** [2] - 103:2, 175:21

**raised** [8] - 131:2, 147:14, 173:15, 173:17, 174:6, 174:20, 174:24, 175:23
**random** [3] - 92:8, 138:2, 138:3
**Ranfla** [1] - 114:10
**range** [1] - 24:14
**ranking** [1] - 152:10
**Raton** [3] - 35:8, 38:18, 39:2
**rea** [2] - 154:13, 172:6
**reach** [2] - 46:14, 46:18
**reached** [1] - 26:17
**reaches** [1] - 15:4
**reaction** [1] - 14:12
**read** [30] - 51:21, 51:25, 58:5, 71:2, 79:22, 90:10, 90:16, 90:18, 90:21, 91:2, 91:13, 106:9, 119:8, 122:5, 124:13, 126:9, 132:18, 135:13, 149:20, 153:8, 160:7, 160:16, 161:1, 161:6, 161:9, 167:15, 168:23, 169:20, 178:4, 178:9
**reading** [4] - 92:11, 93:4, 132:22, 147:17
**readings** [1] - 7:9
**ready** [8] - 22:6, 55:8, 55:19, 104:15, 105:7, 106:5, 106:6, 178:7
**real** [1] - 15:8
**realidad** [2] - 92:24, 92:25
**realize** [2] - 162:14, 167:15
**really** [33] - 4:11, 5:9, 21:12, 81:9, 91:9, 91:11, 91:15, 91:22, 92:9, 93:1, 108:4, 109:1, 109:17, 111:25, 115:15, 115:16, 120:25, 121:10, 125:13, 127:5, 133:14, 134:22, 143:13, 145:12, 157:2, 161:17, 163:6, 163:23, 165:9, 166:24, 167:4, 167:8, 173:13
**reason** [6] - 92:2, 117:21, 127:10, 133:6, 152:25, 164:22
**reasonable** [15] - 105:18, 115:12, 126:19, 140:18, 154:4, 160:12, 160:22, 161:18, 162:1, 168:2, 169:13, 170:7, 170:9, 170:20, 176:15
**reasonably** [5] - 115:11, 140:25, 148:15, 152:2, 168:5
**reasons** [2] - 117:11, 175:3
**rebuild** [1] - 32:7
**rebuilding** [1] - 32:18
**rebuilt** [1] - 33:2
**rebut** [4] - 158:12, 174:5, 175:12, 176:19
**rebutted** [2] - 156:13
**rebutting** [1] - 175:14
**receipt** [1] - 52:23
**receive** [9] - 9:24, 16:13, 23:7, 24:9, 24:19, 77:3, 82:6, 130:23, 158:25
**received** [24] - 7:3, 11:3, 11:20, 13:18, 17:15, 19:19, 37:6, 51:2, 56:23, 58:2, 60:1, 69:18, 70:16, 71:15, 72:23, 79:4, 82:12, 85:18, 85:19, 85:21, 85:22, 87:2, 87:3, 87:6
**Received** [1] - 2:12
**receives** [1] - 76:21
**receiving** [10] - 13:11, 76:17, 76:19, 78:1, 83:17, 84:25, 85:2, 86:7, 87:8, 87:14
**recent** [2] - 98:12, 116:14
**recess** [1] - 89:9
**recessed** [4] - 55:6, 89:11, 136:18, 178:15
**recharge** [1] - 108:9
**reckless** [16] - 132:24, 133:2, 134:17, 150:8, 153:16, 156:3, 156:14, 156:18, 158:15, 159:6, 160:18, 161:3, 161:20, 167:10, 176:8
**recklessly** [4] - 152:1, 167:25, 169:11, 173:25
**recklessness** [3] - 153:25, 154:17, 156:16
**recognize** [8] - 31:18, 34:18, 71:17, 100:1, 100:6, 100:9, 100:18, 101:1
**recognized** [3] - 67:25, 162:10, 162:11
**recognizes** [1] - 162:15
**recollection** [7] - 51:11, 141:2, 149:11, 149:14, 149:17, 162:4, 166:10
**record** [34] - 5:11, 10:24, 21:19, 51:22, 55:7, 82:8, 88:2, 89:12, 98:3, 101:19, 109:1, 117:8, 117:13, 136:1, 136:19, 136:20, 153:14, 156:20, 157:1, 157:23, 159:17, 159:18, 160:25, 161:9, 162:10, 162:18, 162:19, 165:25, 166:5, 166:25, 170:13, 170:23, 171:16, 176:3
**recorded** [3] - 45:16, 45:22, 46:2
**recording** [4] - 35:17, 70:4, 70:5, 99:16
**recordings** [1] - 116:21
**records** [6] - 50:16, 50:21, 51:8, 52:17, 52:20, 57:19
**recover** [2] - 33:21, 33:25
**recoverable** [1] - 32:21
**recovered** [3] - 31:14, 31:19, 32:15
**recovering** [1] - 34:12
**red** [5] - 14:6, 30:22, 56:5, 56:6, 57:11
**redact** [3] - 92:11, 93:7, 93:13
**redacted** [5] - 91:17, 92:15, 92:20, 93:5, 173:21
**redaction** [3] - 91:6, 92:2, 93:3
**reddish** [2] - 12:14, 13:5
**reddish-brown** [2] - 12:14, 13:5
**redirect** [2] - 46:21, 98:24
**REDIRECT** [2] - 2:9, 99:1
**refer** [2] - 120:18, 121:22
**reference** [3] - 87:18, 140:15, 145:2
**referenced** [1] - 84:7
**references** [2] - 93:10, 143:19
**referencing** [3] - 71:4, 86:20, 91:12
**reflected** [3] - 77:10, 82:5, 82:8
**reflects** [1] - 51:11
**reformatting** [1] - 120:11
**refresher** [1] - 37:20
**refrigerator** [1] - 95:3
**refuse** [2] - 168:3, 170:21
**regard** [2] - 140:21, 145:14
**regarding** [2] - 26:11, 126:8
**regardless** [1] - 139:14
**regional** [2] - 24:12, 24:23
**registered** [4] - 53:5, 53:19, 57:13, 79:18
**registration** [2] - 51:9, 80:2
**regular** [3] - 9:3, 112:24, 112:25
**regularly** [1] - 8:16
**regulations** [1] - 33:8
**rejoin** [1] - 101:23
**related** [3] - 24:25, 25:9, 106:25
**relating** [2] - 34:13, 169:4
**relationship** [2] - 168:5, 169:15
**relative** [2] - 31:12, 59:14
**release** [3] - 40:4, 73:17
**releasing** [1] - 16:21
**relevance** [4] - 74:15, 75:18, 75:21, 78:2
**relevant** [7] - 75:16, 78:5, 83:23, 90:24, 129:24, 174:5, 175:11
**reliable** [1] - 14:24
**reliance** [1] - 147:18
**relies** [2] - 148:2, 167:15
**rely** [4] - 132:15, 133:8, 150:6, 173:1
**relying** [2] - 90:10, 156:10
**remain** [2] - 8:17, 8:21
**remained** [1] - 9:4
**remaining** [4] - 3:17, 19:12, 73:10, 136:22
**remains** [2] - 34:12, 44:10
**remember** [21] - 43:9, 88:16, 105:16, 107:8, 107:13, 107:21, 107:24, 108:1, 108:2, 132:22, 157:12, 157:13, 157:16, 157:18, 157:20, 162:9, 162:16, 163:2, 165:20, 166:3, 166:13
**remembered** [1] - 66:3
**reminding** [1] - 88:17
**rent** [2] - 111:20, 111:24
**reopen** [3] - 173:16, 175:13, 175:25
**repeat** [5] - 14:11, 14:13, 14:16, 18:2, 108:2
**repercussion** [1] - 157:10
**report** [4] - 11:1, 17:10, 36:19, 39:1
**reported** [2] - 18:19, 19:24
**REPORTED** [1] - 1:20
**Reporter** [2] - 1:21, 178:22
**reports** [3] - 29:15, 38:8, 59:13
**repossessed** [1] - 53:11
**reposts** [1] - 92:5
**representations** [1] - 36:15
**represented** [1] - 37:13
**reprisal** [1] - 128:21
**request** [6] - 134:7, 134:10, 147:21, 158:16, 170:13, 175:13
**requested** [2] - 134:23, 146:14
**requesting** [1] - 177:17
**requests** [2] - 76:8, 77:3
**required** [12] - 7:14, 112:15, 114:15, 124:1, 130:4, 130:15, 144:24, 146:23, 150:16, 156:6, 165:22, 176:7
**requirement** [1] - 169:25
**requirements** [2] - 9:3, 151:18
**requires** [5] - 124:16, 125:24, 143:18, 149:10, 156:17
**resale** [1] - 111:3
**research** [5] - 29:15, 88:23, 108:1, 130:19, 173:11

**researching** [1] - 155:20
**residence** [22] - 35:12, 35:13, 35:25, 36:1, 37:10, 37:16, 37:18, 38:2, 38:11, 39:4, 39:11, 39:23, 40:5, 40:6, 40:15, 41:14, 42:11, 43:7, 44:7, 57:13, 58:17, 59:13
**resolved** [4] - 19:3, 19:15, 20:3, 20:21
**respect** [4] - 114:12, 114:16, 114:22
**respond** [1] - 123:7
**response** [3] - 110:7, 142:15, 156:5
**responsibilities** [1] - 8:9
**responsible** [2] - 124:16, 125:24
**rest** [8] - 35:9, 104:10, 104:13, 104:16, 104:21, 105:8, 108:8, 121:24
**rested** [7] - 102:3, 102:11, 105:15, 105:25, 106:19, 174:7, 175:25
**restroom** [2] - 54:20, 136:14
**rests** [3] - 102:1, 105:22, 123:15
**result** [8] - 17:11, 17:17, 17:21, 17:22, 152:14, 153:9, 163:23, 167:2
**resulted** [1] - 151:8
**results** [6] - 8:20, 8:22, 18:16, 19:1, 20:2, 21:4
**resume** [1] - 54:10
**retaliation** [1] - 131:14
**retrieved** [1] - 32:1
**retrospect** [1] - 98:1
**return** [2] - 79:13, 81:18
**returns** [5] - 72:15, 72:23, 72:24, 73:6, 83:18
**reverse** [1] - 52:19
**reversed** [1] - 149:3
**review** [2] - 9:20, 9:22
**reviewed** [2] - 9:19, 174:11
**reviewing** [4] - 10:24, 10:25, 89:23, 107:23
**revised** [7] - 119:16, 122:3, 122:6, 135:10, 135:21, 136:7, 177:5
**Ricardo** [4] - 28:17, 52:12, 53:8, 66:13
**RICO** [8] - 25:1, 25:4, 117:23, 117:24, 152:9, 172:12, 172:13, 173:8
**ride** [2] - 39:9, 167:13
**riding** [2] - 43:8, 43:22
**Riffe** [10] - 148:3, 148:6, 148:7, 148:11, 148:17, 148:21, 149:2, 168:10, 168:12, 174:23
**RIFFE** [2] - 148:3, 174:25
**rigorous** [1] - 169:25
**rise** [11] - 4:4, 54:11, 55:5, 73:20, 78:14, 89:2, 89:10, 102:8, 105:11, 136:15, 178:14
**rising** [1] - 171:12
**risk** [2] - 45:24, 47:4
**rival** [4] - 152:13, 161:24, 161:25, 162:3
**rivals** [1] - 86:20
**RMR** [2] - 1:21, 178:21
**Road** [5] - 40:21, 42:3, 44:2, 44:3, 44:20
**Rock** [1] - 42:3
**RODOLFO** [1] - 1:10
**Rodolfo** [1] - 1:22
**Rodrigo** [1] - 58:13
**role** [1] - 109:22
**roll** [1] - 159:10
**Room** [2] - 1:24, 178:24
**room** [8] - 54:5, 54:10, 88:11, 88:24, 102:3, 106:13, 107:22, 108:12
**Rosenbaum** [18] - 3:14, 4:1, 59:24, 76:3, 93:15, 93:24, 102:22, 103:8, 105:23, 108:16, 128:18, 141:15, 144:2, 145:21, 147:6, 157:16, 160:19, 165:16
**ROSENBAUM** [68] - 1:16, 1:17, 2:8, 3:13, 4:2, 21:23, 37:4, 50:25, 56:20, 57:25, 59:23, 69:15, 70:14, 71:13, 73:8, 73:24, 74:3, 74:8, 74:11, 75:15, 77:20, 89:16, 89:20, 89:23, 90:4, 90:19, 91:16, 91:19, 91:22, 92:16, 93:25, 94:2, 95:11, 95:12, 98:4, 98:22, 102:17, 102:19, 102:23, 104:20, 105:22, 108:18, 122:1, 122:8, 122:15, 122:19, 125:21, 127:1, 133:25, 135:2, 135:5, 138:11, 138:14, 138:17, 139:25, 140:12, 140:15, 141:21, 141:23, 142:12, 142:14, 144:9, 146:1, 146:5, 147:7, 157:20, 157:23, 177:3
**Rosenbaum's** [2] - 93:9, 146:22
**Rosendo** [3] - 63:11, 67:15, 71:22
**roughly** [2] - 54:24, 58:8
**round** [4] - 4:3, 55:9, 78:13, 105:10
**rounded** [1] - 160:20
**route** [1] - 43:10
**routinely** [1] - 10:19
**rubric** [1] - 115:8
**Ruiz** [1] - 1:22
**RUIZ** [1] - 1:10
**Rule** [14] - 104:21, 105:2, 108:17, 110:5, 110:7, 110:10, 115:7, 115:12, 115:24, 117:11, 117:14, 122:16, 122:20, 165:12
**rule** [4] - 107:18, 154:12, 154:21, 161:25
**ruled** [1] - 129:16
**rules** [15] - 33:8, 88:16, 94:17, 107:13, 112:16, 130:2, 130:14, 132:2, 132:8, 132:9, 133:23, 150:15, 151:17, 152:7, 153:9
**ruling** [4] - 122:16, 122:20, 146:1, 146:5
**run** [4] - 127:14, 135:12, 167:11, 176:21
**running** [1] - 112:2

## S

**S.E** [1] - 1:18
**S7** [1] - 124:2
**safety** [1] - 47:5
**Salvador** [5] - 23:5, 110:22, 111:4, 114:11, 152:11
**Salvatrucha** [2] - 57:6, 87:18
**Salvatruchas** [1] - 30:25
**sample** [7] - 14:21, 15:25, 16:24, 17:7, 19:7, 19:10, 20:9
**samples** [11] - 7:8, 7:14, 12:13, 13:17, 13:18, 15:12, 16:5, 16:10, 17:10, 17:14, 18:17
**sanctity** [1] - 107:11
**sanitized** [1] - 173:13
**sat** [1] - 101:8
**satan** [2] - 90:14, 92:20
**Satan** [2] - 91:12, 93:10
**satanic** [1] - 91:11
**satisfied** [4] - 112:4, 114:25, 115:23, 151:18
**satisfies** [1] - 110:14
**saw** [8] - 82:18, 84:22, 101:8, 109:25, 113:15, 117:16, 148:12, 163:4
**scenarios** [1] - 21:12
**scene** [16] - 15:24, 21:2, 34:7, 35:7, 36:13, 38:17, 43:8, 70:25, 109:11, 112:10, 123:25, 124:19, 125:4, 126:11, 173:23, 173:25
**Scene** [1] - 6:20
**scenes** [3] - 35:25, 37:11, 40:2
**schedule** [2] - 4:18, 106:16
**scheduling** [3] - 88:15, 107:4, 107:7
**Science** [1] - 7:1
**science** [1] - 7:2
**scientific** [1] - 14:24
**scientifically** [1] - 15:2
**Scientist** [3] - 5:21, 6:5, 6:10
**scientist** [4] - 6:1, 9:3, 9:5, 9:6
**scope** [2] - 116:3
**screen** [1] - 32:23
**screens** [1] - 32:3
**seal** [1] - 51:7
**search** [8] - 31:21, 31:23, 35:1, 56:10, 72:6, 72:14, 72:15, 72:18
**seat** [2] - 5:8, 64:23
**seated** [13] - 3:2, 4:7, 54:13, 55:12, 73:22, 78:16, 89:4, 89:13, 93:19, 102:10, 104:4, 105:13, 108:15
**Second** [3] - 129:22, 150:19, 156:7
**second** [71] - 11:4, 16:23, 20:18, 59:19, 68:24, 69:3, 70:4, 81:1, 82:14, 82:24, 85:3, 89:18, 90:12, 91:2, 110:16, 118:4, 118:19, 124:15, 125:22, 132:23, 137:20, 137:22, 138:19, 138:21, 138:23, 139:8, 139:10, 139:18, 139:20, 139:25, 140:1, 140:3, 140:5, 140:10, 140:16, 141:9, 141:11, 142:5, 142:9, 142:11, 142:24, 143:5, 143:11, 143:17, 143:18, 143:23, 143:25, 144:5, 144:10, 144:12, 144:16, 144:20, 144:22, 145:2, 145:4, 145:9, 146:9, 146:10, 146:18, 146:19, 153:15, 155:25, 171:22, 172:3, 172:5, 172:21, 172:22, 177:11, 177:12, 177:22
**second-degree** [43] - 118:19, 138:21, 138:23, 139:8, 139:10, 139:18, 139:20, 139:25, 140:1, 140:3, 140:5, 140:10, 140:16, 141:9, 141:11, 142:9, 142:11, 142:24, 143:5, 143:11, 143:17, 143:18, 143:23, 143:25, 144:5, 144:10, 144:12, 144:16, 144:20, 144:22, 145:2, 145:4, 145:9, 146:10,

146:18, 146:19, 171:22, 172:3, 172:5, 172:21, 172:22, 177:11
**second-to-last** [2] - 124:15, 125:22
**secondary** [3] - 64:14, 130:17, 171:14
**SECURITY** [13] - 4:4, 54:11, 55:5, 73:20, 78:14, 89:2, 89:10, 89:15, 93:17, 102:8, 105:11, 136:15, 178:14
**see** [53] - 4:7, 4:9, 17:6, 31:1, 31:2, 32:3, 40:19, 55:9, 57:5, 73:18, 78:2, 78:12, 78:18, 79:13, 79:14, 81:12, 81:20, 82:11, 83:23, 86:13, 86:19, 88:20, 88:25, 89:8, 92:1, 95:20, 96:24, 100:13, 101:1, 108:12, 112:14, 113:2, 115:10, 119:18, 119:19, 119:22, 120:2, 120:19, 120:24, 128:3, 131:23, 138:17, 143:8, 144:23, 145:15, 156:6, 156:10, 165:25, 166:9, 169:10, 178:13
**seeing** [3] - 74:12, 134:14, 161:2
**seek** [1] - 80:8
**seem** [5] - 43:23, 86:19, 124:10, 133:13, 137:2
**segments** [1] - 73:5
**select** [2] - 10:2, 73:5
**self** [4] - 112:9, 116:21, 166:17, 170:2
**self-serving** [3] - 112:9, 116:21, 166:17
**selfies** [2] - 80:10, 83:7
**sell** [3] - 110:20, 111:7, 111:17
**seminars** [1] - 7:18
**send** [5] - 72:15, 84:24, 110:22, 111:4, 176:23
**sender** [2] - 82:5, 82:14
**sending** [8] - 77:23, 77:24, 83:7, 83:17, 85:6, 85:7, 85:8, 87:12
**sends** [1] - 8:19
**sense** [3] - 4:16, 121:2, 151:2
**sent** [13] - 77:13, 80:25, 82:4, 82:7, 82:12, 83:3, 84:8, 85:11, 85:13, 85:15, 85:17, 85:21
**sentence** [1] - 138:1
**separate** [6] - 104:22, 118:22, 118:23, 120:13, 124:10, 171:7
**separated** [1] - 158:21
**September** [2] - 26:23, 53:1
**sequences** [3] - 14:13, 14:15, 100:22
**series** [16] - 27:14, 28:3, 36:9, 46:10, 47:16, 49:22, 50:4, 65:10, 65:14, 65:21, 68:15, 68:18, 70:6, 70:25, 85:16, 130:6
**serious** [10] - 140:25, 152:22, 160:3, 160:10, 166:3, 166:22, 167:1, 167:24, 169:9, 176:12
**serology** [4] - 12:8, 12:9, 12:18, 13:3
**serves** [2] - 134:21, 135:25
**service** [1] - 6:19
**serving** [3] - 112:9, 116:21, 166:17
**set** [1] - 3:17
**sets** [1] - 135:12
**settled** [1] - 156:25
**seven** [1] - 91:16
**seventh** [2] - 11:9, 81:18
**several** [6] - 11:20, 11:23, 11:25, 13:11, 15:14, 100:22
**share** [2] - 58:16, 107:6
**shared** [4] - 57:13, 77:13, 84:8, 84:13
**shaved** [1] - 63:25
**shaven** [1] - 64:25
**sheet** [1] - 135:20
**sheriff's** [1] - 25:12
**Sheriff's** [17] - 5:20, 5:24, 6:13, 6:16, 6:18, 7:6, 8:24, 23:20, 23:23, 24:2, 25:25, 26:5, 26:13, 36:19, 38:8, 38:20, 39:1
**shifting** [5] - 162:21, 163:14, 165:23, 171:9, 171:10
**shifts** [1] - 163:3
**shirt** [10] - 96:3, 96:7, 96:10, 96:12, 96:16, 97:12, 97:17, 97:18, 97:19, 97:20
**short** [5] - 14:11, 14:13, 52:15, 96:9, 96:16
**shot** [3] - 163:5, 163:6, 163:8
**shotgunned** [1] - 112:24
**show** [38] - 34:13, 37:13, 39:12, 47:16, 47:25, 49:15, 60:3, 65:9, 70:7, 71:7, 79:7, 79:17, 91:15, 93:2, 94:9, 97:5, 99:17, 99:22, 100:11, 118:2, 147:8, 153:12, 156:15, 158:14, 159:7, 159:8, 159:12, 159:17, 159:18, 159:20, 161:8, 161:14, 162:19, 163:22, 169:6, 169:19, 170:4
**showed** [15] - 18:3, 47:21, 48:5, 63:12, 64:1, 64:6, 68:19, 69:5, 70:21, 70:24, 97:6, 97:16, 98:6, 99:18, 100:11
**showing** [34] - 28:2, 29:7, 30:18, 31:16, 34:16, 38:1, 38:22, 39:15, 40:13, 40:14, 41:3, 47:18, 48:7, 49:17, 51:4, 56:25, 62:14, 62:20, 63:7, 64:11, 69:20, 70:18, 81:1, 82:9, 83:10, 99:17, 100:5, 155:22, 156:2, 159:1, 159:5, 160:1, 160:14, 175:22
**Showing** [1] - 68:17
**shown** [6] - 62:7, 63:3, 64:9, 64:12, 95:14, 100:22
**shows** [4] - 76:2, 76:6, 76:14, 79:19
**shut** [1] - 107:1
**sic** [1] - 49:19
**side** [7] - 104:18, 133:11, 135:17, 138:9, 140:7, 140:8, 177:15
**sidebar** [1] - 73:9
**sides** [1] - 106:19
**sign** [2] - 76:22, 114:11
**signature** [2] - 95:18, 95:20
**signed** [1] - 61:4
**significance** [1] - 86:22
**significant** [8] - 38:6, 39:6, 39:25, 40:5, 57:6, 81:20, 101:14, 128:25
**significantly** [2] - 43:17, 101:11
**Silva** [32] - 26:6, 26:22, 27:1, 27:4, 29:11, 30:15, 31:6, 31:20, 33:19, 34:13, 34:25, 37:21, 41:21, 42:8, 44:10, 45:18, 48:1, 61:1, 64:6, 65:24, 76:24, 82:21, 83:25, 84:8, 91:3, 92:21, 95:14, 100:22, 101:9, 101:12, 110:18, 111:16
**Silva's** [5] - 27:24, 33:9, 36:11, 41:5, 113:6
**silver** [2] - 50:13, 55:24
**similar** [10] - 33:2, 49:4, 83:14, 94:19, 95:6, 95:9, 98:1, 99:17, 99:18, 148:14
**simply** [6] - 123:24, 124:4, 124:19, 144:25, 153:8, 166:6
**single** [8] - 4:14, 8:23, 9:18, 10:23, 18:14, 106:22, 152:13, 172:14
**single-source** [1] - 18:14
**sit** [1] - 102:4
**sites** [1] - 83:15
**sitting** [5] - 27:20, 32:4, 64:22, 112:11, 178:8
**situation** [14] - 127:4, 132:25, 133:3, 133:6, 149:25, 153:17, 153:25, 154:2, 155:4, 156:3, 161:21, 167:25, 169:12, 170:24
**six** [9] - 23:10, 91:16, 97:21, 98:16, 100:6, 100:10, 100:13, 100:22, 101:2
**six-pack** [4] - 100:6, 100:13, 100:22, 101:2
**six-person** [1] - 100:10
**sixth** [1] - 11:8
**Sixth** [8] - 129:11, 129:16, 147:16, 147:20, 148:4, 149:3, 167:17, 174:24
**skin** [2] - 14:7, 95:6
**sleeping** [1] - 67:24
**slip** [1] - 135:11
**slot** [9] - 48:10, 62:5, 62:14, 65:16, 65:23, 66:8, 66:12, 67:7, 67:14
**slower** [1] - 43:17
**small** [2] - 17:2, 177:7
**smoked** [1] - 112:24
**smoking** [1] - 112:22
**smuggling** [1] - 148:14
**Smukler** [9] - 3:9, 4:24, 5:14, 123:1, 123:8, 124:22, 135:19, 147:14, 172:9
**SMUKLER** [39] - 1:13, 2:5, 2:6, 5:1, 5:15, 5:17, 9:10, 9:14, 9:16, 21:18, 21:20, 123:10, 123:12, 124:6, 128:25, 129:4, 129:7, 132:20, 132:22, 133:10, 149:22, 150:7, 150:11, 150:13, 150:21, 151:4, 151:11, 151:13, 155:7, 158:11, 158:17, 159:25, 160:9, 161:17, 167:14, 173:3, 173:10, 174:22, 177:17
**sneaker** [13] - 11:8, 11:9, 11:10, 11:11, 12:24, 12:25, 18:8, 18:9, 18:20, 18:22, 19:9, 19:25, 20:12
**sneakers** [2] - 11:23, 18:23
**So.2d** [1] - 171:21
**social** [5] - 29:15, 80:6, 83:14, 88:23, 107:24
**sold** [2] - 52:14, 52:17
**Solitario** [9] - 30:13, 40:12, 49:14, 63:17, 80:14, 81:4, 97:21, 100:13, 100:21
**Solitario's** [3] - 84:9, 84:14, 84:19
**solution** [1] - 16:22
**Sombra** [19] - 26:12, 26:13, 26:17, 26:20, 26:22, 31:12, 31:15, 33:23, 34:20, 35:7, 35:23, 39:7, 40:16, 41:13,

48:1, 61:1, 65:24, 100:21, 109:9
**Sombra's** [9] - 35:4, 36:16, 37:14, 39:23, 43:1, 43:4, 43:21, 44:24, 66:2
**someone** [18] - 10:16, 66:3, 85:8, 85:13, 85:15, 100:1, 114:19, 117:7, 130:7, 131:17, 132:1, 132:10, 142:24, 157:25, 161:13, 161:15, 167:5
**sometime** [1] - 76:25
**sometimes** [1] - 80:7
**somewhat** [3] - 101:13, 148:5, 176:18
**somewhere** [1] - 69:24
**sorry** [11] - 18:2, 30:18, 50:6, 79:17, 79:22, 86:5, 89:20, 100:21, 102:18, 140:8, 174:7
**sort** [5] - 9:23, 18:23, 91:8, 158:10, 159:13
**sorts** [1] - 92:8
**sound** [1] - 95:16
**sounds** [2] - 11:20, 51:25
**source** [1] - 18:14
**sources** [1] - 170:10
**South** [2] - 38:18, 39:2
**south** [1] - 111:9
**southbound** [1] - 44:3
**Southern** [3] - 1:23, 139:1, 178:23
**SOUTHERN** [1] - 1:1
**Southwest** [9] - 36:7, 37:17, 37:23, 38:4, 38:10, 42:10, 59:14, 60:9, 86:17
**space** [1] - 54:16
**Spanish** [16] - 47:3, 47:4, 47:6, 47:7, 73:25, 74:22, 87:17, 90:9, 90:10, 90:16, 90:19, 91:7, 91:23, 92:12, 93:10
**speaker** [1] - 47:4
**speaking** [2] - 59:7, 168:17
**special** [5] - 23:8, 24:19, 31:13, 55:8, 78:8
**Special** [6] - 3:10, 3:19, 22:3, 22:10, 51:4, 79:7
**specialize** [1] - 32:5
**specialized** [2] - 7:4, 32:13
**specials** [2] - 134:22
**specific** [10] - 24:24, 33:13, 33:23, 37:11, 118:16, 147:20, 148:16, 148:21, 153:1, 154:23
**specifically** [7] - 25:17, 28:8, 33:19, 89:24, 124:14, 151:25, 155:14
**specificity** [1] - 150:4
**specified** [2] - 118:3
**spectator** [5] - 124:9, 124:25, 125:1, 126:21, 128:8
**speculate** [1] - 21:12
**speculation** [2] - 147:22, 153:14
**speed** [1] - 43:13
**speeds** [3] - 43:11, 43:17, 43:23
**spell** [2] - 5:11, 148:3
**spelled** [1] - 144:21
**spite** [2] - 141:1, 141:6
**splitting** [1] - 177:22
**spoken** [1] - 102:16
**spot** [4] - 11:4, 42:24, 113:22, 147:5
**spotted** [1] - 138:7
**sprung** [1] - 173:10
**Squad** [3] - 22:18, 22:21, 23:14
**square** [1] - 44:23
**stab** [8] - 113:3, 113:22, 116:16, 153:4, 163:13, 163:19, 163:20
**stabbed** [13] - 148:24, 148:25, 153:4, 153:13, 154:24, 155:17, 160:22, 163:11, 163:18, 163:21, 163:22, 165:11, 167:3
**stabbing** [17] - 109:4, 113:2, 113:16, 116:11, 116:15, 117:10, 123:18, 125:6, 125:8, 127:7, 128:20, 149:14, 153:2, 154:23, 159:14, 163:10, 176:16
**stabs** [1] - 164:21
**stage** [1] - 107:11
**staining** [1] - 12:14
**stains** [1] - 13:5
**stand** [3] - 22:3, 89:15, 93:17
**standard** [7] - 13:13, 13:14, 16:7, 110:8, 115:6, 115:20, 140:22
**standards** [18] - 11:14, 11:15, 11:16, 11:17, 11:18, 12:3, 12:5, 13:12, 15:21, 15:23, 16:3, 16:6, 16:9, 17:9, 17:15, 19:5, 19:17, 19:19
**standing** [1] - 57:6
**stands** [3] - 25:5, 133:6, 150:3
**start** [11] - 6:6, 27:14, 37:9, 60:21, 65:12, 114:8, 115:6, 119:20, 160:6, 164:17, 170:25
**started** [7] - 4:22, 6:11, 7:7, 39:9, 64:14, 162:24, 163:1
**starting** [5] - 41:10, 42:20, 44:19, 54:14, 136:24
**starts** [4] - 42:18, 120:12, 137:23, 162:23
**state** [20] - 5:11, 7:22, 34:6, 35:23, 40:2, 45:24, 50:21, 140:7, 140:17, 146:11, 151:22, 151:23, 154:12, 167:19, 170:10, 171:23, 172:6, 172:8, 174:7, 174:20
**State** [6] - 40:21, 44:3, 51:19, 118:14, 151:24, 171:20
**state-certified** [1] - 50:21
**statement** [20] - 43:22, 69:23, 70:4, 108:25, 112:9, 112:13, 112:21, 128:19, 130:14, 134:11, 162:21, 164:4, 165:10, 165:11, 165:18, 166:11, 166:16, 168:18, 173:15, 173:20
**statements** [14] - 33:23, 35:4, 36:12, 37:14, 43:1, 43:5, 43:21, 45:21, 46:9, 113:9, 116:11, 116:21, 125:5, 166:18
**STATES** [5] - 1:1, 1:4, 1:10, 1:14, 1:14
**States** [17] - 1:22, 3:4, 3:9, 23:6, 86:25, 102:2, 129:10, 129:22, 131:10, 147:15, 151:14, 158:20, 168:24, 173:5, 174:14, 174:16, 178:22
**stating** [1] - 151:16
**status** [13] - 90:7, 90:15, 91:7, 92:18, 92:19, 109:19, 114:7, 114:16, 114:23, 116:13, 116:23, 117:4, 117:9
**statute** [8] - 118:6, 118:17, 139:8, 141:9, 142:21, 143:20, 144:10
**statutes** [1] - 118:18
**stay** [8] - 4:13, 7:23, 88:20, 88:22, 107:24, 108:5, 131:25, 168:22
**staying** [1] - 40:17
**stays** [1] - 14:2
**STENOGRAPHICALLY** [1] - 1:20
**step** [9] - 16:18, 16:19, 16:23, 17:1, 17:5, 54:19, 122:11, 131:7, 145:3
**steps** [3] - 34:4, 102:5, 154:10
**stern** [1] - 157:6
**stick** [1] - 106:4
**still** [14] - 19:17, 44:16, 53:16, 76:6, 76:16, 76:17, 93:3, 114:15, 118:12, 120:24, 134:7, 143:14, 172:6, 172:7
**stop** [1] - 41:19
**stopped** [1] - 44:4
**story** [5] - 163:15, 163:17, 171:9, 171:11
**straight** [3] - 121:11, 121:13, 141:20
**streams** [1] - 32:20
**street** [1] - 60:8
**Street** [5] - 1:15, 1:18, 24:14, 24:25, 39:24
**Street-focused** [1] - 24:14
**stretch** [2] - 55:14, 88:12
**strike** [1] - 94:24
**striking** [1] - 145:4
**strikingly** [1] - 148:14
**stripes** [1] - 164:17
**stronger** [2] - 126:6, 149:23
**structure** [1] - 101:14
**struggling** [1] - 155:6
**stuff** [1] - 167:13
**sub** [2] - 142:4
**subject** [4] - 94:22, 100:1, 152:2, 152:15
**subjecting** [1] - 170:8
**subjects** [1] - 44:25
**submission** [1] - 11:15
**submit** [2] - 10:9, 115:1
**submits** [1] - 114:24
**submitted** [5] - 10:10, 10:21, 16:6, 135:20, 168:25
**submitting** [1] - 10:7
**subpoena** [1] - 35:1
**subsequent** [2] - 34:3, 43:3
**subsequently** [1] - 170:9
**substance** [2] - 90:23, 118:11
**substances** [1] - 111:2
**substantially** [1] - 94:19
**substantive** [8] - 117:23, 117:24, 119:17, 119:24, 121:5, 121:11, 121:14, 135:22
**substituted** [1] - 119:2
**subsumed** [1] - 125:12
**suffice** [1] - 170:2
**sufficient** [8] - 103:7, 104:8, 115:11, 115:24, 117:8, 148:8, 169:2, 175:9
**sufficiently** [1] - 175:18
**suggest** [7] - 125:6, 154:24, 156:11, 161:2, 172:10, 172:15, 176:4
**suggests** [1] - 160:21
**Suite** [1] - 1:18
**summarize** [2] - 11:20, 106:24
**summer** [1] - 26:4
**superseding** [2] - 118:4, 138:20
**supervised** [2] - 7:10, 40:4

**support** [6] - 123:13, 162:10, 166:6, 167:20, 168:15, 168:20
**supports** [2] - 132:16, 147:21
**supposed** [1] - 85:3
**supremacist** [1] - 24:15
**Supreme** [2] - 140:12, 148:6
**Sureños** [2] - 24:25, 86:18
**surpassed** [1] - 110:10
**surprise** [1] - 131:9
**surrender** [1] - 151:18
**surrounded** [1] - 160:23
**surrounding** [2] - 35:2, 86:16
**suspect** [1] - 26:14
**suspected** [17] - 11:4, 11:6, 11:8, 11:10, 12:22, 12:23, 12:24, 12:25, 13:4, 18:5, 18:6, 18:7, 18:8, 27:5, 34:20, 35:12, 35:25
**suspects** [7] - 38:25, 39:7, 40:6, 40:9, 40:16, 72:19, 72:22
**suspicion** [1] - 43:6
**sustain** [2] - 92:14, 108:19
**SW** [1] - 37:19
**swab** [31] - 11:3, 11:5, 11:6, 11:7, 11:8, 11:9, 11:10, 12:23, 12:24, 12:25, 13:4, 13:6, 13:15, 15:14, 15:16, 16:20, 16:21, 17:9, 18:4, 18:5, 18:6, 18:7, 18:8, 18:20, 19:9, 19:25, 20:12
**swabs** [12] - 11:11, 11:12, 11:21, 11:23, 11:25, 13:1, 15:15, 15:18, 16:14, 16:15, 18:9, 18:10
**swallowing** [1] - 154:12
**swapped** [1] - 119:9
**swapping** [1] - 117:18
**SWC** [1] - 86:17
**swear** [1] - 5:6
**sweat** [1] - 14:7
**swelling** [1] - 32:8
**sworn** [3] - 5:7, 22:5, 103:4
**symbol** [1] - 86:15
**symbolizing** [1] - 76:22
**symbols** [3] - 76:22, 86:9, 86:11
**system** [1] - 45:24

**T**

**tab** [1] - 51:15
**tabbed** [1] - 137:5
**table** [3] - 3:10, 54:16, 101:23
**tables** [1] - 89:7
**tags** [1] - 92:3
**talks** [8] - 90:12, 112:11, 116:10, 117:1, 153:15, 171:19, 173:21
**Tam** [1] - 42:3
**Tamarac** [6] - 36:3, 36:22, 39:5, 40:21, 41:23, 58:16
**tan** [1] - 100:3
**tandem** [2] - 14:11, 69:11
**tango** [2] - 58:7
**task** [4] - 22:18, 24:4, 24:5, 24:18
**tattoo** [3] - 57:5, 96:15, 97:13
**tattoos** [4] - 33:14, 94:21, 96:1, 114:9
**taught** [1] - 94:9
**taxi** [3] - 36:23, 39:13
**team** [1] - 102:12
**teamed** [1] - 26:19
**technical** [1] - 9:19
**technologies** [2] - 7:23, 7:25
**tend** [1] - 129:25
**tender** [1] - 9:11
**tenth** [1] - 11:12
**term** [4] - 25:4, 25:7, 80:3, 112:19
**terms** [7] - 32:9, 92:1, 133:19, 134:14, 154:12, 174:9, 177:21
**test** [9] - 8:18, 8:22, 9:5, 10:13, 10:22, 12:11, 12:13, 12:17
**tested** [2] - 8:16, 10:5
**testified** [15] - 9:7, 41:4, 76:24, 77:9, 77:10, 91:3, 108:22, 110:20, 110:23, 111:16, 113:15, 114:6, 148:12, 164:13, 165:1
**testify** [16] - 10:25, 21:1, 35:17, 75:25, 102:14, 102:21, 102:24, 103:6, 103:11, 103:14, 103:21, 103:24, 104:2, 104:7, 104:8, 110:13
**testimony** [35] - 23:3, 27:21, 27:24, 46:21, 76:14, 110:18, 113:7, 116:14, 126:8, 127:13, 133:14, 133:16, 147:18, 149:15, 151:16, 155:9, 155:14, 155:15, 155:18, 157:13, 157:17, 157:21, 157:23, 157:24, 158:1, 158:3, 158:8, 160:21, 162:5, 162:10, 165:17, 166:21, 174:2, 175:24
**testing** [4] - 13:9, 14:10, 14:11, 17:11
**tests** [3] - 7:9, 12:10, 12:22
**Texas** [1] - 86:18
**text** [6] - 32:20, 83:15, 84:8, 86:14, 90:13, 92:23
**texts** [3] - 73:25, 76:21, 86:7
**That'd** [1] - 55:1
**that'd** [1] - 73:14
**that'll** [4] - 37:5, 51:1, 58:1, 70:15
**THE** [223] - 1:10, 1:13, 1:16, 3:2, 3:11, 3:16, 3:21, 4:1, 4:3, 4:4, 4:6, 5:3, 5:8, 5:12, 5:14, 9:13, 21:21, 21:24, 21:25, 22:1, 22:4, 22:6, 37:5, 50:24, 51:1, 53:24, 54:2, 54:11, 54:13, 54:25, 55:3, 55:5, 55:8, 55:12, 55:21, 56:19, 56:21, 57:24, 58:1, 59:22, 59:24, 69:12, 69:16, 70:15, 71:12, 71:14, 73:10, 73:15, 73:20, 73:22, 74:2, 74:7, 74:9, 74:16, 74:19, 74:21, 75:1, 75:7, 75:9, 75:12, 75:22, 77:5, 77:19, 78:3, 78:14, 78:16, 79:2, 86:1, 86:3, 88:1, 88:4, 89:2, 89:4, 89:10, 89:13, 89:15, 89:18, 89:22, 90:2, 90:18, 90:21, 91:5, 91:18, 91:21, 91:25, 92:14, 92:17, 92:21, 92:25, 93:8, 93:14, 93:17, 93:19, 98:23, 101:18, 101:22, 102:2, 102:8, 102:10, 102:18, 102:20, 102:25, 103:2, 103:5, 103:10, 103:11, 103:12, 103:13, 103:15, 103:16, 103:18, 103:19, 103:22, 103:23, 103:25, 104:1, 104:3, 104:4, 104:24, 105:11, 105:13, 105:23, 108:15, 110:6, 115:4, 118:22, 118:25, 119:4, 119:19, 120:5, 120:9, 121:6, 121:8, 121:20, 122:2, 122:9, 122:18, 122:23, 123:9, 123:11, 124:5, 124:13, 126:7, 127:3, 129:3, 129:5, 131:5, 132:21, 133:5, 133:11, 134:9, 135:4, 135:8, 135:24, 136:5, 136:15, 136:17, 136:20, 137:2, 137:7, 137:11, 137:15, 137:17, 137:19, 137:24, 138:2, 138:4, 138:6, 138:9, 138:13, 138:16, 139:19, 140:4, 140:14, 140:16, 141:22, 141:25, 142:13, 142:15, 143:1, 143:10, 144:14, 146:4, 146:7, 147:3, 147:8, 150:3, 150:10, 150:12, 150:19, 150:23, 151:10, 151:12, 152:17, 156:5, 156:9, 157:22, 158:13, 159:4, 160:6, 160:16, 162:4, 162:22, 162:24, 164:7, 164:10, 164:12, 164:15, 164:18, 164:24, 165:3, 165:20, 166:17, 168:22, 173:9, 174:21, 175:16, 177:4, 177:12, 177:19, 178:6, 178:12, 178:14
**themselves** [2] - 117:7, 160:17
**theories** [2] - 128:22, 166:14
**theory** [20] - 112:7, 123:4, 123:16, 124:7, 125:2, 125:14, 126:5, 127:18, 128:1, 128:5, 128:6, 128:14, 153:2, 153:19, 154:20, 155:1, 156:23, 169:4, 171:4, 171:13
**theory-of-defense** [1] - 126:5
**therefore** [9] - 96:21, 109:25, 111:12, 114:13, 114:25, 122:21, 133:8, 151:19, 152:3
**they've** [9] - 90:6, 107:20, 139:11, 145:23, 168:16, 168:19, 175:22, 175:23
**Thiago** [7] - 76:23, 82:21, 82:22, 83:25, 84:8, 91:3, 92:21
**thinking** [3] - 104:10, 119:6, 128:16
**thinks** [1] - 163:8
**third** [7] - 8:19, 11:5, 17:1, 81:12, 112:4, 137:25, 154:4
**Third** [1] - 171:24
**third-party** [1] - 8:19
**thousands** [1] - 8:14
**thread** [2] - 83:17, 84:19
**threat** [27] - 112:1, 147:24, 148:16, 148:20, 152:22, 154:8, 159:8, 159:13, 159:23, 160:3, 160:4, 160:10, 160:11, 160:19, 160:20, 160:23, 161:11, 166:3, 167:1, 167:22, 168:4, 169:9, 169:16, 169:25, 170:9, 170:22, 176:12
**threatened** [8] - 148:9, 155:14, 160:13, 161:19, 162:2, 163:17, 163:24, 168:7
**threatening** [2] - 103:20, 148:13

**threats** [7] - 47:5, 116:12, 147:20, 148:1, 148:8, 152:23, 155:18
**three** [21] - 8:8, 20:5, 20:11, 31:14, 31:19, 32:2, 32:16, 59:1, 72:21, 83:16, 97:18, 98:16, 140:17, 142:3, 160:5, 160:12, 160:22, 161:6, 161:18, 168:2, 175:8
**three-door** [1] - 59:1
**three-hour** [1] - 8:8
**threshold** [1] - 169:3
**throughout** [4] - 6:14, 14:2, 14:9, 175:24
**throw** [1] - 113:6
**tight** [1] - 176:21
**timeline** [1] - 78:9
**tiny** [1] - 14:20
**Tirado** [40] - 26:6, 26:12, 26:22, 27:1, 27:4, 27:24, 29:11, 30:15, 31:6, 31:20, 33:9, 33:19, 34:13, 34:25, 36:11, 37:21, 41:5, 41:21, 42:8, 44:10, 45:18, 46:22, 48:1, 50:7, 61:1, 64:6, 65:24, 95:14, 95:21, 100:12, 100:22, 101:9, 101:12, 109:9, 110:18, 110:21, 111:16, 113:6, 160:20
**Tirado-Silva** [26] - 26:6, 26:22, 27:1, 27:4, 29:11, 30:15, 31:6, 31:20, 33:19, 34:13, 34:25, 37:21, 41:21, 42:8, 44:10, 45:18, 48:1, 61:1, 64:6, 65:24, 95:14, 100:22, 101:9, 101:12, 110:18, 111:16
**Tirado-Silva's** [5] - 27:24, 33:9, 36:11, 41:5, 113:6
**tired** [1] - 108:9
**Title** [1] - 51:20
**title** [2] - 5:21, 137:4
**titled** [1] - 51:18
**today** [10] - 3:17, 4:8, 35:7, 87:23, 94:13, 106:1, 108:8, 122:7, 122:16, 173:11
**today's** [1] - 4:11
**together** [6] - 10:8, 33:3, 119:8, 119:15, 122:6, 136:11
**tomorrow** [12] - 4:8, 104:15, 105:7, 106:5, 106:7, 106:12, 106:15, 107:6, 108:6, 108:10, 177:14, 177:24
**took** [11] - 24:5, 34:4, 35:8, 35:23, 36:23, 38:24, 39:8, 40:1, 43:5, 45:15, 64:19
**top** [9] - 57:5, 64:15, 75:15, 81:12, 82:14, 84:17, 92:7, 121:17, 160:6
**total** [1] - 27:7
**totally** [3] - 97:22, 109:23, 157:1
**touch** [2] - 21:10, 21:14
**touched** [1] - 21:13
**tours** [1] - 36:13
**Tovar** [7] - 28:11, 49:10, 65:17, 81:13, 134:1, 158:6, 165:2
**towed** [4] - 52:14, 52:16, 52:23, 53:9
**towed-in** [1] - 52:23
**Towing** [2] - 52:16, 53:10
**townhouse** [1] - 34:3
**Toyota** [5] - 56:5, 56:6, 57:11, 57:19, 59:1
**track** [1] - 145:13
**tracking** [2] - 141:9, 144:3
**tracks** [1] - 146:8
**trafficking** [1] - 24:21
**trailer** [8] - 35:10, 35:13, 36:24, 39:13, 40:1, 40:17, 41:13, 44:24
**trained** [1] - 7:25
**training** [13] - 6:6, 6:12, 7:4, 7:7, 7:15, 8:3, 23:7, 24:9, 24:24, 25:1, 32:14, 87:20, 94:8
**trainings** [5] - 7:18, 7:21, 24:11, 24:19, 24:22
**transcript** [3] - 70:9, 71:3, 99:16
**transcription** [1] - 178:18
**transcripts** [1] - 107:23
**transferred** [1] - 24:1
**transition** [1] - 162:21
**translated** [2] - 33:8, 74:6
**translation** [2] - 74:1, 74:3
**transnational** [3] - 22:24, 22:25, 23:2
**transportation** [1] - 127:5
**transporting** [1] - 127:20
**travel** [2] - 37:14, 38:24
**traveling** [1] - 43:18
**TRIAL** [1] - 1:9
**trial** [8] - 30:16, 107:11, 117:20, 151:19, 158:25, 159:3, 173:18, 173:19
**tried** [1] - 117:22
**tries** [1] - 112:21
**troubles** [2] - 125:21, 126:1
**troubling** [1] - 126:4
**true** [2] - 103:11, 144:3
**truly** [1] - 88:19
**try** [13] - 27:15, 45:19, 71:7, 77:14, 78:11, 86:3, 106:24, 111:1, 111:18, 132:8, 142:4, 163:15, 165:6
**trying** [20] - 29:16, 33:25, 46:6, 54:23, 95:4, 95:5, 113:20, 114:5, 125:14, 128:11, 131:23, 142:13, 144:1, 144:6, 155:2, 162:9, 162:16, 165:7, 167:11, 172:12
**tube** [1] - 16:20
**tubes** [1] - 16:17
**turn** [9] - 4:23, 44:22, 55:18, 74:16, 93:21, 106:10, 122:24, 123:22, 178:10
**turned** [1] - 32:4
**turning** [6] - 28:12, 28:21, 28:24, 29:2, 62:11, 78:20
**turnpike** [1] - 40:20
**turns** [3] - 12:15, 166:24, 167:4
**tweaks** [1] - 176:20
**twelfth** [2] - 11:14, 11:16
**twice** [2] - 8:18, 8:21
**twin** [1] - 94:20
**twin-looking** [1] - 94:20
**twins** [1] - 14:4
**two** [48] - 3:17, 13:5, 19:1, 19:10, 20:2, 20:11, 20:13, 20:14, 26:14, 27:4, 33:19, 39:7, 54:15, 57:9, 76:8, 76:15, 77:8, 77:12, 80:21, 82:10, 83:11, 98:15, 102:3, 104:22, 108:20, 108:21, 109:6, 109:9, 110:3, 116:14, 123:2, 123:3, 134:22, 134:23, 134:25, 137:6, 137:12, 138:6, 139:23, 143:14, 159:16, 160:4, 160:11, 161:20, 164:5, 167:24, 175:6
**two-page** [2] - 80:21, 83:11
**type** [11] - 14:10, 14:11, 14:18, 14:23, 52:6, 79:16, 95:3, 133:7, 133:22, 172:11, 176:19
**types** [1] - 95:6
**typo** [1] - 137:21
**typos** [7] - 9:23, 119:9, 135:9, 135:15, 136:22, 138:9, 138:11

## U

**U.S** [1] - 167:17
**U.S.C** [3] - 115:19, 118:11, 172:25
**ultimately** [5] - 33:21, 56:10, 127:21, 148:25, 167:3
**unable** [1] - 113:21
**unavailable** [1] - 129:17
**uncle** [2] - 57:14, 58:14
**unconfirmed** [1] - 38:24
**under** [46] - 31:1, 31:3, 31:4, 80:15, 84:7, 103:1, 112:7, 115:7, 115:19, 118:5, 118:11, 118:14, 118:16, 118:17, 129:18, 129:20, 130:9, 130:21, 130:24, 131:10, 134:16, 135:25, 138:22, 138:23, 139:12, 139:23, 141:12, 142:4, 142:24, 161:15, 162:8, 165:9, 167:21, 169:8, 169:22, 170:18, 171:6, 171:23, 172:10, 172:15, 172:22, 174:18, 174:20, 175:7, 177:7
**underlying** [1] - 171:15
**underneath** [1] - 30:22
**understood** [3] - 26:13, 78:3, 175:16
**undue** [1] - 91:8
**unfair** [1] - 174:8
**unfortunately** [2] - 133:7, 137:2
**Uniform** [1] - 51:23
**unintentional** [1] - 143:24
**unique** [5] - 14:3, 14:17, 171:15, 171:17, 172:18
**unit** [3] - 5:21, 10:8, 32:13
**Unit** [7] - 6:20, 6:21, 10:18, 23:25, 24:1, 32:5
**United** [17] - 1:22, 3:4, 3:9, 23:6, 86:25, 102:2, 129:10, 129:22, 131:10, 147:15, 151:14, 158:20, 168:24, 173:5, 174:14, 174:16, 178:22
**UNITED** [5] - 1:1, 1:4, 1:10, 1:14, 1:14
**units** [1] - 6:19
**Universal** [1] - 35:17
**University** [1] - 7:1
**unknown** [5] - 13:17, 16:4, 29:13, 38:23, 139:3
**unlawful** [7] - 139:12, 140:19, 145:10, 152:21, 167:22, 169:7, 169:8
**unless** [3] - 79:19, 121:16, 159:1
**untranslated** [1] - 74:10
**unusual** [1] - 112:25
**unwise** [1] - 175:20
**up** [51] - 4:3, 4:12, 5:5, 26:1, 26:19, 31:9, 37:20, 39:1, 39:12, 42:2, 42:3, 44:13, 53:13, 55:9, 55:23, 64:15, 68:12, 72:21, 73:1, 78:13, 79:20, 86:3, 88:9, 89:8, 89:25, 91:24, 94:9, 104:22, 105:10, 109:18, 111:10, 121:12, 128:24, 129:2, 129:8, 130:13,

139:19, 140:4, 140:7, 140:9, 146:6, 152:17, 153:19, 157:5, 158:18, 163:7, 166:14, 178:2
**update** [1] - 38:4
**updated** [4] - 38:3, 92:4, 98:11, 117:17
**updates** [3] - 7:25, 90:8, 91:7
**uploaded** [1] - 80:17
**upper** [1] - 68:10
**user** [6] - 79:9, 80:10, 87:12, 90:13, 91:8, 92:21
**username** [3] - 56:14, 72:13, 79:13
**usurpation** [1] - 115:17
**utilized** [2] - 25:2, 33:2

## V

**valid** [5] - 130:16, 171:22, 173:4, 174:19, 175:7
**validated** [2] - 8:3, 15:2
**validation** [2] - 15:4, 15:6
**value** [2] - 90:5, 90:7
**various** [1] - 33:13
**Vasquez** [21] - 11:12, 11:13, 11:14, 11:16, 12:1, 12:3, 13:2, 17:25, 18:3, 18:10, 18:11, 18:13, 18:21, 19:8, 20:1, 20:16, 34:14, 35:3, 56:3, 60:4, 70:2
**Vasquez-Portillo** [21] - 11:12, 11:13, 11:14, 11:16, 12:1, 12:3, 13:2, 17:25, 18:3, 18:10, 18:11, 18:13, 18:21, 19:8, 20:1, 20:16, 34:14, 35:3, 56:3, 60:4, 70:2
**vehicle** [12] - 43:12, 50:15, 50:16, 50:22, 52:13, 52:16, 52:23, 56:3, 57:18, 58:5, 162:14
**Vehicle/Vessel** [1] - 51:19
**vehicles** [1] - 39:8
**verbalized** [1] - 71:5
**verdict** [2] - 110:11, 115:3
**versa** [2] - 82:7, 94:22
**version** [9] - 38:3, 63:25, 117:17, 117:19, 119:12, 119:16, 120:6, 136:7, 140:11
**versions** [1] - 142:3
**versus** [4] - 3:4, 109:23, 121:7, 139:23
**via** [2] - 26:17, 176:23
**viable** [1] - 172:10
**VICAR** [5] - 25:1, 25:7, 131:4, 152:9, 173:8
**vice** [2] - 82:7, 94:22
**vice-versa** [2] - 82:7, 94:22
**vicinity** [5] - 37:22, 38:11, 41:12, 41:22, 42:10
**victim** [25] - 11:25, 20:16, 33:25, 36:16, 38:9, 39:8, 43:3, 49:22, 50:6, 59:13, 60:4, 72:20, 112:11, 113:3, 113:20, 117:10, 123:18, 127:20, 133:19, 140:18, 140:20, 155:16, 155:17, 158:4, 176:16
**victim's** [9] - 35:9, 36:21, 37:18, 38:21, 39:8, 43:5, 43:8, 43:22, 151:8
**victims** [1] - 72:19
**Video** [10] - 41:8, 41:17, 41:25, 42:5, 42:16, 42:21, 43:15, 43:20, 43:24, 45:3
**Viera** [3] - 110:19, 110:23, 111:15
**Viera-Gonzalez** [3] - 110:19, 110:23, 111:15
**view** [5] - 34:19, 115:14, 124:23, 128:23, 149:19
**viewed** [1] - 170:3
**viewing** [2] - 71:6, 115:9
**Vigil** [27] - 3:5, 3:12, 3:15, 11:19, 12:6, 19:6, 20:6, 20:24, 30:13, 31:1, 49:14, 63:17, 67:24, 72:10, 80:14, 81:4, 81:7, 82:15, 95:23, 98:17, 103:1, 103:4, 103:5, 104:6, 108:25, 109:7, 162:11
**VIGIL** [1] - 1:7
**Vigil-Benitez** [26] - 3:5, 3:12, 3:15, 11:19, 12:6, 19:6, 20:6, 20:24, 30:13, 31:1, 49:14, 63:17, 67:24, 72:10, 80:14, 81:4, 81:7, 82:15, 95:23, 98:17, 103:1, 103:4, 103:5, 104:6, 109:7, 162:11
**VIGIL-BENITEZ** [1] - 1:7
**Vigil-Benitez's** [1] - 108:25
**Villatoro** [6] - 30:7, 31:4, 48:21, 62:24, 67:2, 83:1
**Villatoro-Cruz** [5] - 30:7, 31:4, 48:21, 62:24, 67:2
**VIN** [4] - 51:21, 53:13, 58:6, 58:23
**violating** [5] - 154:5, 168:3, 169:14, 170:20, 176:15
**violation** [3] - 130:18, 130:22, 142:2
**violence** [5] - 112:6, 116:7, 116:18, 118:5, 149:16
**Violent** [3] - 22:18, 22:21, 23:14
**violent** [10] - 22:22, 25:8, 77:15, 130:4, 130:15, 137:13, 138:19, 138:21, 150:17, 172:17
**Virginia** [6] - 23:10, 23:21, 24:8, 40:11, 66:4, 68:4
**visible** [1] - 114:9
**visualize** [1] - 18:24
**vital** [1] - 107:12
**viva** [3] - 90:14, 92:20, 92:24
**VOIR** [2] - 2:5, 5:16
**Volume** [1] - 1:7
**voluntarily** [8] - 103:17, 104:8, 129:18, 130:3, 130:13, 133:1, 150:15, 152:1
**vs** [1] - 1:5

## W

**wait** [4] - 104:21, 122:5, 152:17, 159:4
**waited** [1] - 39:10
**waiting** [2] - 36:22, 102:3
**walks** [1] - 34:7
**wants** [3] - 123:3, 123:6, 174:13
**war** [1] - 86:18
**warrant** [5] - 35:1, 56:10, 72:7, 72:14, 72:15
**warrants** [4] - 31:23, 45:8, 45:18, 72:18
**Washington** [1] - 24:8
**watching** [1] - 27:21
**weapons** [2] - 111:6, 111:18
**weary** [1] - 170:23
**website** [1] - 140:13
**week** [3] - 106:21, 107:12
**weeks** [1] - 131:18
**weigh** [1] - 115:21
**weighing** [1] - 170:25
**weight** [2] - 100:3
**welcome** [1] - 55:21
**well-grounded** [3] - 160:4, 160:11, 167:23
**well-rounded** [1] - 160:20
**well-taken** [1] - 146:22
**west** [1] - 111:10
**Westway** [2] - 52:16, 53:10
**WhatsApp** [1] - 83:15
**whereas** [1] - 117:25
**white** [3] - 24:15, 94:24, 96:12
**whole** [5] - 19:4, 19:13, 51:7, 163:16, 170:6
**widely** [1] - 14:23
**Wilber** [24] - 3:4, 3:14, 11:19, 12:6, 19:6, 20:6, 20:24, 30:13, 49:3, 63:11, 63:17, 67:15, 71:22, 72:10, 81:23, 82:15, 95:23, 98:17, 103:4, 104:5, 108:25, 157:24, 158:2, 158:7
**WILBER** [1] - 1:7
**willful** [3] - 123:20, 124:8, 126:20
**willfully** [1] - 120:21
**willing** [1] - 126:25
**willingly** [1] - 130:8
**willingness** [1] - 102:13
**Wilson** [7] - 26:6, 27:24, 61:1, 65:24, 95:14, 95:21, 100:21
**window** [1] - 89:6
**wise** [1] - 107:4
**wish** [5] - 54:19, 102:23, 103:6, 103:11, 105:19
**wishes** [1] - 143:4
**WITNESS** [3] - 2:3, 5:12, 21:25
**witness** [16] - 4:24, 5:7, 22:1, 22:5, 76:18, 77:9, 84:22, 88:7, 88:9, 93:22, 99:23, 101:24, 103:17, 115:21, 148:12, 157:10
**witnesses** [18] - 3:18, 27:21, 76:5, 104:19, 105:17, 105:20, 108:20, 108:22, 109:6, 110:12, 113:8, 114:7, 114:19, 116:5, 116:14, 125:7, 133:17, 152:12
**word** [3] - 127:2, 146:3, 146:4
**worded** [2] - 141:24, 141:25
**wording** [1] - 144:11
**words** [4] - 126:19, 133:5, 134:4, 148:1
**works** [1] - 15:5
**worries** [1] - 92:5
**worry** [1] - 92:5
**worship** [3] - 90:8, 92:9, 93:10
**worth** [1] - 173:3
**wrap** [1] - 86:3
**Wright** [2] - 171:20, 171:24
**writ** [2] - 34:6, 45:25
**write** [1] - 66:1
**writing** [1] - 95:17
**written** [2] - 8:8, 139:11
**wrote** [1] - 64:16
**WS** [1] - 151:11

## Y

**Yankee** [1] - 58:7
**year** [9] - 5:25, 7:19, 8:18, 8:21, 52:2, 58:25, 62:9, 62:19, 63:1
**years** [10] - 6:23, 8:7, 23:19, 24:11, 32:3, 32:8, 34:3, 75:17, 76:15, 94:6
**yesterday** [1] - 46:20
**York** [4] - 31:11, 31:13, 31:19, 66:4

**you-all** [7] - 3:11, 3:16, 4:7, 73:17, 119:8, 133:12, 164:9
**young** [1] - 68:12
**yourself** [8] - 10:2, 10:12, 15:16, 99:7, 133:5, 133:7, 134:14, 155:4

**Z**

**zero** [1] - 94:22
**Zoe** [1] - 22:24
**zoom** [4] - 28:5, 51:17, 60:22, 95:20
**ZTE** [2] - 32:18, 32:22